## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AZZUR GROUP HOLDINGS LLC, *et al.*,[1] | ) Case No. 25-10342 (KBO) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) **Ref. Docket Nos. 11, 63** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING, (B) GRANT LIENS AND SUPERPRIORITY CLAIMS,
AND (C) GRANT ADEQUATE PROTECTION, (II) MODIFYING THE AUTOMATIC
STAY, (III) SCHEDULING A FINAL HEARING AND (IV) RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned

debtors and debtors in possession (the "Debtors"), by and through its undersigned counsel, hereby

files this objection (this "Objection") to the *Motion of Debtors and Debtors in Possession for Entry*

*of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing,*

*(B) Grant Liens and Superpriority Claims, and (C) Grant Adequate Protection, (II) Modifying the*

*Automatic Stay, (III) Scheduling a Final Hearing and (IV) Related Relief* [Docket No. 11]

(the "DIP Motion")[2] and respectfully states as follows:

### PRELIMINARY STATEMENT

1.      The relief requested in the DIP Motion will put the Debtors on course to

consummate quick sales of their remaining assets, including through the pending $56 million sale

---

[1]     A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.cases.stretto.com/Azzur. The Debtors' headquarters and the mailing address for the Debtors is 330 South Warminster Road, Suite 341, Hatboro, PA 19040.

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Motion or the Interim DIP Order (as defined below), as applicable.

of the Debtors' consulting business.  Yet, all or nearly all of the sale proceeds would be payable to Manufacturers and Traders Trust Company (the "<u>DIP Lender</u>", which is also the "<u>Pre-Petition Lender</u>"), leaving no unencumbered assets for unsecured creditors and possibly creating an administratively insolvent estate.  This is because the DIP Lender seeks to roll up approximately $61 million of approximately $62 million of Pre-Petition Obligations, even though the DIP Credit Facility offers only $8.5 million of true new money loans.  The remaining "advances" under the DIP Credit Facility are either re-borrowed funds from the use of cash collateral to pay-down the Pre-Petition Lender or the roll-up of Pre-Petition Obligations.  Expressed as a function of $8.5 million in new money loans, the proposed roll-up yields a ratio of over 7:1 in terms of Pre-Petition Obligations versus new money loans.  The Committee objects to the proposed roll-up and submits that it should be restricted to the "creeping" roll-up amounts on the revolver, which are projected to be approximately $10.363 million in receipts over the term of the Initial DIP Budget, plus outstanding letter of credit obligations (approximately $1.3 million), all of which were already rolled up under the Interim DIP Order.

2.      The proposed roll-up of the remaining $50 million of Pre-Petition Obligations (net of $10.363 million of the "creeping" roll-up and $1.3 million of letter of credit obligations) is especially prejudicial under the unique circumstances of these cases.  The Debtors' most valuable asset is their consulting business, which has a sale pending for $56 million in cash, plus the assumption of certain liabilities.  By its very nature, the Debtors' consulting business relies on the ongoing and future ***postpetition labor*** of the Debtors' employees and the ***postpetition services*** they render to the Debtors' customers.  Section 552(a) of the Bankruptcy Code provides that, except as to proceeds of existing collateral covered under a prepetition security agreement, "property acquired by the estate or by the debtor after commencement of the case is not subject to any lien

resulting from any security agreement entered into by the debtor before commencement of the case." Under section 552(a) of the Bankruptcy Code, the Pre-Petition Lender does not have a lien on the postpetition receivables generated, or to be generated, by the postpetition work of the Debtors' employees. Hence, the sale proceeds of the Debtors' consulting business must be allocated between the value of the prepetition assets that are validly encumbered by the Pre-Petition Obligations and the value of the postpetition assets that are unencumbered by virtue of section 552(a). These assets include the future revenues created by, **and that are nonexistent without**, the postpetition efforts of the Debtors' workforce. The proposed DIP Credit Facility is exceedingly problematic because it effectively strips the estates of their rights under section 552(a) by rolling up and thereby encumbering all the Debtors' postpetition assets with the Pre-Petition Obligations (except only $1 million that would remain outstanding as prepetition debt). Stated another way, the roll-up of the Pre-Petition Obligations (beyond re-advances of cash collateral) must be denied because it would bestow a gratuitous windfall of newly-acquired postpetition assets upon the Pre-Petition Lender in contravention of section 552(a) of the Bankruptcy Code and at the direct expense of unsecured creditors.

3. The Debtors' other unencumbered assets, including leaseholds and fixtures, commercial tort claims, avoidance actions, and the proceeds thereof, also should remain free and clear of any liens or superpriority claims on account of the roll-up or any grant of adequate protection for the remaining Pre-Petition Obligations. The Debtors' leaseholds and fixtures are a particularly key component of their cleanroom business, which could yet yield material value for unsecured creditors. As to avoidance actions, approximately two months prior to the Petition Date, the Pre-Petition Lender was paid $16 million from the sale of the Debtors' sale of their labs business, which may have included the proceeds of certain unencumbered assets. Any distribution

of such proceeds to the Pre-Petition Lender would be subject to avoidance as preferential transfers. There is no basis to encumber any avoidance claims, especially in favor of the Pre-Petition Lender that is a potential target itself, before any investigation is even conducted.  At a minimum, the DIP Lender should be required to marshal away from any previously unencumbered assets and turn to such assets only after all commercially reasonable efforts to recover from the Pre-Petition Collateral have been exhausted.  Absent the foregoing protections, the contemplated sales of the Debtors' remaining assets will close, including the pending stalking horse bid, all or substantially all of the proceeds will be distributed to the Pre-Petition Lender, and unsecured creditors will be left with nothing.

