**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| | Case No. 25–10342 (KBO) |
| AZZUR GROUP HOLDINGS LLC, *et al.*,[1] | (Jointly Administered) |
| Debtors. | **Re: Docket Nos. 85 & 86** |
| | **Hearing Date: April 11, 2025 at 1:00 p.m. (ET)** |
| | **Objection Deadline: April 7, 2025 at 4:00 p.m. (ET)[2]** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO (I) CONDITIONAL APPROVAL OF THE ADEQUACY OF DEBTORS' COMBINED
DISCLOSURE STATEMENT AND PLAN AND (II) MOTION OF DEBTORS FOR
APPROVAL OF SOLICITATION PROCEDURES AND RELATED RELIEF**

(Related Docket Nos. 85 and 86)

---

[1] A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.cases.stretto.com/Azzur. The Debtors' headquarters and the mailing address for the Debtors is 330 South Warminster Road, Suite 341, Hatboro, PA 19040.

[2] Extended as to the Committee with the consent of the Debtors.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT .................................................................................................1

BACKGROUND ....................................................................................................................4

    A.     General Background .........................................................................................4

    B.     Debtors' Separate, Parallel Sale Process............................................................5

    C.     Debtors' Combined Plan and Disclosure Statement.............................................6

    D.     The Committee's Investigation..........................................................................9

ARGUMENT AND AUTHORITIES ........................................................................................11

I.     OBJECTIONS TO THE ADEQUACY OF THE DISCLOSURE STATEMENT
      AND DS/SOLICITATION MOTION..........................................................................11

    A.     The Disclosure Statement Should Not Be Conditionally Approved
        Because It Does Not Contain Adequate Information.........................................11

    B.     Other Aspects of the Disclosure Statement and DS/Solicitation Motion
        Are Unjustified, Impermissible, or Unreasonable Under the
        Circumstances..................................................................................................13

II.    THE PLAN IS UNCONFIRMABLE ........................................................................15

RESERVATION OF RIGHTS ...............................................................................................19

CONCLUSION....................................................................................................................20

**<u>TABLE OF AUTHORITIES</u>**

**<u>Page(s)</u>**

**CASES**

*Bank of New York Trust Co., NA v. Official Unsecured Creditors' Comm.*
(*In re Pacific Lumber Co.*),
584 F.3d 229 (5th Cir. 2009) ...............................................18

*Central Transp. v. Roberto*
(*In re Tucker Freight Lines*),
62 B.R. 213, n.1 (Bankr. W.D. Mich. 1986) ........................15

*Gillman v. Continental Airlines*
(*In re Continental Airlines*),
203 F.3d 203 (3d Cir. 2000) ...............................................18

*In re 266 Washington Assocs.*,
141 B.R. 275 (Bankr. E.D.N.Y. 1992) .................................16

*In re Aegean Marine Petro. Network*,
599 B.R. 717 (Bankr. S.D.N.Y 2019) ..................................13

*In re Applegate Prop.*,
133 B.R. 827 (Bankr. W.D. Tex. 1991) ................................12

*In re Arrowmill Dev. Corp.*,
211 B.R. 497 (Bankr. D.N.J. 1997).......................................19

*In re Bankston*,
2010 Bankr. LEXIS 854, at *35 (Bankr. W.D. La. Jan. 15, 2010).........................17

*In re Bashas' Inc.*,
437 B.R. 874 (Bankr. D. Ariz. 2010).......................................4

*In re Bigler LP*,
442 B.R. 537 (Bankr. S.D. Tex. 2010).................................17

*In re Claremont Towers Co.*,
175 B.R. 157 (Bankr. D.N.J. 1994)......................................16

*In re Congoleum Corp.*,
362 B.R. 167 (Bankr. D.N.J. 2007).......................................19

*In re Cypresswood Land Partners, I*,
409 B.R. 396 (Bankr. S.D. Tex. 2009)..................................17

*In re D & W Realty Corp.*,
165 B.R. 127 (S.D.N.Y. 1994)............................................16

*In re Digital Impact, Inc.*,
223 B.R. 1 (Bankr. N.D. Okla. 1998)....................................19

*In re Emerge Energy Serv.*,
2019 Bankr. LEXIS 3717, at *53 (Bankr. D. Del. Dec. 5, 2019)............................18

*In re Genesis Health Ventures, Inc.*,
   266 B.R. 591 (Bankr. D. Del. 2001) .................................................................18

*In re Great Bay Hotel & Casino, Inc.*,
   251 B.R. 213 (Bankr. D.N.J. 2000) ....................................................................4

*In re Idearc, Inc.*,
   423 B.R. 138 (Bankr. N.D. Tex. 2009) ..............................................................17

*In re Johns-Manville Corp.*,
   68 B.R. 618 (Bankr. S.D.N.Y. 1986) .................................................................17

*In re Orawsky*,
   387 B.R. 128 (Bankr. E.D. Pa. 2008)................................................................17

*In re Quigley Co.*,
   437 B.R. 102 (Bankr. S.D.N.Y. 2010) ................................................................4

*In re Sis Corp.*,
   120 B.R. 93 (Bankr. N.D. Ohio 1990) ...............................................................17

*In re Sullivan*,
   26 B.R. 677 (Bankr. W.D.N.Y. 1982)................................................................16

*In re Tenn-FLA Partners*,
   1993 Bankr. LEXIS 789, at *2 (Bankr. W.D. Tenn. Apr. 29, 1993) ......................15

*In re Washington Assocs.*
   147 B.R. 827 (E.D.N.Y. 1992) ..........................................................................16

*Kane v. Johns-Manville* Corp.
   843 F.2d 636 (2d Cir. 1988) ............................................................................17

*Kunica v. St. Jean Fin., Inc.*,
   233 B.R. 46 (S.D.N.Y. 1999) ...........................................................................11

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
   848 F.2d 414 (3d Cir. 2013) ............................................................................11

*Orange Cty. Water District v. Fairchild Corp.*
   *(In re Fairchild Corp.*),
   2014 U.S. Dist. LEXIS 174022, at *7 (D. Del. Dec. 17, 2014)............................17

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
   81 F.3d 355 (3d Cir. 1996) ..............................................................................11

*Tex. Extrusion Corp. v. Lockheed Corp.*
   *(In re Tex. Extrusion)*,
   844 F.2d 1142 (5th Cir. 1988) ..........................................................................11

