**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>AZZUR GROUP HOLDINGS LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25–10342 (KBO)<br><br>(Jointly Administered)<br><br>**Re: Docket No. 13**<br><br>**Sale Hearing Date:**<br>**April 11, 2025, at 1:00 p.m. (ET)**<br>**Stalking Horse APA Sale Objection Deadline:**<br>**April 7, 2025 at 4:00 p.m. (ET)** |

**OBJECTION AND RESERVATION OF RIGHTS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' STALKING HORSE SALE**

The Official Committee of Unsecured Creditors (the "Committee") of Azzur Group Holdings LLC, *et al.*, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its proposed undersigned counsel, hereby files this objection and reservation of rights (the "Objection") to the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Potential Sale of the Debtors' Assets, (B) Scheduling Certain Dates With Respect Thereto, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter Into the Consulting Stalking Horse APA and Related Bid Protections, (E) Approving Procedures for Assumption and Assignment, and (F) Granting Related Relief and (II) (A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and*

[1] A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.cases.stretto.com/Azzur. The Debtors' headquarters and the mailing address for the Debtors is 330 South Warminster Road, Suite 341, Hatboro, PA 19040.

*Assignment of Contracts and Leases, and (C) Granting Related Relief* (the "Sale Motion").[2] In support of this Objection, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Debtors filed these cases utilizing a breakneck timeline to sell all their assets, remit all net sale proceeds to their secured lender, and quickly confirm a plan that gives the secured lender and the Debtors' current and former directors and officers gratuitous releases, while general unsecured creditors are strung along and ultimately left out in the cold at the end of this process. The sale proposes to leave nothing for unsecured creditors. The plan effectively proposes to give nothing to unsecured creditors as a distribution. That is not how chapter 11 cases should work.

2. Since its formation over three weeks ago and its engagement of professionals a little over two weeks ago, the Committee has actively engaged with the other key stakeholders in these cases to protect the interests of general unsecured creditors. The Committee has invested substantial effort to getting up to speed in these cases and gaining an understanding of the Debtors' business and the marketing process for the sale of the Debtors' Consulting Business to the Stalking Horse Bidder (or other Successful Bidder) and the COD Business to another potential bidder. While the Committee was able to negotiate certain concessions on the Bidding Procedures, there are still significant issues with the Debtors' sale process generally and unresolved key issues with the Stalking Horse bid.

3. The Committee continues to conduct sale-related diligence, but, as of the filing of this Objection, the Consulting Business sale to the Stalking Horse Bidder provides no value at all to unsecured creditors. The Committee does not oppose a fair, value-maximizing

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion.

sale of the Debtors' Consulting Business, but it is clear that these cases were filed with the goal of ramming through a process that will give the secured lender all the benefits but provides nothing to the Debtors' general unsecured creditors. Instead, the burden is borne solely by unsecured creditors, who provided goods and services to the company while it slid towards bankruptcy. As noted below, the Committee has several objections to the proposed Stalking Horse sale.

**BACKGROUND**

4. On March 3, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court. Since the Petition Date, the Debtors have remained in possession of their assets and have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. On March 3, 2025, the Debtors filed the Sale Motion. The Debtors scheduled the Bidding Procedures Motion for a hearing on March 24, 2025, at 9:30 a.m. (ET), which was later adjourned by agreement to March 27, 2025, at 2:00 p.m. (ET). The Sale Motion also seeks to set the Stalking Horse APA Sale Objection Deadline (i.e., the merits of the sale itself) on the same day as the Bidding Procedures Hearing.

