**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>AZZUR GROUP HOLDINGS LLC, *et al.*,[1]<br><br>              Debtors. | Chapter 11<br><br>Case No. 25-10342 (KBO)<br><br>(Jointly Administered)<br><br>**Related Docket Nos.: 11, 19, 61, 63, 126, 331, 336 & 341** |

**DEBTORS' REPLY IN SUPPORT OF MOTION
FOR ENTRY OF FINAL ORDER APPROVING POSTPETITION FINANCING**

Azzur Group Holdings LLC and its affiliated debtors (collectively, the "Debtors"), respectfully submit this reply to the *Objection of the Official Committee of the Committee to Motion of the Debtors and Debtors in Possession for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Claims, and (C) Grant Adequate Protection, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing and (IV) Related Relief* (the "Objection") [D.I. 341] filed by the Official Committee of Unsecured Creditors (the "Committee"), and in further support of *Motion of the Debtors and Debtors in Possession for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Claims, and (C) Grant Adequate Protection, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing and (IV) Related Relief* [D.I. 11] (the "DIP Motion").[2]  In support hereof, the Debtors respectfully state as follows.

---

[1] A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.cases.stretto.com/Azzur.  The Debtors' headquarters and the mailing address for the Debtors is 330 South Warminster Road, Suite 341, Hatboro, PA 19040.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the DIP Motion or the *Interim Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Claims, and (C) Grant Adequate Protection, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing and (IV) Related Relief* [D.I. 63] (the "Interim DIP Order"), as applicable.

## PRELMINIARY STATEMENT

1.　　The relief sought through the DIP Motion is the product of difficult and vigorous, arms'-length negotiations between the Debtors, and M&T Bank in its capacities as the Pre-Petition Lender and DIP Lender.  The DIP Credit Facility represents the best and only source of financing available to the Debtors, providing sufficient liquidity to continue through the administration of these chapter 11 cases and the Debtors' prepetition sale and marketing process to effectuate one or more going-concern sales, through which employees retain their jobs, vendors continue to have a customer, customers continue to have a vendor and landlords continue to have tenants, each class of which is a constituent of the Committee.  It cannot seriously be argued that the Debtors should elect to pursue their only other alternative—liquidation—rather than enter into the DIP Credit Facility and seek entry of a final order.

2.　　Tellingly, the Committee cannot and does not object to the Debtors' need for the DIP Credit Facility, nor do they contest the fact that it provides necessary liquidity to consummate the Stalking Horse APA sale transaction.  Instead, the Committee objects to the fundamental economic terms of the DIP Credit Facility, including the roll-up.

3.　　Further, the Committee argues that Consulting Business sale proceeds should be allocated based on bald assertions that proceeds of labor are not subject to the Pre-Petition Lender's prepetition lien. This is preposterous based on readily distinguishable facts and caselaw.  Whether considered individually or collectively, the Committee's arguments fail to undermine the Debtors' business judgment and should not sway this Court's approval on a final basis of the only financing available.  An unsecured creditors committee made this argument for allocating intangible and undefined enhancements to value included in the purchase price for the sale of assets.  The court there found that the argument was "unsupported by law, has never been recognized by any court, and is untenable under both the Bankruptcy Code and established precedent."  *Off. Comm. of*

2

*Unsecured Creditors of Guardian Elder Care at Johnstown, LLC v. S&T Bank, N.A. (In re Guardian Elder Care at Johnstown, LLC)*, 666 B.R. 651, 654 (W.D. Pa. 2025).  In the opinion, Judge Deller further reasoned that "the [c]ommittee's theory would undermine the predictability of secured lending in bankruptcy. If courts were to allow retroactive reallocation of sale proceeds based on nebulous 'enhancements,' secured lenders would be disincentivized from consenting to sales, providing debtor-in-possession financing, or negotiating in good faith.  This would be to the detriment of all future debtors seeking to reorganize in bankruptcy." *Id.* at 658.  Further, the Committee's argument challenges the notion of cash collateral – if any business uses employees to create accounts that are collected, then every prepetition lender secured by an all asset lien would not have an interest in cash collateral, rendering much of Sections 361 and 363 a nullity.

