### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AZZUR GROUP HOLDINGS LLC, *et al.*,[1] | Case No. 25-10342 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Related D.I. Nos. 9, 13, 66, 86, 351, 354** |

### OMNIBUS REPLY OF THE DEBTORS IN SUPPORT OF ENTRY OF ORDERS APPROVING THE (I) SALE OF THE CONSULTING BUSINESS TO THE STALKING HORSE PURCHASER, (II) CONDITIONAL APPROVAL OF THE DISCLOSURE STATEMENT AND RELATED SOLICITATION PROCEDURES, AND (III) WAGES MOTION ON A FINAL BASIS

Azzur Group Holdings LLC and its affiliated debtors (the "Debtors") in the above-captioned cases respectfully submit this omnibus reply in support of (i) the Sale Motion [D.I. 13] with respect to the Consulting Business,[2] (ii) the DS and Solicitation Motion [D.I. 86],[3] and (iii) the Wages Motion [D.I. 9].[4]  In support of this omnibus reply and in further support of approval of the foregoing relief requested, the Debtors respectfully state as follows:

### PRELIMINARY STATEMENT

1.      The going-concern sale of the Consulting Business to the Stalking Horse Purchaser for $56 million cash *plus* assumed liabilities unquestionably represents the highest and best value

---

[1] A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Azzur.  The Debtors' headquarters and the mailing address for the Debtors is 330 South Warminster Road, Suite 341, Hatboro, PA 19040.

[2] The Committee filed an objection to the Sale Motion [D.I. 353] (the "Sale Objection") on April 7, 2025.

[3] The Debtors are filing a revised *Combined Disclosure Statement and Joint Chapter 11 Plan of Azzur Group Holdings LLC and its Affiliated Debtors* (including all exhibits and other supplements thereto, and as modified, amended, or supplemented, the "Combined Disclosure Statement and Plan").  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Combined Disclosure Statement and Plan.  The Committee [D.I. 352] and the U.S. Trustee [D.I. 351] each objected to the DS and Solicitation Motion.

[4] The Committee filed an objection to the Wages Motion [D.I. 354] (the "Wages Objection") on April 7, 2025.

for this Debtor business segment.  The Combined Disclosure Statement and Plan is the most efficient vehicle to make timely distributions to creditors and conclude these chapter 11 cases. And the Wages Motion helps ensure that ***rank-and-file*** employees are paid what they are owed for doing the work that maximizes the value of the Debtors' estates.  Yet the Committee— comprised almost entirely of COD-only trade creditors—urges the Court to deny all of that with a barrage of misguided and, at times, misleading objections.  Each of which can and should be easily overruled by the Court.  Apart from the U.S. Trustee's now routine objections to the DS and Solicitation Motion, the Committee is ***the only party in interest*** in these chapter 11 cases to object to the Consulting Sale, conditional approval of the Disclosure Statement and related solicitation procedures, or the relief requested in the Wages Motion.

2.      Nor does the Committee offer any alternative to the Consulting Sale.  It simply would like more for ***COD unsecured trade creditors***—which is self-evident because ***Consulting unsecured creditors*** are expected to be largely unimpaired if the Court approves the Stalking Horse APA Sale Transaction.  To further illustrate the point: the Committee erroneously declares the Consulting Sale "does not benefit general unsecured creditors."  Sale Objection ¶ 14.  This brazenly ignores how approximately 250 employees and contractors will receive offers to work for the Stalking Horse Purchaser on substantially similar terms, up to $365,000 of trade liabilities will be assumed, up to $1,000,000 of accrued employee and contractor obligations will be assumed, and several hundred contracts are proposed to be assumed and assigned to the Stalking Horse Purchaser.

3.      The proposed Consulting Sale represents the best possible result for the Consulting Business and the Debtors' related stakeholders, including unsecured parties like employees, contractors, customers, suppliers, and other trade vendors.  The Committee's professionals served

as consultation parties every step of the way since they were hired.  And the Debtors' secured lender emphatically supports the Consulting Sale.  The extensive prepetition marketing process, which was driven to conclusion on a postpetition basis in accordance with the Bidding Procedures, has yielded the highest and best value for the Consulting Business.  Something the Committee does not—and cannot—dispute.  The Consulting Sale should be approved.

