**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AZZUR GROUP HOLDINGS LLC, *et al.*,[1] | Case No. 25-10342 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Re Docket No: 11, 19, 63, 126, 331, 336, 338, 341 and 368** |

**RESPONSE OF MANUFACTURERS AND TRADERS TRUST COMPANY TO THE
OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POST-PETITION
FINANCING, (B) GRANT LIENS AND SUPERPRIORITY CLAIMS, AND (C) GRANT
ADEQUATE PROTECTION, (II) MODIFYING THE AUTOMATIC STAY, (III)
SCHEDULING A FINAL HEARING, AND (IV) RELATED RELIEF**

Manufacturers and Traders Trust Company ("M&T" or "Bank"), by its attorneys,
Otterbourg P.C. and Richards, Layton & Finger, P.A., respectfully submits this Response to the
*Objection* (the "Objection") *of the Official Committee of Unsecured Creditors* (the "Committee")
*[DE 341] to Motion of Debtors and Debtors in Possession for Entry of Interim and Final Orders
(I) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority
Claims, and (C) Grant Adequate Protection, (II) Modifying the Automatic Stay, (III) Scheduling a
Final Hearing and (IV) Related Relief* (the "DIP Motion") [Docket No. 11].

**PRELIMINARY STATEMENT**

1.      The Committee's Objection to the entry of a final order (the "Final Order")
approving the proposed debtor-in-possession financing facility (the "DIP Facility") seeks to have

---

[1] A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Azzur.
The Debtors' headquarters and the mailing address for the Debtors is 330 South Warminster Road, Suite 341, Hatboro,
PA 19040.

this Court disregard the proper exercise of the Debtors' business judgment and jeopardize a going-concern transaction that undisputedly maximizes recoveries for all stakeholders.  As set forth in the Motion, to effectuate a sale process and a going concern transaction, post-petition financing in the form of the DIP Facility was and is necessary for the Debtors to have access to sufficient liquidity to maintain ongoing day-to-day operations, ensure proper servicing of customers, fund working capital needs and expenses incurred administering their estates, and preserve the Debtors as going concerns through a proposed sale or sales.  And, as no one disputes, post-petition financing to the Debtors was not available on better or other terms from any other source, including the members of the Committee.

2.      Notably, the Committee does not dispute the need for the DIP Facility.  As such, and absent any credible basis to challenge to the budget that the DIP Facility is funding (which, contrary to the Committee's contention, would *not* result in administrative solvency), the Committee instead seeks to attack certain of the DIP Facility's key provisions that the record establishes were negotiated in good faith and which the Committee, by the Motion, now seeks to renegotiate.

3.      The Committee's attempt to re-write the heavily negotiated, arms-length terms of the DIP Facility extended by the Debtors' pre-petition secured lender, M&T, is unavailing.  As demonstrated in the DIP Motion, and borne out in discovery, the terms and conditions of the proposed Final Order and DIP Facility are fair and reasonable under the circumstances, and were negotiated by the parties and their professionals in good faith and at arm's length.  Put simply, absent the inclusion of the negotiated and agreed-upon terms and protections in the DIP Facility, M&T would not have been willing to extend the credit that the Debtors indisputably require to preserve the going-concern sale(s) that all stakeholders desire.

4.     The Committee's primary line of attack is directed at the DIP Facility's roll-up of all of M&T's pre-petition obligations (minus an agreed-upon $1 million unsecured obligation), totaling approximately $61 million.  The argument goes that, in the DIP Facility, M&T has agreed to advance "only" up to $8.5 million of new money and "only" to re-advance collections that constitute M&T's cash collateral under its pre-petition facility.  According to the Committee, therefore, only the advances of new money plus the amount of post-petition revolver advances generated from the collection of pre-petition receivables (a so-called "creeping roll-up") merit the protection of a post-petition grant of liens -- *not* the near full amount of M&T's pre-petition debt. The argument continues that, by rolling up the near full amount of M&T's pre-petition obligation, the DIP Facility unfairly grants M&T post-petition liens on substantial assets to which M&T's pre-petition all-asset lien did not attach, thereby depriving unsecured creditors of assets for a recovery.

5.     The Committee's principal argument in that regard is that M&T's pre-petition all-asset lien does not extend to all or part of the $56 million purchase price for the Azzur Consulting business unit to be sold pursuant the Stalking Horse APA, nor to any post-petition receivables generated from post-petition consulting services provided by that unit -- That is because, under section 552(a) of the United States Bankruptcy Code (11 U.S.C. §§ 101 *et seq.*) (the "Code"), M&T's "floating lien" on such assets was cut off as of the Petition Date.[2]  According to the Committee, it is the post-petition efforts of the Debtors' labor that created the "bulk" of any such

---

[2] Hereafter, sections of the Code simply be referred to as "§ ___."  Capitalized terms not expressly defined herein shall have the meanings ascribed to them in the DIP Motion.

asset value;  thus, under case law interpreting § 552, M&T's pre-petition lien does not extend to any such newly added value.

6.      But the Committee's argument, even if it were to have any legal merit (and it does not), has no application under the indisputable facts of this case.  The flat purchase price for the Azzur Consulting business was negotiated and agreed upon *prior to* the bankruptcy filing, and nothing in the Stalking Horse APA adjusts that price (up or down) based on the Debtors' post-petition performance.  Thus, as a matter of undisputed fact, the post-petition activities of the Debtors' workforce contributed *nothing* to the $56 million purchase price, which was indelibly fixed prior to (or as of) the Petition Date.  And even if the Debtors' post-petition operations did generate some post-petition receivables cut off from M&T's pre-petition liens under § 552(a), and those post-petition receivables were not to be transferred to the buyer of the Azzur Consulting business (none of which has been established), the amount of any such receivables (according to the Debtors) was small enough to be squarely covered by the post-petition lien to which the Committee does not dispute M&T is entitled to protect its new money and post-petition revolver advances under its DIP Facility.  In short, the Committee's argument that the DIP Facility's roll-up of nearly all of M&T's pre-petition obligations unfairly takes value from the Azzur Consulting business away from unsecured creditors is baseless.

