## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AZZUR GROUP HOLDINGS LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-10342 (KBO)<br><br>(Jointly Administered) |

**COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN
OF AZZUR GROUP HOLDINGS LLC AND ITS AFFILIATED DEBTORS**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT TO DATE. THE INFORMATION IN THIS COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN IS SUBJECT TO CHANGE.**

**DLA PIPER LLP (US)**

Stuart M. Brown (DE 4050)
Roxanne M. Eastes (DE 6654)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2462
Email: stuart.brown@us.dlapiper.com
      roxanne.eastes@us.dlapiper.com

Dated: April 10, 2025

W. Benjamin Winger (admitted *pro hac vice*)
Katherine J. Allison (admitted *pro hac vice*)
Stephanie B. Cohen (admitted *pro hac vice*)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Telephone: (312) 368-4000
Facsimile: (312) 236-7516
Email: benjamin.winger@us.dlapiper.com
      katie.allison@us.dlapiper.com
      stephanie.cohen@us.dlapiper.com

*Counsel for the Debtors*

---

[1] A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Azzur.The Debtors' headquarters and the mailing address for the Debtors is 330 South Warminster Road, Suite 341, Hatboro, PA 19040.

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION ................................... 3

ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS ................................... 17

    2.1    Administrative Claims and Priority Tax Claims.................................... 17

    2.2    Professional Fee Claims.................................... 18

    2.3    DIP Claims.................................... 19

ARTICLE III CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES .................................... 19

    3.1    General Rules of Classification .................................... 19

    3.2    Unimpaired Class of Claims .................................... 22

    3.3    Impaired Classes of Claims & Interests.................................... 23

ARTICLE IV BACKGROUND AND DISCLOSURES.................................... 25

    4.1    General Background .................................... 25

    4.2    Events Leading to these Chapter 11 Cases .................................... 27

    4.3    The Chapter 11 Cases .................................... 30

ARTICLE V CONFIRMATION AND VOTING PROCEDURES .................................... 37

    5.1    Confirmation Procedure.................................... 37

    5.2    Procedure for Objections .................................... 38

    5.3    Requirements for Confirmation .................................... 38

    5.4    Classification of Claims and Interests.................................... 39

    5.5    Impaired Claims or Interests .................................... 40

    5.6    Confirmation without Necessary Acceptances .................................... 40

    5.7    Feasibility.................................... 42

    5.8    Best Interests Test and Liquidation Analysis.................................... 42

    5.9    Releases & Exculpations.................................... 43

    5.10    Acceptance of the Plan.................................... 44

ARTICLE VI CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING....... 44

    6.1    The Plan May Not Be Accepted .................................... 45

    6.2    The Plan May Not Be Confirmed .................................... 45

    6.3    Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections .................................... 45

    6.4    Objections to Classification of Claims .................................... 45

    6.5    Failure to Consummate the Plan.................................... 46

6.6    Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan ................................................................................................ 46

6.7    Plan Releases May Not Be Approved................................................................ 46

6.8    Certain Tax Considerations............................................................................... 47

ARTICLE VII MEANS OF IMPLEMENTING THE PLAN ..................................................... 47

7.1    General .............................................................................................................. 47

7.2    Sale Transaction & Sources of Consideration for Plan Distributions.................. 47

7.3    Wind-Down Debtor .......................................................................................... 48

7.4    Plan Administrator ............................................................................................ 49

7.5    Cancellation of Existing Securities and Agreements........................................... 52

7.6    Exemption from Certain Transfer Taxes ............................................................ 52

7.7    Preservation of Retained Actions....................................................................... 52

ARTICLE VIII SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS 53

8.1    Compromise, Settlement, and Release of Claims and Interests........................... 53

8.2    Release of Liens ................................................................................................ 53

8.3    Releases by the Debtors .................................................................................... 54

8.4    Third-Party Release .......................................................................................... 54

8.5    Exculpation ...................................................................................................... 55

8.6    No Liability Pursuant to Section 1125(e) of the Bankruptcy Code ..................... 56

8.7    Injunction ......................................................................................................... 56

8.8    Consensual Non-Debtor Releases...................................................................... 57

8.9    Indemnification Obligations .............................................................................. 57

8.10    Setoffs .............................................................................................................. 57

8.11    Binding Effect................................................................................................... 57

8.12    Terms of Injunctions or Stays ........................................................................... 58

ARTICLE IX EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................ 58

9.1    Rejection of Executory Contracts and Unexpired Leases.................................... 58

9.2    Supplemental Bar Date for Rejection Damages ................................................. 58

ARTICLE X DISTRIBUTIONS.............................................................................................. 58

10.1    Distributions for Claims Allowed as of the Effective Date ................................. 58

10.2    No Distributions on Disputed Claims ................................................................ 59

10.3    Distributions on Claims Allowed after the Effective Date .................................. 59

10.4    Objections to and Estimation of Claims ............................................................ 59

10.5    Delivery of Distributions and Undeliverable or Unclaimed Distributions ........... 59

10.6    *Interest on Claims* ............................................................................................ 60

10.7      *Withholding and Reporting Requirements* .............................................................. 60

10.8      Miscellaneous Distribution Provisions ................................................................. 61

10.9      De Minimis Distribution Provisions ..................................................................... 61

10.10     Distribution Record Date ..................................................................................... 61

ARTICLE XI CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ............ 62

11.1      Conditions to Effective Date ................................................................................. 62

11.2      Substantial Consummation .................................................................................... 62

11.3      Consequences of Non-Occurrence of Effective Date ........................................... 62

ARTICLE XII ADMINISTRATIVE PROVISIONS ..................................................................... 62

12.1      Retention of Jurisdiction ....................................................................................... 62

12.2      Preservation of Exclusivity ................................................................................... 64

12.3      Amendments ......................................................................................................... 64

12.4      Withdrawal of Plan ............................................................................................... 64

12.5      Successors and Assigns ......................................................................................... 65

12.6      Governing Law ...................................................................................................... 65

12.7      Corporate Action ................................................................................................... 65

12.8      Effectuating Documents and Further Transactions ............................................... 65

12.9      Confirmation Order and Plan Control ................................................................... 65

12.10     Notices .................................................................................................................. 65

12.11     No Admissions or Waiver ..................................................................................... 66

ARTICLE XIII RECOMMENDATION AND CONCLUSION ..................................................... 67

## DISCLAIMER

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF.  NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.  CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED.  THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.  HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

THE COMBINED DISCLOSURE STATEMENT AND PLAN CONTEMPLATES THE SALE OF THE DEBTORS' BUSINESS UNITES AS GOING CONCERNS FOLLOWED BY THE LIQUIDATION OF THE DEBTORS, AND PAYMENTS TO CERTAIN CREDITORS, AS ADMINISTERED BY A PLAN ADMINISTRATOR PURSUANT TO THE TERMS HEREOF.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN WHAT IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN.  NO REPRESENTATIONS CONCERNING THE DEBTORS, OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND THE DEBTORS' SCHEDULES.  ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND THEREIN SHOULD NOT BE

**RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3016(b), AND LOCAL RULE 3017-2, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.**

**SEE ARTICLE VI OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN.**

## INTRODUCTION

Azzur Group Holdings, LLC and its affiliates, as debtors and debtors in possession in these Chapter 11 Cases, propose this Combined Disclosure Statement and Plan for the treatment of the Debtors' remaining business units and assets and Distribution of the proceeds of the Estates' assets to the Holders of Allowed Claims against the Debtors as set forth herein. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

This Combined Disclosure Statement and Plan contains, among other things, a discussion of the Debtors' history, businesses, properties, operations, the Chapter 11 Cases, risk factors, summary and analysis of this Plan, and certain other related matters.

The Debtors commenced the Chapter 11 Cases to complete their marketing process and consummate one or more value-maximizing, going concern transactions within the liquidity parameters they faced. The Plan is the best vehicle to conclude the Chapter 11 Cases following the Sale Transaction(s) and provides for the most efficient, orderly, and value-maximizing path to make timely Distributions to creditors.

The Debtors will continue efforts to build consensus with other stakeholders after solicitation launch and before the Confirmation Hearing. ***The Debtors urge you to vote to accept the Plan***.

**ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ARE ENCOURAGED TO READ THE COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY OR OTHER ADVISORS BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, AND IN THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE, OR WITHDRAW THE PLAN, OR ANY PART THEREOF, PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

## ARTICLE I
## DEFINED TERMS AND RULES OF INTERPRETATION

**Defined Terms**

1.1    "***1125(e) Parties***" shall mean collectively, and in each case in its capacity as such:  the Debtors; and the Related Parties of such Entities.

1.2    "***Administrative Claim***" shall mean an unsecured Claim for payment of costs or expenses of administration specified in Bankruptcy Code sections 503(b), 507(a)(2), 507(b), or 1114(e)(2), including: (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Debtors' estates and operating the business of the Debtors; and (b) Professional Fee Claims.

1.3    "***Administrative Claim Bar Date***" shall mean the deadline for filing requests for payment of Administrative Claims (other than requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), which shall be the date that is thirty (30) days after the Effective Date.

1.4    "***Affiliate***" shall mean "affiliate" as defined in section 101(2) of the Bankruptcy Code.

1.5    "***Allowed***" shall mean with respect to any Claim, except as otherwise provided in the Plan:  (a) a Claim that is either (i) scheduled by the Debtors in their Schedules in a liquidated amount and not listed as contingent, unliquidated, zero, undetermined, or disputed; or (ii) asserted in these Chapter 11 Cases by a proof of claim which has been timely filed, or deemed timely filed, with the Claims Agent in accordance with the procedures set forth in the Bar Date Order or late filed with leave of the Bankruptcy Court; and (b) a Claim that is either (i) not objected to within the period fixed by the Bankruptcy Code, the Bankruptcy Rules, and/or applicable orders of the Bankruptcy Court; or (ii) that has otherwise been allowed by a final order or pursuant to the Plan.  An Allowed Claim: (y) includes a previously Disputed Claim to the extent such Disputed Claim becomes allowed when the context so requires, and (z) shall be net of any valid setoff amount, which amount shall be deemed to have been set off in accordance with the provisions of the Plan.  For the avoidance of doubt:  (aa) any Claim that is withdrawn shall not be an Allowed Claim; (bb) any proof of claim filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim; (cc) except as otherwise specified in the Plan or any Final Order, and except for any Allowed Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date; and (dd) the Debtors or Wind-Down Debtor may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.  "Allow" and "Allowing" shall have correlative meanings.

1.6    "***Ballot***" shall mean the form of ballot approved by the Bankruptcy Court and distributed to Holders of Claims entitled to vote on this Plan on which is to be indicated an acceptance or rejection of this Plan and the election described in Section 5.10 hereof.

1.7    "***Bankruptcy Code***" shall mean title 11 of the United States Code, as now in effect or hereafter amended.

1.8    "***Bankruptcy Court***" shall mean the United States Bankruptcy Court for the District of Delaware.

1.9    "***Bankruptcy Rules***" shall mean the Federal Rules of Bankruptcy Procedure and the Local Rules.

1.10    "***Bar Date***" shall mean, with respect to any particular Claim, the specific date set forth in the Bar Date Order or in this Plan as the last day for filing a proof of claim or a request for allowance of an Administrative Claim or a proof of interest against the Debtors in these Chapter 11 Cases for that specific Claim.

1.11    "***Bar Date Order***" shall mean that certain *Order (I) Establishing Deadlines for Filing Proofs of Claim, Including Section 503(b)(9) Claims, (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief* [D.I. 179], entered by the Bankruptcy Court on March 28, 2025.

1.12    "***Bidding Procedures Motion***" shall mean the *Motion of Debtors for Entry of Orders (I) (A) Approving Bidding Procedures for the Potential Sale of the Debtors' Assets, (B) Scheduling Certain Dates with Respect Thereto, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter into the Stalking Horse APA and Related Bid Protections, (E) Approving Procedures for Assumption and Assignment, and (F) Granting Related Relief and (II) (A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* [D.I. 13].

1.13    "***Bidding Procedures Order***" shall mean that certain *Order (I) Approving Bidding Procedures in Connection with Sale of Assets of the Debtors and Related Bid Protections, (II) Approving Form and Manner of Notice, (III) Scheduling Auction and Sale Hearing, (IV) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases, and (V) Granting Related Relief*] [D.I. 177], entered by the Bankruptcy Court on March 28, 2025.

1.14    "***Business Day***" shall mean any day, other than a Saturday, Sunday, or a legal holiday (as used in Bankruptcy Rule 9006(a)).

1.15    "***Cash***" shall mean legal tender of the United States of America or its equivalents, including but not limited to bank deposits, checks, and other similar items.

1.16    "***Causes of Action***" shall mean any and all actions, suits, claims for relief, causes of action, Chapter 5 Causes of Action, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise, whether arising prior to or after the Petition Date.  Causes of Action include, but are not limited to, those Causes of Action listed on a

schedule to be filed with the Plan Supplement, which exhibit may be modified up through and including the Effective Date, subject to the terms of Article 12.3 hereof.  For the avoidance of doubt, Causes of Action shall not include any claims or causes of action transferred to a Purchaser pursuant to a Sale Transaction.

1.17    "***Chapter 5 Causes of Action***" shall mean any and all actual or potential claims and causes of action arising under Chapter 5 of the Bankruptcy Code, including claims, rights, and causes of action arising under sections 510, 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code, including but not limited to, the recovery of preferences and fraudulent transfers from any Entity that received cash or any other interest in property from any Debtor.  For the avoidance of doubt, Chapter 5 Causes of Action shall not include any claims or causes of action transferred to a Purchaser pursuant to a Sale Transaction.

1.18    "***Chapter 11 Cases***" shall mean these Chapter 11 Cases commenced by the Debtors and jointly administered under case number 25-10342 (KBO) in the Bankruptcy Court.

1.19    "***Claim***" shall mean a claim, as such term is defined in Bankruptcy Code section 101(5), against any of the Debtors.

1.20    "***Claims Agent***" shall mean the Debtors' claims, noticing and solicitation agent, Stretto, Inc.

1.21    "***Class***" shall mean a group of Claims or Interests described in Article III of this Plan.

1.22    "***Closing Date***" shall mean the date upon which the Debtors and any Purchaser consummate the Sale Transaction(s).

1.23    "***COD Business***" shall mean the Cleanrooms on Demand$^{TM}$ business segment of the Debtors.

1.24    "***Combined Disclosure Statement and Plan***" means this combined disclosure statement and joint chapter 11 plan proposed by the Debtors, including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time.

1.25    "***Committee***" shall mean the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases [D.I. 99], as may be reconstituted from time to time.

1.26    "***Company***" shall mean the Debtors prior to the Petition Date.

1.27    "***Confirmation Date***" shall mean the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

1.28    "***Confirmation Hearing***" shall mean the first hearing held by the Bankruptcy Court to consider confirmation of the Plan.

1.29    "***Confirmation Order***" shall mean an order of the Bankruptcy Court confirming this Plan pursuant to, among others, section 1129 of the Bankruptcy Code.

1.30    "***Consulting Business***" shall mean the Azzur Consulting business segment of the Debtors.

1.31    "***Debtors***" shall mean each of Azzur Group Holdings LLC, Azzur Group, LLC, Cobalt LLC., Azzur Consulting LLC, Azzur Austin LLC, Azzur Chicago LLC, Azzur Denver LLC, Azzur IT, LLC, Azzur North Carolina, LLC, Azzur of CA, LLC, Azzur of NE, LLC, Azzur Princeton LLC, Azzur San Diego LLC, Azzur San Francisco LLC, Azzur Solutions LLC, Azzur Technical Services - Boston, LLC, Azzur Training Center - Raleigh LLC, Azzur Washington DC LLC, Azzur Worcester LLC, Azzur Cleanrooms-On-Demand - Services LLC, Azzur Cleanrooms-on-Demand - Boston LLC, Azzur Cleanrooms-on-Demand - Burlington LLC, Azzur Cleanrooms-On-Demand - Devens LLC, Azzur Cleanrooms-on-Demand - Raleigh LLC, Azzur Cleanrooms-on-Demand - San Diego LLC, Azzur Cleanrooms-On-Demand - San Francisco LLC, Azzur Labs, LLC, Azzur Labs - Boston LLC, Azzur Labs - Chicago LLC, Azzur Labs - Dallas LLC, Azzur Labs - San Diego LLC, Azzur Labs - San Francisco LLC, and Azzur Labs NC, LLC following the Petition Date.

1.32    "***DIP Budget***" shall mean the budget attached to the applicable DIP Order, or any other "Approved Budget" (as defined in the applicable DIP Order) as in effect during any relevant time.

1.33    "***DIP Collateral***" shall have the meaning given to such term in the applicable DIP Order.

1.34    "***DIP Claims***" shall mean all Claims against any Debtor on account of the DIP Obligations (as defined in the applicable DIP Order) arising on account of the DIP Facility.