4.     Further, there should be no waivers of surcharge, marshaling, or equities of the case rights in favor of the DIP Lender or the Pre-Petition Lender.  As noted above, with respect to the new money DIP loans, the DIP Lender should be required to marshal away from previously unencumbered assets.  With respect to the proposed surcharge and equities of the case waivers, there should be no such waivers unless and until all of the Debtors' projected administrative expenses, including any allowed claims arising under section 503(b)(9) of the Bankruptcy Code, postpetition stub rent claims, and wind-down and liquidating chapter 11 plan costs, have been paid in full or adequately provided for.  Any credit bid also must be expressly subject to challenge rights as to the Pre-Petition Obligations, whether or not they are rolled up.

5.     Finally, the DIP Credit Facility unduly limits the Committee's ability to exercise its statutory duties.  The Committee would be required to conduct its investigation, obtain standing, and file any Challenge to the Pre-Petition Obligations by "no later than the date that is" (i) 75 calendar days after entry of the Interim DIP Order and (ii) five (5) business days prior to the closing

of one or more sales of substantially all of the Debtors' assets.[3]  This deadline should be extended to no less than 75 days from entry of the Interim DIP Order, subject to further extensions with the consent of the Pre-Petition Lender or by the Court for cause.  The Challenge Period also should be tolled if the Committee timely files a motion for standing and attaches a pleading that constitutes a Challenge.  Such tolling should continue until an adequate time, no less than three (3) business days, after the Committee's standing motion is decided by the Court.  In addition, the Committee should be granted more than $25,000 to conduct an investigation of the DIP Lender's asserted liens and claims.  The Committee requests at least $150,000 for this purpose.  Moreover, given that all of the Debtors are limited liability companies, appropriate provisions must be added to any final order on the DIP Motion to preserve the Committee's standing and rights to assert a Challenge on all available grounds, notwithstanding anything to the contrary in applicable nonbankruptcy law that may limit such claims in the case of Debtors that are limited liability companies.

6.      For the reasons set forth herein, the Court should deny the relief requested in the DIP Motion as currently presented.

## **BACKGROUND**

### I.      **General Background**

7.      On March 2, 2025 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"), commencing the above-captioned cases (the "Chapter 11 Cases")".  The Debtors are authorized to continue operating their business and managing their property as debtors in possession pursuant to sections 1107(a)

---

[3]    Interim DIP Order § 4.1(b).  This language is confusing as drafted in the Interim DIP Order.

and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

8.      On March 4, 2025, the Court entered an interim order approving the DIP Motion [Docket No. 63] (the "Interim DIP Order").

9.      On March 14, 2025, the Office of the United States Trustee for Region 3 appointed the Committee, consisting of: (i) Barker Contracting, Inc.; (ii) Southworth-Milton, Inc. d/b/a Milton-Cat International Corp.; (iii) Thomas Scientific, Inc.; (iv) Shiraz Partners LP; (v) DBCI, Inc.; (vi) Controlled Contamination Services, LLC; and (vii) NESPA, Inc.

10.     On March 19, 2025, the Committee selected Pachulski Stang Ziehl & Jones LLP as counsel and Huron Consulting Group as financial advisor.

## II.     Prepetition Funded Debt

11.     The Debtors indicate that they have approximately $62.2 million of funded indebtedness as of the Petition Date, consisting of the Pre-Petition Credit Facility.[4]  A description of the Debtors' prepetition capital structure is set forth in the DIP Motion.

## III.    The Proposed DIP Credit Facility

12.     Pursuant to the DIP Motion, the Debtors seek authority to enter into the DIP Credit Facility, which consists of:  (i) a new money, multi-draw term loan facility consisting of up to $8.5 million; and (ii) a revolving commitment of up to $15 million that are essentially re-advances of cash collateral distributed to the Pre-Petition Lender on a postpetition basis as collections are received (*i.e.*, the "creeping" roll-up).[5]  The DIP Credit Facility includes a roll-up of all other Pre-Petition Obligations, except for a Remaining Pre-Petition Obligation in the amount of $1 million.[6]

---

[4]     DIP Motion ¶ 17.

[5]     DIP Motion ¶ 15.

[6]     DIP Motion ¶ 27.

13.     The key terms of the DIP Credit Facility are set forth on pages 11 through 19 of the DIP Motion.  Suffice it to say that the DIP Lender seeks to take liens on, and superpriority claims payable from, all available assets of the Debtors' estates, including new ***postpetition receivables*** generated from the Debtors' ***postpetition consulting services*** and any future income stream derived therefrom, as well as existing leaseholds and fixtures, commercial tort claims, avoidance actions, and the proceeds thereof.  As mentioned above, the Debtors' leaseholds and fixtures are a principal part of their cleanroom business, which could yield material value for unsecured creditors.  The Debtors are also continuing to generate new postpetition assets in the form of new receivables from postpetition consulting services, and the future revenues derived therefrom, that are not part of the Pre-Petition Collateral under section 552(a) of the Bankruptcy Code.  The DIP Lender and the Pre-Petition Lender also seek immediate payment of the DIP Obligations first and then the Pre-Petition Obligations from the proceeds of any sale or disposition of the Collateral.[7]

14.     The Debtors propose to validate the liens and claims of the Pre-Petition Lender and release any claims against it, unless the Committee conducts an investigation (with a limited budget of $25,000), obtains standing, and asserts claims by "no later than the date that is" (i) 75 calendar days after entry of the Interim DIP Order and (ii) five (5) business days prior to the closing of one or more sales of substantially all of the Debtors' assets.[8]  The foregoing language in the Interim DIP Order is unclear and should be revised to permit a challenge within 75 days after entry of the Interim DIP Order, consistent with local practice.

---

[7]     Interim DIP Order § 1.5(a).

[8]     Interim DIP Order § 4.1(b).