*U.S. Bank Nat'l Assoc. v. Wilmington Trust Co.*
   *(In re Spansion, Inc.)*,
   426 B.R. 114 (Bankr. D. Del. 2010) ..................................................................18

**STATUTES**

11 U.S.C § 1129....................................................................................................................4, 15

**OTHER AUTHORITIES**

5 Lawrence P. King, COLLIER ON BANKRUPTCY ¶ 1125.03 (15th ed. 1992)...............................11

H. Rep. No. 595, 95th Cong., 1st Sess. pp. 413 to 418 (1977)....................................................17

**RULES**

Fed. R. Bankr. P. 3017(d)..........................................................................................................15

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of the above-captioned debtors and debtors in possession (the "<u>Debtors</u>") files this objection (the "<u>Objection</u>") to (I) the adequacy of the *Combined Disclosure Statement and Joint Chapter 11 Plan of Azzur Group Holdings LLC and Its Affiliated Debtors* [Docket No. 85] and (II) the Debtors' motion for approval of the Combined Disclosure Statement and Plan on an interim basis, establishing certain solicitation and tabulation procedures, approving the forms of ballots and solicitation packages, scheduling a combined hearing for final approval of disclosures and Plan confirmation, and granting related relief [Docket No. 86] ("<u>DS/Solicitation Motion</u>").[3]    In support of this Objection, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      The Debtors, as pressed by the Lender, have proposed a placeholder Plan and Disclosure Statement with currently only a blank for the projected percentage recovery of general unsecured creditors, and no liquidation and plan recovery analysis attached.  Under the Debtors' proposed Plan, general unsecured creditors appear unlikely to receive any distribution after the payment of all senior claims (the current proposed Plan treatment).  The Plan also proposes blanket third-party releases without any exceptions for fraud and willful misconduct. The third-party releases also purport to bind all unsecured creditors who vote for the Plan and

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Combined Disclosure Statement and Plan and, as applicable, the DS/Solicitation Motion.

contain no opt-out mechanism.[4]  The beneficiaries of these gratuitous releases include the Lender

and the Debtors' former and current officers, current and former equity holders, directors,

members, managers, and other insiders, as well as a laundry list of individuals and entities

broadly included as Related Parties, notwithstanding the Committee's ongoing investigation of

potential estate claims and causes of action against insiders and M&T.

       2.    For purposes of the immediate matter of interim approval of the

Disclosure Statement, the Disclosure Statement contains insufficient, incomplete, and misleading

information that makes it impossible for creditors to make an informed decision to vote on the

Plan or knowledgeably "consent" to the broad Releases, including Third-Party Releases (as

defined below).  Among other deficiencies, the Disclosure Statement fails to:

      (i)    identify and discuss the estates' unencumbered assets, the value of which should go to unsecured creditors;

      (ii)    explain the risks of the feasibility of the Plan, including any risks related to a sale of the Debtors' assets and the postconfirmation funding of the liquidation of the estates' remaining assets; and

      (iii)    explain the scope of the Debtor Release and Third-Party Releases, including any potential estate causes of action and the value thereof, the specific consideration being provided by the Released Parties (including former insiders) for the releases, and the Debtors' investigative process in examining the propriety of all such releases.

       3.    In summary, the flawed Plan and sale process are being unjustifiably

accelerated here by the Debtors for the benefit of both the Lender, whose liens and claims are

---

[4] As discussed herein, this Court recently approved the use of an opt-out mechanism in the pending *True Value* chapter 11 case (i.e., a creditor voting for the plan would be a releasing party, provided the creditor had the ability to opt out of the third-party release). Counsel for the Debtors and Committee have discussed the Committee's opposition to the Plan and Disclosure Statement and have exchanged views on a potential resolution of some (but not all) of the objections raised herein, including the submission of a Committee letter with the solicitation materials recommending that general unsecured creditors vote to reject the Plan, and revisions to the ballots to provide for an "opt out" mechanism for accepting creditors consistent with the *True Value* decision.  However, subject to final agreement and appropriate documentation resolving the Committee's disputed issues, the Committee reserves all of its rights, arguments and remedies with respect to any conditional approval of the Disclosure Statement and confirmation of the Plan.

currently being investigated by the Committee, as well as the Debtors' former and current insiders, who should also be investigated prior to obtaining the gratuitous releases provided to them under the Plan.

4.      Importantly, the Bankruptcy Code does not permit the Lender and Debtors to steamroll over unsecured creditors.  The Lender cannot, through the Plan under which general unsecured creditors will likely get no recovery, (a) take (or release) unencumbered estate assets (including potentially D&O and other commercial claims, leased property interests, and avoidance actions against insiders), the value of which should properly go to unsecured creditors, or (b) obtain blanket releases for the Lender, insiders and other third parties for no value to the general unsecured creditors.  As such, the Plan violates the best-interest-of-creditors test.  Value attributable to unencumbered assets belong to general unsecured creditors (subject to any limited rights of the DIP Lender).[5]  In a hypothetical chapter 7 case, a trustee could pursue those unencumbered assets (some of which may be covered by Debtors' insurance policies), the proceeds of which could pay unsecured creditors.  Reasonably assuming unsecured creditors would at least get $1 from the unencumbered assets, they would do better in a liquidation than under the Plan.

5.      Moreover, subject to any future clarification by the Debtors, the Plan cannot be confirmed because it contains an improper classification scheme that unfairly discriminates against general unsecured creditors.  The Debtors and Lender do not expressly explain in the Plan (as filed) in which Class M&T's deficiency claim (if any) is placed for voting purposes. M&T's class (Class 3 M&T Claims) appears to include *all claims* related to the M&T

---

[5] The Committee also objects to the final approval of the Debtors' proposed DIP financing by M&T, as set forth in the *Objection of the Official Committee of Unsecured Creditors to Motion of Debtors and Debtors in Possession for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Claims, and (C) Grant Adequate Protection, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing and (IV) Related Relief* (the "DIP Objection")

prepetition loan obligations, including presumably any deficiency claim.[6]    Assuming the Lender's secured and deficiency claims are all in a single class (Class 3), the Debtors' classification structure impermissibly places substantially dissimilar claims (the secured and the unsecured deficiency claims of the Lender) in one class.[7]  This results in the Lender's deficiency claim being treated better and receiving significantly more consideration than other general unsecured claims in Class 4 (General Unsecured Claims). Such unfair discrimination and disparate treatment preclude confirmation of the current Plan.