6. On March 3, 2025, the Debtors also filed the *Motion of the Debtors and Debtors in Possession for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Claims, and (C) Grant Adequate Protection, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing and (IV) Related Relief* [Docket No. 11] (the "DIP Motion"). The DIP Motion contemplates a $23.5 million credit facility consisting over $8.5 million of new term loans and up to $15 million in creeping roll up revolving loans (the "DIP Facility") provided by Manufacturers and Traders

Trust Company ("M&T"), the Debtors' prepetition secured lender (the "Pre-Petition Lender"), plus a roll-up of the remaining obligations owed to the Pre-Petition Lender (approximately $62 million total) minus only $1 million. On March 4, 2025, the Court entered an order approving the DIP Facility on an interim basis [Docket No. 63] (the "Interim DIP Order"). Pursuant to the Interim DIP Order, the current deadline for the Committee to challenge the Pre-Petition Lender's liens and claims or to assert any other Challenges no later than: (i) 75 days after entry of the Interim DIP Order (or May 18, 2025),[3] or (ii) subject to entry of a final DIP Order, five business days prior to the closing of one or more sales of substantially all of the Debtors' assets.

7. On March 14, 2025, the Office of the United States Trustee for Region 3 appointed a seven-member Committee consisting of: (i) Barker Contracting, Inc.; (ii) Southworth-Milton Inc. d/b/a Milton-Cat International Corp.; (iii) Thomas Scientific Inc.; (iv) Shiraz Partners LP; (v) DBCI, Inc.; (vi) Controlled Contamination Services, LLC; and (vii) NESPA, Inc.[4]

8. On March 19, 2025, the Committee selected Pachulski Stang Ziehl & Jones LLP as counsel and Huron Consulting Group to serve as its financial advisor.

9. On March 28, 2025, the Court entered the Bidding Procedures Order,[5] approving the proposed sale timeline

---

3 *See* Interim DIP Order at section 4.1.

4 Docket No. 99.

5 *See Order (I) Approving Bidding Procedures in Connection With Sale of Assets of the Debtors and Related Bid Protections, (II) Approving Form and Manner of Notice, (III) Scheduling Auction and Sale Hearing, (IV) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases, and (V) Granting Related Relief* [Docket No. 177] ("Bidding Procedures Order").

# ARGUMENT

## A. The Sale Provides No Value for Unsecured Creditors

10. First, before the Court approves any sale, it most closely scrutinize the transaction to make sure it provides a benefit to the estates, rather than serving as a convenient federal foreclosure vehicle for a secured lender. A debtor's decision to sell property outside the ordinary course of business under 11 U.S.C. § 363(b) is reviewed by the court for compliance with the business judgment rule.[6] In considering whether to approve a sale of assets outside the ordinary course of business, this Court must "'consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders.'"[7]

11. In determining if the business judgment rule is satisfied, courts consider several factors including: (1) the proportionate value of the asset to the estate as a whole, (2) the amount of elapsed time since the filing, (3) the likelihood that a plan of reorganization will be proposed and confirmed in the near future, (4) the effect of the proposed disposition on future plans of reorganization, (5) the proceeds to be obtained from the disposition vis-vis any appraisals of the property, (6) which of the alternatives of use, sale or lease the proposal envisions, and (7) whether the asset is increasing or decreasing in value.[8]

---

6 *See In re G.S. Distrib.*, 331 B.R. 552, 559 (Bankr. S.D.N.Y. 2005) ("In determining whether to approve a proposed sale under this section, courts require that the sale be based upon the sound business judgment of the debtor."); *In re GSC, Inc.*, 453 B.R. 132, 169 (Bankr. S.D.N.Y. 2011) ("The Trustee's decision of what is best for the estate should be undertaken with the goal of maximizing the value of the estate.").

7 *Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 28 (S.D.N.Y.) (*quoting Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)); *see also In re Embrace Sys. Corp.*, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995) ("A sale of assets is appropriate if all provisions of § 363 are followed, the bid is fair, and the sale is in the best interests of the estate and its creditors.").