4.      The DIP Credit Facility is intended to achieve one ultimate goal: one or more successful going concern transactions for the Debtors' businesses for the maximum possible value, followed by confirmation of a liquidating plan.  The terms of the DIP Credit Facility are entirely reasonable and appropriate under the circumstances of these cases.[3]  The interests of all constituents are aligned in this respect.

5.      The Debtors, in an exercise of their sound business judgment, therefore, urge the Court to approve the DIP Credit Facility, by entry of the proposed Final DIP Order, so that the Debtors can maintain operations, satisfy administrative expenses, and consummate on ore more sale transactions.

---

[3]  The Debtors' response to the Objection is summarized in the chart attached here as **Schedule A** (the "Objection Chart").

<u>**REPLY**</u>

**I.**    **The Proposed Roll-Up Is Reasonable Under the Facts and Circumstances of these Chapter 11 Cases.**

6.    The DIP Loan Documents provide that the Pre-Petition Obligations, other than the Remaining Pre-Petition Obligation, will be rolled up into the DIP Credit Facility and constitute Obligations upon the entry of the Final DIP Order.  The feature of preserving the Remaining Pre-Petition Obligation, in conjunction with the negotiation of the Debtors' liquidating plan and M&T Bank's support for the plan, differentiates this DIP Facility and roll-up from other DIP facilities, in that M&T Bank is supportive of the plan, rather than M&T Bank seeking to protect against cram down and dominate the cases with an outsized administrative claim resulting from the roll-up.  It is the Debtors' belief, in their business judgment, that final approval of the DIP Credit Facility at this time will bring needed stability, confidence and certainty to these chapter 11 cases.  Delaying or denying final approval of the Debtors' postpetition financing could materially jeopardize the Debtors' ability to successfully consummate one or more going-concern sales.

7.    The Committee objects to the terms of the roll-up, and asserts that it should be restricted to "creeping" roll-up amounts on the revolver, as well as the prepetition letter of credit obligations in order to avoid administrative insolvency.[4]  *See* Objection ¶ 18.  The DIP Credit Facility and Approved Budget provide adequate funding for the Debtors' administration of these chapter 11 cases and was and remains the Debtors' only viable option for adequate liquidity to finance these cases and pursue one or more value maximizing transactions for the benefit of all stakeholders, including vendors, customers, employees, landlords and others, all of which are also the Committee's constituents.

---

[4] As described more fully in the *Debtors' Omnibus Reply to Devens Landlord's Limited Objection to DIP Motion and U.S. Trustee's Limited Objection to Sale Incentive Plan* [D.I. 126], upon information and belief, the letter of credit has been fully drawn.

8.      The Committee's objection to the size of the roll-up under the DIP Credit Facility must be overruled.  The Committee asks this Court to supplant the Committee's judgment for the Debtors' determination of the appropriate size and the terms of the DIP Credit Facility, including the roll-up.

9.      In determining whether the Debtors have exercised reasonable business judgment in entering into the DIP facility, a court does not need to determine whether every single business person would make the exact same determination as the debtor, but need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Abitibibowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009).  The Debtors' determination to enter into the DIP Credit Facility, including its roll-up feature, is reasonable.