4.    As to the limited relief requested at this stage in connection with the Combined Plan and Disclosure Statement, neither the U.S. Trustee nor the Committee have identified any unresolved 1125(a) disclosure issue or 1129 issue that cannot proceed to a confirmation hearing. Here, too, the Committee has made clear that it simply would like more under the Plan for general unsecured creditors—although it does not identify any legally cognizable basis for the asserted entitlements.  Those issues no doubt will be fully briefed and argued in connection with confirmation absent a mutually acceptable resolution.  But for purposes of this hearing, the Disclosure Statement clearly provides "adequate information" and the proposed confirmation schedule and solicitation procedures comport with the applicable rules—as well as the liquidity and timeline realties the Debtors face.  To further advance these chapter 11 cases to a value-maximizing conclusion as efficiently as possible, the Court should overrule any remaining U.S. Trustee or Committee objections and approve the limited relief requested in respect of the Combined Plan and Disclosure Statement.

## **REPLY**

## I.    **The Sale of the Consulting Business to the Stalking Horse Purchaser Should Be Approved.**

### A.    **The Sale Is a Sound Business Decision That Maximizes the Value of the Debtor's Estates.**

5.    The proposed Sale to Eliquent Life Sciences, Inc. (the "Stalking Horse Purchaser") under the Stalking Horse APA is the byproduct of more than a years' long marketing and sale

process and prepetition and postpetition outreach to over 1,500 potential purchasers, of which more than 200 signed nondisclosure agreements with the Debtors, gained access to a confidential information memorandum and a virtual data room with more than 30,000 documents in respect of the Consulting Business.  The Debtors' management team and investment bankers held dozens of in-person meetings with potential bidders.  These efforts yielded four indicative offers for the Consulting Business—the highest and best of which was, and remains, the offer made by the Stalking Horse Purchaser.  The Debtors' investment banker thoroughly canvassed the market since the Petition Date, using the Stalking Horse APA Sale Transaction as a baseline against which other potential bidders readily engaged.  This was a full, fair, and competitive marketing and sale process.  Accordingly, on this record there is no question—and the Committee does not even dispute—that the proposed Sale of the Consulting Business to the Stalking Horse Purchaser under the terms of the Stalking Horse APA (the "Consulting Sale") maximizes the value of the Consulting Business.

6.    Contrary to the Committee's assertions and as noted above, the Consulting Sale provides material benefits for the Debtors' unsecured creditors.  A substantial majority of the Debtors' employees will receive offers to continue working for the Stalking Horse Purchaser. Several hundred contracts are expected to be assumed and assigned to the Stalking Horse Purchaser.  Accrued employee obligations and trade payables will be assumed by the Stalking Horse Purchaser at closing.  Customers will continue to receive world-class services.  Vendors will have a solvent counterparty to transact with going forward.  The going-concern result achieved by the Consulting Sale inures to the benefit of an entire ecosystem of unsecured stakeholders.

7.      The Committee concedes that the business judgment rule governs the Debtors' decision to sell property under section 363(b) of the Bankruptcy Code. *See* Sale Objection ¶¶ 10-11. The business judgment rule shields a debtor's management decisions from judicial second-guessing. Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith,' and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) (citations omitted); *see also In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014). The non-SIP participant directors of the Debtors reviewed and approved the proposed Consulting Sale. In addition, the Debtors actively engaged with the Committee and the Pre-Petition Lender and DIP Lender regarding the marketing and sale process for the Consulting Business. The Debtors fully complied with the process established under the Bidding Procedures Order. Accordingly, the proposed Consulting Sale easily satisfies the business judgment standard for the reasons described herein. The Court should apply the business judgement standard of review and approve the proposed Consulting Sale to the Stalking Horse Bidder pursuant to the Stalking Horse APA.

**B.      Chapter 5 Causes of Action Comprise Property of the Estate and Can Be Sold Pursuant to Section 363(b) of the Bankruptcy Code.**

8.      It is black-letter law that estate claims and causes of action are property of the estate. *See* 11. U.S.C. § 541(a). So too is the notion that property of the estate can be sold pursuant to section 363(b) of the Bankruptcy Code. Accordingly, the estate causes of action can be sold as an "Acquired Asset" under the Stalking Horse APA.