7.      The same goes for nearly all of the Committee's other arguments that the DIP Facility's roll-up unfairly disadvantages unsecured creditors.  The value (if any) of the assets on which M&T was granted a post-petition lien, individually and collectively, falls squarely with M&T's new money and recycled cash collateral advances that the Committee does not dispute:

- **Avoidance Actions**.  Under section 1.1(j) of the Stalking Horse APA, all avoidance claims or actions relating to the Azzur Consulting business unit are being transferred

to the buyer.  Regardless, the Debtors have not identified any avoidance claims of material value.  Nor has the Committee made any credible showing such claims exist in any material amount.

- **Liens in Leaseholds and Fixtures and Commercial Tort Claims**.    Similarly,  the Debtors do not identify any leaseholds, fixtures or commercial tort claims (especially any not being acquired by a third-party purchaser under contract) having any material value,    More to the point, the Committee has come forward with no evidence to suggest, much less show, that the amount of any grant of post-petition liens to M&T would be in excess of the amount the Committee agrees M&T is entitled to protect for its new money and post-petition revolver advances.

8.      Regardless, the roll-up of nearly all of M&T's pre-petition obligations was a valid exercise of the Debtors' business judgment.  The roll-up was a condition of M&T's advancing of the post-petition financing that all parties agree was essential to permit the Debtors to achieve value maximizing sale(s) as a going concern business for the benefit of *all* stakeholders.  Without such financing (and all of its associated terms), post-petition financing would not have been available, and a value destructive liquidation would have been the Debtors' only option.  Thus, the roll-up and every other term to which the Committee objects, including the DIP Facility's provisions concerning surcharge waivers, marshaling and the "equities of the case" exception, are appropriate and should be approved.

9.      Lastly, the Committee's insistence on an increased carve-out for its professionals is a standard objection that has no merit.  The Committee has articulated no entitlement to any non-consensual carve-out from M&T's liens, and none exists.  The Committee has no right to re-

write the agreed-upon budget that M&T has agreed to fund, the alternative to which is a liquidation that leaves all stakeholders, and hundreds of employees and independent contractors, bereft.

10.     In summary, and in view of the record evidencing the Debtors' exercise of sound business judgment in entering into the DIP Facility, the Objection should be overruled and the DIP Motion for the entry of a final order approving the DIP Facility should be granted in its entirety.

## BACKGROUND

### A.     Relevant Background

11.     The Debtors are parties to that certain Loan and Security Agreement, by and among Azzur Group, LLC, as lead borrower, and M&T, dated as of April 7, 2020 (as may be amended, modified, supplemented, extended renewed, restated, or replaced, the "Pre-Petition Loan Agreement"). The Pre-Petition Loan Agreement provides for an asset-based revolving credit facility (the "ABL Facility") and a term loan credit facility (the "Term Loan Facility"). The obligations under the ABL Facility and Term Loan Facility are secured by a first-priority lien on substantially all of the Debtors' assets. *See* Ex. A to the DIP Motion, at ¶ 5. As of the Petition Date, the Debtors were obligated to the Pre-Petition Lender in the aggregate amount of approximately $62.2 million (plus accrued and unpaid interest, costs and fees).

12.     Unable to service its debt from operations and to raise the necessary capital to effectuate an out of court sale of its businesses, on March 2, 2025 (the "Petition Date"), each of the Debtors filed petitions for relief under Chapter 11 of the Bankruptcy Code. In support of the various first day motions, the Debtors submitted the Declaration of M. Benjamin Jones, Chief Restructuring Officer of the Debtors, dated March 3, 2025 [Docket No. 12] (the "Jones Declaration").

13.     As set forth in the Jones Declaration, prior to the Petition Date, the Debtors reached agreement with M&T to secure M&T's (i) support for the prepetition sale transaction of the Debtors' Azzur Labs business segment (ii) the sale of the Debtors' Consulting Business unit and (iii) commitment to provide DIP financing in an amount sufficient to fund these chapter 11 cases. Jones Decl. at ¶ 8.

14.     In this respect, as set forth in the Jones Declaration, after a marketing process, the Debtors closed a sale on January 3, 2025 for substantially all of the assets of its Azzur Labs business unit (the "Azzur Lab Sale") in return for gross proceeds of $16 million, the net proceeds of which (approximately $14 million) were paid to M&T to reduce its obligations.  Jones Decl. at ¶ 30.

15.     Concurrently with prepetition Azzur Labs Sale process, the Debtors received expressions of interest for the purchase of the Azzur Consulting Business unit.  The pre-petition marketing process culminated in the execution of that certain Asset Purchase Agreement, dated as of March 2, 2025 (the Petition Date), by and among Eliquent Life Sciences, Inc., as Purchaser ("Eliquent"), and Azzur Group, LLC and its subsidiaries, as Sellers (the "Stalking Horse APA"). Jones Decl. at ¶ 32.  As more fully described in the Stalking Horse APA, subject to higher or otherwise better bids, the Stalking Horse Bidder will purchase the Azzur Consulting Business unit assets for a purchase price of $56,000,000 plus the assumption of certain Assumed Liabilities (as defined in the Stalking Horse APA).  Importantly, the Stalking Horse APA makes no provision for adjustments to the purchase price based on any post-petition performance of the Debtors.  It contemplates that a significant number of the Debtors' Azzur Consulting employees will transition to the Stalking Horse Bidder following consummation of the sale*.  Id.*

7

16.     On March 28, 2025, the Bankruptcy Court entered the *Order (I) Approving Bidding Procedures in Connection with Sale of Assets of the Debtors and Related Bid Protections, (II) Approving Form And Manner of Notice, (III) Scheduling Auction and Sale Hearing, (IV) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases, and (V) Granting Related Relief* [D.I. 177] (the "Bidding Procedures Order"), approving certain dates, deadlines, and procedures for the potential sale of certain of the Debtors' assets, attached to the Bidding Procedures Order as "Exhibit 1" (the "Bidding Procedures").