1.35    "***DIP Credit Agreement***" shall mean that certain *Ratification and Amendment Agreement*, by and among Azzur Group Holdings LLC, a Delaware limited liability company, Azzur Group, LLC, a Pennsylvania limited liability company, Azzur of CA, LLC, a California limited liability company, Azzur Cleanrooms-on-Demand-Boston LLC, a Massachusetts limited liability company, Azzur of NE LLC, a Massachusetts limited liability company, Azzur North Carolina, LLC, a Pennsylvania limited liability company, Azzur Princeton LLC, a Pennsylvania limited liability company, Azzur San Diego LLC, a Pennsylvania limited liability company, Azzur San Francisco LLC, a Pennsylvania limited liability company, Azzur Solutions LLC, a Pennsylvania limited liability company, Azzur IT LLC, a Pennsylvania limited liability company, Azzur Technical Services – Boston LLC, a Massachusetts limited liability company, Azzur Washington DC LLC, a Pennsylvania limited liability company, Azzur Worcester LLC, a Pennsylvania limited liability company, Cobalt LLC, a Pennsylvania limited liability company, Azzur Labs, LLC, a Pennsylvania limited liability company, Azzur Labs NC, LLC, a North Carolina limited liability company, Azzur Labs – Boston LLC, a Pennsylvania limited liability company, Azzur Labs – San Francisco LLC, a Pennsylvania limited liability company, Azzur Austin LLC, a Pennsylvania limited liability company, Azzur Chicago LLC, a Pennsylvania limited liability company, Azzur Cleanrooms-On-Demand Burlington LLC, a Massachusetts limited liability company, Azzur Cleanrooms-On-Demand San Diego LLC, a California limited

liability company, Azzur Denver LLC, a Pennsylvania limited liability company, Azzur Labs – Chicago LLC, a Pennsylvania limited liability company, Azzur Labs – Dallas LLC, a Pennsylvania limited liability company, Azzur Labs – San Diego LLC, a Pennsylvania limited liability company and Azzur Training Center – Raleigh LLC, a Pennsylvania limited liability company, Azzur Cleanrooms-On-Demand – Devens LLC, a Massachusetts limited liability company, Azzur Cleanrooms-On-Demand – San Francisco LLC, a California limited liability company, Azzur Cleanrooms-On-Demand – Services LLC, a Pennsylvania limited liability company, Azzur Cleanrooms-On-Demand-Raleigh LLC, a North Carolina limited liability company and Azzur Consulting LLC, a Pennsylvania limited liability company, as borrowers, and the DIP Lender, attached to the Interim DIP Order at <u>Exhibit A</u>, as may be amended, restated, supplemented or otherwise modified from time to time.

1.36    "***DIP Facility***" shall mean the debtor-in-possession superpriority senior secured multi-draw credit facility in the aggregate principal amount of up to $23.5 million provided to the Debtors by the DIP Lender pursuant to and subject to the terms and conditions of the DIP Credit Agreement and the DIP Orders.

1.37    "***DIP Lender***" shall mean Manufacturers and Traders Trust Company.

1.38    "***DIP Orders***" shall mean, collectively, the Interim DIP Order and the Final DIP Order.

1.39    "***Disallowed***" shall mean, when used in reference to a Claim, all or that portion, as applicable, of any Claim that has been disallowed under the Combined Disclosure Statement and Plan, the Bankruptcy Code, applicable law or by a Final Order.

1.40    "***Disclosure Statement***" shall mean the disclosure statement, as amended, supplemented or modified from time to time, that is embodied within this Combined Disclosure Statement and Plan and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, Local Rule 3017-1, other applicable law, and orders of the Bankruptcy Court.

1.41    "***Disputed***" shall mean, with respect to any Claim or Interest, any Claim or Interest, or any portion thereof, that is not yet Allowed.

1.42    "***Distributable Cash***" means any net Cash proceeds from a Sale Transaction, if any, including Net Sale Proceeds, and Net Residual Asset Proceeds, in excess of the Allowed DIP Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed M&T Claims (other than an Allowed M&T Deficiency Claim) <u>plus</u> any other Cash available in the Estates <u>after giving effect to</u> any other Sale Transaction(s), the Reserves, the Wind Down, and any other Cash amounts necessary to satisfy obligations under the Plan as reasonably determined by the Plan Administrator.

1.43    "***Distribution***" shall mean the distribution of Cash and other non-Cash consideration, including mutual releases, as the case may be, in accordance with the Plan.

1.44    "***Distribution Address***" shall mean the address set forth in (a) the Proof of Claim filed by the Holder, (b) any written notice of address change delivered to the Debtors after

the date of filing of any related Proof of Claim, (c) the Schedules, if no Proof of Claim has been filed and the Debtors have not received a written notice of a change of address, (d) the other records of the Debtors at the time of the Distribution if no Proof of Claim has been filed, the Debtors have not received a written notice of a change of address, and the Schedules do not include an address, or (e) any change of address as reflected on the Bankruptcy Court docket.

1.45    "*Distribution Date*" shall mean the date determined by the Plan Administrator when Distributions shall be made under the Plan.

1.46    "*Distribution Record Date*" shall mean the record date for purposes of making Distributions under this Plan on account of Allowed Claims, which date shall be the first day of the Confirmation Hearing, or such other date as is designated in a Final Order of the Bankruptcy Court.

1.47    "*Effective Date*" shall mean the first date on which all of the conditions of Section 11.1 of the Plan have been satisfied or have been waived in writing and the Debtors declare the Plan effective.  For the avoidance of doubt, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

1.48    "*Entity*" shall have the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

1.49    "*Estate*" shall mean the estate of each Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases on the Petition Date and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtors after the Petition Date through the Effective Date.

1.50    "*Estimation Order*" shall mean an order or orders of the Bankruptcy Court estimating for voting and/or Distribution purposes (under section 502(c) of the Bankruptcy Code) the amount of any Claim, or the aggregate (and if applicable, individual) Face Amount of Disputed Claims in each relevant Class.  The defined term Estimation Order includes the Confirmation Order if the Confirmation Order grants the same relief that would have been granted in a separate Estimation Order.

1.51    "*Exculpated Parties*" shall mean, each in their respective capacities as such, (a) the Debtors and the Wind-Down Debtor, (b) the Committee, (c) the Related Parties of each of the foregoing in each case as to the Persons and entities in this clause (c) to the extent such Person or Entity is a fiduciary of any of the Estates (including, without limitation, as an officer or director of the Debtors).

1.52    "*Executory Contract or Lease*" shall mean a contract or lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.53    "*Face Amount*" shall mean (a) with respect to any Claim for which a proof of claim is filed, an amount equal to:  (i) the liquidated amount, if any, set forth therein, or (ii) any other amount set forth in an Estimation Order; or (b) with respect to any Claim scheduled in the

relevant Debtor's Schedules, but for which no proof of claim is timely filed, the amount of the Claim scheduled as undisputed, noncontingent, and liquidated.

1.54     "*File*," "*Filed*," or "*Filing*" shall mean, respectively, file, filed, or filing with the Bankruptcy Court or its authorized designee in these Chapter 11 Cases.

1.55     "*Final DIP Order*" shall mean that certain *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Utilize Cash Collateral; (II) Granting Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [D.I. [•]].

1.56     "*Final Order*" shall mean an order or judgment of the Bankruptcy Court, as entered on the docket of the Bankruptcy Court, that has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, seek review, rehearing, or to file a petition for certiorari has expired and no timely filed appeal or petition for review, rehearing, remand, or certiorari is pending, or (b) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; *provided*, *however*, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or other rules governing procedure in cases before the Bankruptcy Court, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.57     "*First Day Declaration*" shall mean the *Declaration of M. Benjamin Jones, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [D.I. 12].

1.58     "*General Unsecured Claim*" shall mean a Claim that is not (a) a DIP Claim, (b) an Other Secured Claim, (c) an Administrative Claim, (d) a Priority Tax Claim, (e) an Other Priority Claim, (f) a M&T Claim, or (g) an Intercompany Claim.  For the avoidance of doubt, the M&T Deficiency Claim shall be treated as a General Unsecured Claim for all purposes hereunder.

1.59     "*General Unsecured Claims Recovery*" shall mean any Distributable Cash after taking into account amounts necessary to satisfy all Allowed DIP Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed M&T Claims (other than an Allowed M&T Deficiency Claim); *provided, however*, that in all scenarios, the General Unsecured Claims Recovery shall consist of Cash in the aggregate amount of $200,000.

1.60     "*General Bar Date*" shall mean April 30, 2025 at 5:00 p.m. (ET).

1.61     "*Governmental Unit*" shall have the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

1.62     "*Governmental Bar Date*" shall mean September 1, 2025 at 5:00 p.m. (ET).

1.63     "*Holder*" or "*Holders*" shall mean a Person or an Entity holding a Claim or Interest.

1.64   "*Impaired*" shall mean, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.65   "*Impaired Class*" shall mean a Class of Claims or Interests that is Impaired.

1.66   "*Insider*" shall have the meaning ascribed to such term in section 101(31) of the Bankruptcy Code.

1.67   "*Intercompany Claims*" shall mean any Claim held by a Debtor against another Debtor, including, without limitation: (a) any account reflecting intercompany book entries by a Debtor with respect to another Debtor, (b) any Claim not reflected in such book entries that is held by a Debtor against another Debtor, and (c) any derivative Claim asserted by or on behalf of one Debtor against another Debtor.

1.68   "*Intercompany Interests*" shall mean any Interest held by a Debtor in another Debtor.

1.69   "*Interest*" shall mean any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor.

1.70   "*Interim Approval and Procedures Order*" shall mean that certain *Order (I) Approving the Debtors' Combined Disclosure Statement and Plan on an Interim Basis for Solicitation Purposes Only; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Combined Disclosure Statement and Plan; (III) Approving the Form of Ballot and Solicitation Packages; (IV) Establishing the Voting Record Date; (V) Scheduling a Combined Hearing for Final Approval of the Adequacy of Disclosures in, and Confirmation of, the Combined Disclosure Statement and Plan; and (VI) Granting Related Relief* [D.I. [•]].

1.71   "*Interim DIP Order*" shall mean that certain *Interim Order (I) Authorizing Debtors and Debtors in Possession to (A) Obtain Postpetition Financing, and (B) Grant Liens and Super-Priority Claims, and (C) Grant Adequate Protection; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [D.I. 63] as amended [D.I. 336].

1.72   "*Lien*" shall mean: (a) a judicial lien as defined in section 101(36) of the Bankruptcy Code; (b) a lien as defined in section 101(37) of the Bankruptcy Code; (c) a security interest as defined in section 101(51) of the Bankruptcy Code; (d) a statutory lien as defined in section 101(53) of the Bankruptcy Code; and (e) any other lien, interest, charge, or encumbrance.

1.73   "*Local Rules*" shall mean the Local Rules of the United States Bankruptcy Court for the District of Delaware as now in effect or hereafter amended.

1.74   "*M&T*" shall mean Manufacturers and Traders Trust Company, in its capacity as DIP Lender and Prepetition Lender.

1.75   "*M&T Claim*" shall mean any Claim of M&T arising under, derived from, secured by, or based on the M&T Credit Documents or any DIP Order.  For the avoidance of doubt, the M&T Claim shall include contingent, unliquidated indemnification obligations.

10

1.76   "**M&T Credit Documents**" shall mean the M&T Loan Agreement and all other agreements, documents, and instruments related thereto, including any pledge and collateral agreements, subordination agreements, intercreditor agreements, and other security agreements.

1.77   "**M&T Deficiency Claim**" shall mean the unsecured portion of the M&T Claim.

1.78   "**M&T Loan Agreement**" shall mean that certain Loan and Security Agreement, dated as of April 7, 2020 (as amended by the First Amendment and Modification to Loan and Security Agreement, dated as of January 21, 2021, the Second Amendment and Modification to Loan and Security Agreement dated as of April 16, 2021, the Third Amendment and Modification to Loan and Security Agreement, dated as of August 20, 2021, the Fourth Amendment and Modification to Loan and Security Agreement, dated as of January 5, 2023, the Fifth Amendment and Modification to Loan and Security Agreement, dated as of May 3, 2023, the Forbearance Agreement and Sixth Amendment to Loan and Security Agreement, dated as of February 26, 2024, Amendment No. 1 to Forbearance Agreement and Seventh Amendment to Loan and Security Agreement, dated as of August 13, 2024, Amendment No. 2 to Forbearance Agreement and Eighth Amendment to Loan and Security Agreement, dated as of August 23, 2024, Amendment No. 3 to Forbearance Agreement and Ninth Amendment to Loan and Security Agreement, dated as of August 30, 2024, and Amendment No. 4 to Forbearance Agreement and Tenth Amendment to Loan and Security Agreement, dated as of January 6, 2025).

1.79   "**Net Residual Asset Proceeds**" shall mean the proceeds of any Residual Assets, less any customary transaction fees and expenses including, if applicable, any contingency fees payable to counsel retained by the Plan Administrator, all as more fully described in the Purchase Agreement and/or Sale Order, *provided*, *however*, that Net Residual Asset Proceeds shall not include the Cash necessary to establish, or that is held in, the Reserves.

1.80   "**Net Sale Proceeds**" shall mean the proceeds of a Sale Transaction, less any customary transaction fees and expenses, all as more fully described in the Purchase Agreement and/or Sale Order, *provided*, *however*, that Net Sale Proceeds shall not include the Cash necessary to establish, or that is held in, the Reserves.

1.81   "**Objection(s)**" shall mean any objection, application, motion, complaint, or any other legal action seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, establish the priority of, expunge, subordinate, or estimate any Claim (including any objection or opposition to any request for allowance or payment of any Administrative Claim).

1.82   "**Other Priority Claim**" shall mean any Claim entitled to priority under sections 503(b) or 507(a)(2) of the Bankruptcy Code that is not a Priority Tax Claim.

1.83   "**Other Secured Claim**" shall mean any Secured Claim, including a Secured Tax Claim, other than the M&T Claim.

1.84   "**Person**" shall mean any individual, corporation, partnership, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, governmental unit, or any political subdivision thereof, the Committee, Holders of Interests, Holders of Claims, current or former employees of the Debtors, or any other Entity.

1.85    "*Petition Date*" shall mean March 2, 2025, the date on which the Debtors commenced their Chapter 11 Cases in the Bankruptcy Court.

1.86    "*Plan*" shall mean this joint plan under chapter 11 of the Bankruptcy Code, together with any amendments, supplements or modifications hereto as the Debtors may file hereafter in accordance with the terms of this Plan.

1.87    "*Plan Administrator*" shall mean the Person or Entity, or any successor thereto, designated by the Debtors, who will be disclosed at or prior to the Confirmation Hearing, to have all powers and authorities set forth in Section 7.4 hereof.

1.88    "*Plan Documents*" shall mean the documents, including this Combined Disclosure Statement and Plan, to be executed, delivered, assumed, docketed, recorded, noticed, and/or performed in connection with the consummation of this Plan, including, without limitation, the documents to be included in the Plan Supplement, and any and all exhibits to the Plan and the Disclosure Statement.

1.89    "*Plan Supplement*" shall mean the supplemental appendix to this Plan, filed with the Bankruptcy Court not less than seven (7) calendar days prior to the Voting Deadline and incorporated herein, which contains, among other things, draft forms or signed copies, as the case may be, of the Schedule of Retained Causes of Action, the Wind-Down Budget, and any other schedules, lists, or documents that supplement or clarify aspects of this Plan and are identified as part of the Plan Supplement.

1.90    "*Post Effective Date Reserve*" shall mean any reserve established by the Plan Administrator in accordance with Section 7.4 hereof and funded from Cash available in the Estates on the Effective Date, up to (i) the Wind-Down Amount and (ii) the amounts (if any) contemplated under the DIP Budget, which have accrued and remain unpaid, for the Allowed Administrative Claims, Allowed Priority Claims, and Allowed Other Priority Claims.

1.91    "*Prepetition Lender*" shall mean M&T.

1.92    "*Priority Tax Claim*" shall mean any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.93    "*Pro Rata*" shall mean the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

1.94    "*Professional*" shall mean any professional Person or Entity employed in these Chapter 11 Cases by Court order pursuant to Bankruptcy Code sections 327, 328, 363, or 1103 or otherwise.

1.95    "*Professional Fee Claim*" shall mean a Claim for compensation or reimbursement of expenses of a Professional pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code in connection with these Chapter 11 Cases.

1.96    "***Professional Fee Claims Estimate***" shall mean (i) with respect to each Professional, the Professional's good faith estimate of the amount of such Professional's accrued unpaid Professional Fee Claims through the Effective Date, to be provided by each Professional in writing to the Debtors, not less than five days prior to the Effective Date, and (ii) with respect to all of the Professionals, collectively, the sum of all individual Professional Fee Claims Estimates.

1.97    "***Professional Fee Escrow Account***" shall mean an escrow account to hold an amount of Cash equal to the Professional Fee Claims Estimate funded by the Debtors as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date solely for the purpose of paying all remaining Allowed Professional Fee Claims.  For the avoidance of doubt, the Professional Fee Escrow Account may be that certain escrow account established and funded pursuant to the DIP Orders for the purpose of paying Bankruptcy Court-approved professional fees.

1.98    "***Purchase Agreement***" shall mean each of, or collectively, as applicable, the asset purchase agreement(s), as may be amended, supplemented, restated, or modified from time to time, by and between any Purchaser, as buyer, and any of the Debtors, as sellers for the transfer of any acquired assets pursuant to one or more Sale Transactions in the Chapter 11 Cases, in each case to the extent approved by the Sale Order or other Order of the Bankruptcy Court.

1.99    "***Purchaser***" shall mean each of and collectively, as applicable, the party or parties who, pursuant to one or more Purchase Agreements and Sale Orders, purchases any of the acquired assets and assumes any of the Assumed Liabilities and Assumed Contracts, as such terms are defined in the applicable Purchase Agreement.

1.100    "***Rejection Damages Bar Date***" shall mean the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) 5:00 p.m. (ET) on the date that is 30 days following entry of an order approving the rejection of an executory contract or unexpired lease.