## OBJECTION

### I.    The Proposed Roll-Up DIP Loans Should Be Reduced

15.    A court should only approve a proposed debtor in possession financing if the debtor meets its burden to prove that such financing "is in the best interest of the general creditor body."[9] Postpetition financing should not be authorized if its primary purpose is to benefit or improve the position of a particular secured lender.[10]   Indeed, courts have long acknowledged the unequal bargaining power inherent in negotiations leading to proposed postpetition financing, as well as the significant harm that can befall creditors if the proposed financier is permitted to exploit its leverage position.[11]   The DIP Credit Facility should not simply become a tool for the DIP Lender to enhance its collateral position.[12]

---

[9]    *In re Roblin Indus., Inc.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) (*citing In re Vanguard Diversified, Inc.*, 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983)); *see also In re Tenney Village Co.*, 104 B.R. 562, 569 (Bankr. D. N.H. 1989) ("The debtor's prevailing obligation is to the bankruptcy estate and, derivatively, to the creditors who are its principal beneficiaries."). Moreover, the proposed financing terms must be "fair, reasonable, and adequate."  *In re Crouse Grp., Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987).

[10]    *See, e.g., In re Aqua Assocs.*, 123 B.R. 192, 195–98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); *Tenney Village*, 104 B.R. at 568 (stating that debtor in possession financing terms must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the secured creditor").

[11]    *See, e.g., In re FCX, Inc.*, 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.").

[12]    *See In re Ames Dept. Stores*, 115 B.R. at 38–39 ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); *see also In re Laffite's Harbor Dev. I, LP*, No. 17-36191, 2018 Bankr. LEXIS 2, at *6 (Bankr. S.D. Tex. Jan. 2, 2018) ("While certain favorable terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender.  Thus, courts look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest.").

16.     Roll-ups are "generally viewed as a more controversial form of adequate protection that courts will approve sparingly."[13]  They are generally disfavored because they provide no benefit to the estate while favoring certain prepetition creditors over others.[14]  Roll-ups like the one at issue here generally harm unsecured creditors in at least two ways.  First, they enhance the lenders' collateral package by providing liens on unencumbered assets that would otherwise be available to unsecured creditors.  Second, the Bankruptcy Code requires this "rolled-up" debt to be repaid in full and in cash in order for a debtor to emerge successfully from chapter 11, thereby exacerbating the risk of administrative insolvency and precluding the debtor from treating the prepetition rolled-up debt in accordance with section 1129(b)(2)(A) of the Bankruptcy Code.[15]

17.     Both issues exist in these cases.  The DIP Lender should not be permitted to wrest control over unencumbered assets, such as ***postpetition receivables*** and other future income generated from the Debtors' ***postpetition services***, leaseholds and fixtures, commercial tort claims and avoidance actions through a roll-up that totals over seven times (7x) the amount of the true new money ($8.5 million) contemplated by the DIP Credit Facility.  The roll-up is so substantial that it risks leaving the Debtors' estates administratively insolvent. The DIP Credit Facility contemplates a roll up of approximately $61 million and only $8.5 million of new money loans.

---

[13]   1 COLLIER LENDING INSTITUTIONS & THE BANKRUPTCY CODE ¶ 5.03[2][b] (citing cases).

[14]   *In re Bruin E&P Partners, LLC*, Tr. of Hr'g at 67:9–10, No. 20-33605 (Bankr. S.D. Tex July 17, 2020) (finding that roll-ups are "heavily disfavored under the Bankruptcy Code"); *In re Verasun*, No. 08-12606 (BLS) (Bankr. D. Del. Dec. 3, 2008) [ECF No. 316] (noting that bankruptcy courts in the District of Delaware, the Southern District of New York, and elsewhere have found that "rollups are not favored.  They are strongly discouraged on day one, and the bottom line is that for approval a substantial showing [of need for the financing] has to be made"). *See also In re Saybrook Mfg. Co.*, 963 F.2d 1490, 1494–96 (11th Cir. 1992) (noting that postpetition cross-collateralization is an "extremely controversial form of Chapter 11 financing" before holding that it was not authorized by section 364 of the Bankruptcy Code); *Reynolds v. Servisfirst Bank* (*In re Stanford*), 17 F.4th 116, 128 (11th Cir. 2021) (Jordan, J., concurring) (discussing the increase in requests for roll-ups since *Saybrook Manufacturing*, and describing roll-ups as "a formally distinct but functionally similar financing arrangement" to cross-collateralization).

[15]   *See, e.g.*, 3 COLLIER ON BANKRUPTCY ¶ 364.06[2] (16th ed.).

This totals over $69.5 million of DIP Obligations that would suddenly become allowed administrative expenses of these estates.

18.      The Committee submits that the roll-up should be reduced to the "creeping roll-up amounts" only, which are projected to be approximately $10.363 million in the Initial DIP Budget, plus outstanding letter of credit obligations of approximately $1.3 million, both of which have already been rolled up under the Interim DIP Order.  Such a limitation is necessary to avoid administrative insolvency.  The roll-up also should not extend to previously unencumbered assets, which should remain available for the benefit of unsecured creditors.  Moreover, any credit bid must be expressly subject to challenge rights as to the Pre-Petition Obligations, whether or not they are rolled up.

## II.     The DIP Credit Facility Contains Various Overreaching Provisions That Prejudice Unsecured Creditors

### A.     *Unencumbered Assets Should Remain Unencumbered and Free of Any Liens or Superpriority Claims, Especially Newly-Created and Future Postpetition Assets Under 11 U.S.C. § 552(a)*

19.      The Debtors propose to encumber all unencumbered assets that otherwise would be available to unsecured creditors in favor of the DIP Lender and, through the proposed roll-up, the Pre-Petition Lender.  Such assets include new ***postpetition assets*** generated through the Debtors' ***ongoing and future consulting services*** as well as pre-existing leaseholds and fixtures, commercial tort claims, and avoidance actions (including potential claims against the Pre-Petition Lender itself).  As noted, the Debtors' cleanroom business relies in large part on leasehold interests and the fixtures thereon.