6.    In short, the chapter 11 process is not intended to unfairly benefit a debtor's secured lenders and insiders and it cannot deprive other creditors and parties in interest of their due value entitlements, reallocate such entitlements to the lenders or other favored stakeholders, and otherwise over-compensate preferred parties.[8]    Accordingly, the DS/Solicitation Motion should be denied by the Court.

## BACKGROUND

### A.    General Background

7.    On March 2, 2025 (the "Petition Date"), each Debtor filed a voluntary petition with this Court under the Bankruptcy Code.

---

[6] "M&T Claim" is defined in the Plan (at 10) as "any Claim of M&T arising under, derived from, secured by, or based on the M&T Credit Documents or any DIP Order.  For the avoidance of doubt, the M&T Claim shall include contingent, unliquidated indemnification obligations."

[7] The Committee's objection on this issue is based on the current version of the Plan.  The Debtors have since communicated that they will clarify that M&T's deficiency claim should be classified as a Class 4 general unsecured claims. The Committee reserves all rights to object to the revised treatment of M&T's deficiency claim when it reviews the Debtors' changes to any filed Plan.

[8] *See generally In re Quigley Co.,* 437 B.R. 102, 131 (Bankr. S.D.N.Y. 2010) (plan process benefitting certain preferred creditors to the detriment of others not proposed in "good faith"); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 240 (Bankr. D.N.J. 2000) ("Of course, the classification and treatment of classes of claims is always subject to the good faith requirements under § 1129(a)(3)."); *In re Bashas' Inc.*, 437 B.R. 874, 909 (Bankr. D. Ariz. 2010) ("Good faith is an inherent requirement which runs throughout the entire Bankruptcy Code. Because the bankruptcy court is a court of equity, as well as a court of law, and because of the fluidity of bankruptcy proceedings, equity demands a constant balancing of the competing needs of the various constituencies. It is essential that bankruptcy proceedings be transparent, candid and always operate in that spirit.")*.*

8.    The Debtors have continued in possession of their property and are operating and managing their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 cases.

9.    On March 14, 2025, the Office of the United States Trustee for Region 3 appointed the Committee.  On or about March 19, 2025, the Committee engaged as its counsel Pachulski Stang Ziehl & Jones LLP and Huron Consulting Group as its financial advisor.

**B.    Debtors' Separate, Parallel Sale Process**

10.    The day after the bankruptcy filing, on March 3, 2025, the Debtors filed a motion for approval of certain bidding procedures and other relief (the "Sale Motion") [Docket No. 13] relating to the sale of the Debtors' assets to third-party purchasers—specifically the sale of the Debtors' consulting business and related assets to the stalking horse purchaser Eliquent Life Sciences Inc. for $56 million plus assumption of certain liabilities (or other successful overbidder), and potentially the Debtors' COD business to another stalking horse purchaser or bidder.

11.    The Committee has several concerns relating to the parallel sale process being implemented by the Debtors.  Among other things, the Debtors are attempting to sell their remaining assets on an expedited timeline for the sole benefit of the Lender with no expected recovery for general unsecured creditors.[9]

---

[9] The Committee is reviewing the Sale Motion and, absent a consensual resolution of the Committee's issues, expects to file an opposition to that motion.

C.      **Debtors' Combined Plan and Disclosure Statement**[10]

12.     On March 7, 2025, the Debtors filed the Combined Disclosure Statement and Plan [Docket No. 85] and the DS/Solicitation Motion [Docket No. 86].  The DS/Solicitation Motion seeks preliminary conditional approval of the Disclosure Statement and a combined hearing on final approval of the adequacy of the Disclosure Statement and the hearing to confirm the Plan.

13.     The Combined Disclosure Statement and Plan is a placeholder in key respects because information on creditor recoveries and other terms is missing or bracketed.  The projected recovery for Class 4 (General Unsecured Claims) is not yet disclosed in the Disclosure Statement.

○ ***DIP Claims:*** To be the extent not previously indefeasibly paid upon the consummation of a Sale Transaction pursuant to a Sale Order, indefeasible payment in full of its Pro Rata share of the Net Sale Proceeds (subject to the Carve Out), to be applied in accordance with the terms of the applicable Sale Order(s), DIP Orders, and/or the other DIP Documents.  If the Stalking Horse APA Transaction closes before confirmation or consummation of the Plan, M&T would be entitled to receive such proceeds as set forth under the applicable Sale Order(s) and DIP Orders; and any payment of Net Sale Proceeds to the DIP Lender prior to the Effective Date will be deemed indefeasible and not subject to

---

[10] For sake of brevity, the description of the Plan set forth herein only relates to those provisions of the Plan relevant to this Objection.

challenge, avoidance, or disgorgement unless otherwise provided in the DIP Orders or the Plan.[11]

○ **_Class 3 M&T Claims:_** To be paid proceeds of stalking horse sale and/or any other sale transactions, net residual asset proceeds, its collateral, or other treatment as agreed to by the Debtors and M&T.[12]

○ **_Class 4 General Unsecured Claims:_** To be provided a pro rata share of the General Unsecured Claims Recovery, if any (essentially any remaining value, if any, after payment of all secured, administrative, priority or other senior claims). Further, if the creditor votes to accept the Plan, it will be deemed a Releasing Party with no ability to opt out of the Third-Party Releases.

14.     Under the Plan, in lieu of a liquidating trustee and a liquidating trust, a "Plan Administrator" will be appointed by the Debtors to implement and take all actions on behalf of the estates under the Plan on and after the Effective Date, in liquidating the estates' remaining assets, making distributions to creditors, and winding down the chapter 11 cases. The Committee is afforded no role in the selection of a Plan Administrator or the structure of the Plan.