8 *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147 (D. Del. 1999) (citing *In re Lionel Corp.*, 722 F.2d at 1071); *see also In re Delaware & H.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

12. Further, the Court must scrutinize the sale proposed by the Debtors more critically than it would a normal section 363 sale because, the Debtors are proposing to sell substantially all of their remaining assets (i.e. the Consulting Business and COD Business). These sales in the aggregate dispose of the most valuable parts of the Debtors' estates without the creditor protections of the disclosure statement and plan process, and, as such, courts require that the transactions be closely scrutinized.[9]

13. In evaluating whether debtors have demonstrated a sound business purpose for a sale of assets under section 363, bankruptcy courts have held that a sound business purpose does not exist when the sale is proposed for the benefit of secured creditors if it does not benefit unsecured creditors.[10] Indeed, these courts found no sound business justification for sales that do "not create proceeds which would inure to the benefit of the unsecured creditors."[11]

14. Here, the Sale, as currently proposed, provides no value to unsecured creditors. At the closing of the Consulting Business sale or COD Business sale, under the proposed Final DIP Order net sale proceeds will be used to pay the Pre-Petition Obligations of M&T, leaving nothing behind for lower priority creditors. The Court should find that there is no sound business purpose here because the Sale to the Stalking Horse Bidder only benefits M&T – it does not benefit general unsecured creditors.

---

9 *See In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) (a sale of substantially all of a chapter 11 debtor's assets outside plan of reorganization requires careful review by the court); *see In re Channel One Commc'ns, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (citing *In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987)); *see also In re CGE Shattuck, LLC*, 254 B.R. 5, 12 (Bankr. D.N.H. 2000) ("The closer a proposed transaction gets to the heart of the reorganization process, the greater scrutiny the Court must give to the matter.").

10 *See In re Encore Healthcare Assocs.*, 312 B.R. 52 (Bankr. E.D. Pa. 2004) (applying *Lionel* standard and finding no business justification where purpose of section 363 sale was to liquidate assets for benefit of secured creditors); *In re Fremont Battery Co.*, 73 B.R. 277 (Bankr. W.D. Ohio 1987) (same); In re Silver, 338 B.R. 277, 281 (Bankr. E.D. Va. 2004).

11 *Fremont Battery*, 73 B.R. at 279.

**B. The Sale Should Not Include Chapter 5 Causes of Action Against Insiders and No Sale Should Include Claims or Causes of Action Relating to D&O Claims**

15. The Stalking Horse APA provides that the Acquired Assets includes:

> in each case to the extent primarily related to the Business or related to any Transferred Employee or Consulting Advisor, (i) all preference or avoidance claims or actions arising under the Bankruptcy Code or other applicable Law, and (ii) all other rights, claims, causes of action, rights of recovery, rights of set-off and rights of recoupment as of the Closing; provided, however, that, with respect to any Transferred Employee or Consulting Advisor, Purchaser agrees not to pursue any of the claims, rights, causes of action, and so forth referenced in the foregoing subparts (i) and (ii).

Stalking Horse APA at 1.1(j).

16. Avoidance actions belong to the Debtors' creditors, not the Debtors.[12] Avoidance powers are intended to allow a debtor-in-possession or a trustee to recover certain payments for the benefit of unsecured creditors,[13] and are designed to ensure equitable distributions of a debtor's estate.[14] Indeed, avoidance powers are intended to allow a debtor-in-possession or other party with standing to gain recoveries for the benefit of all

---

12 *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 243–47 (3d Cir. 2000) (holding that a fraudulent transfer claim belongs to creditors and not to a chapter 11 debtor-in-possession); *Official Comm. of Unsecured Creditors v. Goold Electronics Corp. (In re Goold Electronics Corp.)*, 1993 WL 408366, *3–4 (N.D. Ill. Sept. 22, 1993) (vacating lien on preference actions granted under financing order).

13 *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. Partnership IV*, 229 F.3d 245, 250 (3d Cir. 2000) (stating, "when recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors"); *Mellon Bank, N.A. v. Glick (In re Integrated Testing Prods. Corp.)*, 69 B.R. 901, 904 (D.N.J. 1987) (finding that only the trustee, acting on behalf of all creditors, has a right to recover payments made as preferences).