10.     Courts generally grant considerable deference to Debtors' business judgment in obtaining postpetition financing.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender.").  In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the proposed lender.[5]

11.     The roll-up is an integral component of the DIP Credit Facility.  Roll-ups are routinely approved in this District and others.  *See, e.g.*, *In re Sientra, Inc.*, No. 24-10245 (JTD) (Bankr. D. Del. Mar. 3, 2024) (authorizing a $90 million DIP facility, including a $67.5 million

---

[5] *See In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (stating that approval of DIP financing requires terms that are "fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender"); *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should also be considered in light of current market conditions. *See In re Lyondell Chem. Co.*, Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

roll-up, constituting a 3:1 ratio); *In re NanoString Technologies, Inc.*, No. 24-10160 (CTG) (Bankr. D. Del. Feb. 6, 2024) (authorizing $142.5 million DIP facility, including a $95 million roll-up); *In re Restoration Forest Products Group, LLC*, No. 24-10120 (KBO) (Bankr. D. Del. Feb. 1, 2024) (authorizing approx. $93.3 million DIP facility, including approx. $64.3 million roll-up, constituting a 2.2:1 ratio); *In re Phoenix Servs. Topco LLC*, Case No. 22-10906 (MFW) (Bankr. D. Del. Sept. 29, 2022) (approving a $100 million DIP facility with a 3:1 roll-up ratio consisting of $75 million of prepetition debt and $25 million of new money); *In re Shiloh Industries Inc.*, Case No. 20-12024 (LSS) (Bankr. D. Del. Sep. 1, 2020) (authorizing roll-up on a 4.5:1 basis). Here, the roll-up is less than a 3:1 ratio, consisting of new money Supplemental DIP Line Advances of up to $8.5 million and other revolving advances of up to $15 million, for a total amount of $23.5 million.

12.     Further, contrary to the Committee's assertions, strong bankruptcy policies weigh in favor of approving entry into the DIP Credit Facility. The Debtors' principal mandate in these chapter 11 cases is to maximize the value of the bankruptcy estates. *See Toibb v. Radloff*, 501 U.S. 157, 163 (1991) ("Chapter 11 also embodies the general Code policy of maximizing the value of the bankruptcy estate."). The DIP Credit Facility is the uncontroverted only avenue for the Debtors to do so.

13.     As part of a broader package which gives the Debtors the liquidity they need to operate at least through the projected closing date under the Stalking Horse APA (which has been designated the Successful Bid [D.I. 360]), the Debtors determined in their business judgment that use of cash collateral alone would be inadequate and DIP financing, including the roll-up, was necessary. While the Committee clearly wants these chapter 11 cases funded to maximize recovery to its constituency, it cannot pick-and-choose which portions of the DIP Credit Facility it would like the Court to discard. The roll-up is part of a comprehensive adequate protection package

negotiated at arms'-length and in good faith with the DIP Lender.  The DIP Credit Facility is the only available and actionable financing to fund these chapter 11 cases.  Without continued access to the DIP Credit Facility on a final basis, the Debtors lack sufficient liquidity to fund the administration of these chapter 11 cases, which would be value destructive for all stakeholders.

II.     **The Debtors Do Not Have Any Valuable Unencumbered Assets, as all Postpetition Revenue and Receivables Are Proceeds of the Pre-Petition Lender's Prepetition Collateral Subject to Valid Liens under § 552(b)(1).**

14.     The Committee argues that the sale proceeds of the Debtors' Consulting Business must be allocated between the value of encumbered prepetition assets and the value of new postpetition assets generated through the Debtors' ongoing and future consulting services that are unencumbered by virtue of section 552(a) of the Bankruptcy Code.  *See* Objection ¶ 25.  As an initial matter, the Committee does not assert that the Pre-Petition Lender has not properly perfected any of its security interests in the Debtors' property, other than the proceeds of the labor of the employees, certain leases and commercial tort claims.  The Committee attempts to mischaracterize the people-forward nature of the Debtors' Consulting Business as somehow relying entirely on the value of the labor of the employees, completely ignoring the more than one hundred prepetition contracts in place as of the Petition Date, giving rise to revenues generated from prepetition accounts and from postpetition services rendered under the Debtors' contracts with customers of the Consulting Business.  The Committee simply ignores the breadth of the Debtors' assets involved in the Consulting Business or the scope of M&T Bank's prepetition liens.  The Committee goes through no analysis of the Debtors' assets encumbered by such liens and steers[6] directly into the court's reaction in the Western District of Pennsylvania – "If courts were to allow