9.      The Committee erroneously contends that avoidance actions are ***not*** property of a debtor's estate, but rather belong to the unsecured creditors of a Debtor. *See* Sale Objection ¶¶ 15-

19. In fact, the opposite is true: avoidance actions **are property of the estate** and **can be sold by the debtor**. *See, e.g.*, *Briar Cap. Working Fund Cap., L.L.C. v. Remmert (In re S. Coast Supply Co.)*, 91 F.4th 376 (5th Cir. 2024) (affirming bankruptcy court decision authorizing the sale of avoidance power causes of action);[5] *Pitman Farms v. ARKK Food Co., LLC (In re Simply Essentials, LLC)*, 78 F.4th 1006 (8th Cir. 2023) (holding that chapter 5 avoidance actions are property of the estate and affirming the sale of the chapter 5 avoidance actions). And if not sold, the proceeds are available to pay the non-released claims against the estate in the order of priority provided for by the Bankruptcy Code.

10. Here, the Stalking Horse Purchaser made clear that it did not want the individuals working for the Consulting Business to be sued by the Debtors' estates post-closing. *See* Stalking Horse APA ¶ 1.1(j). Such litigation could trigger indemnification obligations due and owing from the Stalking Horse Purchaser and/or otherwise distract such employee from the work he/she has been hired to perform.[6] This is a normal and customary protection that 363 buyers require, especially in circumstances like these where the Committee has indicated a desire to litigate purported claims against the Debtors' employees even before undertaking any kind of an investigation and/or considering relevant affirmative defenses. *See, e.g.*, *In re Fast Radius, Inc.*, Case No. 22-11051 (JKS), D.I. 204 (Bankr. D. Del. Dec. 12, 2022) (overruling committee objection while approving sale of estate claims and causes of action, including any avoidance actions, against transferred employees); *In re GenapSys, Inc.*, Case No. 22-10621 (BLS), D.I. 243 (Bankr. D. Del. September 12, 2022) (same); *In re Armstrong Flooring, Inc.*, Case No. 22-10426

---

[5] "[C]laims to avoid allegedly preferential transfers arise with the filing of the bankruptcy petition, making them property that the debtor has an interest in as of the commencement of the case. . . . Thus, preference actions plainly fit the statutory definition of 'property of the estate' and may validly be sold under § 363(b)." *Id.* at 382.

[6] Similar logic applies to the sale of avoidance actions against trade vendors that will transact with a buyer on a go-forward basis. *See* Stalking Horse APA ¶ 1.1(i). Notably, the Committee does **not** object to the sale of avoidance actions to the Stalking Horse Purchaser in respect of claims and causes of action against such vendors.

(MFW), D.I. 549 (Bankr. D. Del. July 13, 2022) (same); *In re EYP Group Holdings, Inc.*, Case No. 22-10367 (MFW), D.I. 291 (Bankr. D. Del. June 22, 2022) (same); *In re Bluestem Brands, Inc.*, Case No. 20-10566 (MFW), D.I. 575 (Bankr. D. Del. July 7, 2020) (same).[7]

11.    The Debtors considered the inclusion of estate claims and causes of action as part of the "Acquired Assets" and the overall sale and chapter 11 processes.  The sale of such "Acquired Assets" is a negotiated term of the Stalking Horse APA.  There is no legal basis—and the Committee cites to none—that supports the proposed selective deletion of negotiated deal terms.  The unintended consequence of sustaining the Committee's objection would be incredibly value destructive and actually prejudicial to the unsecured constituency the Committee is charged to represent.  The Court should overrule the Committee's objection on these grounds.

### C.    The Sale of the Consulting Business Is Not an Impermissible *Sub Rosa* Plan.

12.    The Sale of the Consulting Business is not a *sub rosa* plan, but rather a sale of a discrete business segment within the Azzur enterprise for the best available price.  The Debtors, among other assets, continue to market the COD business segment for sale.  Further, the Final DIP Order, which has not yet been entered, will inform whether and on what terms the disposition of DIP Collateral and Prepetition Collateral will pay down secured obligations.  So too will the proposed Sale Order as well as any agreements by and among the parties.

13.    "An objector arguing that a proposed sale constitutes a sub rosa plan must clearly articulate the rights and benefits the [] creditor is being deprived of through the sale that it would gain through a Chapter 11 plan."[8]  The Committee makes no such "clear articulation."  And here,

---

[7] Because of the voluminous nature of such orders, they are available upon request to Debtors' counsel.