17.     The Bidding Procedures Order established April 7, 2025, at 5:00 p.m., as the deadline by which Bids must be submitted with respect to the Debtors' Assets.  On April 8, 2025, the Debtors filed a *Notice of Successful Bidder and Cancellation of Auction Solely with Respect to the Sale of the Debtors Consulting Business* (the "Bid Notice") [Docket No. 360].  As set forth in the Bid Notice, the Debtors advised that they received no other qualified bid for the Consulting Business other than the Stalking Horse Bid submitted by the Stalking Horse Bidder.  The Debtors thus cancelled the auction and declared Eliquent as the successful bidder with respect to the Consulting Business.

18.     In addition to seeking approval of the sale of the Consulting Business, among the Debtors' first-day filings, the Debtors also filed the DIP Motion seeking *Interim and Final* Orders*: (I) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Claims, and (C) Grant Adequate Protection, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing and (IV) Related Relief* [Docket No. 11].

19.     As set forth in greater detail in the DIP Motion, the Debtors seek authorization to enter into the DIP Credit Facility, which contemplates a postpetition senior secured superpriority debtor in possession multi-draw revolving credit facility, in an aggregate principal amount of up

8

to $8.5 million plus other revolving Advances (including Advances from collections of M&T's pre-petition cash collateral), up to a total principal amount of $23.5 million. As Jones attested, without contradiction, "the proposed DIP Facility is designed to provide the Debtors with liquidity to fund operations and a value maximizing sale process. Specifically, the Debtors require immediate access to additional liquidity to ensure that they are able to continue to operate during these chapter 11 cases, consummate the Stalking Horse APA, and maximize the value of their estates for the benefit of all stakeholders." Jones Decl. at ¶ 48.

20.     Further, Jones attested, and there is no basis to dispute, that the DIP Facility was the product of weeks long, arms'-length negotiations, and that the Debtors and their professionals "worked to negotiate the most favorable terms and provisions of the DIP Financing available to the Debtors given the Debtors' lack of alternative third-party financing." Jones Decl. at ¶ 50. Jones further averred to the efforts to find alternative financing and stated that "given the nature of the Debtors' business and existing secured debt, the Debtors were unable to obtain any other financing and such efforts would have been futile in light of the Debtors' existing capital structure." Jones Decl. at ¶ 51.

21.     Thus, according to Jones' uncontroverted sworn statements, "the Debtors used their business judgment to obtain the best financing terms possible with the DIP Lender, which offers the Debtors access to much-needed liquidity on reasonable or favorable terms with all interest and the upfront fee paid-in-kind, and without significant other fees that are customary in many postpetition financing arrangements." Jones Decl. at ¶ 52.

22.     On March 3, 2024, the Court entered an *Interim Order (A) Authorizing Debtors and Debtors in Possession to (A) Obtain Post-petition Financing, (B) Grant Liens and Superpriority Claims, and (C) Grant Adequate Protection; (II) Modifying the Automatic Stay; (III)*

9

*Scheduling a Final Hearing; and (IV) Granting Related Relief* [Docket No. 63, the "Interim DIP Order"].

23.     Pursuant to the Interim DIP Order, the Debtors were authorized, *inter alia*, to obtain post-petition loans, advances and other financial accommodations from M&T on a superpriority basis, secured by first priority liens on security interests in substantially all of Debtors' assets and properties pursuant to the terms of the Interim DIP Order.

**B**.     **The Objection to the DIP Motion**

24.     On April 4, 2025, the Committee filed the Objection to the DIP Motion.  [Docket No. 341].  The Objection does not contend that the Debtors should not avail themselves of DIP financing.  Rather, the Committee labels the negotiated terms of the DIP Facility as "prejudicial" and "problematic" in several respects, including the proposed roll-up, granting of replacement liens on postpetition receivables generated, granting of liens on alleged unencumbered assets, including the proceeds of avoidance actions, leaseholds and fixtures and commercial tort claims, the mechanism for challenging liens and asserting claims, and the granting of a § 506(c) waiver. (Docket No. 341, ¶¶ 1-5).

25.     The objections raised by the Committee are standard, routinely-raised objections by unsecured creditors that have no application or merit under the facts of this case.  For the reasons set forth herein, the Court should approve the DIP Motion and enter the Final Order.

## ARGUMENT

### THE TERMS OF THE DIP FACILITY ARE FAIR, REASONABLE AND CUSTOMARY, AND ENTERING INTO THE DIP FACILITY IS A PROPER EXERCISE OF THE DEBTORS' BUSINESS JUDGMENT

26.    Bankruptcy courts routinely and properly defer to a debtor's business judgment on the decision as to whether, and under what terms, to enter into a post-petition financing arrangement.  *See e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving an interim loan, receivables facility and asset-based facility because they "reflect[ed] sound and prudent business judgment … [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); *see also In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[A] court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

27.    As one bankruptcy court put it, business judgments "should be left to the board room and not to [the] court."  *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985); *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest").

28.    Courts have articulated a three-part test to determine whether a debtor or trustee is entitled to financing pursuant to § 364(c) of the Bankruptcy Code.  Specifically, courts look to

11

whether: (a) the trustee/debtor is unable to obtain unsecured credit under § 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim; (b) the credit transaction is necessary to preserve the assets of the estate; and (c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor/trustee-borrower and proposed lenders. *See, In re Ames Dep't Stores*, 115 B.R at 37–40. The DIP Facility passes this three-part test with flying colors.