1.101    "***Related Parties***" shall mean, with respect to any (w) Person or Entity, (x) such Person's or Entity's current and former direct or indirect subsidiaries, affiliates, parents, predecessors, successors, and assigns, (y) with respect to each of the foregoing in clause (w) and (x), solely in their respective capacities as such, their current and former directors, members, managers, officers, limited partners, general partners, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns, (z) with respect to each of the foregoing in clause (w) through (y), solely in their respective capacities as such, each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, designees, trustees, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals or representatives, and any other fiduciaries to such Person or Entity with any involvement related to the Debtors; and (zz) with respect to each of the foregoing in clauses (w) through (z), such Person's or Entity's respective heirs, executors, estates, servants, and nominees.

1.102 "***Released Parties***" shall mean collectively, and in each case in its capacity as such: (a) the Debtors; (b) M&T; (c) all Holders of Claims or Interests that (i) vote to accept the Plan and do not opt-out of the voluntary release contained in Section 8.4 hereof by checking the opt out box on the ballot, or (ii) abstain from voting or do not vote on the Plan and affirmatively opt-in to the releases provided under the Plan; and (d) with respect to each of the Debtors, and each of the foregoing Entities in clauses (a) through (c), the Related Parties of such Entities; *provided*, that any Holder of a Claim or Interest that votes to reject or objects to the Plan shall not be a "Released Party."

1.103 "***Releasing Parties***" shall mean collectively, and in each in case in its capacity as such: (a) the Debtors and the Post-Effective Date Debtor; (b) each Holder of a Claim or Interest that (x) votes to accept the Plan and does not opt-out of the voluntary release contained in Section 8.4 hereof by checking the opt-out box on the ballot, or (y) either (I) abstains from voting on the Plan or (II) is deemed to accept or reject the Plan and, in the case of either (I) or (II), affirmatively opts-in to the voluntary release contained in Section 8.4 hereof by checking the opt-in box on the ballot or notice, and returning it in accordance with the instructions set forth thereon, indicating that they opt-in to grant the releases provided in the Plan; and (c) the Related Parties of the foregoing but only to the extent such Related Party would be obligated to release under principles of agency if it were so directed by the applicable Person or Entity in clauses (a) through (b); *provided, however*, that notwithstanding the foregoing, M&T shall not be deemed a "Releasing Party" under the Plan and shall benefit only from releases by the Debtors.

1.104 "***Reserves***" shall mean, collectively, the Post Effective Date Reserve and the Professional Fee Escrow Account as contemplated by the DIP Orders.

1.105 "***Residual Assets***" shall mean all property of the Estates that has not been sold, transferred, assigned, or disposed of as of the Effective Date, including after giving effect to any Sale Transaction(s).

1.106 "***Retained Actions***" shall mean the Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, a schedule of which may be set forth in the Plan Supplement, as may be amended, modified, or supplemented from time to time; *provided*, that, for the avoidance of doubt, Retained Actions shall not include any Causes of Action that are or were settled, released, waived, exculpated, or transferred (a) prior to the Petition Date by any of the Debtors, or (b) pursuant to the Plan, any Purchase Agreement, or any Order of the Bankruptcy Court entered in these Chapter 11 Cases, as the same may be amended, modified, or supplemented from time to time.

1.107 "***Sale Transaction***" shall mean, each and collectively, those certain transactions between the Debtors and the Purchaser(s) in connection with the Purchase Agreement(s) and approved by the Sale Order(s), inclusive of the Stalking Horse APA Sale Transaction.

1.108 "***Sale Order***" shall mean that certain *Order (I) Approving and Authorizing the Sale of the Debtors' Consulting Business and Related Assets, (II) Approving Assumption and Assignment of Certain Executory Contracts, and (III) Granting Related Relief* [D.I. [•]], as may be

amended, supplemented, or otherwise modified from time to time, together with any other Order of the Bankruptcy Court authorizing any other Sale Transaction(s).

1.109   "*Schedules*" shall mean the schedules of assets and liabilities, schedules of Executory Contracts or Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been or may be amended, modified, or supplemented from time to time.

1.110   "*Secured*" shall mean when referring to a Claim:  (a) secured by a Lien on which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined by section 506(a) of the Bankruptcy Code, or (b) Allowed pursuant to this Plan as a Secured Claim (subject to the Confirmation Order becoming a Final Order).

1.111   "*Secured Tax Claim*" shall mean any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under Bankruptcy Code section 507(a)(8) (determined irrespective of time limitations), including any related Secured Claim for penalties.

1.112   "*Stalking Horse APA*" means that certain asset purchase agreement for the Debtors' consulting business segment, which was filed as "Exhibit B" to the Bidding Procedures Motion [D.I. 13], as modified by the Bidding Procedures Order, and as may be further amended, supplemented, or otherwise modified from time to time.

1.113   "*Stalking Horse APA Sale Transaction*" means the transactions related to the sale of the Consulting Business contemplated by the Stalking Horse APA.

1.114   "*Unclaimed Distributions*" shall mean any Cash or other distributable property unclaimed on or after the Effective Date or the date on which an additional Distribution would have been made in respect of an Allowed Claim.  Unclaimed Distributions shall include (a) checks (and the funds represented thereby) mailed to a Distribution Address and returned as undeliverable without a proper forwarding address, (b) funds for checks that have not been cashed within ninety (90) days of the mailing of the Distribution upon which time the Plan Administrator may issue a stop payment, (c) checks (and the funds represented thereby) not mailed or delivered because no Distribution Address to mail or deliver such property was available, and (d) any Distribution deemed to be an Unclaimed Distribution pursuant to Section 10.5 hereof.

1.115   "*Unimpaired*" shall mean, when used in reference to a Claim or Interest, any Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.116   "*U.S. Trustee*" shall mean the Office of the United States Trustee for Region 3.

1.117   "*U.S. Trustee Fees*" shall have the meaning ascribed to it in Section 2.1 hereof.

1.118   "***Voting Deadline***" shall mean May 5, 2025 at 4:00 p.m. (prevailing Eastern Time), the date specified in the Disclosure Statement, the Ballots, the Interim Approval and Procedures Order, and/or any related solicitation documents approved by the Bankruptcy Court through the Interim Approval and Procedures Order as the last date for Holders of Claims entitled to vote on this Plan to submit their Ballots with respect to this Plan, as such date may be extended by the Debtors.

1.119   "***Wind Down***" means the wind down and dissolution of the Debtors and final administration of the Estates following the Effective Date as set forth in Article VII hereof.

1.120   "***Wind-Down Budget***" means that certain budget governing the fees, expenses, and disbursements included with the Plan Supplement.

1.121   "***Wind-Down Debtor***" shall mean Debtor Azzur Group, LLC, on or after the Effective Date; *provided*, that if the Plan Administrator elects to establish a trust under Section 7.3, references to Wind-Down Debtor in Section 2.1 hereof shall be inclusive of such trust.

1.122   "***Wind-Down Funds***" or "***Wind-Down Amount***", shall mean Cash in an amount of $500,000 to be reserved and used in accordance with the Wind-Down Budget for the sole purpose of the Wind Down.

**Rules of Interpretation**

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein, unless the context requires otherwise. The words "include" and "including" shall mean "include, without limitation," or "including," as the case may be. Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

Any reference in this Plan to a contract, instrument, release, indenture, or other agreement or documents being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, and any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented. Subject to the provisions of any contract, certificates or articles of incorporation, by-laws, instruments, release, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules.

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Wind-Down Debtor shall mean the Debtors and the Wind-Down Debtor, as applicable and to the extent the context requires.

The captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Any reference to any Entity as a holder of a Claim or Interest includes that Entity's successors and assigns.

**Rules of Construction.**

(a)     **Undefined Terms**.  Any term used herein that is not defined herein shall have the meaning ascribed to any such term used in the Bankruptcy Code and/or the Bankruptcy Rules, if used therein.

(b)     **Miscellaneous Rules**.  This Combined Disclosure Statement and Plan is subject to the following miscellaneous rules:  (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, unless superseded herein or in the Confirmation Order; (ii) any reference in this Plan to an existing document or Exhibit means such document or Exhibit as it may have been amended, restated, modified or supplemented as of the Effective Date; (iii) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; (iv) whenever this Plan provides that a payment or Distribution shall occur "on" any date, it shall mean "on, or as soon as reasonably practicable after," such date; and (v) references in this Plan and other Plan Documents to "Section" or "Article" shall be interchangeable.

(c)     **Appendices and Plan Documents.**  All Plan Documents and appendices to the Plan are incorporated into the Plan by reference and are a part of the Plan as if set forth in full herein.  The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.  Holders of Claims and Interests may inspect a copy of the Plan Documents, once filed, in the Office of the Clerk of the Bankruptcy Court during normal business hours, or free of charge at https://stretto.com/Azzur.

(d)     **Nonconsolidated Plan**.  Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

# ARTICLE II
# TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, Professional Fee Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

2.1     **Administrative Claims and Priority Tax Claims**.  Except with respect to Administrative Claims that are Professional Fee Claims, Claims for U.S. Trustee Fees, or subject to section 503(b)(1)(D) of the Bankruptcy Code, Holders of Administrative Claims must file with the Claims Agent and serve on the Wind-Down Debtor requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, so as to be actually received on or before the Administrative Claim Bar Date.

To the extent not already paid or assumed by the Purchaser as of the Effective Date and unless otherwise agreed to by the Holder of an Allowed Administrative Claim or Allowed Priority Tax Claim, each Holder of an Allowed Administrative Claim or Allowed Priority Tax Claim will receive (as applicable) payment in full, as soon as practicable after the later of (i) the Effective Date but in no event later than 30 days after the Administrative Claim Bar Date, or (ii) the date such Administrative Claim or Priority Tax Claim becomes an Allowed Claim by Final Order of the Bankruptcy Court, to be paid in cash or pursuant to such other treatment as may be agreed upon by the Holder of such Claim and the Debtors or the Wind-Down Debtor, as applicable.

Any Person or Entity who is required to timely file such Claim but fails to do so shall not be treated as a creditor with respect to such Claim for the purpose of Distribution purposes in these Chapter 11 Cases on account of such Claim.  The notice of the Effective Date of the Plan that will be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Administrative Claim Bar Date and shall constitute notice of such Administrative Claim Bar Date.

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("U.S. Trustee Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Debtors, the Wind-Down Debtor (a "Disbursing Entity"), and the liquidating trust, if any, shall be jointly and severally liable to pay any and all U.S. Trustee Fees when due and payable.  The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  Within two business days of the Effective Date, the Wind-Down Debtor shall file a Notice of Occurrence of the Effective Date, identifying the Effective Date and indicating that it has occurred.   After the Effective Date, the Wind-Down Debtor shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  Each and every one of the Debtors, the Reorganized Debtors, and the Wind-Down Debtor shall remain obligated to pay U.S. Trustee Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.  The U.S. Trustee shall not be required to file any Administrative Claim in the case, and shall not be treated as providing any release under the Plan.

2.2    **Professional Fee Claims**.  All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be filed and served within 30 days of the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and an opportunity for a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders.

The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates or the Debtors or Wind-Down Debtors.

Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account or Cash in the other Reserves, as applicable, as and when such Claims are Allowed by entry of an order of the Bankruptcy Court. When all Allowed Professional Fee Claims have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be transferred to the Post Effective Date Reserve for all purposes hereunder. Notwithstanding the foregoing, the Holder of an Allowed Professional Fee Claim may receive such other, less favorable treatment as may be agreed upon by such Holder and the Debtors.

From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtor, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

2.3    **DIP Claims**. Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable or different treatment, in full satisfaction of the DIP Claims and to the extent not previously indefeasibly paid upon the consummation of a Sale Transaction pursuant to a Sale Order, each Holder of an Allowed DIP Claim shall receive, on or as soon as reasonably practicable after the Effective Date, indefeasible payment in full the Net Sale Proceeds (subject to the Carve Out), to be applied in accordance with the terms of the applicable Sale Order(s), DIP Orders, and/or the other DIP Documents. For the avoidance of doubt:  (a) if the Stalking Horse APA Transaction closes before confirmation or consummation of this Plan, M&T would be entitled to receive such proceeds of all DIP Collateral, subject to the Carve Out, as set forth under the applicable Sale Order(s) and DIP Orders; and (b) any payment of Net Sale Proceeds to the DIP Lender prior to the Effective Date shall be deemed indefeasible and not subject to challenge, avoidance or disgorgement, unless otherwise provided in the DIP Orders.

## ARTICLE III
## CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE, THEREFORE, SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AND ALLOWED INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

3.1    **General Rules of Classification**.  The Plan groups the Debtors together solely for the purposes of describing treatment under the Plan.  As noted herein, notwithstanding such groupings, the Plan constitutes a separate chapter 11 plan for each Debtor.  For brevity and convenience, the classification and treatment of Claims and Interests have been arranged into one chart.  Such classification shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets.  Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the claims reconciliation process.  Actual recoveries may vary widely within these ranges, and without any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distribution received by Creditors.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only.  In addition to the cautionary notes contained elsewhere in the Combined Disclosure Statement and Plan, the Debtors emphasize that they make no representation as to the accuracy of these recovery estimates.  The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

All Claims and Interests except Administrative Claims and Priority Tax Claims are placed in the Classes set forth below.  The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation, and Distribution under the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

| Class | Status / Voting | Projected Amount of Claims / Interests | Projected Recovery[2] |
|---|---|---|---|
| **Class 1** Other Secured Claims | Unimpaired<br><br>Not entitled to vote<br><br>Deemed to accept Plan | Up to approx. $1.3 million | 100% |
| **Class 2** Other Priority Claims | Unimpaired<br><br>Not entitled to vote | De Minimis | 100% |

---

[2] The Debtors' estimate of projected recoveries assumes the consummation of the Stalking Horse APA Sale Transaction in accordance with its disclosed terms.

| **Class** | **Status / Voting** | **Projected Amount of Claims / Interests** | **Projected Recovery**[2] |
|---|---|---|---|
| | Deemed to accept Plan | | |
| **Class 3**<br>M&T Claims | Impaired<br><br>Entitled to vote | Approx. $51.2 million[3] | Approx. 71% |
| **Class 4**<br>General Unsecured Claims | Impaired<br><br>Entitled to vote | Approx. $45.8 million[4] | Less than 1% |
| **Class 5**<br>Intercompany Claims & Interests | Impaired / Unimpaired<br><br>Not entitled to vote<br><br>Deemed to reject Plan / Presumed to accept Plan | N/A | N/A[5] |
| **Class 6A**<br>Azzur Group Holdings Interests | Impaired<br><br>Deemed to reject<br><br>Not entitled to vote | Approx. 108 million in total equity interests | 0% |
| **Class 6B**<br>Section 510(b) Claims | Impaired<br><br>Deemed to reject<br><br>Not entitled to vote | None | 0% |

---

[3] The Debtors' estimate of the amount of Allowed M&T Claims is projected as of April 30, 2025, consistent with the terms of the Interim DIP Order.

[4] Inclusive of all potential lease rejection damages claims (without regard to any mitigation or other potential defenses or offsets) and exclusive of the M&T Deficiency Claim.

[5] For the avoidance of doubt, as set forth in Article 3.2 hereof, there shall be no Distribution on account of any Intercompany Claim or Intercompany Interest.

3.2 **Unimpaired Class of Claims**.

**Class 1:  Other Secured Claims.**

(a) **Classification, Impairment, and Voting**

Class 1 shall consist of Other Secured Claims against the Debtors.  Allowed Class 1 Claims are Unimpaired by the Plan and are therefore deemed to accept the Plan and not entitled to vote on the Plan.

(b) **Treatment**

Except to the extent that a Holder of an Allowed Other Secured Claim and the applicable Debtor prior to the Effective Date, or after the Effective Date, such Holder and the Wind-Down Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release, and in exchange for such Allowed Other Secured Claim, each such Holder shall receive at the applicable Debtor's, or the Wind-Down Debtor's, discretion:

(i) payment in full in Cash of the unpaid portion of such Holder's Allowed Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, payment shall be made in accordance with its terms in the ordinary course);

(ii) the applicable Debtor's interest in the collateral securing such Holder's Allowed Other Secured Claim; or

(iii) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired in accordance with section 1124(1) or (2) of the Bankruptcy Code.

**Class 2:  Other Priority Claims.**

(a) Classification, Impairment, and Voting

Class 2 shall consist of Other Priority Claims against the Debtors.  Allowed Class 2 Claims are Unimpaired by the Plan and are therefore deemed to accept the Plan and not entitled to vote on the Plan.

(b) Treatment

Except to the extent that a Holder of an Other Priority Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the later of the Effective Date, the date such Other Priority Claim becomes an Allowed Other Priority Claim, or such other date(s) permitted under section 1129(a)(9) of the Bankruptcy Code, each Holder of an Allowed Other Priority Claim shall receive one or more Distributions in Cash in an aggregate amount equal to such Allowed Other Priority Claim.

3.3    **Impaired Classes of Claims & Interests**.

**Class 3:  M&T Claims**

(a)    Classification, Impairment, and Voting

Class 3 shall consist of the M&T Claims (other than the M&T Deficiency Claim, which shall be treated as a Class 4 General Unsecured Claim).  The Class 3 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

(b)    Treatment

Except to the extent that a Holder of an M&T Claim agrees to a less favorable or different treatment, each Holder of an M&T Claim shall receive, in full and final satisfaction, settlement, compromise, and release of, and in exchange for, each such Allowed Claim:

*(i)*    the proceeds of the Stalking Horse APA Sale Transaction and/or any other Sale Transaction(s), including, for the avoidance of doubt, Net Sale Proceeds;[6]

*(ii)*    Net Residual Asset Proceeds;

*(iii)*    delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; and/or

*(iv)*    such other treatment as agreed to by the Debtors and M&T, including some combination of the foregoing subparts (i) – (iii).