20.      Postpetition revenues and receivables are not subject to floating security interests except insofar as such amounts are "proceeds" of prepetition collateral.  "Under § 552 of the Bankruptcy Code, post-petition property acquired by the debtor's estate, such as revenues

generated from operations, is not subject to any liens resulting from pre-petition security agreements unless the pre-petition security agreements create a security interest in pre-petition property and its proceeds, product, offspring, rents or profits and the post-petition property constitutes such proceeds, product, offspring, rents or profits." *In re Cafeteria Operators, L.P.*, 299 B.R. 400, 405 (Bankr. N.D. Tex. 2003) (citing 11 U.S.C. § 552). "From a plain reading of § 552, revenues generated post-petition solely as a result of the debtor's labor are not subject to a pre-petition lender's security interest." *Id.*

21.     "As a general rule, postpetition revenue is not cash collateral.  Under § 552(a), a creditor's prepetition security interest does not extend to property acquired by the debtor postpetition even if there is an 'after acquired' clause in the security agreement." *Far E. Nat'l Bank v. United States Tr. (In re Premier Golf Props., LP)*, 477 B.R. 767, 771 (B.A.P. 9th Cir. 2012); *see also In re Blackjewel L.L.C.*, No. 3:19-bk-30289, 2020 Bankr. LEXIS 3413, at *47 (Bankr. S.D. W. Va. Dec. 7, 2020) ("[I]t is well settled that § 552(b) cuts off any security interest in accounts receivable arising post-petition.").

22.     "[W]here it is only post-petition acts which generate an account receivable, those post-petition receivables will not be considered proceeds because there is no interest in, or connection to, the right in the account receivable created pre-petition." *Arkison v. Frontier Asset Mgmt., LLC (In re Skagit Pac. Corp.)*, 316 B.R. 330, 336 (B.A.P. 9th Cir. 2004). "Furthermore, revenue generated by the operation of a debtor's business, post-petition, is not considered proceeds if such revenue represents compensation for goods and services rendered by the debtor in its everyday business performance.  Revenue generated post-petition solely as a result of a debtor's labor is not subject to a creditor's pre-petition interest." *Id.* (citing *Cafeteria Operators*, 299 B.R. at 405); *see also In re Texas Tri-Collar, Inc.*, 29 B.R. 724, 726–27 (Bankr. W.D. La. 1983)

("[A]ccounts receivable generated after commencement of the case are in no way proceeds, product, offspring, rents or profits of prepetition accounts receivable . . . ."); *In re Cross Baking Co.*, 818 F.2d 1027, 1032 (1st Cir. 1987) (noting that postpetition receivables generally do not constitute proceeds of prepetition receivables).

23.     Courts have consistently held that postpetition revenues and receivables from a debtor's business operations or labor cannot be subject to liens in connection with prepetition security agreements.  *See, e.g.*, *Premier Golf Props.*, 477 B.R. at 777 (finding that a golf club's revenue from green fees and driving range fees were "not proceeds of the Bank's security interest and [did] not constitute the Bank's cash collateral"); *Johnson v. RFF Family P'ship, LP (In re Johnson)*, 554 B.R. 448, 466–67 (Bankr. S.D. Ohio 2016) (finding that section 552(a) terminated any interest of a secured creditor in an NHL player's postpetition contract earnings and that such earnings did not constitute proceeds of prepetition collateral for purposes of section 552(b)); *In re Ne. Chick Servs., Inc.*, 43 B.R. 326, 329, 331 (Bankr. D. Mass. 1984) (finding that no security interest attached to the debtor's postpetition receivables from the sale of chickens and eggs, because the secured creditor did "not have a right to proceeds arising from the sale of what is not [its] (pre-petition) collateral"); *Shearer v. Tepsic (In re Emergency Monitoring Techs., Inc.)*, 366 B.R. 476, 500 (Bankr. W.D. Pa. 2007) (finding that section 552(a) operated to terminate a "security interest as of, and with respect to—in particular—receivables generated after, the date of the Debtor's bankruptcy petition filing" and that section 552(b) did not change the result because "accounts receivable that are generated post-bankruptcy, in any event, cannot constitute 'proceeds, products, offspring, or profits' of accounts receivable that are generated pre-bankruptcy"); *Ne. Copy Servs. v. Bridgeport Park Assocs. (In re Ne. Copy Servs.)*, 175 B.R. 580, 583 (Bankr. E.D. Pa. 1994) ("Although the proceeds of NE's sale of its property are Concord's cash

collateral, . . . Mammoth's revenues are not Concord's cash collateral. Thus, Mammoth may proceed to utilize its revenues free from any alleged lien thereon of Concord."); *In re S-Tek 1, Ltd. Liab. Co.*, No. 20-12241-j11, 2023 Bankr. LEXIS 673, at *25–26 (Bankr. D.N.M. Mar. 15, 2023) ("Section 552 cuts off the attachment of Surv-Tek's security interest in after-acquired accounts receivable because S-Tek's post-petition accounts receivable are not proceeds, products, offspring, or profits of its pre-petition accounts receivable."); *U.S. Trust Nat'l Assoc. v. Venice MP LLC*, 92 F. App'x. 948, 953 (4th Cir. 2004) (finding that revenues generated by the sale of food at the debtor's restaurant were not "proceeds" of prepetition inventory where such revenues derived from operation of the debtor's service-oriented business); *Timothy Dean's, Inc. v. White (In re Timothy Dean Rest. & Bar)*, 342 B.R. 1, 23–24 (Bankr. D.D.C. 2006) (finding that a hotel's postpetition receivables from room service and other guest charges were not subject to security interests and were not proceeds of the sale of inventory); *In re Inman*, 95 B.R. 479, 480–81 (Bankr. W.D. Ky. 1988) (finding that revenues generated from the operation of a debtor's fast-food restaurants were not proceeds from the sale of inventory subject to a creditor's security interest).