15.     With no likely recovery for general unsecured creditors, the raison d'etre of the Debtors' liquidating Plan is to effectuate a blanket Debtor release of estate claims and causes of action against M&T, former and current insiders, and other third parties (Plan § 8.3) ("Debtor Release") and blanket "consensual" releases by the Releasing Parties (including general

---

[11] Particularly given the compressed timing of relevant events, the Committee's ongoing investigation of certain matters, and the not-yet-lapsed challenge period for the Committee, the Committee objects to any attempt (current or subsequent) by the Debtors to obtain de facto releases for the Lender through Plan provisions other than the Release Provisions, including, without limitation, Plan provisions that payments made to the Lender are indefeasible, absolute or otherwise final, and the like. In the event any payment to the Lender is authorized, it must be subject to disgorgement in the event of successful prosecution of claims by the Committee.

[12] _See_ discussion herein regarding whether M&T deficiency claim is included in Class 3.

unsecured creditors who vote for the Plan and have no option to opt out of the release)[13] in favor

of M&T, former and current insiders, and other third parties (Plan § 8.4) ("Third-Party

Releases"), together with a permanent Plan injunction to enforce the Debtor Release and Third-

Party Releases (Plan § 8.7) ("Plan Injunction"), and a broad exculpation provision covering the

Debtors, the Post-Effective Date Debtor and former and current directors, officers, managers,

members and other related third parties (Plan § 8.5)[14] ("Exculpation" and together with the

Debtor Release, the Third-Party Releases, and the Plan Injunction, the "Releases" or "Release

Provisions").  Notably, the Debtor Release and Third-Party Releases do not even exclude claims

or causes of action for fraud, willful misconduct, or gross negligence by the Released Party—

typical carveouts routinely required by bankruptcy courts for obvious policy reasons. In all

events, as discussed further herein, any Release approved by the Court should include at a

minimum such typical exclusions.  The Plan's purported exculpation of Exculpated Parties for

*prepetition* claims and Causes of Action also makes the Plan patently unconfirmable.[15]

Similarly, the Debtors also purport to exculpate the "Post Effective Date Debtor" even though

the Plan limits exculpation to acts arising prior to the Effective Date.  Any exculpation of the

Post Effective Date Debtor for acts occurring after the Effective Date, as well as the Plan's

attempt to exculpate parties from prepetition acts, is not appropriate.

---

[13] The Releasing Parties are "(a) the Debtors and the Post-Effective Date Debtor; (b) each Holder of a Claim or Interest that (x) votes to accept the Plan, or (y) either (I) abstains from voting on the Plan or (II) is deemed to accept or reject the Plan and, in the case of either (I) or (II), affirmatively opts in to the voluntary release contained in Section 8.4 hereof by checking the opt in box on the ballot or notice, and returning it in accordance with the instructions set forth thereon, indicating that they opt in to grant the releases provided in the Plan; and (c) the Related Parties of the foregoing but only to the extent such Related Party would be obligated to release under principles of agency if it were so directed by the applicable Person or Entity in clauses (a) through (b); *provided, however*, that notwithstanding the foregoing, M&T shall not be deemed a "Releasing Party" under the Plan and shall benefit only from releases by the Debtors."  (Combined Disclosure Statement and Plan at 13-14.)

[14] The Exculpated Parties under the Plan (at 8) are "(a) the Debtors and the Post-Effective Date Debtor, (b) the Committee, (c) the Related Parties of each of the foregoing in each case as to the Persons and entities in this clause (c) to the extent such Person or Entity is a fiduciary of any of the Estates (including, without limitation, as an officer or director of the Debtors or the Plan Administrator)."

[15] Plan, § 8.5, p.50.

**D.       The Committee's Investigation**

16.      The Committee retained its proposed counsel, Pachulski Stang Ziehl & Jones LLP, and financial advisor just over two weeks ago, but has expeditiously begun its investigation of the secured status and claims of the Lender, any and all Unencumbered Assets (discussed further below), as well as identifying any potential causes of action owned by the Debtors against M&T, insiders, and other third parties.

17.      Although the Committee has only recently begun its investigation, it believes that there may be valuable estate assets that are not encumbered by M&T's liens, including potentially:

(a)      any leased real estate or any fixtures located thereon to the extent not prepetition secured collateral of M&T,[16]

(b)      any D&O and commercial tort claims that are not specifically identified in the M&T prepetition credit documents,

(c)      any avoidance actions against insiders and other third parties,

(d)      all postpetition consulting contracts and the revenues generated therefrom (which constitute new postpetition assets of the Debtors' estates that are not part of M&T's prepetition collateral under Section 552(a)), and

(e)      the proceeds of the foregoing (collectively, together with any other unencumbered estate property, the "Unencumbered Assets").

18.      To date, the Committee has not had sufficient time and access to the Debtors' information to reach conclusions concerning the potential liability of the Debtors' directors, officers, managers, members, the Lender, or other third parties.   Accordingly, as

---

[16] The Debtors' leaseholds and fixtures are a particularly key component of their cleanroom business, which could yet yield material value for unsecured creditors.

discussed herein, the Debtors' proposed condensed timetable must be extended to provide the Committee with reasonable time and opportunity to vet the proposed Debtor Release and Third-Party Releases, conduct Plan and sale related discovery, and object, as necessary, to the Debtors' actions.

19.     In the Committee's view, the Plan structure here should have provided for a posteffective date liquidating trust for the benefit of general unsecured creditors into which funding sufficient for a meaningful distribution to general unsecured creditors as well as any Unencumbered Assets and retained causes of action could distributed to be liquidated, prosecuted, or settled, together with an allowance of reasonable funding for operating the trust.[17] Instead, the unsecured creditors will in all likelihood receive nothing, and no effort has been made by the Debtors to negotiate a consensual resolution of these Chapter 11 cases. The Lender is pursuing its own agenda here—and the Debtors have acquiesced—in setting up a Plan with basically nothing for general unsecured creditors. The Plan also provides for the "indefeasible" payment of the Lender's DIP Obligations,[18] even though the Committee's challenge period has not yet expired. As a preliminary matter, any payment of the Lender's prepetition claims should not occur until after the expiration of the Committee's challenge period and, if any claims are advanced by the Committee, after final determination of such claims. However, even if the Lender is somehow paid before the expiration of the challenge period or in advance of the final determination of any claims or causes of action brought by the Committee, any such payment should be subject to disgorgement and should not be indefeasibly paid until the Court's final determination of any such claims or causes of action.

---

[17] Moreover, M&T should waive its deficiency claims (if any) or any rights to distributions from the liquidating trust and the Committee should select the Plan Administrator.