14 Avoidance actions are not property of a debtor's estate, but rather a construct of bankruptcy law for the benefit of unsecured creditors. *See* 5 COLLIER ON BANKRUPTCY ¶ 541.14 at n.1 ("The avoiding powers of a debtor in possession granted in chapter 5 of the [Bankruptcy] Code are not property of the estate but statutorily created powers to recover property."); *see also Frank v. Mich. State Unemployment Agency (In re Thompson Boat Co.)*, 252 F.3d 852, 854 (6th Cir. 2001) (affirming lower courts' determination that "the bankruptcy Code allows only a trustee, not debtors, to initiate a preference action to avoid certain transfers, so proceeds recovered are property of the bankruptcy estate, not the debtor."); *Cullen Ctr. Bank & Tr. v. Hensley (In re Criswell)*, 102 F.3d 1411, 1414 (5th Cir. 1997) (noting that avoidance powers under the Bankruptcy Code were created to "facilitate[e] the prime bankruptcy policy of equality of distribution among creditors of the debtor").

unsecured creditors.[15] Accordingly, bankruptcy courts often restrict a debtor's ability to pledge avoidance actions and their proceeds as collateral.[16]

17. Assets such as avoidance actions against insiders, as well as potential claims with respect to M&T as the Pre-Petition Lender, claims against D&Os, commercial tort claims, and other unencumbered causes of action should not be part of any sale.

18. In addition, the Debtors have not identified if any of the causes of action being sold also include claims related to the Consulting Business that could overlap with the COD Business and might involve the exact same potential defendant. As such, a sale of such causes of action related to the Consulting Business might inadvertently waive or impair the estates' rights with respect to any causes of action related to the COD Business.

19. Moreover, the sale timeline itself cuts off the Committee's ability to investigate, and determine the value of, potential claims against M&T and other parties because the Challenge Deadline under the propose Final DIP Order is triggered to automatically accelerate based on when the sale closing occurs. The Committee has objected to this inappropriate Challenge Deadline trigger mechanism in its separate objection to the final DIP financing.[17] When the proposed Final DIP Order provisions are combined with the expedited sale timeline, it backs the Committee into a corner where it is not able to conduct a thorough

---

15 *See Buncher Co. v. Official Comm. (In re GenFarm Ltd. Partn. IV)*, 229 F.3d 245, 250 (3d Cir. 2000).

16 *See, e.g., Gaudet v. Babin (In re Zedda)*, 103 F.3d 1195, 1203 (5th Cir. 1997) ("A trustee's avoidance powers are intended to benefit the debtor's creditors, as such powers facilitate a trustee's recovery of as much property as possible for distribution to the [unsecured] creditors."); *McFarland v. Leyh (In re Texas Gen. Petrol. Corp.)*, 52 F.3d 1330, 1335–36 (5th Cir. 1995) ("[T]he proceeds recovered in an avoidance action satisfy the claims of priority and general unsecured creditors before the debtor benefits."); *In re Excel Maritime Carriers, Ltd.*, No. 13-23060 (RDD) (Bankr. S.D.N.Y. Aug. 6, 2013), ECF No. 133 (excluding avoidance actions and proceeds thereof from scope of adequate protection liens and property that could be used to pay super-priority administrative expense claims); *United Cap. Corp. v. Sapolin Paints, Inc. (In re Sapolin Paints, Inc.)*, 11 B.R. 930, 937 (Bankr. E.D.N.Y. 1981) ("[N]either a trustee. . . nor a debtor-in-possession, can assign, sell or otherwise transfer the right to maintain a suit to avoid a preference.").

17 *See* Docket No. 341.

investigation of, inter alia, the transactions that took place prior to the Petition Date to appropriately guard against sale transaction provisions that give up estate rights for no consideration.