---

[6] The Committee asserts, "These assets include the future revenues created by, and that are nonexistent without, the postpetition efforts of the Debtors' workforce." Objection at ¶ 2 (emphasis omitted).  The same can be said with respect to every business operated by every debtor.

retroactive reallocation of sale proceeds based on nebulous 'enhancements,' secured lenders would be disincentivized from consenting to sales, providing debtor-in-possession financing, or negotiating in good faith. This would be to the detriment of all future debtors seeking to reorganize in bankruptcy." *In re Guardian Elder Care at Johnstown, LLC*, 666 B.R. at 658. The Committee ignores the fact that (i) the accounts, revenue and receivables generated postpetition are proceeds of ***prepetition contracts*** that fall squarely within the § 552(b)(1) exception, rendering them encumbered postpetition assets, and (ii) the Debtors' postpetition operations are funded by new money advances under the DIP Facility. In both cases the Committee misses the mark by asserting that the Pre-Petition Lender and DIP Lender are not perfected in the accounts, revenues and receivables generated postpetition, therefore, there should be no allocated value of the Stalking Horse APA to unencumbered proceeds.

    **A.**    **The Pre-Petition Lender Holds Properly Perfected, Valid, Enforceable Security Interests In Substantially All Of The Debtors' Prepetition Assets And Proceeds Thereof. The Postpetition Proceeds Are Encumbered Under § 552(b)(1).**

    15.    Section 552(b)(1) of the Bankruptcy Code provides an exception to the rule under § 552(a) that property acquired by the debtor postpetition is not subject to any prepetition lien. The Committee relies on § 552(a), but fails to recognize that § 552(b) provides that the prepetition liens continue postpetition to the proceeds of the prepetition collateral. Under § 552(b)(1), if the prepetition security interest extends to "property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property," then the prepetition security interest extends to these proceeds acquired postpetition. 11 U.S.C. § 552(b)(1). Section 552(b)(1) of the Bankruptcy Code, however, allows the court, after notice and a hearing and based on "the equities of the case" to order otherwise. The equities of the case exception generally only applies when the lender will obtain a windfall from collateral that has appreciated

in value as a result of the debtor's use of other unencumbered assets of the estate, which would normally go to general creditors. *See In re Muma Servs.*, 322 B.R. 541, 558 (Bankr. D. Del. 2005). The Committee does not put forth an equities of the case argument in the Objection, because it cannot, as substantially all assets of the Debtors are encumbered by the Pre-Petition Lender's liens and the DIP Lender is funding the postpetition expenses.

16.    The Debtors have stipulated that the Pre-Petition Lender holds a perfected, enforceable prepetition security interest in substantially all of the Debtors' assets and all proceeds thereof, which includes all contracts and general intangibles, accounts and property, plant and equipment, including those used in connection with the Consulting Business.  The Debtors have not entered into many postpetition Consulting Business customer contracts that are with new customers, but have entered several with existing customers.[7]  As such, all new statements of work for existing customers, accounts derived therefrom and postpetition revenue constitutes proceeds of prepetition contracts and all work performed postpetition in connection with these prepetition contracts and any work under the new postpetition contracts has been funded by the DIP Lender. The conclusion is inescapable, the value and receipts are collateral of M&T Bank, so too are the Stalking Horse APA sale proceeds.