[8] *In re Summit Global Logistics, Inc.*, 2008 WL 819934, at *16 (Bankr. D.N.J. Mar. 26, 2008) (citing *In re Torch Offshore, Inc.*, 327 B.R. 254, 257 (Bankr. D. La. 2005) (citing *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1228 (5th Cir. 1986) (concluding that the objecting creditor's "inability to establish its detriment through the sale . . . and the Debtors' satisfaction of the sound business judgment and good faith requirements given their severe liquidity crisis, mandate a finding that the proposed asset sale does not constitute a *sub rosa* plan"))).  *See also*, *e.g.*, *In re Boston*

the Debtors face meaningful limitations in terms of availability liquidity and timeline to consummate one or more sale transactions. Indeed, these chapter 11 cases were predicated on completing a marketing and sale process for the Consulting and COD business segments that began over a year ago in the first 60 days. The proposed Consulting Sale indisputably represents the highest and best value for such business segment. And it is a sound exercise of the Debtors' business judgment to consummate such a value-maximizing transaction outside of a chapter 11 plan given the milestones under the Stalking Horse APA and DIP Facility—which may be incompatible with the confirmation timeline and other terms that the Committee seeks to impose. That is, the proposed Consulting Sale should not be held hostage to a contested chapter 11 plan process with the Committee, which appears intent on litigating whatever it can for the foreseeable future. Such a scenario would put the proposed Stalking Horse APA at great risk because of the milestones and termination rights set forth therein. *See, e.g.*, Stalking Horse APA ¶¶ 8.1(c), (g), (h), (j).

14.    The Committee's real target appears to be the proposed distribution of Consulting Sale proceeds—notwithstanding the fact that such proceeds do not exceed the quantum of secured obligations and administrative claims with relative priority over general unsecured claims. However, such realities of the waterfall are not a result of any provision of the proposed Sale Order or the Stalking Horse APA. The Debtors conducted a robust marking process for all of their assets, including the Consulting Business, and the best offer that they received for the Consulting Business continues to be the one set forth under the Stalking Horse APA.

---

*Generating, LLC,* 440 B.R. 302, 331 (Bankr. S.D.N.Y. 2010) (concluding that the chapter 11 debtors, in seeking bankruptcy court approval for proposed sale of substantially all of their assets outside plan confirmation process, were not improperly seeking to establish terms of a *sub rosa* plan, where debtors had proper business justification for seeking to sell their assets before they ran out of funds to operate, and where debtors sought merely to sell their assets, with proceeds to be distributed in accordance with priority of creditors' competing liens and terms of any subsequent plan).

15.     The Committee also incorrectly argues that distribution of sale proceeds from the Consulting Sale cannot take place prior to confirmation of a plan and must be stalled until an administrative bar date (of all things) has passed.  *See* Sale Objection ¶¶ 23-25. However, the paydown of DIP Obligations and reservation for winddown expenses prior to plan distributions are features commonly approved in DIP financings.[9]  Courts have also approved paydowns from the sale proceeds to parties with secured claims against the assets sold.[10]  After good-faith and hard-fought negotiations, the Debtors and DIP Lender agreed to the terms of the Interim DIP Order (as amended), which the Debtors continue to believe to be reasonable and appropriate in light of the Debtors' anticipated winddown expenses and other agreements with the DIP Lender to conclude these chapter 11 cases via chapter 11 plan.

16.     Accordingly, approval of the Consulting Sale pursuant to the proposed Sale Order does not constitute a sub rosa plan.  The Committee's conclusory assertions aside, the mere fact the Final DIP Order could provide for how proceeds from the disposition of a subset of DIP Collateral may be applied does not trigger sub rosa plan concerns.  To the contrary, the proposed Sale Order, together with one or more other sale transactions involving the COD business segment and other estate assets, represent a viable path to confirming a chapter 11 plan and making distributions to creditors as quickly and efficiently as possible.  That is, under the proposed Plan, the Debtors intend to monetize and distribute any and all remaining assets upon

---

[9] *See, e.g., In re Allied Systems Holdings*, 2013 WL 12301178 (Bankr. D. Del. 2013) (providing for paydown of DIP loans upon sale closing and provision of a winddown budget); *In re Vyaire Medical, Inc.*, Case No. 24-11217 (BLS) (Bankr. D. Del. Sept. 4, 2024) [D.I. 496, 497] (approving the sales and overruling committee objection to the DIP payoff and holdback amounts).

[10] *See In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934, 942–43 (Bankr. S.D. Tex. 1988) (finding no reason to delay a secured creditor's receipt of sale proceeds in which it has undisputed priority claim and explaining that distribution of proceeds to the creditor would not "materially dictate the terms of the debtor's reorganization nor otherwise endanger the creditor protections available to" the objecting unsecured creditor).

the Effective Date or as soon as practicable thereafter.  Should the proposed Plan go effective before the closing of the Consulting Sale, the proceeds of such sale would be distributed under the Plan.