29.     The Debtors have determined, in the reasonable and independent exercise of their business judgment, that the DIP Facility offers the *only* viable opportunity to maximize the value of the Debtors' estates, and the Committee has not shown otherwise. Cash collateral alone was insufficient to finance the post-petition activities of the Debtors needed to preserve a going concern sale; the Debtors' trade creditors and other unsecured creditors apparently were unwilling to extend the Debtors the credit they needed; and the only creditor who did offer to finance the Debtors' post-petition activities to achieve going concern sale(s) was M&T on the terms ultimately agreed to in the DIP Facility.

30.     Under these circumstances, this Court should not second guess the Debtors' business judgment in entering into the DIP Facility, but should instead grant the relief requested by the Debtors in the DIP Motion on a final basis. As set forth below, the Committee's objections to the contrary are meritless.

**A.  The Proposed Roll-Up Is Appropriate**

31.     Roll-ups, and "creeping" roll-ups, are standard and permissible features of DIP financing arrangements. *See In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 511 and n. 15 (Bankr. D. Del. 2010); *In re Energy Future Holding Corp.*, 527 B.R. 157, 167 (D. Del. 2015). The

12

Supreme Court of the United States has recognized that roll-ups may serve significant Bankruptcy Code objectives. *See Czyzewski v. Jevic Holding Corp.*, 580 US. 451, 468 (2017).

32.    In this case, the roll-up is appropriate consideration to M&T for making essential liquidity under the DIP Facility immediately available to the Debtors to enable them to achieve the sale of the Consulting Business unit to Eliquent on a going concern basis, which all parties agree was in the best interest of all stakeholders.  (Jones Decl., at ¶ 48).

33.    Accordingly, as bankruptcy courts in this Circuit and others have regularly done when necessary for a debtor to obtain DIP financing, the Court should approve the roll-up provisions. *See, e.g.*, *In re Franchise Group, Inc.*, Case No. 24-12480 (JTD) (Bankr. D. Del. December 11, 2024) (approving a $750 million DIP Credit Facility with a 2:1 ratio consisting of $500 million of prepetition debt and $250 million of new money); *In re Restoration Forest Products Group, LLC*, Case No. 24- 10120 (KBO) (Bankr. D. Del. Feb. 1, 2024) (authorizing an approximately $93 million DIP Credit Facility, including a $64 million roll-up of the prepetition bridge facility on an interim basis); *In re DeCurtis Holdings LLC*, Case No. 23- 10548 (JKS) (Bankr. D. Del. June 23, 2023) (authorizing an approximate $27 million DIP Credit Facility, including a $20.5 million roll-up of prepetition loans); *In re SiO2 Medical Prods., Inc.*, Case No. 23-10366 (JTD) (Bankr. D. Del. Apr. 26, 2023) [Docket No. 216] (authorizing an approximately $120 million DIP Credit Facility, including a $60 million roll-up of the prepetition term loan); *In re Phoenix Servs. Topco LLC*, Case No. 22-10906 (MFW) (Bankr. D. Del. Sept. 29, 2022) [Dkt. No. 73] (approving a $100 million interim DIP Credit Facility with a 3:1 roll-up ratio consisting of $75 million of prepetition debt and $25 million of new money); *In re Tuscany Int'l Holdings (U.S.A.) Ltd.*, 2014 WL 1419488 (Bankr. D. Del. Mar. 21, 2014) (authorizing roll-up of certain prepetition obligations); *In re True Temper Sports, Inc.*, 2009 WL 7226692 (Bankr. D. Del. Oct.

30, 2009) (authorizing a $80 million roll-up); *In re WCI Cmtys., Inc.,* No. 08-11643 (KJC) (Bankr. D. Del. Sept. 23, 2008) (authorizing the debtors to use a portion of the DIP proceeds to repay the prepetition credit agreement).[3]

34.     The Committee objects to the proposed roll-up as prejudicial because M&T "seeks to roll up approximately $61 million of approximately $62 million of Pre-Petition Obligations, even though the DIP Credit Facility offers only $8.5 million of true new money loans."  (Obj. ¶ 1) However, contrary to this contention, the roll-up is not prejudicial.  Rather, the roll-up is a material component of the structure of the DIP Facility that was heavily negotiated.  Further, M&T is offering lending terms that no one else, including members of the Committee, offered to the Debtors.

35.     In short, unsecured creditors are not being harmed in any way by the proposed DIP Facility.  As set forth below, the Committee has not demonstrated any harm to unsecured creditors as a result of the DIP Facility.  To the contrary, in the absence of the DIP Facility, unsecured creditors (and their professionals) would get nothing from the liquidation that would ensue.

---

[3] The cases relied upon by the Committee are not to the contrary.  *See e.g. In re Verasun*, No. 09-12606 (BLS)(while finding that "rollups are not favored," the court nonetheless held that they can be approved if a "substantial showing [of need for the financing] is made"); *Matter of Saybrook Mfg. Co., Inc.*, 963 F.2d 1490, 1496 (11th Cir. 1992)(*Saybrook*, an Eleventh Circuit case that held that the bankruptcy court erred in using its general equitable powers to authorize cross-collateralization.  First, roll-ups are not cross collateralization.  In addition, *Saybrook* has not been adopted by the Courts in this Circuit or by any other Court of Appeals, and is not binding upon the Court. Rather, as stated, bankruptcy courts have routinely entered debtor-in-possession financing orders that have authorized cross-collateralization and/or "roll-up" refinancing of pre-petition secured indebtedness, such as is proposed in this case); *Reynolds v. Servisfirst Bank (In re Stanford)*, 17th F.4th 116, 128 (11th Cir. 2021)(Case involved dismissal of an appeal from sale authorized by the Bankruptcy Court that involved roll-up loan, Court dismisses the appeal as moot. In dicta from a concurring opinion, Court merely acknowledges the increase in roll-up requests since the *Saybrook* opinion).