**Class 4: General Unsecured Claims.**

(a)    Classification, Impairment, and Voting

Class 4 shall consist of all General Unsecured Claims against the Debtors. Class 4 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

(b)    Treatment

Except to the extent that a Holder of a General Unsecured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the later of the Effective Date or the date such General Unsecured Claim becomes an Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, and release, and in exchange for, such General Unsecured Claim,

---

[6] For the avoidance of doubt, if the Stalking Horse APA Transaction closes before confirmation or consummation of this Plan, M&T would be entitled to receive such proceeds as set forth under the applicable Sale Order(s) and DIP Orders.

> > > *(i)* its Pro Rata Share of the General Unsecured Claims Recovery; and

> > > *(ii)* if such Holder votes to accept the Plan and does not opt-out of the Third-Party Release under Section 8.4 hereof, such Holder shall be deemed a Released Party for all purposes hereunder;

> > > > *provided*, *however*, that notwithstanding the foregoing, such Holder shall receive a Cash payment (if any) in an amount at least equal to the amount such Claim would so receive if the applicable Debtor were liquidated under chapter 7 of the Bankruptcy Code as of the Effective Date; *provided*, *further*, *however*, that, for the avoidance of doubt, M&T has not agreed to waive any M&T Deficiency Claim that it may choose to assert as a General Unsecured Claim in relation to the M&T Claims.

**Class 5**:  **Intercompany Claims & Intercompany Interests**.  Class 5 shall consist of all Intercompany Claims and Intercompany Interests.  Each Allowed Intercompany Claim or Intercompany Interest, unless otherwise provided for under the Plan, will either be Reinstated or cancelled and released at the option of the Debtors; *provided* that no Distributions shall be made on account of any such Intercompany Claim or Intercompany Interest.

**Class 6.**

**Class 6A:  Interests in Debtor Azzur Group Holdings, LLC**

(a) Classification, Impairment, and Voting

Class 6A shall consist of all Interests in Debtor Azzur Group Holdings, LLC. Because Holders of such Class 6A Interests will not receive any Distribution under the Plan, Holders of Class 6A Interests are deemed to reject the Plan and, therefore, not entitled to vote on the Plan.

(b) Treatment

On the Effective Date, Interests in Debtor Azzur Group Holdings, LLC shall be canceled, released, and expunged without any Distribution on account of such Interests, and such Interests will be of no further force or effect.

**Class 6B:  Section 510(b) Claims.**

(a) Classification, Impairment, and Voting

Class 6B shall consist of all Section 510(b) Claims.  Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.  The Debtors are not aware of any valid Section 510(b) Claim and believe that no such Claim exists.

Because Holders of such Class 6B Section 510(b) Claims will not receive any Distribution under the Plan, Holders of Class 6B Section 510(b) Claims are deemed to reject the Plan and, therefore, not entitled to vote on the Plan.

        (b)     Treatment

On the Effective Date, Section 510(b) Claims shall be canceled, released, and expunged without any Distribution on account of such Section 510(b) Claims, and such Claims will be of no further force or effect.

# ARTICLE IV
## BACKGROUND AND DISCLOSURES

4.1    **General Background**.

        (a)     *Overview of the Debtors and the Debtors' History*

The Debtors are a partner to marquee clients across the biotechnology and pharmaceutical industries, serving companies during the entire lifecycle of drug development and providing a suite of complementary and supplemental services for clients. The Debtors work with leading pharmaceutical, biotechnology, and medical device manufacturers to provide efficient and innovative solutions that help such businesses start, scale, and sustain their good practice guidelines and regulations compliance ("GxP"). Founded in 2010 and headquartered in Philadelphia, Pennsylvania, the Company has grown to serve more than 350 life science clients at eighteen locations across nine states.

Historically, the Company had three distinct, yet complementary life science related business units: (1) Azzur Consulting ("Azzur Consulting" or the "Consulting Business"), (2) Azzur Labs, and (3) Cleanrooms on Demand™ ("COD" or the "COD Business"). The Company's three business units offered solutions at every stage of the post-R&D drug development and commercialization lifecycle, while leveraging long-standing client relationships to create cross-selling opportunities among the business units. The business units were designed to be complementary, allowing the Company to serve a client's clinical and compliance needs.

The Azzur Consulting business unit consists of more than 260 cGMP consultants, engineers, and scientists, the Consulting Business unit provides regulatory, compliance, quality assurance, and other GxP advisory services to the life science industry. Consulting services include, but are not limited to, (i) validation and qualification, quality and compliance, and controls and automation services; (ii) information technology advisory services; (iii) technical services; (iv) training services; and (v) engineering services. Azzur Consulting serves well-established commercial clients and emerging sponsors. From 2021 to 2024, Azzur Consulting grew from approximately 135 to 160 unique clients.

The Azzur Labs business unit was sold before the commencement of the Chapter 11 Cases, as set forth below. Prior to the sale of the Azzur Labs business unit, Azzur Labs provided a suite of analytical lab testing services, including (i) chemistry testing, (ii) microbiological testing, (iii) microbial identification, (iv) environmental monitoring, (v) cleaning validation and verification, and (vi) critical systems/utilities testing services, for variety of end-markets and users,

including universities, hospitals, and pharmaceutical companies.  Azzur Labs also provided on-site, custom-tailored laboratory trainings and certain maintenance services.

The COD Business unit provides cleanrooms to small and mid-size biotechnology and large pharmaceutical clients.  The Company leases open warehouse spaces, which are then subdivided into cleanrooms and provides services that meet various levels of cGMP regulations,[7] in order to provide a controlled, sterile environment.  The cleanrooms on demand model offers multi-tenant cGMP facilities with flexible cleanroom configurations, eliminating the need for in-house construction and management of cGMP facilities.  In addition to cleanroom space, COD clients have access to a variety of services, such as personnel support, sterility management and environment monitoring, quality control testing, security, waste management, and access to materials storage and raw material sampling and testing.  The COD Business unit supports a range of client needs, including gene therapy, cell banking, microbiome, and novel therapeutics, catering to clients seeking cost-effective manufacturing solutions, overflow capacity, or temporary cleanroom options during infrastructure development.

In April 2021, Baird Capital ("Baird") invested approximately $30.2 million in the Company in order to help the Company accelerate expanding its development of COD locations and consulting business (the "Baird Investment").  Following the Baird Investment, the Company embarked on a COD expansion project, developing cleanroom locations in North Carolina, Massachusetts, and California.  The North Carolina and Massachusetts locations were opened in 2024.

(b)    *Overview of the Debtors' Prepetition Debt & Unsecured Promissory Notes*

Each of the Debtors are parties to that certain *Loan and Security Agreement*, by and among Azzur Group, LLC, as lead borrower, and M&T, dated as of April 7, 2020 (as may be amended, modified, supplemented, extended renewed, restated, or replaced, the "Pre-Petition Loan Agreement").[8]  The Pre-Petition Loan Agreement provides for an asset-based revolving credit facility (the "ABL Facility") and a term loan credit facility (the "Term Loan Facility").  The obligations under the ABL Facility and Term Loan Facility are secured by a first-priority lien, subject to permitted encumbrances, on substantially all of the Company's assets.  As of the Petition Date, the Debtors were obligated to M&T in the aggregate amount of approximately $62.2 million (plus accrued and unpaid interest, costs and fees).

Debtor Azzur Cleanrooms-on-Demand Devens, LLC and Debtor Azzur Group, LLC are each party to three unsecured promissory notes (the "Promissory Notes") with contractors under (i) that certain *Promissory Note* by and among Barker Contracting, Inc., Azzur Cleanrooms-on-Demand Devens, LLC, and Azzur Group, LLC dated as of July 11, 2024 (the "Barker Note") in the original principal amount of $1,413,958; (ii) that certain *Promissory Note* by and between Barker Contracting, Inc. and Azzur Group, LLC dated as of July 19, 2024 (the "Alameda Note") in the original principal amount of $1,159,383; and (iii) that certain *Promissory Note* by and among

---

[7] Current Good Manufacturing Practice ("cGMP") compliance is a set of regulations that a ensure the quality, safety, and efficacy of products manufactured in pharmaceutical, medical device, and the biotechnology industries.

[8] The Debtors and M&T also entered into a series of forbearance agreements as set forth herein.

RGK Group, LLC (d/b/a Angstrom Technology), Azzur Cleanrooms-On-Demand Devens, LLC, and Azzur Group, LLC dated as of July 11, 2024 (the "Angstrom Note") in the original principal amount of $3,327,912. These Debtors entered into the Promissory Notes to resolve certain disputes related to mechanics' liens recorded against the Debtors' leasehold estates and potentially the fee of the properties leased by the Debtors. As of the Petition Date, approximately $5.2 million remained due and owing in the aggregate on account of the Promissory Notes.

### 4.2    Events Leading to these Chapter 11 Cases

The Debtors entered these Chapter 11 Cases after a year-long post-default and prepetition marketing and sale process intended to maximize the value of the Company's assets. Though a confluence of factors contributed to the need to commence these Chapter 11 Cases, the Company's COD Business was unable to grow customers and revenues at a pace that matched its expenses.

The COVID-19 pandemic saw an increased need for laboratory testing and cleanroom services. At the beginning of the COVID-19 pandemic in 2020, the Company only operated one cleanroom but envisioned that the medium and long-term effects of the pandemic would prove an opportunity for Company expansion. Accordingly, the Company expanded its geographic footprint and entered into a number of long-term leases for additional COD locations. As the pandemic subsided, however, the ongoing need for pharmaceutical drug development in cleanrooms did not materialize as anticipated. Cleanroom facilities have high operating costs (notably, the somewhat fixed costs of utilities, rent, and attendant services) which cannot be scaled down when cleanroom occupancy is not at full capacity. As such, the COD Business has struggled to generate profit during periods of lower than projected facility occupancy.

In light of the foregoing challenges, the resulting liquidity shortfall, and related defaults under the M&T prepetition facility as described herein, the Company and its management team retained DLA Piper LLP (US) as legal counsel and Ankura as financial advisor, in December 2023 to negotiate with M&T and assess various strategic options for the Company. In addition, in January of 2024, the Company entered into an agreement with Ankura Capital Advisors, LLC ("ACA") to raise certain junior financing alternatives and provide related assistance. For the avoidance of doubt, ACA and Ankura are related but distinct entities. Also in January 2024, the Company retained BGL to act as investment banker in connection with a potential capital stock, sale, or other strategic transaction. Ankura and the Debtors' management team analyzed the Debtors' cash flows and prepared forecasts to manage the Debtors' liquidity to provide a runway to explore the various strategic alternatives and facilitate sale and capital raising diligence.

### (a)    *Overview of the Forbearance Agreements*

In late 2023, the Debtors breached several covenants under the Pre-Petition Loan Agreement, including, among other things: (i) failure to maintain a Fixed Charge Coverage Ratio for the fiscal quarter, ending September 30, 2023, (ii) failure to maintain a minimum of $10,000,000 on deposit at all times in one or more accounts maintained with the Pre-Petition Lender, as of the end of the fiscal quarter, ending September 30, 2023, and (iii) the occurrence of an Out-of-Formula Advance (as defined in the Pre-Petition Loan Agreement) on December 1, 2023, in the amount of $3,750,000. After extensive, arms'-length negotiations, on February 26, 2024, the Company and M&T executed a forbearance agreement and amendment to

the Pre-Petition Loan Agreement (the "Forbearance Agreement"), whereby M&T agreed to forbear from exercising any rights and remedies available under the Pre-Petition Loan Agreement and arising in connection with the Existing Events of Default.

Pursuant to the terms of the Forbearance Agreement, the forbearance was conditioned upon the Debtors initiating parallel capital raise and sale processes, whereby, pursuant to "Track 1," the Debtors would seek to raise an initial subordinated capital investment of up to $20 million by April 30, 2024 (the "Initial Capital Investment"); and, if consummated, would extend the facility's maturity date to November 1, 2025 and negate the obligation to pursue a "Track 2" wholistic recapitalization transaction. If the Debtors failed to consummate the Initial Capital Investment by April 30, 2024, the facility's maturity date would spring forward to July 31, 2024. Contemporaneously, the Company would initiate the "Track 2" recapitalization (the "Recapitalization"), whereby the Company would seek a sale of, or investment into, the Company, by July 31, 2024.

In February 2024, with the assistance of ACA and BGL, the Company commenced a targeted marketing process in support of the Initial Capital Investment and the Recapitalization. The Debtors' dual-tracked marketing efforts included targeted outreach by both ACA and BGL to potential junior capital providers, and structured equity partners, respectively. During this process, ACA contacted 121 potential investors and BGL contacted 63 potential structured equity investors. The Debtors invited these parties to execute non-disclosure agreements. In response to this initial outreach, and throughout February and March 2024, the Company executed nondisclosure agreements with 39 parties. While one party submitted an indication of interest with respect to an Initial Capital Investment another party executed a letter of intent for a Recapitalization transaction, in consultation with their advisors and stakeholders, the Company ultimately determined that, after continued diligence and negotiation of terms, neither potential transaction was actionable. That is, despite the robust marketing efforts from January 2024 to July 2024, the Company failed to consummate either an Initial Capital Investment or Recapitalization transaction by their respective milestone deadlines.[9]

To provide the Company with additional runway to expand the marketing process to focus on a sale of the business as a whole or for one or any combination of their business units, between August 2024 and January 2025, the Company and M&T entered into a series of Amendments to the Forbearance Agreement.[10]  In connection with the Third Amendment to Forbearance Agreement, the Company entered into an addendum to their investment banking engagement with BGL to relaunch the marketing and sale process on an accelerated timeline in the third quarter of 2024 to facilitate a sale transaction of one or more of the Company's business segments. BGL solicited 47 additional parties—or 231 parties in total—which resulted in executing non-disclosure

---

[9] Following the failure to consummate the Initial Capital Investment, ACA's involvement with the Debtors ended.

[10] The Debtors and Pre-Petition Lender executed the following Amendments: (i) Amendment No. 1 to the Forbearance Agreement and Seventh Amendment to Loan and Security Agreement, dated August 13, 2024 (the "First Amendment"); (ii) Amendment No. 2 to the Forbearance Agreement and Eighth Amendment to Loan and Security Agreement, dated August 23, 2024 (the "Second Amendment"); (iii) Amendment No. 3 to the Forbearance Agreement and Ninth Amendment to Loan and Security Agreement, dated August 30, 2024 (the "Third Amendment to Forbearance Agreement"); and (iv) Amendment No. 4 to Forbearance Agreement and Tenth Amendment to Loan and Security Agreement, dated January 6, 2025  (the "Fourth Amendment to Forbearance Agreement," and together with the First Amendment, Second Amendment, and Third Amendment, the "Amendments" ).

agreements with 19 additional parties—or 58 parties in total.  These parties had access to a virtual data room and, where appropriate, management presentations and site visits.  As further described herein, several parties submitted indications of interest and/or offers to purchase discrete business segments.

(b)      *Overview of the January 2025 Azzur Labs Sale*

During the third and fourth quarters of 2024, the Company marketed the business segments on a collective, combination, and singular basis.  Multiple parties submitted indications of interest and/or offers to purchase the Labs business segment.  On November 19, 2024, the Company executed a letter of intent with Keystone Capital Management, L.P. and Bluebirds Ventures, LLC to sell substantially all of the Azzur Labs business unit (the "Azzur Labs Sale") to a newly formed company, AL Holdings, Inc. (the "Labs Buyer").  After significant diligence and continued negotiation of terms, this marketing process culminated with, on January 3, 2025, the simultaneously signing and closing of the Azzur Labs Sale in consideration of receipt gross proceeds of $16,000,000.  All of the proceeds of the Azzur Labs Sale constituted proceeds of M&T's collateral.  Upon the closing of the Azzur Labs Sale, (i) approximately $12,000,000 was used to pay down a portion of the Term Loan Facility, (ii) approximately $2,000,000 was used to pay down a portion of the ABL Facility (applied to outstanding amount of the Line Advances, all as provided for more fully in the Fourth Amendment to Forbearance Agreement), and (iii) the remaining amounts were applied to transaction fees.  M&T also made available another $2,000,000 as a Supplemental Line to bolster the Company's liquidity as it pursued the Consulting transaction described herein—all as more fully set forth in the Fourth Amendment to Forbearance Agreement.

Additionally, in connection with the Azzur Labs Sale, the Company entered into a transition services agreement (the "TSA") with the Labs Buyer as a closing condition of the sale to ensure an orderly transition of the business unit.  The TSA provided for an initial term of thirty (30) days, which the Labs Buyer has opted to extend by further agreement with the Company.  Additionally, pursuant to the Azzur Labs Sale, a significant number of the Company's Azzur Labs employees transitioned to the Labs Buyer.

(c)      *Overview of the Stalking Horse APA Transaction for the Consulting Business*

Multiple parties submitted indications of interest and/or offers to purchase the Consulting business segment.  On December 17, 2024, the Company executed a letter of intent with Eliquent Life Sciences, Inc. in furtherance of such a sale transaction.  After significant diligence and continued negotiation of terms, this marketing process culminated in the execution of that certain Asset Purchase Agreement dated as of March 2, 2025 by and among Eliquent Life Sciences, Inc., as Purchaser (the "Stalking Horse Bidder"), and Azzur Group, LLC and its subsidiaries, as Sellers (the "Stalking Horse APA").  As more fully described in the Stalking Horse APA, subject to higher or otherwise better bids, the Stalking Horse Bidder will purchase the Azzur Consulting business unit assets (the "Consulting Business") for a purchase price of $56,000,000 plus the assumption of certain Assumed Liabilities (as defined in the Stalking Horse APA) (the "Stalking Horse Bid").  The Stalking Horse APA also contemplates that a significant number of the Debtors' consulting employees will receive offers to continue working for the Stalking Horse Bidder following consummation of the sale.