24.     The secured creditor bears the burden of proving that it has a lien in proceeds under section 552 of the Bankruptcy Code. *See Bank of N. Ga. v. Strick Chex Columbus Two, LLC (In re Strick Chex Columbus Two, LLC)*, 542 B.R. 914, 918 (Bankr. N.D. Ga. 2015) (citations omitted) (quoting 11 U.S.C. § 363(p)(2)) ("[I]n order for a pre-petition security interest to attach to a debtor's after-acquired cash, making it 'cash collateral,' the secured creditor must show that the security agreement attaches to the proceeds of the collateral covered by the agreement and that the proceeds claimed as cash collateral are in fact proceeds . . . of pre-petition property subject to the lien. '[T]he entity asserting an interest in property has the burden of proof on the issue of validity, priority, or extent of such interest.'"). "Caselaw interpreting 11 U.S.C. § 552 has established that

§ 552(b) is to be read narrowly in determining whether a certain security interest falls outside the general rule of § 552(a) that pre-petition security interests do not survive post-petition. Furthermore, 'the secured party bears the burden of proving that its pre-petition lien retained its vitality as a postpetition lien on property acquired by a debtor after the filing of bankruptcy.'" *Ne. Copy Servs. v. Bridgeport Park Assocs. (In re Ne. Copy Servs.)*, 175 B.R. 580, 583 (Bankr. E.D. Pa. 1994) (citations omitted) (quoting *In re Sherwood Ford, Inc.*, 125 Bankr. 957, 962 (Bankr. D. Md. 1991)); *see also Cafeteria Operators*, 299 B.R. at 405 ("Under the Bankruptcy Code, the secured lender has the burden of proof on the issue of validity, priority and/or extent of its lien on the property.").

25.     Here, the Pre-Petition Lender cannot carry its burden of establishing that it has a lien on the Debtors' postpetition assets or the proceeds thereof.  The bulk of the value in the Debtors' estates is not tied to assets that existed as of the Petition Date.  Although the Debtors had certain prepetition receivables, fixed personal property assets, and customer contracts in place as of the Petition Date (which should be allocated some value from the $56 million sale of the consulting business), those assets do not add up to much.  Under the unique circumstances of these cases, the primary asset of these estates consists of the products of ***postpetition labor*** of the Debtors' consulting employees.  The Pre-Petition Lender's asserted lien on this property is cutoff by virtue of section 552(a).  The value of the Debtors' consulting business tied to future work and the capacity to generate future revenue is unencumbered as of the Petition Date and should remain unencumbered by the Pre-Petition Obligations (except, solely, to the extent of re-advances of cash collateral and assumed letter of credit obligations under the DIP Credit Facility).  The rights of unsecured creditors to recover from the ***newly-created and postpetition assets*** of the Debtors' estates, including accounts receivable generated postpetition and the discounted cash flow value

of the future revenue stream associated with the Debtors' consulting business, must be fully preserved.

26.     As to the Debtors' remaining unencumbered assets, they too should remain unencumbered.  Access to the DIP Credit Facility (aside from the new money loans) and use of cash collateral stands to benefit primarily the Pre-Petition Lender by substantially enhancing its collateral position, particularly by allowing it to receive the proceeds of all of the Debtors' assets. The only way to preserve and protect the interests of unsecured creditors under such circumstances is to treat the estates' unencumbered assets as free and clear of any liens or superpriority claims with respect to the roll-up and adequate protection.

27.     Further, with regard to the new money loans under the DIP Credit Facility, the DIP Lender should be required to marshal away from any previously unencumbered assets and turn to such assets only after all commercially reasonable efforts to recover from the Pre-Petition Collateral have been exhausted.  As proposed, the DIP Credit Facility would immediately encumber all such previously unencumbered assets in favor of the DIP Lender and the Pre-Petition Lender on account of the roll-up, without any prospect of recovery by unsecured creditors.  The contemplated $56 million stalking horse sale would close, all or substantially of the sale proceeds would be distributed to the DIP Lender / Pre-Petition Lender, and the estates would be left with nothing, except for the remaining unpaid DIP loans (about $13.5 million).

28.     Avoidance actions (and the proceeds thereof), in particular, are uniquely designed for the benefit of general creditors of the estate, not secured creditors, and such actions should not be encumbered in favor of secured lenders.[16]  Avoidance actions are statutory rights intended to

---

[16]  *See Official Comm. of Unsecured Creditors v. Goold Elecs. Corp. (In re Goold Elecs. Corp.)*, No. 93-4196, 1993 U.S. Dist. LEXIS 14318, at *12 (N.D. Ill. Sept. 20, 1993) (vacating a bankruptcy court order approving post-petition financing "to the extent that the order assigns to the bank a security interest in the debtor's preference actions").

ensure equitable distributions of a debtor's estate.[17]   Indeed, avoidance powers are intended to

allow a debtor in possession or other party with standing to gain recoveries for the benefit of all

unsecured creditors.[18]   Accordingly, bankruptcy courts often restrict a debtor's ability to pledge

avoidance actions and their proceeds as collateral.[19]

29.    Here, there is no basis for the DIP Lender or the Pre-Petition Lender to take liens

and superpriority claims on the Debtors' unencumbered assets with respect to the roll-up and

adequate protection when the Debtors' estates could be left insolvent and unsecured creditors have

no other source of recovery.   There are also potential avoidance claims against the Pre-Petition

Lender itself arising from the $16 million pay-down of the Pre-Petition Obligations with the

proceeds of the prepetition labs sale on the cusp of the Petition Date.   Therefore, any further interim

or final orders should make clear that no DIP liens on account of the roll-up or adequate protection

liens shall attach to any of the Debtors' previously unencumbered assets and any associated

---

[17]    Avoidance actions are not property of a debtor's estate but rather are a construct of bankruptcy law for the benefit of unsecured creditors.   *See* 5 COLLIER ON BANKRUPTCY ¶ 541.14 at n.1 ("The avoiding powers of a debtor in possession granted in chapter 5 of the [Bankruptcy] Code are not property of the estate but statutorily created powers to recover property."); *see also Frank v. Mich. State Unemployment Agency (In re Thompson Boat Co.)*, 252 F.3d 852, 854 (6th Cir. 2001) (affirming lower courts' determination that "the Bankruptcy Code allows only a trustee, not debtors, to initiate a preference action to avoid certain transfers, so proceeds recovered are property of the bankruptcy estate, not the debtor"); *Cullen Ctr. Bank & Tr. v. Hensley (In re Criswell)*, 102 F.3d 1411, 1414 (5th Cir. 1997) (noting that avoidance powers under the Bankruptcy Code were created to "facilitate[e] the prime bankruptcy policy of equality of distribution among creditors of the debtor").