[18] Plan § 2.3.

**ARGUMENT AND AUTHORITIES**

20.     The Committee requests that the Court deny interim approval of the Disclosure Statement and the DS/Solicitation Motion.   The Disclosure Statement contains inadequate information as to how to vote on the Plan (including whether to accept the proposed Plan treatment that does not properly account for Unencumbered Assets and the net proceeds thereof that should go to unsecured creditors and the Releases in favor of the Released Parties), and the Plan does not comply with applicable provisions of the Bankruptcy Code or Third Circuit law.

### I.     OBJECTIONS TO THE ADEQUACY OF THE DISCLOSURE STATEMENT AND DS/SOLICITATION MOTION

### A.     The Disclosure Statement Should Not Be Conditionally Approved Because It Does Not Contain Adequate Information.

21.     "Disclosure is the 'pivotal' concept in Chapter 11 reorganization."[19]   A disclosure statement is the primary source of information creditors and other parties in interest rely on in making informed decisions about a debtor's plan of reorganization.[20]   Full disclosure is fundamental to the proper functioning of the bankruptcy process:

> The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court.  Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of "adequate information."

*Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 417 (3d Cir. 2013).[21]

---

[19] *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999) (citing 5 Lawrence P. King, COLLIER ON BANKRUPTCY ¶ 1125.03 (15th ed. 1992)).

[20] *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion)*, 844 F.2d 1142, 1157 (5th Cir. 1988).

[21] *See also Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) ("Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated.").

22.    In determining whether a plan proponent has provided "adequate information" to creditors and parties in interest, the standard is not whether the failure to disclose information would harm creditors but whether "hypothetical reasonable investors receive such information as will enable them to evaluate for *themselves* what impact the information might have on their claims and on the outcome of the case, and to decide for themselves what course of action to take."[22]

23.    In the instant matter, the Disclosure Statement contains insufficient, incomplete, and misleading information that makes it impossible for creditors to make an informed decision to vote on the Plan or knowledgeably "consent" to the broad Releases, including Third-Party Releases (as defined earlier).  Among other deficiencies, the Disclosure Statement fails to:

(i)    include a detailed liquidation and Plan recovery analysis, comparing the potential recoveries for Class 4 general unsecured creditors under the Plan and in a hypothetical chapter 7 liquidation, and other relevant financial and valuation information—all of which information is crucial for unsecured creditors to understand how much they will recover under the Plan and whether the Plan meets the requirements for confirmation, including feasibility, the best-interest-of-creditors test, and the absolute priority rule;[23]

(ii)    identify and discuss the estates' unencumbered assets, including potential estate claims and causes of action, avoidance actions against insiders and other third parties, and leasehold and fixture interests, the value of which should go to unsecured creditors, and the potential values thereof;

(iii)    explain the risks of the feasibility of the Plan, including any and all risks concerning the contemplated parallel sale of the Debtors' assets and the postconfirmation funding of the liquidation of the estates' remaining assets (patently the proposed $500,000 Wind-Down Amount is inadequate); and

(iv)    explain the scope of the Debtor Release and Third-Party Releases, including any potential estate causes of action and the value thereof; the specific consideration being provided by the Released Parties (including former insiders) for the releases; and the

---

[22] *In re Applegate Prop.,* 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991).

[23] Specifically, in order to meet the best-interest-of-creditors test, a liquidation analysis must be provided that includes a comprehensive schedule of assets and liabilities of each of the Debtors (no substantive consolidation is proposed under the Plan).  Without that information, creditors cannot determine whether they are receiving as much as they would in a chapter 7 liquidation.

Debtors' investigative processes (prior and current) in examining the propriety of all such releases, potential estate causes of action, and material prepetition transactions.

24. As discussed herein, the Plan and sale processes are being unjustifiably accelerated in these chapter 11 cases for the benefit of the Lender—whose liens and claims are currently being investigated by the Committee—and former and current insiders and other third parties being provided gratuitous releases under the Plan. Given the automatic nature of the Third-Party Releases (in the case of Class 4 unsecured creditors who vote for the Plan) and the "presumed consent" standard this Court is being asked to apply, it is vital that the Disclosure Statement adequately set forth the basis for the Releases so creditors can make an informed decision. As one court put it: "[T]hird-party releases are not a merit badge that somebody gets in return for making a positive contribution to a restructuring. They are not a participation trophy, and they are not a gold star for doing a good job. Doing positive things in a restructuring case—even important positive things—is not enough."[24] The self-interested actions of the Released Parties in these Chapter 11 Cases, which benefit no one but themselves, cannot merit a release without some indication of the value of the claims being released and the consideration being paid, particularly given that unsecured creditors are unlikely to receive any Plan distributions.

**B.      Other Aspects of the Disclosure Statement and DS/Solicitation Motion Are Unjustified, Impermissible, or Unreasonable Under the Circumstances.**

25. Additionally, other aspects of the relief requested by the DS/Solicitation Motion are impermissible, unreasonable and/or otherwise unjustified, and should be modified accordingly:

**(1)      Unreasonably Compressed Timetable:** The Debtors' proposed solicitation/confirmation timetable is unreasonably compressed and prejudices the Committee's right and opportunity to review and object, as necessary, to the final approval of the Disclosure

---

[24] *In re Aegean Marine Petro. Network*, 599 B.R. 717, 726-727 (Bankr. S.D.N.Y 2019).

Statement and confirmation of the Plan. Further, without a reasonable extension of the timetable, as a practical matter, many general unsecured creditors will have two weeks or less to review the Combined Disclosure Statement and Plan and vote on the Plan. The Debtors' proposed scheduling in the DS/Solicitation Motion, including a solicitation launch of April 10,[25] a voting/objection deadline of April 24, and a combined hearing date of May 1, 2025, must be extended out for several additional weeks to enable the Committee to conduct meaningful Plan and confirmation related discovery including investigation of potential estate claims and other Unencumbered Assets. [26]

(2)   **Claims Bar Date:** Because the general claims bar date of April 30, 2025 is beyond the currently-proposed Voting Record Date of April 10, 2025, the order should provide that the Debtors will promptly serve (by email and/or overnight mail) the applicable solicitation package/notices upon creditors filing a proof of claim after the Voting Record Date prior to the Voting Deadline (currently proposed to be April 24, 2025). Otherwise, potentially many general unsecured creditors timely filing their claims by the general claims bar date will be unjustifiably disenfranchised.[27] Indeed, while the Committee is mindful that expediting the plan process may be in the best interest of creditors in some cases, reasonable, sufficient notice and due process must be provided to creditors in all events. If, for example, a creditor with an unsecured claim properly and timely files a proof of claim on April 21 and gets email service of the solicitation package by the next day, that creditor will only have two days to review the Combined Disclosure Statement and Plan and cast its ballot under the proposed schedule.