**C. The Sale Must be Denied Because, In Conjunction with the DIP Order, It Is a Sub Rosa Plan**

20. The sale, combined with the terms of the proposed Final DIP Order, constitute a sub rosa plan because all the sale proceeds must be immediately paid to M&T. The Interim DIP Order provides:

> 5.3. Disposition of Collateral. It shall be an Event of Default for the Debtors to seek or obtain such an order, which seeks to sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral outside the ordinary course, other than pursuant to the terms of the DIP Loan Documents or Court order, without the prior written consent of DIP Lender (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Lender). All cash proceeds generated from the sale of the Collateral shall be paid to the DIP Lender in accordance with the DIP Credit Agreement upon the closing of such sale for permanent application to the Obligations owing by Debtors to the Pre-Petition Lender and the DIP Lender, as applicable in accordance with the terms and conditions of (a) this Interim Order and (b) the DIP Credit Agreement and other DIP Loan Documents until such time as all such Obligations are Paid in Full.

Interim DIP Order at 5.3.

21. In addition, section 7.6 of the DIP Credit Agreement—attached as Exhibit A to the Interim DIP Order—provides that net sale proceeds must be applied to the Pre-Petition Obligations.

> 7.6 Repayment of Advances. Section 4 of the Pre-Petition Loan Agreement is hereby amended by adding a new Section 4.12 immediately after Section 4.11 as follows:
>
> ‘4.12 Repayment of Loans. Notwithstanding anything to the contrary contained in this Agreement or any of the other Loan Documents, any such payments or proceeds shall be applied first, to the Pre-Petition Obligations until such Pre-Petition Obligations are Paid in Full and second, to the Post-Petition Obligations until such Post-Petition Obligations are Paid in Full; provided, that, unless otherwise agreed to by Lender in its sole discretion and in accordance with the

> Financing Orders, upon the consummation of either the Consulting Business Sale Transaction or the COD Business Sale Transaction, the net proceeds of each such transaction shall be applied first to Pre-Petition Obligations consisting of the Loan Limit Line Advances until such Pre-Petition Obligations are Paid in Full (other than the Remaining Pre-Petition Obligation to the extent due and payable), second to the Pre-Petition Obligations consisting of Line Advances and then to the Supplemental Line Advances, until such Pre-Petition Obligations (other than the Remaining Pre-Petition Obligation to the extent due and payable) are Paid in Full, and third, to the Post-Petition Obligations consisting of Supplemental DIP Line Advances until such Post-Petition Obligations are Paid in Full.'

DIP Credit Agreement § 7.6.

22. In conjunction with the proposed Final DIP Order, the closing of the sale of Consulting Business requires the Debtors to immediately pay down the Pre-Petition Obligations outside of a plan. As the Supreme Court has stated, debtors in Chapter 11 are not permitted to enter into transactions that "circumvent the [Bankruptcy] Code's procedural safeguards."[18] "The reason sub rosa plans are prohibited is based on a fear that a debtor-in-possession will enter into transactions that will, in effect, 'short circuit the requirements of Chapter 11 for confirmation of a reorganization plan.'"[19]

23. Any immediate distribution of net sale proceeds at the Sale closing on account of the secured lender obligations prior to confirmation of a plan runs afoul of the fundamental principle of chapter 11 that distributions to prepetition creditors should not take place except under a confirmed plan that ensures payment of all allowed administrative expenses in full, including allowed estate professional fees.[20] Indeed, Federal Rule of Bankruptcy

---

18 *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 986 (2017).

19 *Motorola Inc. v Official Comm. (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007) (quoting *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983)). *See also In re Belk Properties, LLC*, 421 B.R. 221, 225-26 (Bankr. N.D. Miss. 2009) (rejecting as "sub rosa chapter 11 plan" proposed DIP financing that would enable the lender to obtain a controlling equity stake in the debtor).

20 *See In re Conroe Forge & Mfg. Corp.*, 82 B.R. 781, 784 (Bankr. W.D. Pa. 1988) ("The general rule is that distribution should not occur except pursuant to a confirmed plan of reorganization, absent extraordinary circumstances.") (citing *Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986)); *see also*

Procedure 3021 assumes that distribution will occur only after a plan is confirmed: "[A]fter a plan is confirmed, distribution shall be made to creditors whose claims have been allowed ..." Fed. R. Bankr. P. 3021.