17.    A neighboring District addressed the issue raised by the Committee here that sale proceeds should be allocated based on assertions that proceeds are not subject to the lender's prepetition lien.  The District Court for the Western District of Pennsylvania found that the unsecured creditors committee's argument for allocating intangible and undefined enhancements to value included in the purchase price for the sale of assets was "unsupported by law, has never

---

[7] The Debtors have entered into postpetition contracts with two new Consulting Business customers.  However, no postpetition receipts associated with either of these postpetiton contracts have been received, and the Debtors anticipate that revenue, which may be earned under statements of work issued in connection with these contracts, will not be realized until after the closing of the Stalking Horse APA.

been recognized by any court, and is untenable under both the Bankruptcy Code and established precedent." *In re Guardian Elder Care at Johnstown, LLC*, 666 B.R. at 654 (holding that the secured lender's blanket lien attached to the court-approved § 363 sale proceeds based on the estate's interest in the property, not on speculative theories of postpetition enhancement). The court further reasoned that "the [c]ommittee's theory would undermine the predictability of secured lending in bankruptcy. If courts were to allow retroactive reallocation of sale proceeds based on nebulous 'enhancements,' secured lenders would be disincentivized from consenting to sales, providing debtor-in-possession financing, or negotiating in good faith. This would be to the detriment of all future debtors seeking to reorganize in bankruptcy." *Id.* at 658. The same is true here.[8]

### B. Postpetition Receivables Derived From Prepetition Contracts Are Proceeds Distinct From General Postpetition Accounts Receivable Arising Under Postpetition Contracts.

18. The Committee rests their argument on cases from outside the Third Circuit that discuss whether postpetition accounts receivable and revenues are unencumbered under § 552(a). However, these cases are distinguishable from the facts and circumstances of these chapter 11 cases, as they address debtors with revenue generated by services ***without*** a connection to prepetition contracts.[9] Here, all relevant revenue is generated either in connection with (i) prepetition executory contracts or (ii) postpetition labor funded by the Supplemental DIP Line

---

[8] The roll-up does not strip value away from unsecured creditors. *See* Objection at ¶ 2. The Committee conflates its argument between the extent of the roll-up and whether M&T Bank holds a lien on proceeds of its prepetition collateral. The Committee has waived its 552(b) "equities of the case" argument.

[9] *See e.g. In re Cafeteria Operators, L.P.*, 299 B.R. 400, 405 (Bankr. N.D. Tex. 2003) (finding that the lien was limited to the revenue generated as a result of the sale of the food and beverage inventory, but not the revenue generated by the services of restaurant employees). In the Debtors' businesses, the revenue of employee services is incidental to the services provided by the Debtors under their contracts. The receipts of the Debtors are proceeds rather than general postpetition unencumbered revenues because they are the result of labor incident to and under the prepetition contracts in contrast to the restaurant services that are performed postpetition without a connection to the prepetition collateral as there are no underlying encumbered contracts with customers in the restaurant.

Advances without the use of the Debtors' unencumbered assets. *See In In re Sherwood Ford, Inc.*, 125 B.R. 957 (Bankr. D. Md. 1991) (holding that a prepetition security agreement in a company's general intangibles and proceeds continued to cover those proceeds in bankruptcy and, because movant was the holder of a perfected prepetition security interest in substantially all the assets of the debtor, there was no need to trace proceeds).

19.    The Committee contends generally that "[r]evenue generated postpetition solely as a result of a debtor's labor is not subject to a creditor's pre-petition interest." *See* Objection ¶ 22 (quoting *Arkison v. Frontier Asset Mgmt., LLC (In re Skagit Pac. Corp.)*, 316 B.R. 330, 336 (B.A.P. 9th Cir. 2004)). However, the postpetition revenue in *Skagit Pac. Corp.* was from a ***new***, ***postpetition*** account. *Id.* at 333. There, the debtor made a bid for a new contract, was awarded the contract, and performed the contract all postpetition. *Id.* The contract was not proceeds of prepetition collateral. Accordingly, the court held that those postpetition revenues were unencumbered under § 552(a). Here, however, all but two Azzur Consulting Business contracts were entered into prepetition, or are proceeds or amendments or extensions of prepetition contracts and any accounts or revenue generated from postpetition services are proceeds of the prepetition contracts. Further, when accounts receivable generated postpetition are derived from a prepetition contract, the § 552(b)(1) exception for proceeds applies and such accounts and receipts therefrom constitute proceeds of the lender's prepetition collateral. *See United Virginia Bank v. Slab Fork Coal Co.*, 784 F.2d 1188 (4th Cir. 1986).[10]