> **D.      The Committee's Proposed Line-Edits to the Stalking Horse APA and Sale Order Are Either Untimely or Illegitimate Grounds to Object.**

17.      At this stage of the marketing and sale process for the Consulting Business—after the Stalking Horse Purchaser has been named the Successful Bidder—the Stalking Horse Purchaser has indicated that it is unwilling to entertain the Committee's proposed line-edits to the Stalking Horse APA, including as to representations and warranties and termination events.  The Debtors, for their part, are focused on consummating a value-maximizing transaction with the Successful Bidder in accordance with the milestones and other terms set forth under the Stalking Horse APA.  Again, there is simply no basis to cherry-pick whichever provisions the Committee would like to see deleted or modified.  The Committee can and should have raised these issues in connection with the agreed Bidding Procedures Order and designation of Eliquent Life Sciences, Inc. as the Stalking Horse Bidder.

18.      With respect to the proposed Sale Order, the Debtors intend to present evidence that support the proposed findings contained therein.  The Debtors remain ready, willing, and able to continue working with all parties in interest to narrow issues in advance of what appears to be a contested Sale Hearing with the Committee.

**II.    The DS and Solicitation Motion Should Be Approved Because the Disclosure Statement Contains "Adequate Information" and the Plan Is Not "Patently Unconfirmable".  The Remaining Objections Are Meritless and/or Confirmation Issues.**

19.     There are essentially two narrow issues before the Court.  *First*, whether the Combined Disclosure Statement and Plan[11] contains adequate information, within the meaning of section 1125 of the Bankruptcy Code, and therefore should be approved on a conditional basis as permitted by Local Bankruptcy Rule 3017-2.  The answer to that is "yes".  And *second*, whether the Plan is "patently unconfirmable" such that the Debtors should not be permitted to proceed with solicitation.  The answer to that is "no".[12]

**A.    The Disclosure Statement Contains "Adequate Information" under Section 1125 of the Bankruptcy Code and Should Be Conditionally Approved.**

20.     Under section 1125 of the Bankruptcy Code, a plan proponent must provide parties voting on the plan with "adequate information" to make an informed judgment as to whether to accept or reject a chapter 11 plan.  The "adequate information" standard set forth in section 1125 of the Bankruptcy Code is not intended to be onerous—it requires only that a debtor provide enough information for voting parties to make an informed judgment when deciding whether to accept or reject a chapter 11 plan.  Courts have interpreted "adequate information" to mean information that is reasonably practicable to permit an "informed judgment" by creditors and interest holders to vote on a chapter 11 plan.  *See, e.g., In re Lower Buck Hosp.*, 571 Fed. Appx. 139, 142 (3d Cir. 2014).  On the other hand, however, a disclosure statement "should not be burdened with overly technical and extremely numerous additions, where such information would serve only to diminish the

---

[11] Prior to the filing of their respective objections, the Debtors provided the U.S. Trustee and the Committee with a draft, and sought feedback in respect of, a revised Combined Disclosure Statement and Plan that addressed many of the U.S. Trustee and Committee's objections.

[12] The Debtors' response to the remaining U.S. Trustee and Committee objections is summarized in the chart attached hereto as **Exhibit A** (the "DS and Solicitation Objection Chart").  The Debtors' responses in the DS and Solicitation Objection Chart are incorporated into this reply as though fully set forth herein.

understanding of a typical creditor or interest holder." *In re Avianca Holdings S.A.*, 632 B.R. 124, 130 (Bankr. S.D.N.Y. 2021) (quoting *In re Cardinal Congregate I*, 121 B.R. 760, 765-66 (Bankr. S.D. Ohio 1990)); *see also In re Stanley Hotel, Inc.*, 13 B.R. 926, 933–34 (Bankr. D. Colo. 1981) ("[C]ompounding a disclosure statement for the sake of a lawyer's notion of completeness, or because some additional information might enhance one's understanding, may not always be necessary or desirable . . . ."). The determination of whether a disclosure statement contains adequate information is made on a case-by-case basis. *See Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d 414, 417 (3d Cir. 1988).