**1.    The DIP Facility Does Not Confer Unfair Advantage to M&T Under § 552 of the Bankruptcy Code**

36.    The Committee contends that the roll-up of nearly all of M&T's Pre-Petition obligations unfairly transfers to M&T the value of assets that, immediately upon the bankruptcy filing, became unencumbered by M&T's pre-petition liens and, thus, which otherwise would go to pay the unsecured creditor body.   Primarily, the Committee argues that, under § 552(a), once the Debtors filed their petition, M&T's "floating lien" on future receivables and intangibles was cut off; therefore, M&T no longer had (and has) a pre-petition lien on any receivables, or other value created by the Debtors' personnel, after the Petition Date.  (Obj. ¶¶ 19-23).  According to the Committee, "the bulk of the value in the Debtors' estates is not tied to assets that existed as of the Petition Date." (*Id.* ¶ 25)

37.    More specifically, the Committee argues, "[t]he value of the Debtors' consulting business tied to future work and the capacity to generate future revenue is unencumbered as of the Petition Date and should remain unencumbered by the Pre-Petition Obligations (except, solely, to the extent of re-advances of cash collateral and assumed letter of credit obligations under the DIP Credit Facility)." (*Id.*)   Further, "new postpetition receivables generated from the Debtors' postpetition consulting services" are cut off from M&T's pre-petition lien and should remain unencumbered. (*Id.* ¶ 13)  As set forth below, the Committee's arguments are wrong as a matter of fact and law.

38.    First, the purchase price in the Stalking Horse APA was negotiated and executed prior to and/or on March 2, 2025, immediately *before* the filing of the Petition.  That purchase price provides for Eliquent  to purchase the Azzur Consulting Business unit assets for a purchase price of $56,000,000 in cash, plus the assumption of certain Assumed Liabilities (as defined in the Stalking Horse APA).  Per the plain terms of the Stalking Horse APA, that $56 million cash

purchase price, is not adjusted (either up or down) based on any of the Debtors' post-petition activities. Rather, the price was *fixed* as of (and, in fact, prior to) the Petition Date. Hence, as a matter of indisputable fact, the Debtors' post-petition operations contributed *zero* to the price, which was fully established *pre-petition*. Thus, contrary to the Committee's position, the full (fixed) purchase price for the Debtors' sale of its Consulting Business unit good will *was, in fact,* the subject of M&T's pre-petition lien. The Committee's novel § 552(a) argument that any post-petition value contributed to a going concern sale must be evaluated and allocated, even if it had any legal basis (and no court has found that it does), is factually baseless in this case.

39.     *Second*, even assuming (contrary to fact) that the Debtors' post-petition operations did contribute to the purchase price of the Consulting Business unit, there would be no basis in law to parse out, after the fact, any such contribution from the purchase price and to somehow reduce the amount of M&T's lien accordingly. Altering, after the fact, the benefit of a secured creditor's bargain for financing a transaction based on "amorphous 'bankruptcy created' value" would impair the market for secured lending and, consequently, restrict, and raise the cost of capital, of lending for all market participants. *In re Guardian Elder Care at Johnstown, LLC*, 666 B.R. 651, 658 (Bankr. W.D. Pa. 2025). That result should be avoided, and "any attempt to reduce [a bank's] recovery by imposing a subjective and extralegal reallocation of 'value' . . . must be rejected." *Id.*, at 656.

40.     *Third*, the Committee's argument that any post-petition receivables based on post-petition consulting services also are divorced from M&T's pre-petition lien, likewise, is legally and factually wrong. M&T's pre-petition security interest covers "present and future" "accounts," "contract rights," "other rights to the payment of money …. for services rendered or goods sold," and all "products and proceeds" of those assets. (*See* Ex. A to the DIP Motion, at ¶ 5.).

16

Consequently, under § 552(b)(2), M&T's pre-petition security interest *would attach* to any post-petition proceeds of proceeds of pre-petition Contracts. *E.g.*, *United Virginia Bank v. Slab Fork Coal Co.*, 784 F.2d 1188 (4th Cir. 1986) (cash proceeds generated under prebankruptcy petition contract for supply of coal were subject to prepetition security interest in contract and its proceeds, even though received after petition was filed); *In re Blanton*, 2009 WL 10742930, at *3 (Bankr. M.D. Fla. Oct. 20, 2009) ("Any post-petition payments made under the Broiler Production Agreement are proceeds of the encumbered account under § 552(b)."); *Cadle Co. v. Schlichtmann*, 267 F.3d 14, 20 (1st Cir. 2001) ("Cadle held a security interest in the firm's contingency fee agreement relating to the Groton matter and the proceeds from that agreement. That Schlichtmann performed much of the work after the firm's dissolution and his bankruptcy and before the right to payment arose does not alter the fact that Cadle held a security interest in the payment."); *In re Patio & Porch Sys., Inc.*, 194 B.R. 569, 574 (Bankr. D. Md. 1996) ("The [post-petition] payments made under the [pre-petition home improvement] contracts were proceeds of the accounts receivable for purposes of 11 U.S.C. § 552(b)."). Per the Debtors, those proceeds constitute all or substantially all of any post-petition receivables that the Debtors have generated or may generate based on post-petition consulting. (Debtors' Reply in Support of Motion for Entry of Final Order Approving Postpetition Financing (the "Reply"), at ¶16.) That is precisely what any collections of post-petition receivables generated from post-petition consulting services would constitute.