29

Shortly before the Petition Date, the Company determined, upon the advice of its external advisors and in consultation with stakeholders, that the Stalking Horse Bid, including the Bid Protections (as described herein), constituted the highest or otherwise best offer for the Consulting Business currently available under the facts and circumstances, recognizing that such bid will be subject to an open and competitive postpetition marketing and sale process.

4.3    **The Chapter 11 Cases**.

(a)    *Generally.*

As set forth above, on the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  The commencement of a chapter 11 case creates an estate that is composed of all of the legal and equitable interests of the debtor as of that date.  The Bankruptcy Code provides that a debtor is authorized to continue to operate its business and remain in possession of its property as a "debtor in possession."  From the Petition Date, the Debtors have continued to operate their business and manage their properties as debtors and debtors in possession.  By order entered March 3, 2025 [D.I. 38], the Chapter 11 Cases are being jointly administered for procedural purposes only.  No trustee or examiner has been appointed in the Chapter 11 Cases.

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoins all collection efforts and actions by creditors, the enforcement of Liens against property of the Debtors and both the commencement and the continuation of prepetition litigation against the Debtors.  With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay remains in effect from the Petition Date until the Effective Date of the Plan.

(b)    *"First Day" Motions and Related Applications.*

On the Petition Date, the Debtors filed a number of "first day" motions and applications designed to ease the Debtors' transition into chapter 11, maximize the value of the Debtors' assets, and minimize the effects of the commencement of the Chapter 11 Cases.  On March 4 and 5, 2025, the Bankruptcy Court entered orders providing various forms of first-day relief, including interim or final orders approving:

      i.    ***Joint Administration Motion***. *Motion of the Debtors for Entry of an Order (I) Granting Joint Administration of Their Chapter 11 Cases, and (II) Granting Related Relief [D.I. 2];*

      ii.    ***156(c) Claims Agent Retention Application***. *Application of the Debtors for Entry of an Order (I) Approving the Retention and Appointment of Stretto, Inc. as the Claims and Noticing Agent to the Debtors, Effective to the Petition Date, and (II) Granting Related Relief [D.I. 50];*

      iii.    ***DIP Financing Motion***. *Motion of the Debtors and Debtors in Possession for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Claims, and*

*(C) Grant Adequate Protection, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing and (IV) Related Relief [D.I. 63];*

iv. ***Cash Management Motion***. *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Operate Their Cash Management System, (B) Honor Prepetition Obligations Related Thereto, and (C) Perform Intercompany Transactions; (II) Waiving Strict Application of Section 345(B) of the Bankruptcy Code and the U.S. Trustee Guidelines to the Extent Necessary; and (III) Granting Related Relief [D.I. Nos. 59, 355];*

v. ***Creditor Matrix and Redaction Motion***. *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' Twenty Largest Unsecured Creditors in Lieu of Filing Lists for Each Debtor, (C) Serve Certain Parties in Interest by Email, and (D) Redact Certain Personally Identifiable Information of Natural Persons; and (II) Granting Related Relief [D.I. 62];*

vi. ***Insurance Motion***. *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain their Prepetition Insurance Program and Pay Related Prepetition Obligations, and (B) Renew, Supplement, Modify, or Purchase Insurance and Surety Coverage, (II) Authorizing Banks to Honor Related Checks and Transfers, and (III) Granting Related Relief [D.I. 163];*

vii. ***Taxes Motion***. *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief [D.I. 167];*

viii. ***Utilities Motion***: *Motion of the Debtors for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, (III) Approving the Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (IV) Establishing Procedures for Resolving Objections by Utility Companies, and (V) Granting Related Relief [D.I. 160];*

ix. ***Wages Motion***. *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Wages and Compensation and Maintain and Continue Employee Benefit Programs and (II) Authorizing and Directing Banks to Honor and Process Checks and*

31

*Transfers Related to Such Employee Obligations, and (III) Granting Related Relief [D.I. 66].*[11]

(c)    *Retention of Professional Advisors*

(i)    **DLA Piper LLP (US) – Counsel for the Debtors**

On March 14, 2025, the Debtors filed the *Application of the Debtors for Entry of an Order (I) Authorizing the Debtors to Retain and Employ DLA Piper LLP (US) as Counsel, Effective as of the Petition Date and (II) Granting Related Relief* [D.I. 109] (the "DLA Retention Application"). On March 31, 2025, the Debtors submitted the *Supplemental Declaration of Stuart M. Brown in Support of Application of the Debtors for Entry of an Order (I) Authorizing the Debtors to Retain and Employ DLA Piper (US) as Counsel, Effective as of the Petition Date and (II) Granting Related Relief* [D.I. 320]. The Bankruptcy Court entered an order [D.I. 326] approving the DLA Retention Application on April 1, 2025.

(ii)    **Ankura Consulting Group, LLC – Financial Advisor for the Debtors**

On March 14, 2025, the Debtors filed the *Application of the Debtors for Entry of an Order Authorizing the Debtors to (I) Retain Ankura Consulting Group, LLC to Provide Debtors a Chief Restructuring Officer and Certain Additional Personnel and (II) Designate M. Benjamin Jones as Chief Restructuring Officer for the Debtors, Effective as of the Petition Date* [D.I. 111] (the "Ankura Retention Application"). The Bankruptcy Court entered an order [D.I. 359] approving the Ankura Retention Application on April 8, 2025.

(iii)    **Stretto, Inc. – Administrative Advisor for the Debtors**

On March 14, 2025, the Debtors filed the *Application of the Debtors for Appointment of Stretto, Inc. as Administrative Advisor Effective as of the Petition Date* [D.I. 110] (the "Stretto Retention Application"). The Bankruptcy Court entered an order [D.I. 327] approving the Stretto Retention Application on April 1, 2025.

(iv)    **Brown Gibbons Lang & Co. Securities, Inc. ("BGL") – Investment Banker for the Debtors**

On March 3, 2025, the Debtors filed the *Application of the Debtors for Entry of an Order (I) Authorizing the Employment and Retention of Brown Gibbons Lang & Co. Securities Inc. as Investment Banker to the Debtors Effective as of the Petition Date, (II) Modifying Certain Time-Keeping Requirements, and (III) Granting Related Relief* [D.I. 44] (the "BGL Retention Application"). The U.S. Trustee filed an objection [D.I. 94] to the BGL Retention Application on March 11, 2025. In response, the Debtors (i) filed a reply [D.I. 124] and (ii) submitted supplemental declarations of J. Kyle Brown [D.I. 125] and M. Benjamin Jones [D.I. 127] in support of the BGL Retention Application. The Bankruptcy Court held a hearing on the BGL Retention Application on March 27, 2025 (the "Second Day Hearing"). At the Second Day Hearing, the Debtors and the U.S. Trustee presented evidence with respect to the BGL Retention

---

[11] On April 7, 2025, the Committee filed an objection [D.I. 354] to the Wages Motion. The Debtors filed a reply [D.I. 369] on April 9, 2025. The Bankruptcy Court scheduled a hearing on the Wages Motion for April 11, 2025.

Application.  The Bankruptcy Court ultimately approved the BGL Retention Application and entered an order on March 28, 2025 [D.I. 176].

      (d)      *Appointment of the Official Committee of Unsecured Creditors*

On March 14, 2025, the U.S. Trustee appointed the Committee [D.I. 99].  The Committee is composed of (i) Barker Contracting, Inc.; (ii) Southworth-Milton Inc. d/b/a Milton-Cat International Corp.; (iii) Thomas Scientific Inc.; (iv) Shiraz Partners LP; (v) DBCI, Inc.; (vi) Controlled Contamination Services, LLC; and (vii) NESPA, Inc.  On March 19, 2025, the Committee engaged Pachulski Stang Ziehl & Jones LLP as its counsel and Huron Consulting Group as financial advisor, and counsel for the Committee filed the *Notice of Appearance and Request for Notices of the Official Committee of Unsecured Creditors* [D.I. 130] on March 20, 2025.

      (e)      *Claims Process and Bar Dates*

      i.      *Schedules & Statements*

On the Petition Date, the Debtors filed the *Motion of the Debtors for Entry of an Order (I) Extending the Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs and (II) Granting Related Relief* [D.I. 10] (the "SOFA and Schedules Motion").  The SOFA and Schedules Motion sought an extension through April 16, 2025 as the deadline to file the statements of financial affairs and schedules.  The Debtors, however, filed their Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules" or "SOFA", as applicable) on March 30-31, 2025, which are incorporated herein by reference in all respects. Among other things, the Debtors' SOFA lists the Debtors' current and former officers and directors who are Released Parties under this Plan, as well as transfers made to the Debtors' officers and directors within a year of the Petition Date and other transfers made to the Debtors' non-insider creditors within 90 days of the Petition Date.

On April 1, 2025, the Bankruptcy Court entered the *Order (I) Extending the Time to File Schedules and Statements and (II) Granting Related Relief* [D.I. 329].

      ii.      *Claims Bar Dates*

On March 10, 2025, the Debtors filed the *Motion of the Debtors for Entry of an Order (I) Establishing Deadlines for Filing Proofs of Claim, Including Section 503(b)(9) Claims, (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief* [D.I. 93] (the "Bar Date Motion").  On March 28, 2025, the Bankruptcy Court entered the *Order (I) Establishing Deadlines for Filing Proofs of Claim, Including Section 503(b)(9) Claims and (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief* [D.I. 179] (the "Bar Date Order").

The Bar Date Order set (i) the General Bar Date of April 30, 2025 at 5:00 p.m. (ET), (ii) the Governmental Bar Date of September 1, 2025 at 5:00 p.m. (ET), as well as (iii) the Amended Schedules Bar Date, and (iv) the Rejection Damages Claims Bar Date.  The Debtors served the Bar Date Order and applicable bar date notice on March 31, 2025.

iii.        *Section 341(a) Meeting of Creditors*

The section 341(a) meeting of creditors was held on April 7, 2025 at 1:00 p.m. (ET) and has been continued to April 16, 2025 at 2:00 p.m. (ET) [D.I. 362].

(f)        *The Bidding Procedures and the Sale of Substantially All of the Debtors' Assets*

On March 3, 2025, the Debtors filed the Bidding Procedures Motion [D.I. 13] seeking entry of an order (i) authorizing and approving the Debtors' proposed Bidding Procedures; (ii) scheduling an auction (the "Auction") and sale hearing (the "Sale Hearing"); (iii) approving the form and manner of notice of the Auction and the Sale Hearing; (iv) authorizing the Debtors to enter into, and perform under, the Stalking Horse APA; (v) approving the Bid Protections; and (vi) approving procedures for the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases and approving the form and manner of notice thereof.

With respect to the Consulting Business, to induce the Stalking Horse Bidder to expend the time, energy, and resources necessary to negotiate and ultimately execute the Stalking Horse APA, benefit the Estate through promoting competition to maximize the value of the Debtors' assets, and to keep the Stalking Horse Bid open and irrevocable through the sale process, the Debtors agreed to provide the Stalking Horse Bidder with certain bid protections (the "Bid Protections"). The Bid Protections include: (i) a break-up fee in the amount equal to $1,680,000, which represents approximately three (3) percent of the cash component of the Purchase Price (the "Break-Up Fee"), (ii) reimbursement to the Stalking Horse Bidder for its reasonable and documented expenses in conjunction with the Stalking Horse Bid up to a maximum amount of $1,000,000 (the "Expense Reimbursement"), and (iii) if an Auction is conducted, (a) the initial overbid (in excess of the Purchase Price) must be a minimum of $2,880,000, which sum is comprised of the amount of the Expense Reimbursement and Break-Up Fee, plus an initial incremental overbid amount of $200,000, and (b) any subsequent incremental overbids must be in a minimum amount of $200,000, subject to increase upon agreement among the Sellers (as defined in the Stalking Horse APA) and Stalking Horse Bidder.

Under the proposed Bidding Procedures, the Debtors reserved the right to designate a stalking horse bidder for the COD Business (the "COD Stalking Horse Bidder") and to request bid protections in the form of a break-up fee and/or expense reimbursement for such COD Stalking Horse Bidder by an appropriate motion to the Court.

In addition, the Debtors filed a motion to redact certain portions of the Bidding Procedures Motion [D.I. 79] on March 6, 2024. The Bankruptcy Court entered an order granting the motion to redact on March 27, 2025 [D.I. 168].

The Bankruptcy Court granted the Bidding Procedures Motion on the record during the Second Day Hearing. The Bankruptcy Court entered the Bidding Procedures Order [D.I. 177] on March 28, 2025. Under the Bidding Procedures Order, the deadline to submit a bid for either the Consulting Business or the COD Business was April 7, 2025 at 5:00 p.m. (ET) (the "Bid Deadline"). Subject to the Bidding Procedures Order, the Debtors intend to seek entry of one or more orders at the Sale Hearing to consider approval of the successful bid and any backup bid (or to approve the Stalking Horse Bid as the successful bid for the Consulting Business if no

Auction is held).  The Sale Hearing was scheduled to take place on April 11, 2025, if there was no Auction (or if the Stalking Horse Bidder is the Successful Bidder at such Auction), or April 16, 2025 in all other scenarios.

Following the Bid Deadline for the Consulting Business, on April 8, 2025, the Debtors filed the *Notice of Successful Bidder and Cancellation of Auction Solely with Respect to the Sale of the Debtors' Consulting Business* [D.I. 360].  As a result, the Stalking Horse Bidder was the successful bidder with respect to the Consulting Business, and the Auction was cancelled.  On April 8, 2025, the Debtors filed the *Notice of Extension of the Bid Deadline Solely with Respect to the Sale of the Debtors' Cleanrooms-on-Demand Business* [D.I. 363] (the "COD Bid Extension Notice").  The COD Bid Extension Notice provides that, in consultation with the Consultation Parties, the Debtors elected in their business judgment to extend the Bid Deadline solely with respect to the COD Business and related assets for an additional seven (7) days, to April 14, 2025 at 5:00 p.m. (ET).

(g)     *Other Filings*

On March 3, 2025, the Debtors filed the *Omnibus Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Reject Certain Unexpired Leases and (B) Abandon Any Remaining Property Located at Premises of Rejected Leases and (II) Granting Certain Related Relief* [D.I. 45] (the "Lease Rejection Motion").  The Lease Rejection Motion seeks to reject eight (8) leases to preserve value of the Debtors' estates by avoiding unnecessary rent costs.  The Lease Rejection Motion is scheduled for hearing on April 11, 2025.

In addition, on March 3, 2025, the Debtors also filed the *Motion of the Debtors for Entry of an Order (I) Approving the Debtors' Sale Incentive Plan, and (II) Granting Related Relief* [D.I. 46] (the "SIP Motion") under seal.  On March 18, 2025, the U.S. Trustee filed a limited objection [D.I. 122] (the "UST SIP Objection") to the SIP Motion.  The Debtors submitted the *Supplemental Declaration of M. Benjamin Jones in Support of the Motion of the Debtors for Entry of an Order (I) Approving the Debtors' Sale Incentive plan, and (II) Application to Employ and Retain Brown Gibbons Lang & Co. LLC as Investment Banker* [D.I. 127] on March 20 2025, and on March 26, 2025, the Committee filed an objection [D.I. 147] (the "Committee SIP Objection") to the SIP Motion.  The Debtors filed an omnibus reply [D.I. 126] that addressed the UST SIP Objection.  On March 27, 2025, the Committee withdrew [D.I. 156] the Committee SIP Objection.  The Debtors also filed a motion to redact certain portions of the SIP Motion [D.I. 81], which the Bankruptcy Court granted on March 27, 2025 [D.I. 166].

The Bankruptcy Court held a hearing on the SIP Motion during the Second Day Hearing and granted the SIP Motion on the record.  On March 28, 2025, the Bankruptcy Court entered the *Order (I) Approving the Debtors' Sale Incentive Plan, and (II) Granting Related Relief* [D.I. Nos. 171-72].

(h)     *Plan Formulation, Negotiation, and Debtor Release*

In formulating the terms of the Plan, the Debtors, with the assistance of their advisors, undertook a careful and comprehensive review of potential claims and causes of action belonging to the Estate, and whether and to what extent such potential claims and causes of action may be

non-frivolous and otherwise serve as a viable source of distributable net value for the benefit of the Debtors' creditors, taking into account the foreseeable costs, time, and inherent uncertainty associated with litigation. During the course of that assessment, the Debtors engaged in extensive discussions with the Debtors' management team and board. The Debtors have disclosed prepetition transfers to non-insider creditors within 90 days of the Petition Date. *See* SOFA No. 3, which has been fully incorporated by reference herein. The Debtors also disclosed prepetition transfers to the Debtors' insiders within one year of the Petition Date. *See* SOFA No. 4, which has been fully incorporated by reference herein. The Debtors also engaged with the Committee in respect of its views of any potential claims and causes of action belonging to the Estate.

In formulating the release in Section 8.3 of the Plan (the "Debtor Release"), the Debtors reviewed, among other things, potentially recoverable transfers to any Released Party as potential preferences. In connection therewith, the Debtors considered potentially applicable defenses with respect to any such transfers, such as the "ordinary course" and "new value" affirmative defenses, in designing the Plan. With respect to any transfers to insiders within one year of the Petition Date, the Debtors do not believe there is any reasonably foreseeable material recoverable value on account of such claims, let alone risk- and litigation-adjusted value that could theoretically exceed the value of such insiders' respective contributions to the Debtors, the marketing and sale process, monetizing other assets of the Estates, the Plan, and administering these chapter 11 cases. In addition, the Debtors considered, among other things, whether any insiders could assert indemnification claims against the Estate in the event any estate claims and causes of action were prosecuted against such individuals. Part of the Debtors' review process included an evaluation of the likelihood of success, the cost(s) of prosecuting such claims and causes of action, the risk(s) of collection, the inherent uncertainty of litigation, and related considerations. Altogether, the Debtors have thus far determined that the relative contributions the insider transferees have made and continue to make to the Debtors' estates outweigh any reasonably foreseeable benefit(s)— which may be no benefit at all—to be achieved by prosecuting claims and causes of action, including potential purported preference actions, against such parties. The Debtors' review remains ongoing.