[18]    *See Buncher Co. v. Official Comm. (In re GenFarm Ltd. P'ship IV)*, 229 F.3d 245, 250 (3d Cir. 2000).

[19]    *See, e.g.*, *Gaudet v. Babin (In re Zedda)*, 103 F.3d 1195, 1203 (5th Cir. 1997) ("A trustee's avoidance powers are intended to benefit the debtor's creditors, as such powers facilitate a trustee's recovery of as much property as possible for distribution to the [unsecured] creditors."); *McFarland v. Leyh (In re Texas Gen. Petrol. Corp.)*, 52 F.3d 1330, 1335–36 (5th Cir. 1995) ("[T]he proceeds recovered in an avoidance action satisfy the claims of priority and general unsecured creditors before the debtor benefits."); *In re Excel Maritime Carriers, Ltd.*, No. 13-23060 (RDD) (Bankr. S.D.N.Y. Aug. 6, 2013) (ECF No. 133) (excluding avoidance actions and proceeds thereof from the scope of adequate protection liens and property that could be used to pay superpriority administrative expense claims); *United Capital Corp. v. Sapolin Paints, Inc. (In re Sapolin Paints, Inc.)*, 11 B.R. 930, 937 (Bankr. E.D.N.Y. 1981) ("[N]either a trustee . . . nor a debtor-in-possession, can assign, sell or otherwise transfer the right to maintain a suit to avoid a preference.").

superpriority claims shall not be payable from the proceeds thereof.  Otherwise, general unsecured creditors likely will be wholly disenfranchised and left with no recovery.

   B.     **The Full Range of Adequate Protection Proposed for the Pre-Petition Lender is Excessive Under the Circumstances**

   30.     The Bankruptcy Code only requires debtors to provide a secured creditor with adequate protection to the extent that the automatic stay, the debtors' use of property, or a priming lien "results in a decrease in the value of such entity's interest in such property." 11 U.S.C. § 361(1).  The purpose is to protect a secured creditor from diminution in the value of its collateral during the use period.[20]  "[T]he initial burden of showing the need for adequate protection [is] upon the creditor having an interest in the property being used by the debtor.  In order to meet this burden, the secured creditor must demonstrate that such relief is required by showing a likelihood that the collateral will decrease in value or establishing some other basis for the relief.  The burden then shifts to the debtor to show that adequate protection is not needed or can be provided in a different manner."[21]  Here, there has been no showing that adequate protection in favor of the Pre-Petition Lender is needed to the extent proposed in the DIP Motion and, to the Committee's knowledge, the Debtors have not conducted any analysis with respect to the adequate protection proposed to be provided under the proposed DIP Credit Facility.

---

[20]   *See United Sav. Ass'n v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 368 (1988); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (stating that the goal of the adequate protection requirement is to "safeguard the secured creditor from diminution in the value of its interest"); *Lincoln Nat'l Life Ins. v. Craddock-Terry Shoe Corp. (In re Craddock-Terry Shoe Corp.)*, 98 B.R. 250, 255 (Bankr. W.D. Va. 1988) (finding that what needs to be adequately protected is the decrease in value attributable to the stay arising on the petition date).

[21]   *Zink v. Vanmiddlesworth*, 300 B.R. 394, 402–03 (N.D.N.Y. 2003) (citations omitted).  *See also In re Gunnison Ctr. Apartments*, 320 B.R. 391, 396 (Bankr. D. Colo. 2005) (quoting *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994)) ("The secured creditor 'must, therefore, prove this decline in value—or the threat of a decline—in order to establish a *prima facie* case.'"); *In re Continental Airlines, Inc.*, 146 B.R. 536, 539 (Bankr. D. Del. 1992) ("Post-*Timbers* courts have uniformly required a movant seeking adequate protection to show a decline in value of its collateral.").

31.     Absent diminution, no adequate protection is needed.  Accordingly, where the lenders' collateral is not diminishing as a result of its use, nothing further is required for adequate protection.[22]  Moreover, diminution is not equivalent to cash collateral use.  A prepetition lender is "not entitled to an adequate protection claim on a dollar-for-dollar basis for cash collateral used during the case."[23]  Yet the definition of "Diminution in Value" used here would grant the Pre-Petition Lender a postpetition claim for precisely that—using estate funds to support the credit bid sale process to itself.[24]

32.     The Committee would not oppose adequate protection to the Pre-Petition Lender in the form of replacement liens with the same extent, priority, and validity as existed on the Petition Date.  However, the Debtors propose to grant the Pre-Petition Lender much more, including:

- The roll-up of approximately $61 million of the Pre-Petition Obligations (leaving only the $1 million Remaining Pre-Petition Obligation);

- Adequate protection liens, to the extent of any diminution in value, on all Collateral in favor of the Pre-Petition Lender, including ***postpetition assets*** generated from the labor of the Debtors' employees on a ***postpetition basis*** and the value of future revenues derived therefrom;

- Superpriority claims, to the extent of any diminution in value, in favor of the Pre-Petition Lender payable from the Collateral, including unencumbered assets;

- Validation of the liens and claims of the Pre-Petition Lender and broad releases, subject to a short challenge period and a small investigation budget for the Committee of only $25,000;

- Section 506(c) surcharge, marshaling, and equities-of-the-case waivers for the duration of the Chapter 11 Cases; and

---

[22]  *Save Power Ltd. v. Pursuit Athletic Footwear (In re Pursuit Athletic Footwear)*, 193 B.R. 713, 716 (Bankr. D. Del. 1996).