(3)   **Ballots–Debtors List:** Given the circumstances, including that there are thirty-three Debtors, the Debtors should provide a chart of all Debtors on the Class 4 ballots, and the voting creditor would check the applicable Debtor (against whom the Class 4 claim is asserted), in order to minimize confusion and facilitate vote tabulation and processing on a Debtor-by-Debtor basis.

(4)   **Nonmaterial Changes:** The proposed Tabulation Procedures [Docket No. 86, Ex. 1] provide: "II. To the extent necessary, the Debtors may modify, in any non-material manner, these Tabulation Procedures without further Bankruptcy Court order." At a minimum, the Debtors should provide prior notice to the Committee of such modifications, which should be specifically included in the voting report to be filed.

(5)   **Committee Letter:** If the Court does conditionally approve the Disclosure Statement, the Committee should be able to include a separate letter in the solicitation package (the "Committee Letter") expressing the Committee's views regarding the Debtors' proposed Plan. The Committee will provide a form of the Committee Letter which will be

---

[25] While the Debtors have communicated that they are going to propose a revised confirmation schedule, the Committee reserves all rights to object any revised schedule.

[26] *See Order (I) Establishing Deadlines for Filing Proofs of Claim, Including Section 503(b)(9) Claims and (II) Approving* the *Form and Manner of Notice Thereof, and (III) Granting Related Relief* [Docket No. 179].

[27] Among other information regarding creditors who file proofs of claim after the Voting Record Date, the Debtors' voting report should identify any untimely ballots submitted by creditors who filed proofs of claim after the Voting Record Date and the dates such creditors had been served with solicitation packages.

presented to the Court prior to or at the hearing on conditional approval of the Disclosure Statement.[28]

26.     Based on all of the foregoing, the Disclosure Statement should not be conditionally approved and the other objectionable procedures and other provisions of the DS/Solicitation Motion should be appropriately modified or otherwise rejected by the Court.

## II.    THE PLAN IS UNCONFIRMABLE

27.     The Plan is unconfirmable and thus it serves no purpose at this stage in conditionally approving the Disclosure Statement and related solicitation and confirmation procedures (the "DS/Solicitation Procedures").   The following is a brief summary of the Committee's preliminary objections to the Plan:

a.     **The Plan violates the best-interest-of creditors-test set out in section 1129(a)(7) of the Bankruptcy Code.**[29]   Unencumbered Assets and their value

---

[28] Bankruptcy Rule 3017(d) specifies the materials to be distributed to holders of allowed claims and equity interests upon approval of a disclosure statement, including the court-approved plan and disclosure statement and notice of the time within which acceptances and rejections of the plan may be filed.  Fed. R. Bankr. P. 3017(d).  Bankruptcy Rule 3017(d)(4) further provides that "any other information as the court may direct" may be included in the materials distributed to creditors and equity holders.  *Id*.; *see also In re Tenn-FLA Partners*, 1993 Bankr. LEXIS 789, at *2 (Bankr. W.D. Tenn. Apr. 29, 1993) ("[Rule] 3017(d)(4) . . . provides for much discretion as to what other information the court may deem appropriate to send out with the disclosure statement.")  This information may include, and in many complex chapter 11 cases have included, a letter by an official committee recommending that creditors vote to reject or accept a plan.  *See, e.g.,* Disclosure Statement for the Debtors' Proposed Second Amended Joint Plan, *In re JHT Holdings, Inc.,* No. 08-11267 (BLS) (Bankr. D. Del. Aug. 29, 2008), ECF No. 302 (disclosure statement included recommendation by creditors' committee summarizing concerns and urging creditors to reject the plan in bold, all capital letters); *Central Transp. v. Roberto* (*In re Tucker Freight Lines*), 62 B.R. 213, 215 n.1 (Bankr. W.D. Mich. 1986) (permitting a creditors' committee objecting to a disclosure statement to include in the ballot package a letter recommending that creditors vote against acceptance of the plan); Order Approving Proposed Disclosure Statement, *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Jan. 5, 2018), ECF No. 1639 (authorizing debtors to send letters from committees to creditors in voting classes); Order Approving Disclosure Statement, *In re Number Holdings, Inc*., No. 24-10719 (JKS) (Bankr. D. Del. Dec. 20, 2024), ECF No. 1612 (requiring inclusion of letter from creditors' committee regarding plan).  The Committee urges the Court to require the Debtors to include the Committee Letter as part of the solicitation packages.

[29] Section 1129(a)(7) provides as follows:
    (a)  The court shall confirm a plan *only* if *all* of the following requirements are met:
        (7)  With respect to each impaired class of claims or interests –
            (A)  each holder of a claim or interest of such class –
                (i)  has accepted the plan; or
                (ii)  will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; . . . .
11 U.S.C § 1129(a)(7) (emphasis added).

are either being allocated to the Lender under the Plan or, in the case of certain causes of action against former and current officers, directors, members, managers, and other insiders, gratuitously released.  In a hypothetical chapter 7 case, a trustee could pursue those Unencumbered Assets (some of which may be covered by insurance), the proceeds of which could pay unsecured creditors.  If monetization of the Unencumbered Assets yields even one cent on the dollar to unsecured creditors, they would indisputably do better in a liquidation than under the Plan, which does not provide the value of any Unencumbered Assets to unsecured creditors.[30]  Moreover, and as more fully explained in the DIP Objection, in a chapter 7 liquidation, a trustee would likely argue that the postpetition labor of the Debtors' employees and newly created assets derived therefrom (including the postpetition consulting contracts and revenues) constitute after-acquired estate property that is not subject to the Lender's lien pursuant to Bankruptcy Code section 552(a).