24. Here, the proposed Sale, in conjunction with the proposed Final DIP Order, dictates key terms of an eventual plan of reorganization by prematurely disbursing to M&T, as Pre-Petition Lender, tens of millions proceeds of the sale to pay down the Pre-Petition Obligations. *See* Interim DIP Order § 5.3. Payment of pre-petition claims to the secured lender should not be permitted outside of a confirmed plan.

25. This is especially true where, as here, an administrative claims bar date has not yet been set in these cases.[21] Neither the Debtors, the Committee, nor this Court have any means to determine the true magnitude of administrative claims until such deadline passes. The Committee does not yet have the visibility or comfort that it needs into the size of the administrative and priority claims pool. The Committee does not have the certainty it requires to assure itself that any remaining cash on hand after the Debtors disburse millions of sale proceeds to M&T will be sufficient to satisfy all wind-down costs, other secured, administrative, and priority claims. Therefore, the Committee requests that, if the Sale is approved, no sale proceeds be paid out to the secured lender.

---

*Rosenberg Real Estate Equity Fund III v. Air Beds, Inc. (In re Air Beds, Inc.),* 92 B.R. 419, 422 (B.A.P. 9th Cir. 1988) (same).

[21] While the bar date order requires section 503(b)(9) claimants to file proofs of claim by the General Bar Date (April 30, 2025), administrative expense claims under section 503 and 507(a)(2) are expressly excluded from the bar date order. *See* Docket No. 179.

## D. The Sale Order Should be Modified

26. The Sale Order has several provisions that should be modified as noted below:

- Finding H – The parenthetical in the last sentence should be revised if there are any open cure issues that are not yet resolved.
- Finding K – The third sentence should end after "reasonably calculated to maximize value."
- Finding L – The word "substantial" should be removed.
- Finding O – The words "after extensive prepetition and postpetition marketing efforts" should be removed, and the last sentence should be removed.
- Finding V(ii) – This language should be removed as there is no evidence to support this finding.
- Finding X – This finding should include the following condition: "except as otherwise provided for in the APA or in this Sale Order."
- Finding CC – The third sentence does not comport with the adequate assurance standard. There is no basis under the Bankruptcy Code for allowing a purchaser's covenants under an APA to alone be sufficient for adequate assurance of future performance. Any purchaser should have already provided adequate assurance in the form of financial wherewithal, showing ability to perform.
- Paragraph 3 – The words "fair and equitable" should be removed and the language should just reference that the mentioned items complied with the Bankruptcy Code and Bankruptcy Rules.
- Paragraph 8 – Any amendments to the APA without a court order must first give prior written notice to the Committee before being consummated, and the Committee should be consulted beforehand.
- Paragraph 22 – The Committee should be given notice with rights to object to payment of such claims.
- Paragraph 23 – The release language is too broad and encompasses future conduct, which is not appropriate. There should also be an exclusion for any claims preserved for the estates.

**E. The Debtors' Representations in the Stalking Horse APA Are Far Too Extensive for a Bankruptcy Sale**

27. The Committee understands the need for representations in a bankruptcy sale transaction. However, the standard approach is to keep the Debtors' representations to a minimum, and the vast majority of section 363 sales in bankruptcy are qualified as "as is" sales with limited representations. Indeed, as other courts have noted, "[b]ankruptcy sales by a trustee are typically 'as is' final sales devoid of contingency clauses and walk away provisions."[22]

28. By contrast, Article III of the Stalking Horse APA creates substantial uncertainty with respect to the transaction in that it contains extensive Seller Representations (23 total representations that span 16 pages) that bear on the certainty of closing because the accuracy of such representations is a closing condition for the Stalking Horse Bidder. The more chances there are for technical foot faults through expansive representations, the greater room there is for the Stalking Horse Bidder to walk away from the deal, to the detriment of the estates and creditors.