---

[10] In *Slab Fork Coal*, the bank had a prepetition lien that covered the debtor's coal mining contract and such proceeds as might be derived from that contract. *Id.* at 1190. The debtor was placed into involuntary bankruptcy and shut down its coal mining operation. *Id.* at 1189. Another mining company made an agreement with one of the customers to mine coal for its account under the original contract. *Id.* The court found that the work done postpetition was done pursuant to the original contract, subject to the bank's security interest, and the right to the postpetition payment was subject to the bank's security interest. The court declined to apply the equities of the case exception and added that "§ 552(b) gives the bankruptcy court considerable latitude in applying prepetition security interests to postpetition proceeds." *Id.* at 1191.

C.    **The Postpetition Revenues Are Attributable to the Use Of Prepetition Collateral and Postpetition DIP Financing. Postpetition Labor Is Not An Unencumbered Asset.**

20.    The Committee argues that the value of the postpetition labor and services to customers is unencumbered and falls under § 552(a), therefore, the corresponding revenue cannot be subject to the prepetition security interest. *See* Objection ¶ 25. However, employee wages and benefits are being paid from Supplemental DIP Line Advances and proceeds of the DIP Collateral. Accordingly, any postpetition revenues or increase in value of the prepetition collateral (as the contracts term burn off, the contracts are not increasing in value) would be directly attributable to the revenues under such collateral, and not unencumbered assets. Contrary to the Committee's argument, the proceeds of the Consulting Business sale cannot be allocated between prepetition and postpetition value because all assets and proceeds are encumbered. *See In re Laurel Hill Paper Co.*, 393 B.R. 89, 92 (Bankr. M.D.N.C. 2008) (denying debtor's request to set aside $1,000,000 of sale proceeds attributable to the efforts of the CRO pursuant to the equities of the case exception, where compensation and expenses of the debtor's CRO were paid from the debtor's DIP financing, which was repaid at the closing of the sale from proceeds that were subject to the secured creditor's lien).

21.    The Debtors' postpetition receivables from the Consulting Business constitute encumbered proceeds of the prepetition collateral consistent with § 552(b)(1), because (i) the revenue is generated from services provided arising directly from the prepetition contracts, and (ii) the labor used to produce the services is paid for by DIP Financing advances, and does not constitute unencumbered non-estate resources.

## MISCELLANEOUS OBJECTIONS

22.    The Committee asserts miscellaneous other objections to entry of the proposed Final DIP Order approving the DIP Financing.   These objections are described in **Schedule A**,

which is attached hereto and incorporated herein.  **Schedule A** also includes a brief discussion of the Debtors' reply.

## CONCLUSION

23.     For the foregoing reasons, as well as the reasons set forth in the DIP Motion, the Debtors respectfully request that the Court (a) overrule the Objection, (b) enter the proposed Final Order, and (c) grant such other further relief that the Court deems just and proper.

**WHEREFORE**, the Debtors respectfully request that the Court overrule the Objection and grant the Motion and such other and further relief as the Court may deem just and proper.

Dated: April 9, 2025
       Wilmington, Delaware

Respectfully submitted,

**DLA PIPER LLP (US)**

 _/s/  Stuart M. Brown_
Stuart M. Brown (DE 4050)
Aaron S. Applebaum (DE 5587)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2462
Email:  stuart.brown@us.dlapiper.com
       aaron.applebaum@us.dlapiper.com

- and -

W. Benjamin Winger (admitted *pro hac vice*)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Telephone: (312) 368-4000
Facsimile: (312) 236-7516
Email:  benjamin.winger@us.dlapiper.com

*Counsel to the Debtors*