21.    The Combined Disclosure Statement and Plan describes, among other things, estimated claims and projected recoveries under the Plan, the history and background of the Debtors and these chapter 11 cases, risk factors to be considered when voting on the Plan, procedures governing and the terms of consensual releases under the Plan, and the Court-approved sale and marketing process under the Bidding Procedures Order, which has and will continue to provide a pathway for one or more value-maximizing sale transactions. As set forth in the DS and Solicitation Objection Chart, the vast majority of the "adequate information" objections have been addressed through additions to the Combined Disclosure Statement and Plan. Consistent with applicable law, the revised Combined Plan and Disclosure Statement contains the categories of information necessary for voting creditors to make an informed judgment to accept or reject the Plan, by including information regarding, among other things:

- ▪ ***Treatment of Claims and Interests***: Art. III

- ▪ ***Debtors' Corporate History, Structure, and Business Overview***: Art. IV

- ▪ ***Description of Events Leading to Chapter 11***: § 4.2

- ▪ ***Disclosure of ownership of Estate assets, including potential Estate claims (if any), unencumbered assets (if any), and the value thereof***: §4.3(e)(i)

- ▪ ***Releases***: §§ 4.3(h), 5.9, 8.1-8.12

- ▪ ***Liquidation Analysis***: § 5.8

- ▪ ***Sale and Marketing Process***: § 4.3(f)

- ▪ ***Description of the Plan and Means for Implementation***: Art. V, Art. VII

- ▪ ***Confirmation of the Plan***: Art. V

- ▪ ***Tax Consequences***: § 6.8

- ▪ ***Risk Factors, including with respect to feasibility and risks associated with the parallel Sale of the Debtors' assets and post-confirmation funding***: §§5.7, 6.7; Art. VI

- ▪ ***Solicitation and Voting Procedures***: Art. V; Interim Approval and Procedures Order

- ▪ ***Recommendation***: Art. XIII

22.     The balance of the issues raised in the DS and Solicitation objections are properly raised at confirmation and do not implicate the "adequate information" standard.  To the extent that any of the points by the objectors are not addressed by specific changes to the revised Combined Disclosure Statement and Plan, the Debtors respectfully submit that the DS and Solicitation Objections should be overruled.  *See In re Waterville Timeshare Grp.*, 67 B.R. 412, 413 (Bankr. D.N.H. 1986) ("[O]verly technical and extremely numerous additions to a disclosure statement suggested by an objecting party may themselves be self-defeating in terms of the resulting clarity and understandability of the document to the average investor.").  The Combined Plan and Disclosure Statement provides the estates' stakeholders with adequate information to make an informed decision on whether to cast their vote for or against the Plan.  The Debtors respectfully submit this is not a remotely close call.

**B.      The Plan Is Not "Patently Unconfirmable".     The Objecting Parties' Confirmation Objections Are Premature.**

23.      It is well established that, unless a disclosure statement "describes a plan of reorganization which is ***so fatally flawed that confirmation is impossible***" (*i.e.,* the plan is "patently unconfirmable"), a court should approve a disclosure statement that otherwise adequately describes the chapter 11 plan at issue.  *See In re Cardinal Congregate I,* 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) (emphasis added); *see also In re Unichem Corp.,* 72 B.R. 95, 98 (Bankr. N.D. Ill. 1987) (courts should disapprove of the adequacy of a disclosure statement on confirmability grounds only "where it is ***readily apparent*** that the plan accompanying the disclosure statement could ***never*** be legally confirmed") (emphasis added).  "A plan is patently unconfirmable where (1) confirmation defects [cannot] be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing."  *In re Am. Capital Equip., LLC,* 688 F.3d 145, 154–55 (3d Cir. 2012) (internal quotations and citation omitted) (alteration in the original).

24.      As an initial matter, the Third-Party Release does not render the Plan patently unconfirmable because it is wholly consensual.  Notwithstanding the many, many paragraphs deployed by the U.S. Trustee and the Committee on this topic, general unsecured creditors must "opt in" to the Third-Party Release in order to give (and get) any release under the Plan.[13] Meanwhile, the Debtor Release is a sound exercise of business judgment.  The Plan's releases are