41.     According to the Debtors, they have not entered into many postpetition Consulting Business customer contracts that are with new customers, but have entered several with existing

customers. (Reply, ¶ 16) [4]  As such, all new statements of work for existing customers, accounts

derived therefrom and postpetition revenue constitutes proceeds of prepetition contracts and all

work performed postpetition in connection with these prepetition contracts and any work under

the new postpetition contracts has been funded by the DIP Lender.  (*Id.*)  The conclusion is

inescapable that the value and receipts are collateral of M&T Bank, just like the Stalking Horse

APA sale proceeds.

42.    Payments pursuant to pre-petition Contracts are also the "proceeds" of pre-petition

goodwill.[5]  Those proceeds, pursuant to § 552(b), also would be subject to M&T's pre-petition

lien.  Further, the Stalking Horse APA provides that, as consideration for the $56 million cash

purchase price, Eliquent will receive "all goodwill, payment intangibles and general intangible

assets and rights of Sellers associated with the Business."  (APA §§ 1.1, 1.1(l)).  Accordingly, any

post-petition good will that the Debtors might generate would go to Eliquent, without any

adjustment to the cash purchase price.  In short, the Committee's argument that the DIP Facility's

---

[4] M&T understands that the Debtors have entered into postpetition contracts with two new Consulting Business customers.  (Reply ¶ 16)  However, no post-petition receipts associated with either of these postpetiton contracts have been received, and the Debtors anticipate that revenue, which may be earned under statements of work issued in connection with these contracts, will not be realized until after the closing of the Stalking Horse APA. (*Id.*)

[5] Debtors' security interest includes "[a]ll present and future general intangibles." (Loan Agreement § 5.1(c)). "General intangibles" include goodwill.  *See, e.g.,* 13 Pa. Stat. and Cons. Stat. Ann. § 9102 (West) See, e.g., 13 Pa. Stat. and Cons. Stat. Ann. § 9102 (West) (defining "[g]eneral intangible" as "[a]ny personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money and oil, gas or other minerals before extraction …," and stating that "[t]he term includes controllable electronic records, payment intangibles and software"); 13 Pa. Stat. and Cons. Stat. Ann. § 9102 (West) § 9-102 Comment 5.d ("'General intangible' is the residual category of personal property, including things in action, that is not included in the other defined types of collateral."); *Makse Jewelry Inc. v. Rock*, 2000 WL 1738382, at *5 (S.D.N.Y. Nov. 27, 2000) (the phrase "general intangibles" includes goodwill), citing *In re Leasing Consultants Inc.*, 486 F.2d 367, 371 n. 5 (2d Cir. 1973) (same).  *See also Bischoff v. LCG Blue, Inc.*, 2009 WL 148519, at *6 (Cal. Ct. App. Jan. 22, 2009) (not officially published) (noting that "the cases have found that goodwill falls within the category of 'general intangibles'"), citing *DFS Secured Healthcare Receivables Tr. v. Caregivers Great Lakes, Inc.*, 384 F.3d 338, 344 n.4 (7th Cir. 2004) ("The valuable assets in this case [which included items considered goodwill] would be considered 'general intangibles' under Indiana's version of Article 9 of the UCC.  *See* Ind. Code § 26–1–9.1–102(a)(42).").

roll-up would unfairly grant to M&T post-petition liens on assets unencumbered by its pre-petition liens is wrong.

43.     The Committee cites numerous cases which it claims support the proposition that "postpetition revenues and receivables from a debtor's business operations or labor cannot be subject to liens in connection with prepetition security agreement." (Obj. ¶ 23 and authorities cited therein).  However, none of those cases involved circumstances that are even remotely similar to those here.  Because M&T has a pre-petition lien on substantially all of the Debtors' assets, including the Stalking Horse APA cash proceeds and any proceeds from post-petition consulting services, none of those cases are on point.  Accordingly, M&T has met its burden of proving that it has a lien in proceeds under § 552 of the Bankruptcy Code and, thus, the Committee's objection to the pre-petition roll-up on this basis should be overruled.

### 2.     Liens on Proceeds of Avoidance Actions, Leaseholds and Fixtures and Commercial Torts Are Appropriate

44.     The Committee also takes exception to the roll-up on the grounds that it purportedly grants to M&T post-petition liens on the proceeds of avoidance actions, leaseholds and fixtures and commercial torts as to which M&T's pre-petition liens in the amount of nearly all of M&T's pre-petition obligations.  The Committee complains that this, too, improperly transfers value from unsecured creditors to M&T.  As set forth herein, however, M&T is entitled to liens on the foregoing, including the proceeds of avoidance actions -- as well as the other protections set forth in the Bankruptcy Code -- as a condition to making a DIP loan.  *See* 11 U.S.C. § 364(c).  Moreover, granting a post-petition lien on such assets, under the facts of the case, does not unfairly disadvantage unsecured creditors.

45.     In assessing requests under § 364(c), courts generally apply a three-part test requiring a showing that: (1) the debtor cannot obtain unsecured credit or without granting

19

superpriority status; (2) the proposed financing is necessary to preserve assets of the estate; and (3) the terms of the proposed financing are fair, reasonable and adequate. *In re Crouse Group*, 71 B.R. 544 (Bankr. E.D. Pa. 1987). The Committee does not credibly dispute that the Debtors have satisfied this test. Rather, the Committee summarily contends that M&T should not be granted liens on proceeds of avoidance actions, leaseholds and fixtures and commercial torts, and thus seeks to have this Court rewrite the parties' bargained-for deal.

46.     In enacting § 364, Congress recognized the natural reluctance of lenders to extend credit to a company in bankruptcy and designed § 364 to provide "incentives to the creditor to extend post-petition credit" so that the debtor may be able to reorganize. *In re Ellingsen MacClean Oil, Inc.*, 834 F.2d 599, 603 (6th Cir. 1987), *cert. denied*, 488 U.S. 817, 109 S.Ct. 55, 102 L.Ed.2d 33 (1988). The granting of liens on avoidance action proceeds is one of those incentives. As courts have recognized, limiting the protections offered by § 364 undercuts the reorganizational goals of bankruptcy and would cause a chilling effect on DIP financing. *In re Florida West Gateway, Inc.*, 147 B.R. 817 (Bankr. S.D. Fla. 1992).