Accordingly, the Debtor Release was the product of the Debtors' review and discussions and the result of good faith and arms'-length negotiations throughout the course of the Plan formulation process by the Debtors and various other parties in interest. Each of the Released Parties is a stakeholder and critical participant in the Sale and Plan processes and shares a common goal with the Debtors in maximizing value and seeing the Plan succeed. Significantly, the Released Parties that are directors and officers played a key role in the negotiation and execution of the Stalking Horse APA and were crucial to the Debtors' prepetition and postpetition marking and sale processes, each of which provided the Debtors with a path to proposing—and, ultimately seeking confirmation of—the Plan. Moreover, the Debtor Release is being given in exchange for the Released Parties' efforts in developing and implementing a restructuring strategy that facilitated the Debtors' smooth transition into chapter 11, as well as their management of operations throughout the pendency of these Chapter 11 Cases. Significantly, in connection with the forbearance agreements, Amendments, and dual track marketing process, the Debtors' board met and regularly held meetings prepetition with the Debtors' chief restructuring officer to guide the capital raise and sales process, which led to strategic value maximizing decisions. Absent the Debtor Release, these parties would have been unlikely to participate in the negotiations, compromises, and processes that led to the ultimate formation of the Plan. In the case of M&T,

they provided the Company with multiple forbearance agreements and extended maturity dates as Prepetition Lender and have funded these chapter 11 cases pursuant to the DIP Orders as the DIP Lender.  Like the Debtors, these parties support confirmation of the Plan and have played a critical role in facilitating the Debtors' Chapter 11 Cases.

The releases and injunctions in Article VIII of the Plan are integral parts of the Plan and the settlements implemented under the Plan, and the approval of such releases under the Confirmation Order is a condition to the occurrence of the Effective Date.  All of the Released Parties have relied on the efficacy and conclusive effects of such releases and injunctions and on the Bankruptcy Court's retention of jurisdiction to enforce such releases and injunctions when making concessions pursuant to the Plan and by agreeing to, accepting, and supporting the settlement and treatment of their respective Claims, causes of action, and other rights under the Plan.  Moreover, parties that (i) vote to accept the Plan (and do not elect to opt-out of the Releases) or (ii) abstain from voting or vote to reject the Plan and also opt-in to the Releases, become Released Parties under the Plan.

The Debtors' review of the scope of the Debtor Release is ongoing.

On March 7, 2025, the Debtors filed the (i) *Motion of the Debtors for Entry of an Order (I) Approving the Combined Disclosure Statement and Plan on an Interim Basis for Solicitation Purposes Only; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Combined Disclosure Statement and Plan; (III) Approving the Form of Ballot and Solicitation Packages; (IV) Establishing the Voting Record Date; (V) Scheduling Combined Hearing for Final Approval of the Adequacy of Disclosures in, and Confirmation of, the Combined Disclosure Statement and Plan; and (VI) Granting Related Relief* [D.I. 86] (the "DS Motion") and (ii) *Combined Disclosure Statement and Joint Chapter 11 Plan of Azzur Group Holdings LLC and Its Affiliated Debtors* [D.I. 85].

On April 7, 2025, the U.S. Trustee and Committee filed objections [D.I. Nos. 351, 352] (the "DS Objections") to the Solicitation Motion.  The Debtors filed a reply [D.I. 369] on April 9, 2025.  The Bankruptcy Court scheduled a hearing on the DS Motion and DS Objections, among other matters, for April 11, 2025.

The Plan provides for the best possible means to conclude these Chapter 11 Cases and make Distributions to creditors.

## ARTICLE V
## CONFIRMATION AND VOTING PROCEDURES

5.1     **Confirmation Procedure**.  On April [11], 2025, the Bankruptcy Court entered the Interim Approval and Procedures Order conditionally approving the Combined Disclosure Statement and Plan for solicitation purposes only and authorizing the Debtors to solicit votes to accept or reject the Plan.  The Confirmation Hearing has been scheduled for May [13], 2025 at [10:30 a.m.] (prevailing Eastern Time) to consider (a) final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.  The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice,

37

except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

      5.2    **Procedure for Objections**.  Any Objection to final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on the following parties: (a) counsel to the Debtors, DLA Piper LLP (US) (i) 1201 North Market Street, Suite 2100 Wilmington, Delaware 19801 (Attn.: Stuart M. Brown [stuart.brown@us.dlapiper.com]); and (ii) 444 West Lake Street, Suite 900 Chicago, Illinois 60606 (Attn.: W. Benjamin Winger [benjamin.winger@us.dlapiper.com] and Stephanie Cohen [stephanie.cohen@us.dlapiper.com]); (b) financial advisor to the Debtors, Ankura Consulting Group, LLC, 485 Lexington Avenue, 10th Floor, New York, New York 10017 (Attn.: M. Benjamin Jones, Chief Restructuring Officer of the Debtors [ben.jones@ankura.com]); (c) counsel to the DIP Lender and Pre-Petition Lender, (i) Richards, Layton & Finger, PA, 920 North King Street, Wilmington, Delaware 19801 (Attn.: John H. Knight [knight@rlf.com]) and (ii) Otterbourg P.C., 230 Park Avenue, New York, New York 10169 (Attn.: Andrew M. Kramer [akramer@otterbourg.com] and James V. Drew [jdrew@otterbourg.com]); (d) proposed counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899-8705 (Courier 19801) (Attn.: Laura Davis Jones [ljones@pszjlaw.com], David M. Bertenthal [dbertenthal@pszjlaw.com], Colin R. Robinson [crobinson@pszjlaw.com.], and Edward A. Corma [ecorma@pszjlaw.com]); and (e) the Office of the United States Trustee for Region 3, J. Caleb Boggs Federal Building, 844 King St., Lockbox 35, Wilmington, Delaware 19801 (Attn.: Jonathan Lipshie [jon.lipshie@usdoj.gov]).  Unless an Objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

      5.3    **Requirements for Confirmation**.  The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code.  Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (b) must be feasible.  The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

      Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be presumed to have accepted the Plan.

5.4      **Classification of Claims and Interests**.

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified).  The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest.  The Debtors believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.  It is possible that a holder of a Claim or Interest may challenge the classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If this occurs, the Debtors intend, in accordance with the terms of the Plan, to make such modifications to the Plan as may be necessary to permit its confirmation.  Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

**EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.  Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the

applicable Class.  Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distribution received by creditors.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein.  The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority of such Claims and Interests.  The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan.  Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtor reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

5.5 **Impaired Claims or Interests**.

Pursuant to section 1126 of the Bankruptcy Code, only classes of claims or interests that are Impaired under a plan may vote to accept or reject such plan.  Under section 1124 of the Bankruptcy Code, a claim or interest is Impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan.  In addition, if the holders of claims or interests in an Impaired Class do not receive or retain any property under a plan on account of such claims or interests, such Impaired Class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, holders of Claims in Classes 3 and 4 are Impaired and are entitled to vote on the Plan.  Holders of Claims or Interests in Classes 5 and 6 are Impaired and will not receive or retain any property under the Plan on account of such Claims or Interests and, therefore, are not entitled to vote on the Plan and deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.  Under the Plan, holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code.

5.6 **Confirmation without Necessary Acceptances**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.

In the event that any Impaired Class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all Impaired Classes, if the plan has been accepted by at least one Impaired Class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting Impaired Class of claims or interests. Here, because holders of Claims and Interests in Classes 5 and 6 are deemed to reject the Plan, the Debtors may seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, as no holder of a Claim or Interest junior to those in Classes will receive any property under the Plan. In addition, the Debtors reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders, as follows:

(a)     *Secured Creditors*. Either (i) each Impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each Impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b)     *Unsecured Creditors*. Either (i) each Impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the Plan.

(c)     *Equity Interests*. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of

the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the Distributions provided under the Plan satisfy the absolute priority rule, where required.

5.7     **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). Inasmuch as substantially all of the Debtors' assets have been liquidated and the Plan provides for the Distribution of all of the Cash proceeds of the Debtors' assets to holders of Claims that are Allowed as of the Effective Date in accordance with the Plan, for purposes of this test, the Debtors have analyzed the ability of the Wind-Down Debtor to meet its obligations under the Plan. Based on the Debtors' analysis, the Wind-Down Debtor will have sufficient assets to accomplish its tasks under the Plan. Therefore, the Debtors believe that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

5.8     **Best Interests Test and Liquidation Analysis**

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are Impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an Impaired Class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable Distribution to holders of each Impaired Class of claims and interests if a debtor were liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code. To determine if a plan is in the best interests of each Impaired class, the present value of the Distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any Impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such Impaired class.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, there would be additional costs, expenses, and delays that the Estates would incur as a result of liquidating the

Estates in a chapter 7 case.  The Debtors believe that creditors will receive Distributions faster and in greater amounts than any chapter 7 liquidation.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee.  The Debtors believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors.  Conversion also would likely delay the liquidation process and ultimately Distribution of the Residual Assets.  The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals) that are allowed in the chapter 7 cases.  Ultimately, M&T would need to consent to the use of its cash collateral to fund such a chapter 7 process, and there is no guarantee that it would do so.  Without such consent, conversion to chapter 7 would serve only to increase the amount of claims against the Debtors that would not be paid—both in terms of currently incurred and unpaid administrative and priority claims, as well as any costs incurred in administering the chapter 7 case.

The Debtors are currently marketing their businesses and assets for sale on a going-concern and, with respect to their businesses and assets outside the scope of the Stalking Horse APA Sale Transaction, liquidation basis.  The Bidding Procedures Order sets April 7, 2025, as the deadline for bidders to submit bids—including liquidation bids for the Debtors' assets.  Accordingly, in order to avoid material prejudice to the ongoing marketing and sale process for assets that might be subject to liquidation bids, the Debtors intend to provide a more detailed description of a hypothetical liquidation scenario under chapter 7 as compared to the Plan, which will be filed as an exhibit to the Plan Supplement by no later than seven days in advance of the Voting Deadline, and is incorporated herein by reference.

For the reasons set forth herein, the Debtors believe that holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to chapter 7 cases, and therefore, the classification and treatment of Claims and Interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

### 5.9    Releases & Exculpations

The Plan proposes to release the Released Parties and exculpate the Exculpated Parties.  The Debtors' releases, voluntary third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element among the Debtors and such parties in obtaining their continued support for the marketing process, Sale Transaction, and the Plan.

The Released Parties and the Exculpated Parties, including current directors and officers, have made substantial and valuable contributions to the Debtors' restructuring through efforts to market, negotiate, and implement the Sale Transaction and working to closing the Stalking Horse APA, and with respect to the formulation of the Plan.  In the case of the Sale Transaction, the Sale Transaction maximizes and preserves the going-concern value of the Debtors for all parties in interest, including employees, and further, in the case of the Plan, optimizes recoveries and provides for the best possible conclusion of these chapter 11 cases.  The proposed releases and exculpations preserve value by enabling the Debtors to emerge swiftly from chapter 11 while

giving finality to stakeholders that elect to give and receive consensual third-party releases. In addition, certain Released Parties and Exculpated Parties, including current directors and officers, have agreed to make further contributions, including by agreeing to reductions in the amounts or waivers of their Claims and supporting the Wind-Down after the Closing Date while not collecting any salary or benefits from the Estates—so long as they receive the full benefit of the Plan's release and exculpation provisions. These chapter 11 cases could not be administered, and the Sale Transaction could not have been realized, but for the contributions of such officers and directors.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are consensual, necessary and appropriate, and meet the requisite legal standards promulgated by the United States Court of Appeals for the Third Circuit and the U.S. Supreme Court. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The releases, exculpation, and injunction provisions are set forth in Article VIII hereof.

5.10    **Acceptance of the Plan**

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of Ballots are set forth in the Interim Approval and Procedures Order.

In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of Insiders, must actually vote to accept the Plan.

**IF YOU ARE ENTITLED TO VOTE ON THE PLAN, THE DEBTORS URGE YOU TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE.** Please be sure to complete the Ballot properly and legibly and to identify the exact amount of your Claim and the name of the Holder. If you are a Holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, you received a damaged Ballot, or you lost your Ballot, or if you have any questions concerning the Plan or procedures for voting on the Plan, please contact the Claims Agent via e-mail at TeamAzzur@stretto.com, or by calling the toll-free information line at (833) 900-1730 or, if calling from outside the United States or Canada, at (949) 202-5650. The Claims Agent is not permitted to provide legal advice.

**ARTICLE VI**
**CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING**

**THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND ASSOCIATED DOCUMENTS BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

6.1    **The Plan May Not Be Accepted**.

The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan of liquidation for the Debtors, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to creditors as those proposed in the Plan.

6.2    **The Plan May Not Be Confirmed**.

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.  Even if the Bankruptcy Court determined that the Combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation had not been met.  Moreover, there can be no assurance that modifications to the Combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes.  If the Plan is not confirmed, it is unclear what Distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent liquidation.

6.3    **Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections**.

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution.  There can be no assurance that the estimated Claim amounts set forth in the Plan are correct.  These estimated amounts are based on certain assumptions with respect to a variety of factors.  Both the actual amount of Allowed Claims in a particular Class and the funds available for Distribution to such Class may differ from the Debtors' estimates.  If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for Distribution to such Class are lower than the Debtors' estimates, the percentage recovery to holders of Allowed Claims in such Class will be less than projected.

6.4    **Objections to Classification of Claims**.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.  To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under

45

the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member. The Debtors believe that they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

6.5    **Failure to Consummate the Plan**.

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

6.6    **Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan**.

There can be no assurance that the estimated Claim amounts set forth in the Plan are correct, and the actual allowed amounts of Claims may differ from the estimates. The estimated amounts are based on certain assumptions with respect to a variety of factors. Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein, thereby materially reducing the recovery to the Holders of Claims in Classes 3 and 4.

6.7    **Plan Releases May Not Be Approved**.

There can be no assurance that the releases, as provided in Article VIII of the Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a chapter 11 plan that differs from the Plan, the Plan not being confirmed, or the Plan not going effective. If the releases are not approved, certain Released Parties my withdraw their support for the Plan.

6.8     **Certain Tax Considerations**.

There are a number of material income tax considerations, risks and uncertainties associated with the Plan described herein.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**ARTICLE VII**
**MEANS OF IMPLEMENTING THE PLAN**

In addition to the provisions set forth elsewhere in this Plan, the following shall constitute the means of execution and implementation of this Plan.

7.1     **General**

Upon confirmation of the Plan, and in accordance with the Confirmation Order, the Debtors or the Wind-Down Debtor, as applicable, will be authorized to take all necessary or appropriate steps, and perform all necessary or appropriate acts, to consummate the terms and conditions of the Plan, including, as applicable, consummation of the Sale Transaction, the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or other corporate transactions. Such actions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (d) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

7.2     **Sale Transaction & Sources of Consideration for Plan Distributions**

The Wind-Down Debtor will fund distributions under the Plan with Cash held on the Effective Date by or for the benefit of the Debtors or the Wind-Down Debtor, including the remaining Net Sale Proceeds due and payable under the Purchase Agreement(s) and Sale Order(s) after the Closing Date, the Net Residual Asset Proceeds assets held by the Wind-Down Debtor,

and the assumption of liabilities by the Purchaser(s) under the Purchase Agreement(s) and Sale Order(s).  The Debtors have also offered to grant certain releases to Holders of Claims that vote to accept the Plan (and do not opt-out of the releases contained herein), abstain from voting but affirmatively opt-in to the releases contained herein, or who reject the Plan but affirmatively opt-in to the releases contained herein.  Notwithstanding anything to contrary herein, on the Effective Date, any Cause of Action not settled, released, enjoined, or exculpated under Article VIII hereof on or prior to the Effective Date shall vest in the Wind-Down Debtor and shall be subject to administration by the Plan Administrator.

### 7.3   **Wind-Down Debtor**

On the Effective Date, Debtor Azzur Group, LLC shall continue in existence after the Effective Date as the Wind-Down Debtor for purposes of (a) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Debtor after the Effective Date and after the consummation of the Sale Transaction, (b) performing the Debtors' obligations under any Purchase Agreement or any transition services agreement entered into on or after the Effective Date by and between the Debtors and the Purchaser, (c) resolving any Disputed Claims, (d) paying or otherwise satisfying Allowed Claims, (e) filing appropriate tax returns, and (f) administering the Plan in an efficacious manner.  The Wind-Down Debtor shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forum, or administrative proceedings outside of the Bankruptcy Court, in each case without the requirement or need for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

Upon the occurrence of the Effective Date, (i) each Debtor's board of managers shall be deemed to have resigned, and (ii) the Net Sale Proceeds and the Residual Assets shall vest in the Wind-Down Debtor for the purpose of administering the Estate and consummating the Plan.  Such assets shall be held free and clear of all Liens, claims, and interests of Holders of Claims and Interests, except as otherwise expressly provided in this Plan.  Any distributions to be made under the Plan from such assets shall be made by the Plan Administrator or its designee.  The Wind-Down Debtor and the Plan Administrator shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

After the Effective Date, Debtor Azzur Group, LLC shall continue to exist as the Wind-Down Debtor for Plan Distribution purposes.  As of the Effective Date, all other Debtors shall be deemed dissolved under applicable state law.  At any time after the Effective Date, the Plan Administrator shall be authorized to dissolve the remaining Debtors upon filing a notice of such dissolution with the Bankruptcy Court, notwithstanding any requirements of applicable state law, without the necessity for any other or further actions to be taken by or on behalf of the remaining Debtors or payments to be made in connection therewith.