[23]  *Official Comm. v. UMB Bank, N.A. (In re Residential Capital)*, 501 B.R. 549, 596–97 (Bankr. S.D.N.Y. 2013).

[24]  Interim DIP Order at § 2.5(b) (defining "Diminution in Value" to include "the diminution in value of [the Pre-Petition Lender's] interests in the Pre-Petition Collateral (including Cash Collateral) on account of the Debtors' use of such Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve-Out on a dollar-for-dollar basis").

- The imposition of various milestones for an accelerated sale process.

33. Section 361 of the Bankruptcy Code includes adequate protection provisions with the goal of "safeguard[ing] the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization."[25] Determinations regarding adequate protection are fact-specific.[26] The focus of the requirement is to protect a secured creditor from diminution in the value of its collateral during the use period.[27]

34. Section 361 of the Bankruptcy Code provides that periodic cash payments, replacement liens, or relief constituting the "indubitable equivalent" of the creditor's interest may provide adequate protection. Provision of a replacement lien in property equal to the value of the cash collateral used specifically complies with section 361(2) of the Bankruptcy Code and provides adequate protection within the meaning of section 363(e) of the Bankruptcy Code.[28]

35. The adequate protection proposed for the Pre-Petition Lender is excessive. The Committee would not oppose replacement liens for the Pre-Petition Lender to the same extent, priority, and validity that existed as of the Petition Date. However, the roll-up, adequate protection, and other lender protections enhance the Pre-Petition Lender's collateral position at the expense of unsecured creditors, who stand to lose their only hope of a recovery from the Debtors' unencumbered assets.

---

[25]   *495 Cent. Park Ave. Corp.*, 136 B.R. at 631.

[26]   *See In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985); *see also* S. Rep. No. 989, 95th Cong., 2d Sess. 54 (1978).

[27]   *Timbers*, 484 U.S. at 368; *see also In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); *Delbridge v. Production Credit Ass'n (In re Delbridge)*, 104 B.R. 824 (E.D. Mich. 1989); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

[28]   *See, e.g.*, *O'Connor*, 808 F.2d at 1398; *In re Dynaco Corp.*, 162 B.R. 389, 393–95 (Bankr. D.N.H. 1993); *In re T.H.B. Corp.*, 85 B.R. 192, 195 (Bankr. D. Mass. 1988).

C.    **The Proposed Section 506(c), Marshaling, and "Equities of the Case" Waivers are Inappropriate**

36.    The Debtors intend to grant broad waivers of Bankruptcy Code section 506(c) surcharge, marshaling, and "equities of the case" rights as to the DIP Lender and the Pre-Petition lender.  To the extent that administrative and priority claims are not funded and paid on a current basis, such as claims arising under section 503(b)(9) of the Bankruptcy Code, postpetition stub rent, and wind-up and liquidating chapter 11 plan costs, the Committee objects to any of these provisions being granted.

37.    Through the proposed section 506(c) waiver, the Debtors would irrevocably waive the estates' rights to charge certain costs or expenses incurred in the administration of the Chapter 11 Cases.[29]  This provision should be stricken from any final order unless and until adequate provision has been made for prompt payment of all accrued and unpaid administrative expenses from liquidation proceeds, including claims arising under section 503(b)(9) of the Bankruptcy Code, unpaid stub rent (if any), and the full estimated amount of the Committee's professionals' fees.  The effect of the proposed section 506(c) waiver is to eliminate a further avenue of recovery for the Debtors' estates.  This result contravenes the essential purpose of section 506(c) of the Bankruptcy Code.[30]  As courts have recognized, DIP financing that contains

---

[29]    Interim DIP Order § 4.3.

[30]    *See Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus.)*, 57 F.3d 321, 325 (3d Cir. 1995) (citation omitted) ("[Section] 506(c) is designed to prevent a windfall to the secured creditor . . . .  The rule understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate . . . ."); *see also In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").

an inadequate budget coupled with a surcharge waiver should not be approved unless modified to provide for timely payment of administrative claims.[31]

38.     The Debtors also seek to restrict the Court's ability to implement equitable marshaling.[32]  The waiver of any marshaling requirements is prejudicial at this stage, especially where there may be no value for unsecured creditors from any other sources aside from the estate's unencumbered assets.  Marshaling may be a key remedy in ensuring that unsecured creditors do not bear the brunt of the expenses of the Chapter 11 Cases while having no prospect of any other distributions.[33]  Indeed, the Committee submits that, as to the new money DIP loans, the DIP Lender should be required to marshal away from any previously unencumbered assets and turn to such assets only after all commercially reasonable efforts to recover from the Pre-Petition Collateral have been exhausted.

39.     Finally, the Debtors propose that the "equities of the case" exception under section 552(b) of the Bankruptcy Code should not apply to the DIP Lender.[34]  The "equities of the case" exception in section 552(b) of the Bankruptcy Code allows a debtor, committee, or other party in interest to exclude postpetition proceeds from prepetition collateral on equitable grounds, including to avoid using unencumbered assets to fund the cost of a secured lender's foreclosure.

---

[31]   *See In re NEC Holdings Corp.*, No. 10-11890 (Bankr. D. Del. July, 13, 2010) (ECF No. 233, and Tr. of Hr'g at 108:1–5, ECF No. 224) ("I need some evidence that there's a probability that admin claims are going to be paid in full, including 503(b)(9) claims or I won't approve the financing."); *Hartford Fire Ins. v. Northwest Bank Minn. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (B.A.P. 8th Cir. 1998) (holding that a provision in a financing order purporting to immunize the postpetition lender from a section 506(c) surcharge was unenforceable); *In re Colad Grp.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (refusing to approve a postpetition financing agreement to the extent that the agreement purported to modify statutory rights and obligations created by the Bankruptcy Code by prohibiting any surcharge of collateral under section 506(c)).