> b.     **The Plan cannot be confirmed because it contains an improper classification scheme that unfairly discriminates against general unsecured creditors.**  The Debtors and the Lender do not expressly explain in the filed version of the Plan in which class M&T's deficiency claim is placed.  The Lender's class (Class 3 M&T Claims) appears to include all claims related to the M&T prepetition loan obligations, including presumably any deficiency claim.[31]  Assuming the Lender's secured and deficiency claims are all in a single class (Class 3), the Debtors' classification structure impermissibly places substantially dissimilar claims (the secured and the unsecured deficiency claims of M&T) in one class.[32]  This results in M&T's deficiency claim being treated better and receiving significantly more consideration than other general unsecured claims in Class 4 (General Unsecured Claims).  This is because under the Plan, the Lender is not only getting all the proceeds from the sale of its collateral, it is getting the proceeds of the postconfirmation winddown.  Such unfair

---

[30] A fundamental question for the Court and creditors is whether the Lender may receive under the Plan more value than it is entitled to under the Bankruptcy Code and applicable state law (e.g., the Uniform Commercial Code) at the expense of unsecured creditors.  However, pending the Committee's preliminary expedited investigation of the Lender's and other third parties' asserted secured claims and liens, suspect prepetition transactions and actions, and other case matters, undue value may be provided to the Lender and/or effectively released and waived by the estates under the Debtor Release for no consideration.

[31] "M&T Claim" is defined in the Plan (at 10) as "any Claim of M&T arising under, derived from, secured by, or based on the M&T Credit Documents or any DIP Order. For the avoidance of doubt, the M&T Claim shall include contingent, unliquidated indemnification obligations."  While there are certain other Plan references that may suggest any M&T deficiency claim is in Class 4 with other General Unsecured Claims for voting purposes, the all-encompassing definition of M&T Claim makes this matter unclear. Notably, in all events, if M&T were to seek to vote any deficiency claim, M&T must prove the amount of any such claim for voting purposes (either in Class 3 or 4).  The Committee reserves all its rights with respect to the foregoing.

[32] *See, e.g., In re D & W Realty Corp.*, 165 B.R. 127, 129 (S.D.N.Y. 1994) (mortgagee's secured claim and unsecured deficiency claim cannot be classified in same class because "a secured claim and an unsecured claim, even those of the same creditor, are about as dissimilar as two claims can be"); *In re 266 Washington Assocs.*, 141 B.R. 275, 285 (Bankr. E.D.N.Y. 1992), *aff'd sub nom. In re Washington Assocs.*, 147 B.R. 827, 828 (E.D.N.Y. 1992) (plan impermissibly classified mortgagee's secured claim and unsecured deficiency claim in one class); *In re Claremont Towers Co.*, 175 B.R. 157, 167-68 (Bankr. D.N.J. 1994) (secured claim must be in separate class); *In re Sullivan*, 26 B.R. 677, 678 (Bankr. W.D.N.Y. 1982) (classification of secured claim and unsecured priority claim in same class was improper).

discrimination and disparate treatment preclude confirmation of the Plan.[33]

   c. **The purported Rule 9019/Section 1123 Plan Settlement is unsupported and should not be approved.** The Plan (§§ 8.1, 8.4) recites in boilerplate fashion that confirmation of the Plan will constitute the Court's approval of a compromise and settlement under Bankruptcy Rule 9019 and Bankruptcy Code section 1123. This purported Plan Settlement, including the Third-Party Releases, are unsupportable under Rule 9019 and applicable Third Circuit law.

   d. **The Plan improperly discharges the liquidating Debtors in violation of section 1141 of the Bankruptcy Code.** The Plan fails to comply with section 1141(d)(3) because the Plan Injunction provision (§ 8.7) effectively function as a discharge of the Debtors. Section 1141(d)(3) makes clear that a liquidating corporate debtor—as in these Chapter 11 cases where the Plan implements a winddown—is not entitled to a discharge in bankruptcy.[34]

   e. **The Releases—both the Debtor Release and the Third-Party Releases—are improper and do not comply with applicable law.** In all events, the scope of the Debtor Release and Third-Party Releases (who the Released Parties are and what the released claims are) should remain subject to the Committee's investigations. Further, the so-called "consensual" Third-Party Releases, which do not even have the typical exceptions for fraud, willful misconduct and gross negligence, are neither consensual nor permissible. The Releases are not in exchange for any consideration and

---

[33] *See, e.g., In re Bankston*, 2010 Bankr. LEXIS 854, at \*35 (Bankr. W.D. La. Jan. 15, 2010) ("an unsecured deficiency claim may be classified separately from trade vendors, but that separate classification does not authorize different treatment. *See* H. Rep. No. 595, 95th Cong., 1st Sess. pp. 413 to 418 (1977)"); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (plan proponent "may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes"), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville* Corp. 843 F.2d 636 (2d Cir. 1988). The burden is on the Debtors to prove that the Plan does not discriminate unfairly. *In re Idearc, Inc*., 423 B.R. 138, 171 (Bankr. N.D. Tex. 2009) ("At a minimum, however, the unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so."); *In re Cypresswood Land Partners, I*, 409 B.R. 396 (Bankr. S.D. Tex. 2009) ("'The concept of unfair discrimination was designed to maintain equity among creditors of equal priority.'") (quoting *In re Orawsky*, 387 B.R. 128, 141 (Bankr. E.D. Pa. 2008)).

[34] *See, e.g., In re Bigler LP*, 442 B.R. 537, 545–46 (Bankr. S.D. Tex. 2010) ("An injunction preventing the post-confirmation prosecution of claims would certainly operate as a discharge of the [d]ebtors. . . . For the same reasons, actions against property of the Estate may not be enjoined after the confirmation of a liquidating plan."); *In re Sis Corp*., 120 B.R. 93, 96 (Bankr. N.D. Ohio 1990) (language limiting a debtor's liability is impermissible in a liquidating plan because the language would effectively "provide the [d]ebtors with a discharge on those specific obligations which are not otherwise treated in the Plan. Such an effort is contrary to the letter and intent of § 1141(d)(3) of the Code"); *Orange Cty. Water District v. Fairchild Corp. (In re Fairchild Corp.)*, 2014 U.S. Dist. LEXIS 174022, at \*7 (D. Del. Dec. 17, 2014) (confirmation of a liquidating plan denies a discharge and dissolves the automatic stay). The Committee notes that while the current Plan definition of Exculpated Parties appears to nominally limit its scope to fiduciaries of the estates, the Committee reserves the right to further object to the scope of the Exculpated Parties, especially pending the Committee's investigation of potential estate claims and causes of action.