**F. The Stalking Horse APA Termination Events Create Uncertainty and Should Be Modified**

29. The Stalking Horse APA contains termination events that are far too broad and some of which are beyond the control of any of the key stakeholders or are solely within the control of the Stalking Horse. These triggers create significant uncertainty with respect to closing the Stalking Horse sale transaction. Although the sale is on a fast track, with a closing scheduled to occur on or before May 2, 2025, under the Bidding Procedures Order, the presence

---

22 *See, e.g.*, *In re Bakalis*, 220 B.R. 525, 535 (Bankr. E.D.N.Y. 1998); *see also see also Bennett Three Leasing Servs. v. Consol. Med. Transp., Inc. (In re Consol. Med. Transp., Inc.)*, 300 B.R. 435, 448–49 (Bankr. N.D. Ill. 2003) (stating, with respect to a provision of an asset purchase agreement providing for an "as-is, where-is" sale with no representations or warranties: "That provision uses terms that sellers routinely use when placing a product on the market. Under normal trade practices, these terms ('as is and where is,' and 'with all faults,' and 'fitness for a particular purpose') limit the liability of the seller for defects in the product being offered.").

of these problematic triggers still create unnecessary uncertainty and could permit the Stalking Horse Bidder to walk, leaving the Debtors, the estate, and creditors in a bind having wasted significant administrative costs and time on a failed sale process.

30. The following termination events in the Stalking Horse APA create uncertainty

- Section 8.1(b) – This termination event is beyond any party's control since a Governmental Body could act without input from either party. If the Debtors or Stalking Horse Bidder are aware of any governmental investigations or potential actions that could occur those should be disclosed.
- Section 8.1(d) – This termination event is far too broad and connects with the concerns that that the Seller representations are extremely lengthy in the Stalking Horse APA. Because this termination event provides that a breach or even an "inaccuracy in, any representation or warranty of Sellers contained" in the Stalking Horse APA gives the Stalking Horse Bidder the right to terminate, it creates a massive exception entitling the Stalking Horse to walk for minor transgressions in the lengthy list of Seller representations.
- Section 8.1(i) – This termination event can be triggered even if an examiner is appointed but that contingency might not necessarily mean anything bad for the Stalking Horse Bidder or that it would disrupt or impair the pending Sale. Thus, this trigger is too broad.
- Section 8.1.(k) – This termination event is too broad and vague. The Stalking Horse Bidder could terminate if there is an "order in conflict with the Bidding Procedures Order, the Sale Order, the Financing Order, this Agreement or the transactions contemplated by" the Stalking Horse APA. Whether an order "conflicts" with the other orders is subjective and in the eye of the beholder. Parties can disagree what conflicts or could take unreasonable positions about what is a "conflicting" order. This termination event should be modified.
- Section 8.1(m)(iii) – This termination event should be removed as it creates uncertainty regarding and should be removed because it creates extra conditions on the Stalking Horse Bidder's ability to be a Backup Bidder and without a locked-in commitment to serve as Backup Bidder.

**RESERVATION OF RIGHTS**

31. Under the Bidding Procedures Order, the Bid Deadline is April 7, 2025, at 5:00 p.m. (ET), after this Objection is due to be filed. Accordingly, the Committee objects to the Sale for the foregoing reasons and reserves its rights to raise any additional or further objections, or to file a supplemental objection, prior to or at any hearing on the Sale to the Stalking Horse Bidder or the Successful Bidder at any auction. In addition, the Committee reserves all rights with respect to the sale of the COD Business and generally with respect to any Successful Bidder that is not the Stalking Horse Bidder, and, in that respect, the Committee's objection deadline in that scenario is the Non-Stalking Horse Objection Deadline on April 14, 2025, at 4:00 p.m. (ET), pursuant to the Bidding Procedures Order.

Dated: April 7, 2025

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
Edward A. Corma (DE Bar No. 6718)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
dbertenthal@pszjlaw.com
crobinson@pszjlaw.com
ecorma@pszjlaw.com

*Proposed Counsel to the*
*Official Committee of Unsecured Creditors*