---

[13] Here, the Third-Party Release is granted only by those parties who *affirmatively vote to accept* the Plan *and choose not to opt-out* of the Third-Party Release or who *reject* the Plan or abstain from voting *and affirmatively opt-in* to the Third-Party Release.  *See* Interim Approval and Procedures Order, Ex. 5-A and 5-B.  The Plan does not give effect to any Third-Party Release without an affirmative manifestation of consent.  The proposed solicitation and voting procedures with respect to the releases are entirely consistent with procedures routinely approved in this Court and generally in this district and contain conspicuous language regarding parties' ability to manifest their consent with respect to the releases.  *See, e.g.*, *In re True Value Company, L.L.C.*, Case No. 24-12337 (KBO) (Bankr. D. Del. Feb. 10, 2025) [D.I. 911] (authorizing opt-out procedure for parties voting to accept the plan and opt-in procedure for parties rejecting the plan); *In re Legacy IMBDS, Inc.*, Case No. 23-10852 (KBO) (Bankr. D. Del. Nov. 2, 2023) [D.I. 701] (authorizing debtors' opt-out procedures).

consistent with those regularly approved in this jurisdiction and others. *See, e.g.*, *In re Wheel Pros, LLC*, No. 24-11939 (JTD) (Bankr D. Del. Oct. 15, 2024) [D.I. 255] (approving similar debtor and third-party release provisions including, among other categories, directors, officers, direct and indirect equity holders, and professional and financial advisors); *In re Sientra, Inc.*, No. 24-10245 (JTD) (Bankr. D. Del. June 18, 2024) [D.I. 450] (same); *In re MVK FarmCo LLC*, No. 2311721 (LSS) (Bankr D. Del. Mar. 29, 2024) [D.I. 858] (same); *In re SiO2 Medical Products, Inc.*, No. 2310366 (JTD) (Bankr. D. Del. Jul. 19, 2023) [D.I. 478] (same); *In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. Sept. 4, 2020) [D.I. 673] (same).

25.    Arguments regarding the propriety of releases are properly raised at confirmation—not the hearing to consider conditional approval of a disclosure statement and related solicitation procedures. *See, e.g.*, Hr'g Tr. at 24:24-25:8, *In re Alto Maipo Delaware LLC*, Case No. 21-11507 (KBO) (Bankr. D. Del. Apr. 6, 2022) [D.I. 479] (approving disclosure statement over objections by the U.S. Trustee to the definition of releasing party, finding it to be an issue for confirmation); Hr'g Tr. at 90:20, *In re Emerge Energy Servs.*, Case No. 19-11563 (KBO) (Bankr. D. Del. Sept. 9, 2019) [D.I. 348] (noting that, "[o]n the releases, it's a confirmation issue"); Hr'g Tr. at 28:14-15, *In re GT Real Estate Holdings, LLC*, Case No. 22-10505 (KBO) (Bankr. D. Del. Sept. 19, 2022) [D.I. 410] (approving disclosure statement and overruling objections in connection with the releases as confirmation issues).

26.    The U.S. Trustee's objection to an injunction to enforce the Plan's release is also misplaced. The purpose of the injunction is to bind the agreement between the Debtors and their stakeholders, as embodied in the Plan, with finality, in the event that certain parties may attempt to renege later. In *Purdue*, the Supreme Court narrowly decided that a bankruptcy court may not approve *non-consensual* releases that extinguish claims against non-debtor third parties. *See*

*Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 226-27 (2024); *see also In re Gigamonster Networks, LLC*, No. 23-10051 (JKS) (Bankr. D. Del. Aug. 27, 2024), Hr'g Tr., Aug. 27, 2024, 64:19–22 (in response to the U.S. Trustee's objection to the plan's third-party releases under *Purdue Pharma*, the court determined that "the Supreme Court declined to express a view on what constitutes a consensual release or the procedural mechanism to obtain a consensual release."). As a result, there is no support for the U.S. Trustee's argument that the Court may not confirm a chapter 11 plan containing an injunction with respect to *consensual* releases.

27.    As set forth in the DS and Solicitation Objection Chart, the vast majority of the remaining objections have been addressed through revisions in the Combined Disclosure Statement and Plan. To the extent that any objections remain, they should be overruled or reserved for confirmation. Accordingly, the Debtors respectfully submit that the Disclosure Statement satisfies the applicable standards under section 1125 of the Bankruptcy Code, and the Debtors therefore respectfully request that the Court overrule the DS and Solicitation Objections and enter the revised Interim Approval and Procedures Order.

### III.    The Wages Motion Should Be Approved on a Final Basis. [14]

28.    In further support of the Wages Motion, the Debtors intend to present evidence at the hearing to consider such relief requested on a final basis consistent with this reply.

29.    Section 363 of the Bankruptcy Code provides in relevant part that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b), courts require only that the debtor "articulate some business justification, other than mere appeasement of major creditors."

---

[14] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Wages Motion.

*In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989), *see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions.").