47.     Further, proceeds of avoidance actions are property of a debtor's estate under § 541(a)(3) of the Bankruptcy Code, which provides that any interest in property that a trustee recovers in an avoidance action under § 550 is property of the estate. Therefore, like all other property of the estate, proceeds of avoidance actions may be pledged to the secure the claims of secured creditors.

48.     For these reasons, priority in payment on proceeds from avoidance actions, and liens on such proceeds are routinely authorized with respect to postpetition financing, particularly when the lender, like here, is providing material benefit in the form of new money to the Debtors'

estates.  M&T is providing new money to the Debtors, which is necessary to allow the Debtors the necessary breathing room to maintain operations to facilitate a sale of their assets.

49.    Numerous courts in this District have authorized the granting of liens on avoidance action proceeds to secure financing, demonstrating that such protections are routinely authorized.  *See e.g., In re Charge Enterprise, Inc*., No. 24-10349 (TMH) (Bankr. D. Del. Apr. 8, 2024); *In re Restoration Forest Prods. Group, LLC*, No. 24-10120 (KBO) (Bankr. D. Del. Mar. 6, 2024); *In re ViewRay, Inc.*, No. 23-10935 (KBO) (Bankr. D. Del. Aug. 29, 2023)*; In re Near Intelligence,* No. 23-11962 (TMH) (Bankr. D. Del. Jan. 23, 2024); *In re Bicent Holdings LLC*, Case No. 12-11304 (KG) (May 16, 2012); *In re Delta Petroleum Corp*., Case No. 11-14006 (KLC) (Jan. 11, 2012); *In re Townsends, Inc*., Case No. 10-14092 (CSS) (Jan. 28, 2011); *In re Xerium Technologies, Inc.*, Case No. 10-11031 (KJC) (Bankr. Del. Apr. 28, 2010); *In re Source Interlink*, Case No. 09-11424 (KG) (Bankr. D. Del May 28, 2009); *In re Silver Cinemas International, Inc.*, Case No. 00-1978 (Bankr. D. Del. August 11, 2000).   These results are in accord with numerous other courts that similarly approved the granting of a lien on avoidance actions to secure financing*.  See e.g. Unsecured Creditors' Comm. v. Jones Truck Lines, Inc.* 156 B.R. 608, 614 (W.D. Ark. 1992) *and Official Unsecured Creditors' Comm. v. Northern Trust (In re Ellingsen MacLean Oil Co.),* 98 B.R. 284, 291-92 (Bankr. W.D. Mich. 1989).   Thus, the granting of a lien on avoidance is one permitted by the Bankruptcy Code and one that is routinely authorized by courts to secure the financing needed to achieve debtors' restructuring goals.

50.    Moreover, the impact on unsecured creditors in this case of granting post-petition liens to M&T on such avoidance action proceeds is not significant.  Under 1.1(j) of the Stalking Horse APA, all preference or avoidance claims or actions arising under the Bankruptcy Code or other applicable law are being transferred to the buyer of the Consulting Business unit.   Thus,

21

M&T is not benefiting from any lien in such avoidance action proceeds.  Beyond that, the Debtors have not identified any avoidance claims of material value.  Nor has the Committee.

51.     The Committee's objection to post-petition liens granted to M&T for leaseholds and fixtures and commercial tort claims are similarly unpersuasive.  The Debtors have not ascribed any significant value to such assets, and the Committee does not describe or identify the existence or value of any such assets with any level of specificity.  Thus, these objections, too, are meritless.

**B.  Waivers of Surcharge, Marshaling and Equities of the Case are Appropriate**.

52.     The Committee objects to the inclusion of waivers of any § 506(c) surcharge, marshaling, and "equities of the case" rights as to M&T in the DIP Facility.  The Committee's objection to such waivers are also misguided as applied to the facts of this case.  First, the right to use, and thus waive, § 506(c) to recover the costs of preserving, or disposing of the collateral in securing an allowed secured claim, is expressly limited to a trustee (or the debtor-in-possession), and the Debtors here have agreed to their waiver in their business judgment.  *See* 11 U.S.C. §§ 506(c) and 1107; *see also Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A*., 530 U.S. 1, 6, 120 S. Ct. 1942 (2000).  Second, the Committee's stated concern with respect to such waiver is only to the extent that administrative and priority claims are not funded and paid on a current basis.  But, here, the Debtors prepared a budget that specifies the post-petition costs and expenses the Debtors intend to incur and pay, and that budget reflects that all administrative and priority claims will be paid.  Further, M&T has agreed to provide the Debtors with the funding necessary to cover the expenses set forth in the budget.  Accordingly, the Committee's concern is misplaced.

53.     In any event, the Debtors are well within their business judgment to agree to waive § 506(c) claims in order to obtain the DIP Facility. There are numerous examples where courts