7.4    **Plan Administrator**.

(a)    ***Appointment***.  The Plan Administrator shall be appointed by the Debtors.  The appointment of the Plan Administrator shall be effective as of the Effective Date.  Successor Plan Administrator(s) shall be appointed in accordance with this Plan.

(b)    ***Powers and Duties***.  The Plan Administrator shall act for the Wind‑Down Debtor in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions hereof (and all certificates of incorporation, bylaws, shareholder agreements, and related documents are deemed amended by the Plan to permit and authorize same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers and officers of the Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall succeed to the powers of the Debtors' directors and officers.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtor.  For the avoidance of doubt, the foregoing shall not limit the authority of the Wind-Down Debtor or Plan Administrator, as applicable, to continue the employment of any former director, officer, employee, or other agent or representative.

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to made distributions thereunder and Wind Down the businesses and affairs of the Debtors and the Wind-Down Debtor, as applicable, including, without limitation:

(i)    to exercise all power and authority that may be or could have been exercised, commence all proceedings that may be or could have been commenced and take all actions that may be or could have been taken by the Debtors with like effect as, if authorized, exercised and taken by unanimous action of the Debtors partners, members, officers, directors and shareholders; including, without limitation, amendment of the certificates of incorporation and by-laws of the Debtors, merger of any Debtor into another Debtor, the dissolution of any Debtor and the assertion or waiver of any Debtors' attorney/client privilege;

(ii)    to open and maintain bank and other deposit accounts, escrows and other accounts, calculate and implement Distributions to Holders of Allowed Claims as provided for or contemplated by the Plan and take other actions consistent with the Plan and the implementation thereof, including the establishment, re-evaluation, adjustment and maintenance of appropriate Reserves in accordance with this Plan, in the name of the Debtors or the Wind-Down Debtor, even in the event of the dissolution of the Debtors;

(iii)    to make a good faith valuation of the non-Cash assets of the Estate;

(iv)    subject to the applicable provisions of the Plan, to collect and liquidate all Residual Assets pursuant to the Plan, to make Distributions generated by the sale or disposition of Residual Assets and to administer the winding-up of the affairs of the Debtors;

(v)    to borrow funds and replenish the Reserves and to take all actions necessary to preserve and maximize the value of the Estate;

*(vi)* to object to any Claims (Disputed or otherwise), and to defend, compromise and/or settle any Claims prior to or following objection without the necessity of approval of the Bankruptcy Court;

*(vii)* to make decisions without further Bankruptcy Court approval, regarding the retention or engagement of professionals, employees and consultants by the Wind-Down Debtor or Plan Administrator, including (i) the charges incurred on or after the Effective Date for services of professionals, without application to the Bankruptcy Court, and (ii) disbursements, expenses or related support services relating to the winding down of the Debtors and implementation of the Plan, without application to the Bankruptcy Court;

*(viii)* to cause, on behalf of the Debtors, the Wind-Down Debtor, and their Estates all necessary tax returns and all other appropriate or necessary documents related to municipal, State, Federal or other tax law to be prepared or filed timely, in accordance with the Plan; *provided*, that the Plan Administrator, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's chapter 11 case, as determined under applicable tax laws;

*(ix)* to enter into any agreement or execute any document required by or consistent with the Plan and perform all of the obligations of the Debtors or the Wind-Down Debtor hereunder;

*(x)* to abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization, any assets that the Plan Administrator determines, at the conclusion of the Case, are of no benefit to creditors of the Debtors or too impractical to distribute;

*(xi)* to investigate (including pursuant to Bankruptcy Rule 2004), prosecute and/or settle any Retained Action, participate in or initiate any proceeding before the Bankruptcy Court or any other court of appropriate jurisdiction, participate as a party or otherwise in any administrative, arbitrative or other non-judicial proceeding, litigate, or settle such Retained Actions on behalf of the Wind-Down Debtor and pursue to settlement or judgment such actions;

*(xii)* to use assets of the Wind Down Debtor to purchase or create and carry all appropriate insurance policies, bonds or other means of assurance and protection of the Wind-Down Debtor and Plan Administrator and pay all insurance premiums and other costs he or she deems necessary or advisable to insure the acts and omissions of the Plan Administrator and its representatives;

*(xiii)* to implement and/or enforce all provisions of this Plan and any Purchase Agreement;

*(xiv)* to maintain appropriate books and records (including financial books and records) to govern the distributions hereunder;

*(xv)* as and to the extent set forth in Section 2.1 hereof, to pay fees incurred pursuant to 28 U.S.C. § 1930(a)(6) and to file with the Bankruptcy Court and serve on the United

States Trustee quarterly post-confirmation financial reports for each of the Debtors until such time as such reports are no longer required, or the Bankruptcy Court orders otherwise, a final decree is entered closing these Chapter 11 Cases or these Chapter 11 Cases are converted or dismissed;

(xvi)    to dissolve the Wind-Down Debtor if the Plan Administrator determines, in reasonable reliance on such professionals as it may retain, that the expense of administering the Wind-Down Debtor so as to make a final Distribution to Holders of Allowed Claims is likely to exceed the value of the remaining assets;

(xvii)    to establish and fund, with any appropriate assets of the Wind-Down Debtor, one or more liquidating trusts; *provided*, for the avoidance of doubt, the Debtors do not foresee any need to establish such trust(s) at this time;

(xviii)    to seek one or more final decrees closing the Cases; and

(xix)    to do all other acts or things consistent with the provisions of this Plan that the Plan Administrator deems reasonably necessary or desirable with respect to implementing the Plan.

(c)    **Compensation**.  The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement.

(d)    **Post Effective Date Reserve**.  The Plan Administrator shall be authorized to establish and fund a Post Effective Date Reserve with an amount of Cash, inclusive of the Wind-Down Amount, it deems necessary or appropriate to satisfy future costs and expenses for the implementation of the Plan and discharge of its duties hereunder.  The Post Effective Date Reserve shall be used by the Plan Administrator solely to satisfy the distributions set forth herein and the expenses of the Wind-Down Debtor and the Plan Administrator as set forth herein.  The Plan Administrator is authorized, but not directed, in accordance with its business judgment, to establish and fund one or more reserves, which shall be deemed part of the Post Effective Date Reserve, in specific amounts from the Post Effective Date Reserve as necessary or appropriate to discharge its duties and make distributions hereunder.  In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes.

(e)    **Limitation of Liability; Exculpation of Plan Administrator**.    The Plan Administrator and all professionals retained by the Wind-Down Debtor or Plan Administrator, or which are governed by or under the supervision of the Plan Administrator, as applicable, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtor; *provided*, *however*, that the foregoing indemnification shall be subject to the parameters, if any, established by any applicable professional rules of responsibility governing such professional.    The Plan Administrator and any such professionals may rely upon written information previously generated by the Debtors**.**

(f)    **Successor Plan Administrator(s)**.  The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court; *provided*, that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator.  Upon its appointment, the successor Plan Administrator, without any further act,

shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtor and the Wind Down shall be terminated.

7.5     **Cancellation of Existing Securities and Agreements**.   Except as otherwise provided in this Plan, and in any contract, instrument or other agreement or document created in connection with this Plan, on the Effective Date, the Interests and any other promissory notes, share certificates, whether for preferred or common stock (including treasury stock), other instruments evidencing any Claims or Interests, and all options, warrants, calls, rights, puts, awards, and commitments, including, without limitation, any agreements purporting to relate to deferred compensation that relate to Interests or options, shall be deemed cancelled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtors under the notes, share certificates, and other agreements and instruments governing such Claims and Interests shall be released; provided, however, that the cancellation, release, and discharge of the foregoing shall not affect whether a timely Claim made on account of such obligation may become an Allowed Claim; provided, further, however, that certain instruments, documents, and credit agreement related to Claims shall continue in effect solely for the purpose of allowing the Plan Administrator to make Distributions in accordance with this Plan.  The Holders of or parties to such cancelled notes, share certificates, and other agreements and instruments shall have no rights against the Debtors, the Estates, and the Wind-Down Debtor or the Plan Administrator arising from or relating to such notes, share certificates, and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to this Plan.

7.6     **Exemption from Certain Transfer Taxes**.  Pursuant to Bankruptcy Code section 1146(a), any transfers from any of the Debtors to any other Entity pursuant to this Plan shall not be subject to any stamp tax or similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any applicable instruments or documents without the payment of any such tax or governmental assessment

7.7     **Preservation of Retained Actions**.  Unless a Retained Action against any Entity is expressly waived, relinquished, released, compromised, exculpated, or settled pursuant to this Plan or any Final Order (including the Confirmation Order, the Final DIP Order, and the Sale Order), the Debtors expressly reserve such Retained Action to be vested in the Wind-Down Debtor for possible prosecution by the Plan Administrator, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Actions upon or after the entry of the Confirmation Order or Effective Date based on the Plan or the Confirmation Order, except where such Retained Actions have been waived, relinquished, released, compromised, exculpated, or settled pursuant to the Plan or any Final Order (including the Confirmation Order and the Sale Order(s)).  In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtor may enforce all rights to commence and pursue, as appropriate, any and all such Retained Actions, whether arising prior to or after the Petition Date, and the Wind-Down Debtor's rights to commence, prosecute, or settle any such Retained Actions shall be preserved notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date.

The failure of the Debtors to list a claim, right, cause of action, suit or proceeding shall not constitute a waiver or release by the Debtors or their Estates of such claim, right of action, suit or proceeding. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Retained Actions against them as any indication that the Wind-Down Debtor will not pursue any and all available Retained Actions against them. The Debtors or the Wind-Down Debtor, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein, including Article VIII hereof.**

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtor. In addition, the Wind-Down Debtor reserves the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits. After the Effective Date, the Wind-Down Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Retained Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VIII
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

8.1 **Compromise, Settlement, and Release of Claims and Interests**. As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interest of the Debtors and their Estates. Subject to Article X hereof, all distributions to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

8.2 **Release of Liens**.

**Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and**

satisfied, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Wind-Down Debtor to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

8.3    **Releases by the Debtors**.

Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Debtors and the Wind-Down Debtor, on their own behalf and as a representative of the Estates, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or Contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors (including the management, ownership, or operation thereof, including as such entities existed prior to or after the Petition Date), the Chapter 11 Cases, negotiation, preparation, Filing, and consummation of the Sale Transaction(s), the marketing and sale process related to the Sale Transaction(s), the negotiation, preparation, dissemination, solicitation, and Filing of this Combined Disclosure Statement and Plan, the Filing of the Chapter 11 Cases, the settlement of Claims or renegotiation of Executory Contracts or Leases, the pursuit of confirmation of this Combined Disclosure Statement and Plan, the consummation of this Combined Disclosure Statement and Plan, or the administration of this Combined Disclosure Statement and Plan or the property to be Distributed under this Combined Disclosure Statement and Plan, the Wind Down, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date (including before the Petition Date) related or relating to the foregoing, that may be asserted by or on behalf of any of the Debtors or their respective Estates, against any of the Released Parties; *provided* that any right to enforce the Purchase Agreement(s), the Sale Order(s), the Plan, and Confirmation Order is not so released.

8.4    **Third-Party Release**.

Effective as of the Effective Date, for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to

facilitate and implement the Plan, the adequacy of which is hereby confirmed, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties shall be deemed to, completely, conclusively, absolutely, unconditionally, irrevocably, and forever, release, waive, void and extinguish each Debtor, Wind-Down Debtor, and Released Party from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability whatsoever (including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors and their Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, for any act or omission in connection with, relating to, or arising out of the Debtors (including the management, ownership, or operation thereof, including as such entities existed prior to or after the Petition Date), the Chapter 11 Cases, negotiation, preparation, Filing, and consummation of the Sale Transaction(s), the marketing and sale process related to the Sale Transaction(s), the negotiation, preparation, dissemination, solicitation, and Filing of this Combined Disclosure Statement and Plan, the Filing of the Chapter 11 Cases, the settlement of Claims or renegotiation of Executory Contracts or Leases, the pursuit of confirmation of this Combined Disclosure Statement and Plan, the consummation of this Combined Disclosure Statement and Plan, or the administration of this Combined Disclosure Statement and Plan or the property to be Distributed under this Combined Disclosure Statement and Plan, the Wind Down, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date (including before the Petition Date) related or relating to the foregoing; *provided* that any right to enforce the Purchase Agreement(s), the Sale Order(s), the Plan, and Confirmation Order is not so released; *provided further*, *however*, that notwithstanding anything to the contrary herein, the provisions of this Section 8.4 shall not apply with respect to any unimpaired Claim until such unimpaired Claim has been paid in full in the Allowed amount of such Claim determined in accordance with applicable law, or on terms agreed to between the holder of such Claim and the Plan Administrator or the Debtors, at which time this Section 8.4 shall apply in all respects as to the applicable unimpaired Claim.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Section 8.4 hereof, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Section 8.4 is: (1) by virtue of the opt-in / opt-out procedure, fully consensual; (2) in exchange for the good and valuable consideration provided by the Released Parties; (3) a good-faith settlement and compromise of claims released; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property, released pursuant to the releases described herein.

8.5    **Exculpation**.

Notwithstanding anything to the contrary herein, effective as of the Effective Date, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is released and exculpated from, any liability to any Entity for any claims or Causes of Action arising

prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, preparing and filing the Chapter 11 Cases, or formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the confirmation or consummation of the Sale Transaction or the Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other postpetition act taken or omitted to be taken in connection with the Chapter 11 Cases, the Disclosure Statement, consummation of the Sale Transaction, or confirmation or consummation of the Plan, except for actions determined by Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

8.6    **No Liability Pursuant to Section 1125(e) of the Bankruptcy Code**.

Without in any way limiting the releases and exculpation set forth in Sections 8.3, 8.4, or 8.5 hereof, to the fullest extent permitted by section 1125(e) of the Bankruptcy Code, each of the 1125(e) Parties is hereby entitled to all of the protections and benefits afforded by section 1125(e) in connection with such party's solicitation and participation in relation to the Plan.

8.7    **Injunction**.

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims against or Interests in the Debtors that have been released, satisfied, or are subject to exculpation are permanently enjoined, from and after the Effective Date from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtor, the Exculpated Parties, the Released Parties, the 1125(e) Parties, or the Plan Administrator:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) on account of or in connection with or with respect to any such Claim or Interest; (ii) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order on account of or in connection with or with respect to any such Claim or Interest; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind on account of or in connection with or with respect to any such Claim or Interest; (iv) asserting any right of setoff, directly or indirectly, on account of or in connection with or with respect to any such Claim or Interest, except as contemplated or allowed by this Plan or pursuant to a

timely filed Proof of Claim; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their Related Parties shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions, treatment, or reinstatement of such Claim or Interest, as applicable, pursuant to the Plan shall be deemed to have consented to the injunction provisions set forth in Section 8.6 hereof.

For the avoidance of doubt, pursuant to section 1141(d)(3) of the Bankruptcy Code, confirmation of the Plan or the occurrence of the Effective Date will not discharge the Debtors.

8.8    **Consensual Non-Debtor Releases**.  Nothing in the Plan is intended to, nor shall the Plan be interpreted to, effect a nonconsensual release by a Holder of a Claim or Interest in favor of a party that is not a Debtor, it being acknowledged that such Holder shall affirmatively elect to release a party that is not a Debtor under the Plan solely to the extent that such holder consensually elects to provide such Plan release in accordance with the opt-out / opt-in release procedures set forth in any applicable Ballot or notice.

8.9    **Indemnification Obligations**.  Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Effective Date to indemnify, defend, reimburse, or limit the liability of the current and former directors, managers, officers, employees, attorneys, other professionals and agents of the Debtors, and such current and former directors', managers' and officers' respective Affiliates, respectively, against any claims or Causes of Action under any indemnification provisions or applicable law, shall survive Confirmation, shall be assumed by the Debtors on behalf of the applicable Debtor and assigned to the Wind-Down Debtor, which shall be deemed to have assumed the obligation, and will remain in effect after the Effective Date if such indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before the Effective Date; *provided* that, notwithstanding anything to the contrary herein, the Wind-Down Debtor's obligation to fund such indemnification obligations shall be limited to the extent of coverage available under any insurance policy assumed by the Debtors and assigned to the Wind-Down Debtor, including any directors and officers insurance policies.  For the avoidance of doubt, neither the Debtors nor the Estates shall have any obligation to reimburse such indemnity claims or expenses.

8.10    **Setoffs**.  Except for Claims expressly allowed hereunder (including the Allowed UPS Claim), on or after the Effective Date, the Wind-Down Debtor, may, pursuant to applicable law (including section 553 of the Bankruptcy Code), offset against any Claim, including an Administrative Claim, before any Distribution is made on account of such Claim, any and all of the claims, rights and Causes of Action of any nature that the Debtors or the Wind-Down Debtor may hold against the Holder of such Claim.

8.11    **Binding Effect**.  This Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Wind-Down Debtor and the Plan Administrator.

8.12    **Terms of Injunctions or Stays**.  Unless otherwise provided in this Plan, all injunctions or stays provided for in these Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until these Chapter 11 Cases are closed.