[32]   Interim DIP Order § 5.9.

[33]   *See Official Comm. v. Hudson United Bank (In re America's Hobby Ctr.)*, 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998); *Ramette v. United States (In re Bame)*, 279 B.R. 833 (B.A.P. 8th Cir. 2002) (invoking the marshaling doctrine against taxing authorities to benefit the estate's unsecured creditors).

[34]   Interim DIP Order § 5.9.

"The purpose of the equity exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of other assets of the estate (which normally would go to general creditors) to cause the appreciated value."[35]

40.     It is unreasonable to ask unsecured creditors—through the unencumbered assets or as administrative advances—to fund any shortfall in the DIP Budget by way of the estates' waiver of important creditor protections.  In sum, the requested waivers of section 506(c), marshaling, and "equities of the case" rights is inappropriate without adequately taking into account estate remedies and where, as here, there is no certainty that adequate provision has been made for the prompt payment of all administrative expenses against the Debtors' estates.

### D.     The Lien Validation and Challenge Provisions are Objectionable

41.     Through the DIP Credit Facility, the Debtors propose to circumscribe the Committee's ability to exercise its statutory duties.  The Committee is given a paltry investigation budget of $25,000 and a short challenge deadline.[36]  This is inadequate for the Committee to conduct a thorough investigation of, inter alia, the transactions that took place prior to the Petition Date.

42.     The Committee submits that:  (a) the Challenge Period should be extended to no less than 75 days from entry of the Interim DIP Order, subject to further extensions with the consent

---

[35]   *In re Muma Servs.*, 322 B.R. 541, 558–59 (Bankr. D. Del. 2005) (quoting *Delbridge*, 104 B.R. at 826).  There is no reason to waive such rights here.  *See, e.g.*, *In re Metaldyne Corp.*, No. 09-13412, 2009 Bankr LEXIS 1533, at *19 (Bankr. S.D.N.Y. June 23, 2009) ("[T]he Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make.  If, in the event, the Committee or any other party [in] interest argues that the equities of the case exception should apply to curtail a particular lender's rights, the Court will consider it."); *Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n (In re TerreStar Networks)*, 457 B.R. 254, 272–73 (Bankr. S.D.N.Y. 2011) (finding that a request for a section 552(b) waiver was premature because the factual record was not fully developed).

[36]   Interim DIP Order §§ 2.3(c)(v), 4.1(b).

of the DIP Lender or by the Court for cause; (b) the Committee's investigation budget should be increased to $150,000, with the relevant provisions of any final order on the DIP Motion being modified to clarify that the investigation budget is solely for the Committee's professionals; and (c) the Challenge Period should be tolled if the Committee timely files a motion for standing and attaches a pleading that constitutes a Challenge. Such tolling should be until an adequate time, no less than three (3) business days, after the Committee's standing motion is decided by the Court.

43.    In addition, all of the Debtors are limited liability companies, which could create standing issues for creditors under some courts' interpretations of applicable state law. Appropriate provisions must be added to any final order on the DIP Motion to preserve the Committee's standing and rights to assert a Challenge on all available grounds, notwithstanding anything to the contrary in applicable nonbankruptcy law that may limit such claims in the case of Debtors that are limited liability companies.

### E.    Other Committee Issues With the DIP Credit Facility

44.    The Committee also raises the following additional objections to any proposed further interim or final order on the DIP Motion:

- *Payment Provisions*. There should be no provisions requiring immediate payment of the Pre-Petition Obligations, aside from the creeping roll-up to the extent of cash collateral used and re-advanced as approved under the Interim DIP Order. As to the DIP Obligations, any payment from the proceeds of any disposition of the Debtors' assets must take into account, and reserve for any accrued and unpaid administrative expenses, including section 503(b)(9) claims. Moreover, any payment provisions regarding the Pre-Petition Obligations, whether rolled up or not, must be subject to challenge rights.[37]

- *Remedies*. Any exercise of remedies by the DIP Lender should be subject to the Committee's challenge rights.

- *Committee Professional Fee Budget.* The Committee reserves all rights with respect to the appropriate amount to budget in these cases for the Committee's

---

[37]    Interim DIP Order §§ 1.5(a), 5.3.

professional fees for purposes of the Carve-Out.  The current budgeted amount of $250,000 through May 2, 2025, is a small fraction of the budget for the Debtors' professionals and is clearly insufficient.

- ***Budgets, Amendments, and Committee Reporting Rights***.  The Committee must be granted advance notice of any new budgets or amendments to the DIP Documents, whether material or nonmaterial, and provided concurrently with all financial reporting, including but not limited to ongoing variance and budget reporting, delivered to the DIP Lender.  Moreover, no decreases should be made to the Committee's professional fee budget without the express consent of the Committee.

The Court should not approve the DIP Credit Facility unless and until the Debtors adequately address the foregoing issues through appropriate revisions to any final order on the DIP Motion.

## **RESERVATION OF RIGHTS**

45.     The Committee expressly reserves all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Objection, to raise other and further objections to the DIP Motion and the form of final order, and to introduce evidence prior to or at any hearing regarding the DIP Motion in the event that the Committee's objections are not resolved prior to such hearing.

## **CONCLUSION**

**WHEREFORE**, for the foregoing reasons, the Committee respectfully requests that the Court deny the DIP Motion until the Committee's objections set forth herein have been adequately addressed and grant such other and further relief as the Court deems just and proper.

Dated:  April 4, 2025    **PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (*pro hac vice* pending)
Colin R. Robinson (DE Bar No. 5524)
Edward A. Corma (DE Bar No. 6718)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
        dbertenthal@pszjlaw.com
        crobinson@pszjlaw.com
        ecorma@pszjlaw.com

*Proposed Counsel to the*
*Official Committee of Unsecured Creditors*