are not necessary for confirmation of the liquidating Plan.[35]  Indeed, as to both types of Releases, exactly what claims and causes of action being gratuitously released are not even specifically identified.  The Third-Party Releases are not consensual where the general unsecured creditor voting for the Plan, who thus is automatically a Releasing Party, will likely get no distribution under the Plan, and the risks of "[c]arelessness, inattentiveness, or mistake" by the creditor are unacceptably high.[36]

> f.    **The Releases impermissibly purport to release former directors, officers, and a litany of "Related Parties" for no consideration.**  In addition to the lack of any articulated consideration to justify the proposed Releases (and the other infirmities identified with respect to the Releases), the Plan also purports to release "*former* directors, members, managers, officers, limited parties, general partners and equity holders (regardless of whether such interest are held directly or indirectly), predecessors, successors, and assignors." (§ 1.99 at 13).  There is no justification to confer Releases on any of the Debtors' former directors, officers, or their Related Parties. These former individuals are not providing any contribution to the Debtors' postpetition sale and restructuring efforts and they should be removed from the definition of "Related Parties." Similarly, equity security holders have not provided any consideration to justify their proposed inclusion as "Related Parties" and are therefore not entitled to the benefit of the Releases. Thus, equity holders should also be deleted from the list of "Related Parties."

> g.    **The Plan must be shown to be feasible.**  As discussed herein, pending case developments—including the sale process—there are concerns that the chapter 11 cases may become administratively insolvent, that a Sale Transaction with commensurate value may not be approved or consummated, and that there may be insufficient funds allocated (currently $500,000) for the postconfirmation liquidation of the estates' remaining assets. Pending the Committee's Plan-related discovery and investigation, the Plan, as presently formulated, is insufficient.

---

[35] The actions of the Debtors and certain Released Parties in proposing a plan and working on the Chapter 11 cases are insufficient to constitute sufficient consideration for the Releases.  Courts have indicated that "facilitating" the Debtors' restructuring does not constitute consideration for a release.  *See, e.g., Bank of New York Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 252-253 (5th Cir. 2009) (exculpation clause designed to absolve the released parties, including the non-debtor plan proponent, from any negligent conduct that occurred during the course of the bankruptcy not permissible); *U.S. Bank Nat'l Assoc. v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 145 (Bankr. D. Del. 2010) ("While I have little doubt that many of the Debtor Releasees undertook substantial (and certainly sometimes exhausting) efforts to formulate and negotiate the current (and former) Plans, I do not believe that those contributions rise to the level of the critical financial contribution contemplated in *Continental* and *Genesis* that is needed to obtain approval of non-consensual releases."); *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 215 (3d Cir. 2000) ("[W]e have found no evidence that the non-debtor D&Os provided a critical financial contribution to the Continental Debtors' plan that was necessary to make the plan feasible in exchange for receiving a release . . . ."); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 606-07 (Bankr. D. Del. 2001) ("[T]here is no showing that the individual releasees have made a substantial contribution of assets to the reorganization.  As in *Zenith*, the officers and directors of the debtors no doubt made meaningful contribution to the reorganization by designing and implementing the operational restructuring of the companies, and negotiating the financial restructuring with parties in interest. However, the officers, directors and employees have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of "assets" to the reorganization.").

[36] *In re Emerge Energy Serv.*, 2019 Bankr. LEXIS 3717, at *53-55 (Bankr. D. Del. Dec. 5, 2019).

28.     With particular regard to the Third-Party Releases, the mere fact that a creditor votes for a plan is legally insufficient to deem such vote to include consent to the release of a nondebtor because the Bankruptcy Code expressly gives creditors the right to vote on a Plan that determines their claims against the Debtors—not against third parties.  There is nothing in the Bankruptcy Code that authorizes treating a vote to accept a chapter 11 plan by itself as consent to a third-party release.[37]  Further, no theory of law permits the Debtors to force creditors to waive their claims against nondebtors yet pay nothing for that waiver.  Because creditors are statutorily entitled to whatever distributions the Plan allocates them regardless of whether they opt out of the nondebtor releases, consent to the nondebtor release cannot be inferred from mere acceptance of the Debtors' Plan.  Based on the foregoing and this Court's views recently expressed in the *True Value* chapter 11 case,[38] the Plan should be revised to allow general unsecured creditors who vote for the Plan to opt out of the Third-Party Releases.

29.     In sum, the Releases here are not consensual and should not be approved without further explanation of their scope and necessity, and with coercive elements and processes removed.  Otherwise, unsecured creditors are effectively being forced to "consent" to Third-Party Releases of unknown claims in exchange for no consideration whatsoever.

## RESERVATION OF RIGHTS

30.     The Committee reserves its right in all respects to supplement this Objection at or prior to the hearing on interim approval of the Disclosure Statement and to further object to both the Disclosure Statement and the Plan.

---

[37] *See, e.g., In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) ("a consensual release cannot be based solely on a vote in favor of a plan"); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (a voluntary release arises only "because the creditor agrees" to it; "a creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings"); *In re Digital Impact, Inc.*, 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998).

[38] *See* Amended Chapter 11 Plan, *In re True Value Co.,* No. 24-12337 (KBO) (Bankr. D. Del. Mar. 31, 2025), ECF No. 1054 (amended plan with opt-out mechanism for creditors voting for plan in definition of releasing parties).

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Committee respectfully requests that the Court deny interim conditional approval of the Disclosure Statement and granting of the DS/Solicitation Motion, and grant the Committee such further relief as may be just and proper under the circumstances

Dated:  April 7, 2025        **PACHULSKI STANG ZIEHL & JONES LLP**

_/s/ Laura Davis Jones_
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (_pro hac vice_ pending)
Colin R. Robinson (DE Bar No. 5524)
Edward A. Corma (DE Bar No. 6718)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:  ljones@pszjlaw.com
           dbertenthal@pszjlaw.com
           crobinson@pszjlaw.com
           ecorma@pszjlaw.com

_Proposed Counsel to the_
_Official Committee of Unsecured Creditors_