30.    Additionally, the Court may authorize the proposed payments under the Wages Motion pursuant to section 105(a) of the Bankruptcy Code, which empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Under section 105(a), courts may permit preplan payments of prepetition obligations when essential to the continued operation of a debtor's business. *See In re Just for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999). Moreover, the relief requested in the Wages Motion is supported by the well-established "doctrine of necessity," whereby a court may authorize the payment of prepetition claims if such payment is essential to the continued operation of the debtor. *In re Lehigh & New England Railway Co.*, 657 F.2d 570, 581 (3d Cir. 1981).

31.    First, the Debtors seek authority to continue the Accrued Performance Bonuses in the aggregate amount of $515,000, to be allocated amongst approximately 32 rank-and-file, non-insider Consulting Business employees. This prepetition long-term incentive program was designed for the Consulting Business unit as a whole, based upon its performance during the fiscal year 2024. The Debtors would like to honor this prepetition program because, among other things, employee retention within the Consulting Business segment is a key term for the closing of the Stalking Horse APA. Payment of the Accrued Performance Bonuses also enables the Debtors to both honor their prepetition obligations to their employees and best position the Debtors to close the sale of the Consulting Business unit. The DIP Lender recognizes the importance of these

employees and consents to this payment of the Accrued Performance Bonuses from the sale proceeds, which constitute proceeds of its Collateral.

32.     Second, the Debtors seek authority to honor a prepetition retention program in the aggregate amount of $410,000 for 21 rank-and-file, non-insider employees.  Following the Petition Date, the Debtors have experienced certain employee flight risk issues.  Accordingly, continuation of the prepetition retention program for rank-and-file non-insider employees is in the best interests of the estate.  The Debtors seek authority, on a final basis, to honor up to $378,000 of Retention Bonuses, to be allocated amongst 17 employees.  Importantly, these Retention Bonuses are only paid upon the earlier of (i) June 30, 2025, or (ii) consummation of a transaction that causes the employee's continued employment by the Debtor to cease.  Since the DIP Budget does not contemplate funding through the outside date of June 30, 2025, these payments, in effect, are predicated upon the closing of a related sale transaction.  Again, employee retention specifically is a key term to closing the Stalking Horse APA.  It is also value-maximizing to continue having key, non-insider employees support the COD Business while that marketing and sale process remains ongoing.  The DIP Lender too appreciates the value of the Retention Bonuses and has agreed to fund these payments from applicable sale proceeds, which constitute proceeds of its Collateral.

33.     Third, the Debtors maintain severance practices for the benefit of certain non-insider employees.  As of the date hereof, the Debtors estimate that non-insider severance payments could be up to $848,000; this figure accounts for three weeks' salary for approximately 84 non-insider employees.  However, these figures assume that every employee would be severed and not transferred to a buyer upon consummation of a sale transaction.  Continuing to honor

prepetition non-insider severance benefits for rank-and-file employees that are not transferred to a purchaser is critical to preserving employee morale during these times of inherent uncertainty.

34.     And fourth, pursuant to the interim order entered by the Court [D.I. 66], the Debtors are authorized to pay up to $900,000 in obligations on account of independent contractors that are essential to the Consulting business.   Out of an abundance of caution, the Debtors estimated that an additional $400,000 in historical prepetition invoices could become due and payable.   After reviewing invoices submitted since the Petition Date, the Debtors believe that it is unlikely that they will need this quantum of relief requested but seek authority to honor any remaining prepetition obligations from such independent contractors that are essential to the Consulting Business.

35.     The relief requested is a sound exercise of the Debtors' business judgment.   Further disclosures have been made.   The evidentiary record will be completed at the hearing.   The Debtors request that the Court overrule the Committee's objection to the Wages Motion and enter the revised proposed Wages order on a final basis.

[*Remainder of page intentionally left blank*]

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court (i) overrule the objections, (ii) enter the proposed orders, and (iii) grant such other and further relief as the Court deems just and proper.

Dated: April 9, 2025
Wilmington, Delaware

Respectfully submitted,

**DLA PIPER LLP (US)**

 */s/ Stuart M. Brown*
Stuart M. Brown (DE 4050)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2462
Email: stuart.brown@us.dlapiper.com

- and -

W. Benjamin Winger (admitted *pro hac vice*)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Telephone: (312) 368-4000
Facsimile: (312) 236-7516
Email: benjamin.winger@us.dlapiper.com

*Counsel to the Debtors*