22

have entered orders approving a debtor's exercise of its business judgment to grant § 506(c) waivers in connection with DIP financing.  *See e.g. In re Charge Enterprise, Inc.*, No. 24-10349 (TMH) (Bankr. D. Del. Apr. 8, 2024); *In re Restoration Forest Prods. Group, LLC*, No. 24-10120 (KBO) (Bankr. D. Del. Mar. 6, 2024); *In re ViewRay, Inc.*, No. 23-10935 (KBO) (Bankr. D. Del. Aug. 29, 2023); *In re Near Intelligence*, No. 23-11962 (TMH) (Bankr. D. Del. Jan. 23, 2024); *In re Lillian Vernon* (No. 08-10323, Bankr. D. Del. March 20, 2008); *Inteliquest Media Corp. v. Miller (In re Inteliquest Media Corp.)*, 326 B.R. 825 (B.A.P. 10th Cir. 2005) (rejecting appellants' argument that the § 506(c) waiver in the financing order violated public policy); *In re Global Home Products LLC, et al.,* Case No. 06-10340 (KG) (Dkt. No. 184 at ¶ 4.3); *In re Rouge Industries, Inc. et al.*, Case No. 03-13272 (MFW) (Dkt. No. 301 at 4.3); *In re PillowTex Corporation, et al.*, Case No. 03-12339 (PJW) (Dkt. No. 391 at 21); *In re Wherehouse Entertainment, Inc. et al*., Case No. 03-10224 (PJW) (Dkt. No. 757 at 22); *In re Enron Corp.*, 2001 Bankr. LEXIS 1563, at *10 (Bankr. S.D.N.Y. Dec. 3, 2001) (approving a post-petition financing arrangement where the debtors' debtor-in-possession loan obligations took priority over any and all administrative expenses or other claims under § 506(c)); *In re Film Equip. Rental Co*., 1991 U.S. Dist. LEXIS 17956 (S.D.N.Y. December 12, 1991) (upholding the bankruptcy court's cash collateral order and enforcing § 506(c) waiver when debtor's counsel later sought to surcharge the secured creditor's collateral for fees).

54.    The Committee's objections to the waiver of marshaling and rights under § 552(b) of the Bankruptcy Code are also misguided as applied to the facts of this case.  With respect to marshalling, it too is unavailable to unsecured creditors, particularly where, as here, there has been (can be) no allegation or showing of fraud, misconduct, bad faith or inequitable conduct here.  *See, e.g., In re Liberty Outdoors, Inc*., 204 B.R. 746, 750 (Bankr. E.D. Mo. 1997) (analyzing Eight

Circuit authority on marshaling and holding that "[w]here no fraud, misconduct, bad faith or inequitable conduct is alleged or shown, courts have refused to expand the doctrine.").  In any event, both the Pre-Petition Loan Agreement and Interim Order already provide such rights to M&T.

55.     Finally, the Committee's reliance on the equities-of-the-case exception is misplaced because "[u]nder the equity exception in section 552(b)(2), the secured party should not receive a windfall when the trustee uses assets of the estate – for example, to finish uncompleted inventory (which is proceeds of collateral acquired by the debtor prepetition) subject to a prepetition security interest."  5 Collier on Bankruptcy ¶ 552.02[4][b] (16th ed.).  *See also In re Laurel Hill Paper Co.*, 393 B.R. 89, 92 (Bankr. M.D.N.C. 2008) (denying debtor's request to set aside $1,000,000 of sale proceeds attributable to the efforts of the CRO pursuant to the equities of the case exception, where compensation and expenses of the debtor's CRO were paid from the debtor's DIP financing, which was repaid at the closing of the sale from proceeds that were subject to the secured creditor's lien).  Here, however, the doctrine is inapplicable, because, to the extent the Debtors added post-petition labor or services, that was fully paid for by M&T's advances  to pay the employees rendering those services;  thus, M&T should and would be entitled to receive the proceeds of any receivables generated therefrom.  Rather than being equitable, application of the "equities-of-the-case" exception here would give the *Debtors* a windfall, and *that* would be improper.  Further, under the circumstances here, it is wholly inequitable to require the Lenders to provide the Debtors with the funding contemplated by the DIP Facility while risking that their liens might be subsequently disturbed under § 552(b).

56.     The aforementioned waivers were part and parcel of a heavily negotiated DIP Facility that has enabled the Debtors to, inter alia, obtain immediate access to liquidity, avoid a

24

costly and distracting fight over priming and other execution risk associated with a new lender transaction, and send a positive signal to the market, and accordingly, should not be disturbed.

## C.    The 75-day Investigation Period Is Warranted

57.    The Committee contends that the DIP Facility circumscribes the Committee's ability to exercise its statutory duties complaining about the Committee's investigation budget of $25,000 and 75-day investigation period.  The 75-day Challenge Period from formation of the Committee is sufficient here where the sales process is due to culminate with a sale of assets within a few weeks.  Therefore, any investigation must be undertaken quickly.  Moreover, the capital structure of the Debtors is straightforward, and there is only one secured credit facility. Accordingly, the timeframe set forth in the Final Order is necessary in light of the timeline for this case, consistent with the Local Rules, and customary in other cases.

58.    In addition, in view of the 75-day provision and the lack of any extraordinary circumstances here, there is no basis for the Committee to be granted a tolling of the challenged period if the Committee timely files a motion for standing and attaches a pleading that constitutes a challenge.

59.    Further, although the Committee proposes that the $25,000 investigation budget must be increased, the Debtors have specifically agreed to the limitation and believes that it is sufficient to perform any investigation here.  Parties in interest should not be granted a blank check to spend as much as they want in connection with an investigation of M&T liens.

8399535.2

## **CONCLUSION**

60.     For all these reasons, and those set forth in the Motion and Reply, M&T respectfully requests that the Court enter the proposed Final Order in the form and with the terms agreed to between the Debtors and M&T.

Dated: April 10, 2025
      Wilmington, Delaware

/s/ John H. Knight

John H. Knight (No. 3848)
David T. Queroli (No. 6318)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: 302-651-7700
Facsimile: 302-651-7701
Email: knight@rlf.com
      queroli@rlf.com

-and-

Andrew M. Kramer (admitted *pro hac vice*)
Adam C. Silverstein (*pro hac vice* pending)
OTTERBOURG, P.C.
230 Park Avenue
New York, NY 10169
Telephone: 212-661-9100
Facsimile: 212-682-6104
Email: akramer@otterbourg.com
      asilverstein@otterbourg.com

*Counsel to Manufacturers and Traders Trust Company, as Pre-Petition and DIP Lender*