**ARTICLE IX**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

9.1    **Rejection of Executory Contracts and Unexpired Leases**.  Except as otherwise provided in the Confirmation Order, this Plan, any other Plan Document, the Sale Order, the Bar Date Order, or any other relevant order of the Bankruptcy Court, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code rejecting all prepetition Executory Contracts or Leases to which any Debtor is a party, to the extent such contracts or leases are Executory Contracts or Leases, on and subject to the occurrence of the Effective Date, unless (a) such contract or lease is expressly assumed hereunder or previously shall have been assumed or assumed and assigned by the Debtors, or (b) is the subject of a pending motion to reject on the Confirmation Date; *provided*, *however*, that as to all policies and agreements giving rise to insurance in favor of the Debtors or their Estates, the Debtors believe that the insurance agreements of the Debtors are not Executory Contracts or Leases and therefore are not subject to assumption or rejection.  To the extent that an insurance policy or agreement is determined to be an Executory Contract or Lease subject to assumption by the Debtors, such executory insurance policy or agreement, as the case may be, is hereby assumed and assigned to, and shall vest with, the Wind-Down Debtor.  For the avoidance of doubt, all insurance policies and agreements of the Debtors, and all obligations of any of the Debtors and the other counterparties thereto, shall be unaffected by the Plan and shall remain enforceable according to their terms and applicable law.

9.2    **Supplemental Bar Date for Rejection Damages**.  If the rejection of any Executory Contract or Lease under this Plan gives rise to a Claim by the non-Debtor party or parties to such Executory Contract or Lease, such Claim, to the extent that it is timely filed and is an Allowed Claim, shall be classified in Class 4; *provided*, *however*, that any potential General Unsecured Claim arising from such rejection shall be forever barred and shall not be enforceable against the Debtors, the Wind-Down Debtor, their successors or properties, unless a proof of such Claim is filed and served on the Debtors or the Wind-Down Debtor, as applicable, within thirty (30) days after the date of notice of the entry of the order of the Bankruptcy Court rejecting the Executory Contract or Lease (which may include the Confirmation Order).

**ARTICLE X**
**DISTRIBUTIONS**

10.1    **Distributions for Claims Allowed as of the Effective Date**.  Except as otherwise provided herein, and only after the funding of the Reserves, or as ordered by the Bankruptcy Court, all Distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on a Distribution Date.  Distributions on account of Claims that first become Allowed Claims after the Effective Date shall be made pursuant to the terms and conditions of this Plan.  Notwithstanding any other provision of this Plan to the contrary, no Distribution shall be made on account of any Claim or portion thereof that (i) has been satisfied after the Petition Date pursuant to an order of the Bankruptcy Court; (ii) is listed in the Schedules as contingent,

58

unliquidated, disputed or in a zero amount, and for which a proof of Claim has not been timely filed; or (iii) is evidenced by a proof of Claim that has been amended by a subsequently filed proof of Claim that purports to amend the prior proof of Claim.

10.2     **No Distributions on Disputed Claims**.  No Distribution shall be made by the Wind-Down Debtor with respect to a Disputed Claim until the same, or some portion thereof, becomes an Allowed Claim.

10.3     **Distributions on Claims Allowed after the Effective Date**.  Payments and Distributions from the Wind-Down Debtor to each respective Holder on account of a Disputed Claim, to the extent that such Disputed Claim ultimately becomes an Allowed Claim, shall be made in accordance with provisions of this Plan that govern Distributions to such Holders of Allowed Claims.  Except as otherwise provided in this Plan, within ninety (90) days after such Disputed Claim becomes an Allowed Claim, the Wind-Down Debtor shall distribute to such Holder any property from the applicable Reserve or the Wind-Down Debtor that would have been distributed on the dates Distributions were previously made to Holders of Allowed Claims if such Disputed Claim had been an Allowed Claim on such dates.

All Distributions made under this Article X on account of an Allowed Claim will be as if such Disputed Claim had been an Allowed Claim on the dates Distributions were previously made to Holders of Allowed Claims included in the applicable Class.

10.4     **Objections to and Estimation of Claims**.  Unless otherwise provided in this Plan, after the Effective Date, the Wind-Down Debtor shall have sole and exclusive standing to object to Claims in order to have the Bankruptcy Court determine the amount and treatment of any Claim. From and after the Effective Date, the Plan Administrator may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.  Except as otherwise provided in this Plan, if a party files a Proof of Claim and (i) the Debtors or the Wind-Down Debtor, as applicable, file an objection to that Claim or otherwise formally challenge the Claim or (ii) the Claim otherwise is a Disputed Claim under this Plan, then such Claim shall be Disputed unless Allowed or Disallowed by a Final Order or as otherwise set forth in this Plan.  Except as otherwise provided in this Plan, all Proofs of Claim filed after the Effective Date shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Debtors or the Estates, without the need for any objection by the Plan Administrator or any further notice to or action, order, or approval of the Bankruptcy Court.

10.5     **Delivery of Distributions and Undeliverable or Unclaimed Distributions**.

(a)     ***Delivery of Distributions in General***.  Distributions to Holders of Allowed Claims shall be made at such Holder's Distribution Address.

Distributions shall be made from the Wind-Down Debtor, as applicable, in accordance with the terms of this Plan.

In making Distributions under this Plan, the Plan Administrator may rely upon the accuracy of the claims register maintained by the Claims Agent in the Case, as modified by any Final Order of the Bankruptcy Court disallowing Claims in whole or in part.

(b)    *Undeliverable and Unclaimed Distributions*.  If the Distribution to any Holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise an Unclaimed Distribution, no further Distributions shall be made to such Holder unless and until the Plan Administrator is notified in writing of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest.  If a Distribution is returned as undeliverable, the Plan Administrator shall use reasonable efforts to determine such Creditor's then-current address.  Unclaimed Distributions shall be returned to the Wind-Down Debtor until such Distributions are claimed.

(c)    *Treatment of Unclaimed Distributions*.  Any Holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an Unclaimed Distribution within three (3) months after the final Distribution Date shall be deemed to have forfeited its Claim for such undeliverable or unclaimed Distribution and shall be forever barred and enjoined from asserting any such Claim for an Unclaimed Distribution against the Debtors and their Estates, the Plan Administrator, the Wind-Down Debtor, and their respective agents, attorneys, representatives, employees or independent contractors, and/or any of its and their property.  In such cases, any Cash otherwise reserved for Unclaimed Distributions shall become the property of the Wind-Down Debtor free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be distributed in accordance with the terms of this Plan.  Nothing contained in this Plan shall require the Debtors or the Plan Administrator to attempt to locate any Holder of an Allowed Claim; *provided*, *however*, that in his / her sole discretion, the Plan Administrator may periodically publish notice of Unclaimed Distributions.

10.6    *Interest on Claims*.  Except as specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder shall be entitled to interest accruing on or after the Petition Date on any Claim.  Except as specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

10.7    *Withholding and Reporting Requirements*.  In connection with this Plan and all Distributions under this Plan, the Plan Administrator shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding, payment, and reporting requirements.  The Plan Administrator shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements.  All amounts properly withheld from Distributions to a Holder as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as part of the Distributions to such Holder.

All Entities holding Claims shall be required to provide any information necessary to effect information reporting and withholding of such taxes.  No Distribution shall be made to or on behalf of such Entity pursuant to this Plan unless and until such Entity has furnished such information. Any property to be distributed pursuant to this Plan shall be deemed:  (i) pending the receipt of such information in the manner established by the Plan Administrator, an Undeliverable Distribution pursuant to Section 10.5 of this Plan; or (ii) if such information is not received by the

deadline established by the Plan Administrator and approved by the Bankruptcy Court upon notice and a hearing, forfeited and treated in accordance with Section 10.5 of this Plan.

Notwithstanding any other provision of this Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Plan Administrator for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Plan Administrator in connection with such Distribution. Any property to be distributed pursuant to this Plan shall be deemed: (i) pending the implementation of such arrangements, an Undeliverable Distribution pursuant to Section 10.5 of this Plan; or (ii) if such arrangements are not implemented by the deadline established by the Wind-Down Debtor and approved by the Bankruptcy Court upon notice and a hearing, forfeited and treated in accordance with Section 10.5 of this Plan.

10.8    **Miscellaneous Distribution Provisions**.

(a)    ***Method of Cash Distributions***. Any Cash payment to be made by the Wind-Down Debtor pursuant to this Plan will be in U.S. dollars and may be made, at the sole discretion of the Plan Administrator, by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law. In the case of foreign creditors, Cash payments may be made, at the option of the Wind-Down Debtor, in such funds and by such means as are necessary or customary in a particular jurisdiction.

(b)    ***Distributions on Non-Business Days***. Any payment or Distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

10.9    **De Minimis Distribution Provisions**. No Distribution shall be required to be made hereunder to any Holder of a Claim unless such Holder is to receive in such Distribution at least $100. Any such Distribution not made in accordance with the provisions of this Article X shall be retained by the Wind-Down Debtor and invested as provided in this Plan. Any Distribution not made in accordance with this Article X to such Holder, shall be held in trust for the relevant Holder until the earlier of (x) the date the next Distribution is scheduled to be made to such Holder; *provided, however*, that such subsequent Distribution, taken together with amounts retained hereby, equals at least $100.

10.10    **Distribution Record Date**. As of the close of business on the Distribution Record Date, the various lists of Holders of Claims and Interests in each of the Classes, as maintained by the Debtors, or their agents, shall be deemed closed and there shall be no further changes in the record Holders of any of the Claims or Interests. Neither the Wind-Down Debtor nor the Plan Administrator will have any obligation to recognize the transfer of or sale of any participation in any Allowed Claim that occurs after the close of business on a Distribution Record Date, and will be entitled for all purposes herein to recognize, deal with and distribute only to those Holders of Allowed Claims who are record Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date, as stated on the official claims register.

**ARTICLE XI**
**CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN**

11.1    **Conditions to Effective Date**.  The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Debtors in writing:

        (a)    the Bankruptcy Court shall have entered the Confirmation Order;

        (b)    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan; and

        (c)    the Reserves shall have been established and funded in accordance with the Plan.

11.2    **Substantial Consummation**. "Substantial Consummation" of the Plan, as defined in sections 1101 and 1127 of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

11.3    **Consequences of Non-Occurrence of Effective Date**.  If the Effective Date does not timely occur, the Debtors reserve all rights to seek an order form the Bankruptcy Court directing that the Confirmation Order be vacated and that this Plan be null and void in all respects. If the Bankruptcy Court shall have entered an order vacating the Confirmation Order, the time within which the Debtors may assume and assign or reject all Executory Contracts and unexpired leases not previously assumed, assumed and assigned, or rejected, shall be extended for a period of thirty (30) days after the date the Confirmation Order is vacated, without prejudice to further extensions.

**ARTICLE XII**
**ADMINISTRATIVE PROVISIONS**

12.1    **Retention of Jurisdiction**.  Notwithstanding confirmation of this Plan or occurrence of the Effective Date, and except as otherwise provided by applicable law, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including for the following purposes:

        (a)    To determine the allowability, classification, or priority of Claims upon objection of the Debtors, the Wind-Down Debtor, the Plan Administrator, or any other party in interest entitled to file an objection, and the validity, extent, priority and nonavoidability of consensual and nonconsensual liens and other encumbrances;

        (b)    To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any Entity, to construe and to take any other action to enforce and execute this Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of this Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Case on or before the Effective Date with respect to any Entity;

(c)     To protect the property of the Estates, from claims against, or interference with, such property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens on property of the Estates;

(d)     To determine any and all applications for allowance of Professional Fee Claims;

(e)     To determine any Administrative Claims, Priority Tax Claims, Other Priority Claims, or any other request for payment of claims or expenses entitled to priority under section 507(a) of the Bankruptcy Code;

(f)     To resolve any disputes arising under or related to the implementation, execution, consummation or interpretation of this Plan and the making of Distributions hereunder;

(g)     To determine any and all motions related to the rejection, assumption or assignment of Executory Contracts or unexpired leases, or to determine any motion to reject an Executory Contract or unexpired lease;

(h)     To determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Chapter 11 Cases, including any remands;

(i)     To enter one or more Final Orders closing the Debtors' Chapter 11 Cases;

(j)     To modify this Plan under section 1127 of the Bankruptcy Code, to remedy any defect, cure any omission, or reconcile any inconsistency in this Plan or the Confirmation Order so as to carry out its intent and purposes;

(k)     To issue such orders in aid of consummation of this Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Entity, to the full extent authorized by the Bankruptcy Code;

(l)     To enable the Wind-Down Debtor to prosecute any and all proceedings to set aside Liens and to recover any transfers, assets, properties or damages to which the Estates may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws except as may be expressly waived pursuant to this Plan;

(m)     To determine any tax liability of the Debtors or the Wind-Down Debtor pursuant to section 505 of the Bankruptcy Code, and to address any request by the Wind-Down Debtor for a prompt audit pursuant to section 505(b) of the Bankruptcy Code;

(n)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(o)     To resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Bar Date Order, or the otherwise applicable Claims bar date, the hearing to consider approval of the Combined Disclosure Statement and Plan or the Confirmation Hearing;

(p) To resolve any dispute or matter arising under or in connection with any order of the Bankruptcy Court entered in these Chapter 11 Cases;

(q) To authorize sales of assets as necessary or desirable and resolve objections, if any, to such sales;

(r) To hear and resolve Claims and Retained Actions;

(s) To resolve any disputes concerning any exculpation of a non-debtor hereunder or the injunction against acts, employment of process or actions against such non-debtor arising hereunder;

(t) To approve any Distributions, or objections thereto, under this Plan;

(u) To approve any Claims settlement entered into or offset exercised by the Wind-Down Debtor; and

(v) To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code.

12.2 **Preservation of Exclusivity.** By jointly proposing this Combined Disclosure Statement and Plan, the Debtors are not waiving their exclusive rights to file and solicit acceptances of a chapter 11 plan under section 1121 of the Bankruptcy Code.

12.3 **Amendments**.

(a) *Preconfirmation Amendment*. The Debtors, in the exercise of their fiduciary duties, may modify this Plan at any time prior to the entry of the Confirmation Order, provided that this Combined Disclosure Statement and Plan, as modified, meet applicable Bankruptcy Code requirements.

(b) *Postconfirmation Amendment Not Requiring Resolicitation*. After the entry of the Confirmation Order, the Debtors may modify this Plan to remedy any defect or omission or to reconcile any inconsistencies in this Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of this Plan, provided that such modification shall not materially and adversely affect the interests, rights, treatment or Distributions of any Class of Allowed Claims or Interests under this Plan.

12.4 **Withdrawal of Plan**. The Debtors reserve the right to revoke and withdraw or modify this Plan at any time prior to the Confirmation Date in the exercise of their fiduciary duties or, if the Debtors are for any reason unable to consummate this Plan after the Confirmation Date, at any time up to the Effective Date. If the Debtors revoke or withdraw this Plan, (a) nothing contained in this Plan shall be deemed to constitute a waiver or release of any claims by or against the Debtors or to prejudice in any manner the rights of the Debtors or any Entity in any further proceeding involving the Debtors and (b) the result shall be the same as if the Confirmation Order were not entered, this Plan was not filed and the Effective Date did not occur.

12.5    **Successors and Assigns**.  The rights, benefits and obligations of any person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such person or Entity.

12.6    **Governing Law**.  Except to the extent that the Bankruptcy Code, Bankruptcy Rules or other federal laws apply, the rights and obligations arising under this Plan shall be governed by and construed and enforced in accordance with the laws of the State of New York, without giving effect to principles of conflicts of law.

12.7    **Corporate Action**.  Any matters provided for under this Plan involving the corporate structure of the Debtors or corporate action, as the case may be, to be taken by or required of the Debtors shall be deemed to have occurred and be effective as of the Effective Date and shall be authorized and approved in all respects, without any requirement of further action by the Debtors or the Wind-Down Debtor, as the case may be.

12.8    **Effectuating Documents and Further Transactions**.  The Debtors and the Wind-Down Debtor shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements and take such other actions as they deem necessary to effectuate and further evidence the terms and conditions of this Plan.

12.9    **Confirmation Order and Plan Control**.  To the extent the Confirmation Order is inconsistent with this Plan, the Confirmation Order (and any other orders of the Bankruptcy Court) controls over this Plan.

12.10    **Notices**.  All notices or requests in connection with this Plan shall be in writing and will be deemed to have been given when received by mail and addressed to:

| **Debtors**: | **Plan Administrator:** |
|---|---|
| **DLA PIPER LLP (US)** | [See Plan Supplement] |
| Stuart M. Brown | |
| 1201 N. Market Street, Suite 2100 | |
| Wilmington, DE 19801 | |
| Telephone: (302) 468-5700 | |
| Facsimile: (302) 394-2462 | |
| Email: stuart.brown@us.dlapiper.com | |
| | |
| - and – | |
| | |
| W. Benjamin Winger | |
| 444 West Lake Street, Suite 900 | |
| Chicago, Illinois 60606 | |
| Telephone: (312) 368-4000 | |
| Facsimile: (312) 236-7516 | |
| Email: benjamin.winger@us.dlapiper.com | |

12.11  **No Admissions or Waiver**.   Notwithstanding anything herein to the contrary, nothing contained in this Plan shall be deemed an admission or waiver by the Debtors with respect to any matter set forth herein, including liability on any Claim or the propriety of a Claim's classification.

[*Signature Page Follows*]

## ARTICLE XIII
## RECOMMENDATION AND CONCLUSION

The Debtors believe that this Combined Disclosure Statement and Plan is in the best interests of the Estates and creditors and urge the Holders of Impaired Claims who are entitled to vote to timely return their Ballots with a vote in favor of this Combined Disclosure Statement and Plan.

AZZUR GROUP HOLDINGS LLC, on behalf of itself and every other Debtor and Debtor-in-Possession

By: */s/ M. Benjamin Jones*
Name: M. Benjamin Jones
Title: Authorized Signatory