**<u>Exhibit A</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AZZUR GROUP HOLDINGS LLC, *et al.*,[1] | Case No. 25-10342 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 13, 177 & 360** |

### ORDER (I) APPROVING AND AUTHORIZING THE SALE OF THE DEBTORS' CLEANROOMS-ON-DEMAND BUSINESS AND RELATED ASSETS, (II) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS, AND (III) GRANTING RELATED RELIEF

Upon the motion [D.I. 13] (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), pursuant to sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and rules 2002, 6004, 6006, 9007, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rules 2002-1, 6004-1, 9006-1, and 9013-1(m) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), for entry of an order (this "Sale Order"):  (a) authorizing the sale (the "Sale") of the Business and Acquired Assets which constitute the Debtors' cleanrooms-on-demand business and assets, free and clear of all Claims and Encumbrances (as defined below) (other than the Assumed Liabilities and Permitted Encumbrances); (b) approving the Asset Purchase Agreement, dated as of April 18, 2025 (as further amended, restated, supplemented, or otherwise modified from time to time,

---

[1]  A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.cases.stretto.com/Azzur.  The Debtors' headquarters and the mailing address for the Debtors is 330 South Warminster Road, Suite 341, Hatboro, PA 19040.

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion, the Bidding Procedures, and the APA as applicable.

the "APA") by and among certain of the Debtors, as sellers, and Chrysalis Holdings LLC, as purchaser (the "Purchaser"), a copy of which APA is attached hereto as **Exhibit 1**, together with a list of the Assigned Contracts to be assumed and assigned pursuant to the APA attached hereto as **Exhibit 2**; (c) authorizing the assumption and assignment of certain unexpired leases and executory contracts in connection with the Sale; and (d) granting related relief; and the Court having entered the *Order (I) Approving Bidding Procedures in Connection With Sale of Assets of the Debtors and Related Bid Protections, (II) Approving Form and Manner of Notice, (III) Scheduling Auction and Sale Hearing, (IV) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases, and (V) Granting Related Relief* on March 28, 2025 [D.I. 177] (the "Bidding Procedures Order") approving, among other things, the Bidding Procedures, the Sale Notice, the Assumption and Assignment Notice, the Successful Bidder Notice, and the Assumption and Assignment Procedures; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b); and the Court having found that it may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion, as further explained in and supported by the First Day Declaration and the Debtors having submitted the proffer of J. Kyle Brown of Brown Gibbons Lang & Co. Securities LLC, the Debtors' investment banker, in support of the Sale, is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and the Court having reviewed the Motion and any objections thereto, and having heard from all parties in

interest who wished to be heard regarding statements in support of or objections to the relief requested therein at a hearing before the Court on April [22], 2025 (the "Sale Hearing") to consider approval of the Sale pursuant to the terms of the APA; and the Court having determined that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

## THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:[3]

A.      **Jurisdiction and Venue.**  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334, and venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

B.      **Bases for Relief.**  The statutory and other legal bases for the relief provided herein are Bankruptcy Code sections 105(a), 363, 365, 503, and 507, and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014, and Bankruptcy Local Rules 2002-1, 6004-1, 9006-1, and 9013-1(m). The consummation of the transactions contemplated by the APA and this Sale Order is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, and the Debtors and the Purchaser have complied with all of the applicable requirements of such sections and rules in respect of such transactions.

C.      **Final Order.**  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as

---

[3]    The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, as made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, waives any stay, and expressly directs entry of judgment as set forth herein.

D.    **Notice of the Motion.**  On March 2, 2025, (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their property as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.[4]

E.    As evidenced by the affidavits of service and publication notice filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, the Bidding Procedures, the Auction, the Sale (and all transactions contemplated in connection therewith), the identity of the Purchaser, the terms of the APA, the assumption and assignment of the Assigned Contracts to the Purchaser pursuant to the APA, the Cure Costs,[5] the Sale Hearing, and all deadlines related thereto, has been provided to all interested parties, in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014, Bankruptcy Local Rules 9013-1(m), and in compliance with the Bidding Procedures Order.

F.    Specifically, the Debtors served the Bidding Procedures Order on the following parties or their respective counsel, as reflected in the affidavit of service filed on April 2, 2025 [D.I. 333]:   (i) the Office of the United States Trustee for Region 3 (Attn.: Jonathan Lipshie [jon.lipshie@usdoj.gov]) (the "U.S. Trustee"); (ii) the holders of the 30 largest unsecured claims

---

[4]    A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of M. Benjamin Jones, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed on the Petition Date [D.I. 12] and incorporated by reference herein.

[5]    Except as otherwise provided herein, "Cure Costs" shall have the meaning provided in the Bidding Procedures Order.

against the Debtors (on a consolidated basis); (iii) counsel to the DIP Lender and Prepetition Lender; (iv) all state attorneys' general and consumer protection agencies in jurisdictions in which the Assets are located or in which the Debtors operate; (v) the United States Department of Justice and the Office of the United States Attorney for the District of Delaware; (vi) the Internal Revenue Service; (vii) counsel to the Committee, if any; (viii) each governmental agency that is an interested party with respect to the proposed Sale, including all federal, state and local regulatory or taxing authorities with an interest in the Acquired Assets; (ix) the Debtors' insurance carriers; (x) all parties known or reasonably believed to have asserted any claim, liens, interests or encumbrances in or upon the Acquired Assets; (xi) all parties entitled to notice pursuant to Bankruptcy Local Rule 9013-1(m) and (xii) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").

G.      The Sale Notice was filed on April [•], 2025 [D.I. [•]], published on the Debtors' case website, served on all parties required to receive such notice under the Bidding Procedures Order and applicable rules (including the Notice Parties and the non-Debtor Counterparties to Assigned Contracts), in accordance with the Bidding Procedures Order and was sufficient and proper notice to any other interested parties, including those parties whose identities are unknown to the Debtors. Service of the Sale Notice was appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale and the Bidding Procedures and the dates and deadlines related thereto. With respect to any parties that may have claims against the Debtors, but whose identities are not reasonably ascertainable by the Debtors, the publication of the Sale and Auction Notice was sufficient and reasonably calculated under the circumstances to reach such parties and no further notice need be given with respect to the proposed Sale.

H.      The Assumption and Assignment Notice was filed on March 3, 2025 [D.I. 42], as supplemented by the Supplemental Cure Notice filed on March 10, 2025 [D.I. 91] (the "First Supplemental Cure Notice"), as further supplemented by the Second Supplemental Cure Notice filed on March 21, 2025 [D.I. 131] (the "Second Supplemental Cure Notice"), as further supplemented by the Third Supplemental Cure Notice filed on March 24, 2025 [D.I. 138] (the "Third Supplemental Cure Notice"), as further supplemented by the Fourth Supplemental Cure Notice filed on April 15, 2025 [D.I. 419] (the "Fourth Supplemental Cure Notice"), as further supplemented by the Fifth Supplemental Cure Notice filed on April 17, 2025 [D.I. 434] (the "Fifth Supplemental Cure Notice," and together with the First Supplemental Cure Notice, the Second Supplemental Cure Notice, the Third Supplemental Cure Notice, and the Fourth Supplemental Cure Notice, the "Supplemental Cure Notices" and each being a "Supplemental Cure Notice"), and served on all parties required to receive such notice under the Bidding Procedures Order and applicable rules and identified, among other things, the Counterparties, the Contracts, and the related Cure Costs.  The service of the Assumption and Assignment Notice and each Supplemental Cure Notice was good, sufficient, and appropriate under the circumstances and in full compliance with the Bidding Procedures Order, and no further notice need be provided in respect of the Debtors' assumption and assignment to the Purchaser of the Assigned Contracts, including with respect to adequate assurance of future performance or the Cure Costs.  Except for the Assigned Contracts listed in any further supplemental Assumption and Assignment Notice, all Counterparties to the Assigned Contracts have had an adequate opportunity to object to the potential assumption and assignment of the Contracts and the Cure Costs (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses such Counterparty from accepting performance by, or rendering

performance to, the Purchaser for purposes of section 365(c)(1) of the Bankruptcy Code). Except as provided in paragraph 15 hereof, all Assignment Objections, responses, or requests for adequate assurance, if any, have been resolved, overruled, or denied, as applicable, and all Counterparties are hereby deemed to consent to the relief granted herein.

I.      On April [•], 2025, the Debtors filed with the Court and published on the case website the Successful Bidder Notice [D.I. 360] in accordance with the Bidding Procedures Order and applicable rules. Service of the Successful Bidder Notice was appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the cancellation of the Auction for the Consulting Business, and the identity of the Successful Bidder.

J.      The notices described in the foregoing Paragraphs D–H are good, sufficient, and appropriate under the circumstances. The Debtors have complied with all obligations to provide notice of the Motion, the Bidding Procedures Order, the Auction, the Sale Hearing, the assumption and assignment of the Assumed Contracts, the APA, this Order and the Sale as required by the Bidding Procedures Order. No other or further notice of the Bidding Procedures, the Sale, the assumption and assignment of the Assigned Contracts to the Purchaser pursuant to the APA, the Cure Costs, the Auction, the Sale Hearing, and all deadlines related thereto is or shall be required. A reasonable opportunity to object or be heard regarding the relief requested in the Motion and provided in this Order was afforded to all parties in interest.

K.      <u>Marketing and Sale Process</u>. The Sale of the Acquired Assets to the Purchaser pursuant to the Bidding Procedures is duly authorized under sections 363(b)(1) and 363(f) of the Bankruptcy Code, Bankruptcy Rule 6004(f), and Bankruptcy Local Rule 6004-1. As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors and their

professionals, agents and other representatives engaged in a robust and extensive marketing and sale process and have marketed the Acquired Assets and conducted all aspects of the sale process in good faith and in compliance with the Bidding Procedures and the Bidding Procedures Order. The marketing process undertaken by the Debtors and their professionals, agents, and other representatives with respect to the Acquired Assets has been adequate and appropriate and reasonably calculated to maximize value for the benefit of all stakeholders.  The Bidding Procedures and the Auction were duly noticed, were substantively and procedurally fair to all parties, and were conducted in a diligent, non-collusive, fair and good-faith manner.

L.      As established by the record of the Sale Hearing, the Bidding Procedures and the Bidding Procedures Order have been complied with in all material respects by the Debtors and the Purchaser.  The Bidding Procedures, together with the substantial prepetition marketing efforts, afforded a full, fair, and reasonable opportunity for any entity or person to make a higher or otherwise better offer to purchase the Acquired Assets, and the APA constitutes the best or otherwise highest offer for the Acquired Assets.

M.      The Bidding Procedures Order is incorporated herein by reference.

N.      The Purchaser is the Successful Bidder (as defined in the Bidding Procedures), and its bid is the Successful Bid (as defined in the Bidding Procedures), for the Acquired Assets in accordance with the Bidding Procedures Order.  The Purchaser has complied in all respects with the Bidding Procedures Order and all other applicable orders of this Court in negotiating and entering into the APA and the Sale likewise comply with the Bidding Procedures Order and all other applicable orders of this Court.

O.      Corporate Authority.  The Acquired Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541 of the

Bankruptcy Code.  The Debtors (i) have full corporate or other organizational power and authority necessary to execute the APA and to consummate the Sale and all transactions contemplated by the APA, (ii) have taken all corporate or other organizational action necessary to authorize and approve the APA and to consummate the Sale and all transactions contemplated by the APA, and (iii) require no consents or approvals, other than those expressly provided for in the APA, to consummate such transaction.

P.    <u>Highest or Otherwise Best Offer; Business Judgment.</u>    The Debtors have demonstrated sufficient basis to enter into the APA, sell the Acquired Assets on the terms outlined therein, and assume and assign the Assigned Contracts to the Purchaser under sections 363 and 365 of the Bankruptcy Code.  All such actions are appropriate exercises of the Debtors' business judgment, maximize the value of the Acquired Assets, satisfy applicable fiduciary duties, and are in the best interests of the Debtors, their creditors, their estates, and other parties in interest. Approval of the Sale pursuant to the APA at this time is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.

Q.    The offer of the Purchaser, upon the terms and conditions set forth in the APA, including the total consideration to be realized by the Debtors thereunder:  (i) is the highest or otherwise best offer received by the Debtors for the Acquired Assets after extensive prepetition and postpetition marketing efforts, including through the Bidding Procedures; (ii) is in the best interests of the Debtors, their creditors, their other stakeholders, their estates, and all other parties in interest; and (iii) constitutes full and adequate consideration, is fair and reasonable and constitutes reasonably equivalent value, fair consideration, and fair value for the Acquired Assets under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, and under the laws of the United States, any state, territory, possession, or the

District of Columbia. Taking into consideration all relevant factors and circumstances, no other entity has offered to purchase the Acquired Assets for greater economic value to the Debtors or their estates.

R.      Neither the Debtors nor the Purchaser or any of their respective affiliates, members, or shareholders (i) have entered into the APA or proposes to consummate the Sale for the purpose of hindering, delaying, or defrauding the Debtors' present or future creditors or (ii) are entering into the APA or proposing to consummate the Sale fraudulently, for the purpose of statutory or common law fraudulent conveyance and fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

S.      Good and sufficient reasons for approval of the APA have been articulated by the Debtors. The Debtors have demonstrated compelling circumstances for the Sale outside (i) the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, and (ii) a plan of reorganization or liquidation (as the case may be), in that, among other things, the immediate consummation of the Sale to the Purchaser is necessary and appropriate to preserve and to maximize the value of the Debtors' estates. To maximize the value of the Acquired Assets, it is essential that the consummation of the Sale occurs promptly.

T.      The Sale of the Acquired Assets outside of a chapter 11 plan pursuant to the APA neither impermissibly restructures the rights of the Debtors' creditors or equity interest holders nor impermissibly dictates the terms of a chapter 11 plan of the Debtors. The APA and the Sale do not constitute a *sub rosa* chapter 11 plan.

U.      On the terms and subject to the conditions contained in the APA, the Purchaser agreed to provide the Purchase Price as aggregate consideration for the Acquired Assets, at the

Closing of the Sale. On or prior to the Closing, the Purchaser shall pay the Cure Costs in respect of the Assigned Contracts on the terms set forth under the APA and the Bidding Procedures Order.

V.    <u>Opportunity to Object</u>. A reasonable opportunity to object or be heard with respect to the Motion, the Bidding Procedures, the Auction, the Sale (and all transactions contemplated in connection therewith), the identity of the Purchaser, the terms of the APA, the assumption and assignment of the Assigned Contracts to the Purchaser pursuant to the APA, and the Cure Costs has been afforded to all interested parties, including, without limitation, the Notice Parties.

W.    <u>Good Faith Purchasers; Arm's Length Sale</u>. The Debtors and their respective officers, directors, employees, agents, advisors, attorneys, and other representatives actively participated in the marketing process, both prepetition and postpetition, and respectively acted in good faith. The APA was negotiated, proposed, and entered into by the Debtors and the Purchaser without collusion, in good faith, and from arm's length bargaining positions. Neither the Debtors, nor the Purchaser, nor any affiliates, members, or shareholders of the Purchaser have engaged in any conduct that would cause or permit the APA or the Sale to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

X.    The Purchaser is a good-faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. In particular: (i) the Purchaser recognizes that the Debtors were free to deal with any other party interested in purchasing the Acquired Assets; (ii) neither the Purchaser nor any of its affiliates, members, or shareholders have violated section 363(n) of the Bankruptcy Code by any action or inaction; (iii) no common identity of directors, officers, or controlling stakeholders exists between any of the Purchaser, its affiliates, members, or shareholders and any of the Debtors; (iv) the Purchaser agreed to subject its bid to the competitive bid procedures set forth in the Bidding Procedures

Order; (v) all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Sale have been disclosed; and (vi) neither the Purchaser nor any of its affiliates, members, or shareholders have acted in a collusive manner with any person.

Y.      Neither the Purchaser nor any affiliates, members, officers, directors, shareholders or any of its or their respective successors or assigns is an "insider" or "affiliate" of any of the Debtors, as those terms are defined in sections 101(31) and 101(2) of the Bankruptcy Code.  The Purchaser's advisors, agents, and other representatives have complied in all respects with the Bidding Procedures Order and all other applicable orders of the Court in negotiating and entering into the APA.  The APA complies with the Bidding Procedures Order and all other applicable orders of the Court.  The Purchaser is therefore entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code.

Z.      The form and total consideration to be realized by the Debtors under the APA constitutes fair value, fair, full and adequate consideration, reasonably equivalent value and reasonable market value for the Acquired Assets.

AA.      <u>Free and Clear Transfer Required by the Purchaser</u>.  The Purchaser would not have entered into the APA and would not have consummated the Sale, thus adversely affecting the Debtors, their estates, and their creditors, if the Sale (including all provisions in connection therewith, including the assumption and assignment of the Assigned Contracts to the Purchaser) and the transfer of the Acquired Assets to the Purchaser were not free and clear of all (i) liens, mortgages, deeds of trust, pledges, charges, security interests, option, rights of first offer or first refusal (or any other type of preferential arrangement), hypothecations, Encumbrances, easements, servitudes, leases or subleases, licenses or sublicenses, rights-of-way, pre-emptive right,

encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, interests or rights under any operating agreement, rights of offset or recoupment, right of use or possession, or other liens (including mechanic's, materialman's, possessory and other consensual and non-consensual liens and statutory liens), judgments, penalties, charges of any kind or nature, including any restriction on use, sale, voting, disposition, transfer, receipt of income or other exercise of any attributes of ownership, or any rights that purport to give any party a right of first refusal or consent with respect to the Debtor's interest in the Acquired Assets or any similar rights; (ii) all claims as defined in section 101(5) of the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code, including, without limitation, all claims, counterclaims, cross-claims, third party claims, debt, rights, remedies, or causes of action (whether in law or in equity), proceedings, warranties, contractual rights, guarantees, indemnities, claims for recovery, reimbursement, subrogation, setoff, recoupment, indemnity or contribution, obligations, demands, expenses, commitments, restrictions, responsibilities, or liabilities of any kind or nature whatsoever arising in connection with or relating to the Debtor, its operations, its business, its liabilities, the Acquired Assets, the Debtor's marketing and bidding process with respect to the Acquired Assets, the Assigned Contracts, or the transactions contemplated by the APA; (iii) all claims, causes of action, or rights based on or related to successor or transferee liability, products liability, alter-ego liability, environmental liability, or tax liability, orders or decrees of any court or foreign or domestic governmental entity; (iv) any and all equity or other interests of any kind or nature whatsoever in or with respect to the Debtor, the Acquired Assets, or the Assigned Contracts; (v) any rights that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of the Debtor's or the Purchaser's interest in the Acquired Assets, or any similar rights; (vi) any labor, collective bargaining, pension,

retiree, and employment claims and any claims, causes of action, or rights under labor, collective bargaining, retirement, or employment agreements; (vii) any claims, causes of action, or rights related to intercompany loans and receivables; (viii) any claims, causes of action, or rights under pension, multiemployer (as such term is defined in Section 3(37) or Section 4001(a)(3) of the Employee Retirement Income Security Act of 1974 (as amended, "ERISA")), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs; (ix) any employee claims related to worker's compensation, occupational disease, or unemployment or temporary disability, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code and of any similar state law (collectively, "COBRA"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (l) the Workers Adjustment and Retraining Notification Act of 1988, as amended, 929 U.S.C. §§ 210 et seq. ("WARN Act"), or any similar foreign, state or local law; (x) any claims, causes of action, or rights under any bulk sales or similar law and any tax laws, statutes, regulations, or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the Acquired Assets prior to the Closing, including, without limitation, any *ad valorem* taxes assessed by any applicable taxing authority;

(xi) any unexpired and executory contract or unexpired lease that is not an Assigned Contract; and (xii) any other Excluded Liabilities, in case of each of the foregoing (i) through (xii), whether disclosed or undisclosed, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, accrued or unaccrued, asserted or unasserted, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, direct or derivative, and regardless of whether currently exercisable, whether arising prior to or subsequent to the commencement of the Chapter 11 Case, and whether imposed by agreement, understanding, law, equity or otherwise (all of the foregoing, the "Claims and Encumbrances"), except for Assumed Liabilities and Permitted Encumbrances, and, therefore, the Sale and the transfer of the Acquired Assets to the Purchaser shall be free and clear of the Claims and Encumbrances.  For the avoidance of doubt, neither the Purchaser nor any of its affiliates, members, or shareholders shall have any responsibility whatsoever with respect to the Excluded Liabilities, which shall remain the responsibility of the Debtors before, on, and after Closing.

BB.    As of the Closing, pursuant and subject to the terms of the APA, the Sale of the Acquired Assets shall effect a legal, valid, enforceable, and effective transfer of the Acquired Assets and will vest the Purchaser with all of the Debtors' rights, title, and interests in the Acquired Assets, free and clear of all Claims and Encumbrances, other than Assumed Liabilities and Permitted Encumbrances.

CC.    Satisfaction of Section 363(f).  The Debtors may sell the Acquired Assets free and clear of any and all Claims and Encumbrances (other than the Assumed Liabilities and Permitted Encumbrances), including any rights or claims based on any putative successor or transferee

liability, as set forth herein, because, in each case, one or more of the standards set forth in sections 363(f)(1)–(5) of the Bankruptcy Code has or have been satisfied. All parties in interest, including, without limitation, any holders of Claims and Encumbrances and any Counterparty to the Assigned Contracts, who did not timely object, or who withdrew their objection, to the Sale, the assumption and assignment of the applicable Assigned Contract or the associated Cure Cost are deemed to have consented to the relief granted herein pursuant to section 363(f)(2) of the Bankruptcy Code. Such holders of Claims and Encumbrances are adequately protected by having their Claims and Encumbrances, if any, attach to the portion of the Purchase Price attributable to the Acquired Assets against or in which such holders hold an interest, in the same order of priority, and with the same validity, force and effect, if any, which such holders now have against such Acquired Assets, subject to any claims and defenses the Debtors or their estates may possess with respect thereto.

DD.     Validity of the Transfer. The consummation of the transactions contemplated under the APA including, without limitation, the Sale and the assumption and assignment of the Assumed Contracts, is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the transactions contemplated under the APA.

EE.     The Acquired Assets constitute property of the Debtors' estates and good title to the Acquired Assets of the Debtors is vested in the Debtors' estates within the meaning of Bankruptcy Code section 541(a). The Debtors are the sole and lawful owners of the Acquired Assets, and no other person has any ownership right, title, or interest therein.

FF.     The APA has been duly and validly executed and delivered by the Debtors and, subject to the terms of the APA, shall constitute a valid and binding obligation of the Debtors,

enforceable against the Debtors in accordance with its terms. The APA, the Sale, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed in these Chapter 11 Cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other person.

GG.    <u>No Successorship; No Merger</u>. By virtue of this Sale Order and the consummation of the transactions contemplated under the APA: (i) neither the Purchaser nor any of its affiliates, members, or shareholders are a continuation of any Debtor or its respective estate, there is no continuity or common identity between any of the Purchaser or its affiliates, members, or shareholders and the Debtors, and there is no continuity of enterprise between the Debtors and the Purchaser or its affiliates, members, or shareholders; (ii) neither the Purchaser nor any of its affiliates, members, or shareholders are holding themselves out to the public as a continuation of the Debtors or their respective estates; (iii) the transactions do not amount to a consolidation, merger, or *de facto* merger of the Purchaser or its affiliates, members, or shareholders and the Debtors and/or the Debtors' estates; and (iv) neither the Purchaser nor any of its affiliates, members, or shareholders is a successor or assignee of the Debtors or their estates for any purpose including, but not limited to, under any federal, state or local statute or common law, or revenue, pension, ERISA, COBRA, tax, labor, employment, environmental, escheat or unclaimed property laws, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules, or regulations), and neither the Purchaser nor any of its affiliates, members, or shareholders shall have any liability or obligation under the WARN Act or the Comprehensive Environmental Response Compensation and Liability Act and neither the Purchaser nor any of its affiliates, members, or shareholders shall be deemed to be a "successor employer" for purposes of the Internal Revenue Code of 1986, Title VII of the Civil Rights Act of 1964, as amended, the Age

Discrimination in Employment Act, the Americans with Disability Act, the Family Medical Leave Act, the National Labor Relations Act, the Labor Management Relations Act, the Older Workers Benefit Protection Act, the Equal Pay Act, the Civil Rights Act of 1866 (42 U.S.C. 1981), COBRA, ERISA, the Multiemployer Pension Protection Act, the Pension Protection Act, and/or the Fair Labor Standards Act.  Except for the Assumed Liabilities, (x) the transfer of the Acquired Assets to the Purchaser and (y) the assumption and assignment to the Purchaser of the Assigned Contracts do not and will not subject the Purchaser nor any of its affiliates, members, or shareholders to any liability whatsoever with respect to the operation of the Debtors' business before the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based on, in whole or in part, directly or indirectly, any theory of law or equity including, without limitation, any theory of antitrust or successor or transferee liability.

HH.  <u>Assigned Contracts</u>.  The Debtors have demonstrated (i) that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts to the Purchaser in connection with the consummation of the Sale and (ii) that the assumption and assignment of the Assigned Contracts to the Purchaser is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.  The Assigned Contracts are an integral part of the Acquired Assets and, accordingly, such assumption, assignment, and cure of any defaults under the Assigned Contracts are reasonable, appropriate, and enhance the value of the Debtors' estates. Any Counterparty to an Assigned Contract that has not filed with the Court an objection to such assumption and assignment in accordance with the terms of the Bidding Procedures Order (including any objections related to Cure Costs or adequate assurance of future performance and objections based on whether applicable law excuses the counterparty from accepting performance

by, or rendering performance to, the Purchaser for purposes of section 365(c)(1) of the Bankruptcy Code) is deemed to have consented to such assumption and assignment.

II.     <u>Cure Costs and Adequate Assurance</u>.  The Debtors and the Purchaser, as applicable, have, including by way of entering into the APA and agreeing to the provisions relating to the Assigned Contracts therein, (i) cured, provided adequate assurance of cure or a resolution of the cure amounts satisfactory to the applicable Assigned Contract counterparty, of any default existing prior to the date hereof under any of the Assigned Contracts within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assigned Contracts within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.  The Purchaser has, based upon the record of these proceedings and its covenants under the APA to perform the obligations under the Assigned Contracts after the Closing, provided adequate assurance of its future performance of and under the Assigned Contracts pursuant to sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.  The Cure Costs are hereby deemed to be the sole amounts necessary to cure any and all defaults under the Assigned Contracts under section 365(b) of the Bankruptcy Code.

JJ.     <u>Time Is of the Essence; Waiver of Stay</u>.  Time is of the essence in consummating the Sale.  To maximize the value of the Acquired Assets, it is essential that the Sale of the Acquired Assets and assignment and assumption of the Assigned Contracts occur within the time constraints set forth in the APA and as set forth in this Order.  Accordingly, there is cause to waive the stays contemplated by Bankruptcy Rules 6004 and 6006.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**I.      The Sale Is Approved.**

1.      The Motion is granted as provided herein, and entry into and performance under, and in respect of, the APA attached hereto as **Exhibit 1** and the consummation of the transactions contemplated thereby, including, without limitation, the Sale of the Acquired Assets and the assumption and assignment of the Assumed Contracts is authorized and approved.

**II.     Objections Overruled.**

2.      All objections or reservation of rights with respect to the entry of this Sale Order or to the relief granted herein, whether filed, stated on the record before the Court or otherwise, which have not been withdrawn, waived, or settled, are hereby denied and overruled on the merits. All objections to the entry of this Sale Order or to the relief granted herein that were not timely filed are hereby forever barred.

3.      Notice of the Bidding Procedures, the Auction, the Sale, the APA, the assumption and assignment of the Assigned Contracts to the Purchaser pursuant to the APA, the Cure Costs, the Sale Hearing, the cancellation of the Auction, and all deadlines related thereto was fair and equitable under the circumstances and complied in all respects with sections 102(1), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014, Bankruptcy Local Rules 9013-1(m), and the Bidding Procedures Order.

**III.    Approval of the APA.**

4.      The Acquired Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541 of the Bankruptcy Code. The Debtors (i) have full corporate or other organizational power and authority necessary to execute

the APA, the other Transaction Agreements, and any related instruments, documents, and agreements, and to consummate the Sale and all transactions contemplated by the APA, (ii) have taken all corporate or other organizational action necessary to authorize and approve the APA, the other Transaction Agreements, and any related instruments, documents, and agreements, and to consummate the Sale and all transactions contemplated by the APA, and (iii) require no consents or approvals, other than those expressly provided for in the APA, to consummate such transaction.

5.       The APA, the other Transaction Agreements, and all other instruments, documents, and agreements related thereto or contemplated thereby, and all of the terms and conditions thereof, are hereby approved.  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are authorized and directed to take any and all actions necessary to fulfill their obligations under, and comply with the terms of, the APA and to consummate the Sale pursuant to and in accordance with the terms and conditions of the APA and this Sale Order, without further leave of the Court. The Debtors are further authorized to pay, without further order of the Court, whether before, at, or after the Closing, any fees, expenses or costs that are required to be paid in order to consummate the transactions contemplated by the APA or perform their obligations under the APA.

6.       The Debtors are authorized, in accordance with the APA, to execute and deliver, and empowered to perform under, consummate, and implement, the APA and the other Transaction Agreements, together with all additional instruments, documents, and other agreements that may be reasonably necessary or desirable to implement the APA, and to take all further actions as may be reasonably requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser or reducing to possession, the Acquired Assets, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the APA.

## IV.    Binding Effect of Order.

7.    This Sale Order and the APA shall be binding upon all creditors of, and equity interest holders in, the Debtors and any and all other parties in interest, including, without limitation, any and all holders of Claims and Encumbrances (including holders of any rights or claims based on any putative successor or transferee liability) of any kind or nature whatsoever, all Counterparties to the Assigned Contracts, the Purchaser and its affiliates, members, or shareholders, all successors and assigns of the Purchaser and its affiliates, members, or shareholders, the Debtors and their affiliates and subsidiaries, and any trustee or successor trustee appointed in the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code.  This Sale Order and the APA shall inure to the benefit of the Debtors, their estates and creditors, the Purchaser, their affiliates, members, and shareholders, and the respective successors and assigns of each of the foregoing.

## V.    Amendments to the APA.

8.    The APA, the other Transaction Agreements, and any related instruments, documents, and agreements, may be modified, amended, supplemented or restated by the parties thereto in a writing signed by such parties and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, supplement or restatement does not have a material adverse effect on the Debtors' estates; provided, further, that the Debtors shall provide the Committee with at least one (1) Business Day's notice and shall consult with the Committee prior to entering into any amendment to the APA.

## VI.    Transfer of the Acquired Assets Free and Clear.

9.    The Purchaser shall assume and be liable for the Assumed Liabilities, and shall not be liable for any Excluded Liabilities.  Except as expressly permitted or otherwise specifically

provided for in the APA or this Sale Order, pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, upon the Closing, the Acquired Assets shall be transferred to the Purchaser, and the Purchaser shall take title to and possession of the Acquired Assets, free and clear of all Claims and Encumbrances (other than Assumed Liabilities and Permitted Encumbrances).

10.    All persons and entities, including, without limitation, the Debtors, the Debtors' estates, all debt security holders, equity security holders, governmental tax and regulatory authorities, lenders, customers, vendors, employees, former employees, litigation claimants, trustees, trade creditors, and any other creditors (or agent of any of the foregoing) who may or do hold Claims for the Excluded Liabilities (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated) against the Debtors or the Acquired Assets owned by the Debtors, arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets owned by the Debtors, the operation or ownership of the Acquired Assets by the Debtors prior to the Closing Date, or the Sale, are hereby prohibited, forever barred, estopped, and permanently enjoined from asserting or pursuing such Claims against the Purchaser, its affiliates, successors, assigns, its property or the Acquired Assets, including, without limitation, taking any of the following actions with respect to any Excluded Liabilities Claims: (a) commencing or continuing in any manner any action, whether at law or in equity, in any judicial, administrative, arbitral, or any other proceeding, against the Purchaser, its affiliates, successors, assigns, assets (including the Acquired Assets), and/or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser, its affiliates, successors, assigns, assets (including the Acquired Assets), and/or properties; (c) creating, perfecting, or enforcing any Claim against the Purchaser, its affiliates, any

of their respective successors, assigns, assets (including the Acquired Assets), and/or properties; (d) asserting a Claim as a setoff, right of subrogation, or recoupment of any kind against any obligation due against the Purchaser, its affiliates or any of their respective successors or assigns; or (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Order, the APA, or the agreements or actions contemplated or taken in respect thereof, including the Debtors' ability to transfer the Acquired Assets to the Purchaser in accordance with the terms of this Order and the APA.  No such Person shall assert or pursue against the Purchaser or its affiliates, successors or assigns any such Claim.

11.     Any holders of Claims and Encumbrances are adequately protected by having their Claims and Encumbrances, if any, attach to the portion of the Purchase Price attributable to the Acquired Assets against or in which such holders hold an interest, in the same order of priority, and with the same validity, force and effect, if any, which such holders now have against such Acquired Assets, subject to any claims and defenses the Debtors or their estates may possess with respect thereto; provided, however, that setoff rights will be extinguished to the extent there is no longer mutuality after the consummation of the Sale.

12.     The Sale of the Acquired Assets to the Purchaser under the APA constitutes a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and laws of all applicable jurisdictions, including, without limitation, the laws of each jurisdiction in which the Acquired Assets are located, and the sale of the Acquired Assets to the Purchaser may not be avoided under any statutory or common law fraudulent conveyance and fraudulent transfer theories whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

**VII.    Vesting of Assets in the Purchaser.**

13.      The transfer of the Acquired Assets to the Purchaser pursuant to the APA shall constitute a legal, valid, and effective transfer of the Acquired Assets on the Closing under Bankruptcy Code sections 105(a), 363(b), and 363(f), and shall vest the Purchaser or its designees with all of the Debtors' rights, title, and interests in the Acquired Assets free and clear of all Claims and Encumbrances (other than Assumed Liabilities and Permitted Encumbrances).

**VIII.    Release of Liens.**

14.      Except for holders of Assumed Liabilities and Permitted Encumbrances, each holder of any Claims and Encumbrances in the Acquired Assets (including, without limitation, the DIP Lender and Prepetition Lender), shall, as of the Closing, be deemed to have waived and released such Claims and Encumbrances, without regard to whether such holder has executed or filed any applicable release, and such Claims and Encumbrances shall automatically, and with no further action by any party, attach to the portion of the Purchase Price attributable to the Acquired Assets against or in which such holders hold an interest, in the same order of priority, and with the same validity, force and effect, if any, which such holders now have against such Acquired Assets, subject to any claims and defenses the Debtors or their estates may possess with respect thereto. Each holder of any such Claim and Encumbrance (including, without limitation, the DIP Lender and Prepetition Lender) is hereby authorized and directed to execute and deliver any waivers, termination statements, instruments of satisfaction, consents, or releases, as reasonably requested by the Debtors or the Purchaser, to effectuate the foregoing.

15.      If any person or entity that has filed any financing statements, mortgages, mechanic's liens, *lis pendens*, or any other documents or agreements evidencing any Claim and Encumbrance on any of the Acquired Assets conveyed pursuant to the APA and this Sale Order

shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, any waivers, termination statements, instruments of satisfaction, consents, or releases of all Claims and Encumbrances which such person or entity has with respect to the Acquired Assets, then (a) the Debtors or the Purchaser are hereby authorized to execute and file such waivers, termination statements, instruments, consents, or releases on behalf of such person or entity with respect to the Acquired Assets, and (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Claims and Encumbrances in the Acquired Assets of any kind or nature whatsoever.

**IX.    <u>Assumption and Assignment of Assigned Contracts.</u>**

16.    Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, the Debtors' assumption and assignment to the Purchaser of the Assigned Contracts is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

17.    Subject to paragraph 15 hereof:

a.    The Debtors are authorized to and may assume and assign to the Purchaser, in accordance with sections 105(a) and 365 of the Bankruptcy Code, the Assigned Contracts, including for the avoidance of doubt, any Assigned Contracts entered into postpetition, effective upon and subject to the occurrence of the Closing, free and clear of all Claims and Encumbrances (other than Assumed Liabilities and Permitted Encumbrances), which Assigned Contracts, by operation of this Sale Order, shall be deemed assumed and assigned to the Purchaser effective as of the Closing. Notwithstanding anything to the contrary in the APA, all Contracts entered into by the Debtors on or after the Petition Date and prior to Closing and designated by the Purchaser as an Assigned Contract in writing shall be included as Assigned Contracts hereunder and under the APA and shall be deemed assigned to the Purchaser, effective upon and subject to the occurrence of the Closing, by operation of this Sale Order, free and clear of all Claims and Encumbrances (other than Assumed Liabilities and Permitted Encumbrances).

b.      The Debtors are authorized to and may assign each Assigned Contract to the Purchaser in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assigned Contract that prohibit, restrict or condition the assignment of such Assigned Contract on the consent of the counterparty thereto or allow the non-Debtor party to such Assigned Contract to terminate, recapture, impose any penalty, condition, renewal or extension, or modify any term or condition a change of control or upon the assignment of such Assigned Contract shall constitute unenforceable anti-assignment provisions which are expressly preempted under section 365 of the Bankruptcy Code and void and of no force and effect, notwithstanding the chapter 11 filing by the Debtors, the financial condition of the Debtors or any other similar circumstances.

c.      All requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption and assignment of the Assigned Contracts by the Debtors to the Purchaser have been satisfied.

d.      Upon the Closing, the Assigned Contracts shall be transferred and assigned to, and shall remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2), 365(e)(1) and 365(f) of the Bankruptcy Code) that prohibits, restricts, limits, or conditions such assignment or transfer.

e.      After the Debtors' transfer and assignment of the Assigned Contracts to the Purchaser, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title, and interest of each Assigned Contract.

f.      The Debtors are hereby authorized, in accordance with the APA, and in accordance with sections 105(a) and 365 of the Bankruptcy Code, to execute and deliver to the Purchaser such instruments, documents, and agreements as the Purchaser may deem necessary to assign and transfer the Assigned Contracts to the Purchaser.

18.      All defaults and other obligations of the Debtors under the Assigned Contracts occurring, arising, or accruing prior to the assignment thereof to the Purchaser at Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured or satisfied by the payment of the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Assigned Contract in the amounts set forth on the schedule of Cure Costs attached to the Assumption and

Assignment Notice, each Supplemental Cure Notice, and any further supplemental Assumption and Assignment Notices (or any other cure cost reached by agreement with a counterparty to an Assigned Contract), which was served in compliance with the Bidding Procedures Order (and if applicable, this Order), and which Cure Costs were satisfied, or shall be satisfied as soon as practicable, by the Purchaser as provided in the APA. For all Assigned Contracts for which an Assumption and Assignment Notice and any Supplemental Cure Notice was served, or for which any further supplemental Assumption and Assignment Notices may be served, and no objection has been or is timely and properly filed by the non-Debtor Counterparty by the applicable Assigned Contract Objection Deadline, the Purchaser is authorized and directed to pay all Cure Costs required to be paid in accordance with the APA upon the Closing. Notwithstanding anything to the contrary in the APA, if prepetition or postpetition Contracts relating to the Consulting Business were omitted from the initial Assumption and Assignment Notice or any Supplemental Cure Notices and the Purchaser designates such Contracts as Assigned Contracts in writing, then (i) the Debtors shall, promptly after such designation, provide supplemental Assumption and Assignment Notices to the Counterparties to such Contracts, (ii) the procedures set forth in the Bidding Procedures and in this paragraph 15 shall apply to the assumption and assignment of such Contracts, and (iii) upon the expiration of the applicable Assigned Contract Objection Deadline (if no timely and properly Assignment Objection is filed by such time) or the resolution of a timely and properly filed Assignment Objection, such Contracts shall be deemed Assigned Contracts hereunder and under the APA. For any prepetition or postpetition Contracts listed on a Supplemental Cure Notice or a supplemental Assumption and Assignment Notice, as applicable, for which an Assignment Objection has been or will be timely and properly filed by the applicable Assigned Contract Objection Deadline to the assumption and assignment of such Contract or the

Cure Costs relating thereto and either (x) such Assignment Objection remains pending as of the date of this Sale Order or (y) the date of the applicable Assigned Contract Objection Deadline is after the date of this Sale Order, the procedures set forth in the Bidding Procedures with respect to the resolution of such Assignment Objection shall apply; provided, however, that if a consensual resolution is not reached between the objecting Counterparty, the Debtors, and the Purchaser, the Debtors may request an emergency hearing to resolve such Assignment Objection. Notwithstanding any further supplemental Assumption and Assignment Notices that may be served, Counterparties which received the initial Assumption and Assignment Notice or any Supplemental Cure Notices and did not timely and properly file an Assignment Objection by the applicable Assigned Contract Objection Deadline (or whose Assignment Objection has been resolved) shall be deemed to consent to the assignment of the Assigned Contracts included in such previously received Assumption and Assignment Notices.  Pursuant to paragraph 28, the terms of this paragraph shall govern the assumption and assignment and transfer process for all Assigned Contracts that may be designated after the entry of this Sale Order, including in the event of any conflicts with (x) Section 1.5(a)(iii) of the APA (requiring the Purchaser to designate any Assigned Contract from the Available Contracts no later than two (2) days before the Sale Hearing), and (ii) any restrictions of transfer that may be imposed by Section 1.5(b) of the APA. For the avoidance of doubt, Contracts listed in any Assumption and Assignment Notice or Supplemental Cure Notice shall be deemed to include any statements of work, purchase orders or similar ancillary agreements or arrangements which are issued or entered into pursuant to, or in accordance with, such Contracts (including any such statements of work, purchase orders or similar ancillary agreements or arrangements which are entered into with an affiliate to the Counterparty listed therein).  Each Counterparty listed in any Assumption and Assignment Notice or Supplemental Cure Notice with

respect to a Contract that is a master service agreement shall be deemed to include its affiliates that are party to statements of work, purchase orders or similar ancillary agreements or arrangements issued or entered into pursuant to, or in accordance with, such master service agreements.

19.     Pursuant to section 365(k) of the Bankruptcy Code, the Debtors and their estates shall be relieved from any liability for any breach of or obligations under any Assigned Contract following the effective date of such assumption and assignment to the Purchaser, subject to the Purchaser's payment of the Cure Costs as provided in the APA and the Bidding Procedures Order.

20.     All Counterparties to the Assigned Contracts shall cooperate and expeditiously execute and deliver, upon reasonable request of the Purchaser, and shall not charge the Debtors or the Purchaser for, any instruments, applications, consents, agreements, or other documents that may be required or requested by any public authority or other party or entity to effectuate the applicable transfers in connection with the Sale.

**X.     Modification of the Automatic Stay.**

21.     The automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement the terms and conditions of the APA and the provisions of this Sale Order.

**XI.     Collection of Acquired Assets.**

22.     All persons and entities that are in possession of any Acquired Assets on the Closing Date are directed to surrender possession of such Acquired Assets to the Purchaser in accordance with the APA on the Closing Date or at such time thereafter as the Purchaser may request.  As of the Closing, the Purchaser and its successors and assigns shall be designated and appointed as the Debtors' true and lawful attorney, with full power of substitution, in the Debtors'

name and stead on behalf of and for the benefit of the Purchaser, and its successors and assigns, for the following sole and limited purposes:  to have the power to demand and receive any and all of the Acquired Assets and to give receipts and releases for and in respect of the Acquired Assets, or any part thereof, and from time to time to institute and prosecute against third parties for the benefit of the Purchaser, its successors and assigns, proceedings at law, in equity or otherwise, which the Purchaser, and its successors and assigns, may deem proper for the collection or reduction to possession of any of the Acquired Assets.

**XII.**    **Effect of Recordation of Order.**

23.    This Sale Order, once filed, registered, or otherwise recorded:  (a) shall be effective as a conclusive determination that, upon the Closing, all Claims and Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) in the Acquired Assets have been unconditionally released, discharged, and terminated and that the conveyances described herein have been effected; and (b) shall be binding upon and shall govern the acts of all persons and entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, local officials, notaries, protonotaries, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to, the Acquired Assets.  Each and every federal, state, local or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity is hereby authorized to accept any and all documents and instruments

necessary and appropriate to consummate the transactions contemplated by the APA, including, without limitation, recordation of this Sale Order.

24.     No governmental unit may revoke or suspend any right, license, or other permission relating to the use of the Acquired Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Sale of the Acquired Assets.

## XIII.    **Release.**

25.     Effective upon, and subject to the occurrence of, the Closing Date, each of the Purchaser, on the one hand, and the Debtors, on the other hand, on behalf of themselves and each of their respective affiliates, subsidiaries, and successors, and all of their respective past, present and future shareholders, partners, members, board of directors and/or supervisors, managers, officers, employees, agents, representatives, attorneys, and advisors (collectively and solely in their capacities as such, their "Related Parties") (each, a "Releasing Party"), shall irrevocably and unconditionally release, remise, and forever discharge each other and each of their respective Related Parties (each, a "Released Party") from any and all suits, legal or administrative proceedings, Claims, demands, damages, losses, costs, liabilities, interest or causes of action whatsoever at law or in equity, known or unknown (collectively, "Losses"), which such Releasing Party might now have, based on, relating to, or arising out of the marketing process, the sale process, the negotiation and formulation of the Sale, the ownership or use of the Acquired Assets, including breaches of statutory or implied warranties, nuisance or other tort actions, rights to punitive damages, or common law rights of contribution; provided, however, that nothing herein shall release any Losses that any Releasing Party may have against any Released Party under the

APA, the other Transaction Agreements, and any related instruments, documents, or agreements, the Bidding Procedures Order, this Sale Order, and any other order of the Court.

## XIV.   **Prohibition of Actions Against the Purchaser**

26.     Except for Assumed Liabilities and Permitted Encumbrances, neither the Purchaser nor any of its affiliates, members, or shareholders shall have any liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Acquired Assets or otherwise or any other Claims and Encumbrances in or against the Debtors or the Acquired Assets, including, without limitation, successor or vicarious liability of any kind or character, based on any theory of antitrust, warranty, product liability, environmental, successor or transferee liability, labor law, ERISA, COBRA, de facto merger, mere continuation, or substantial continuity, whether known or unknown, now existing or hereafter arising, whether fixed or contingent, liquidated or unliquidated.  Upon the Closing, all entities or persons are permanently and forever prohibited, barred, estopped, and enjoined from asserting against any of the Purchaser or its affiliates, members, or shareholders or any of their successors and assigns, or any of their assets, or the Acquired Assets, any Claims and Encumbrances (other than Assumed Liabilities and Permitted Encumbrances), including, without limitation, under any theory of successor or vicarious liability of any kind or character, based on any theory of antitrust, warranty, product liability, environmental, successor or transferee liability, labor law, ERISA, COBRA, de facto merger, mere continuation, or substantial continuity, whether known or unknown, now existing or hereafter arising, whether fixed or contingent, liquidated or unliquidated.

## XV.   **No Interference.**

27.     Following the Closing, no holder of Claims and Encumbrances in or against the Debtors or the Acquired Assets shall interfere with the Purchaser's title to or use and enjoyment

of the Acquired Assets based on or related to such Encumbrances or any actions that the Debtors may take in their bankruptcy cases or any successor cases.

**XVI.   Retention of Jurisdiction.**

28.     The Court retains jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the APA, all amendments thereto, any waivers and consents thereunder, and each related instruments, documents, and agreements in all respects, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the Acquired Assets or performance of other obligations owed to the Purchaser; (b) compel delivery of the Purchase Price or performance of other obligations owed to the Debtors; (c) resolve any disputes arising under or related to the APA, except as otherwise provided therein; (d) interpret, implement, and enforce the provisions of this Sale Order; and (e) protect the Purchaser and its affiliates, members, and shareholders against (1) any Claims and Encumbrances in or against the Debtors or the Acquired Assets of any kind or nature whatsoever and (2) any creditors or other parties in interest regarding the turnover of the Acquired Assets that may be in their possession.

**XVII.  No Stay of Order.**

29.     Notwithstanding Bankruptcy Rules 6004(h),6006(d) and 7062(g), this Sale Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Purchaser are free to close the Sale under the APA at any time pursuant to the terms thereof.

**XVIII. Good Faith Purchaser.**

30.     The Debtors and their respective officers, directors, employees, agents, advisors, attorneys, and other representatives actively participated in the marketing process and respectively acted in good faith.

31.     The Sale contemplated by the APA is undertaken by the Purchaser in good faith, as such term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale of the Acquired Assets to the Purchaser (including the assumption and assignment of any Assigned Contract), unless such authorization is duly stayed pending such appeal.  The Purchaser is a good faith purchaser of the Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

32.     None of the Debtors or the Purchaser has engaged in any conduct that would cause or permit the APA or the transactions contemplated thereby, including, without limitation, the Sale and the assumption and assignment of the Assumed Contracts, to be avoided or costs or damages to be imposed, under Bankruptcy Code section 363(n).  The consideration provided by the Purchaser for the Acquired Assets under the APA is fair and reasonable, and the Sale may not be avoided under Bankruptcy Code section 363(n).

**XIX.     Inconsistencies with Prior Orders, Pleadings, or Agreements.**

33.     To the extent of any conflict between the APA and this Sale Order, the terms of this Sale Order shall govern.  To the extent this Sale Order is inconsistent or conflicts with any prior order or pleading in these chapter 11 cases, the terms of this Sale Order shall govern and any prior orders shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale.

**XX.     Non-Material Modifications**

34.     The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any

35

such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

**XXI.    Failure to Specify Provisions.**

35.    The failure to specifically reference any particular provisions of the APA, the other Transaction Agreements, or other related instruments, documents, and agreements, in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA, the other Transaction Agreements, or other related instruments, documents, and agreements be authorized and approved in their entirety; provided, however, that this Order shall govern if there is any inconsistency between the APA (including all ancillary documents executed in connection therewith) and this Order.  Likewise, all of the provisions of this Order are nonseverable and mutually dependent.  To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these Chapter 11 Cases, the terms of this Order shall control.

**XXII.  Additional Provisions.**

36.    For the avoidance of doubt, notwithstanding anything to the contrary herein or in the APA, the insurance policies issued by Federal Insurance Company and Illinois Union Insurance Company listed on Schedule 3.22 of the APA shall not be assumed and assigned, sold or otherwise transferred pursuant to the APA or this Order.

37.    As set forth in the APA, the Purchaser shall assume the Assumed Liabilities with respect to its employment of the Transferred Employees from and after the Closing, including those Transferred Employees who are foreign national employees of the Debtors. The applicable foreign national Transferred Employees possess talent and expertise necessary to the uninterrupted and successful operation of the Consulting Business. As part of Purchaser's Assumed Liabilities,

at the Closing, the Purchaser assumes all requisite employer immigration obligations from and after the Closing associated with transferring each Transferred Employee's visa to the Purchaser.

38.     Notwithstanding anything to the contrary herein, at the Closing, in accordance with the terms of the Final DIP Order, the Debtors are hereby authorized to pay the proceeds of the Sale to the DIP Lender and Prepetition Lender for application against the obligations owing by the Debtors to the DIP Lender and Prepetition Lender, subject only to the rights of Challenge (as defined in the Final DIP Order) set forth in the Final DIP Order.

39.     Notwithstanding any other provision contained in this Order or the APA, nothing abridges the rights, claims, liens  and interests, of Keystone Capital or of Gillson Testing, Inc. (f/k/a AL Holdings, Inc.) ("Gillson") related to the "Purchased Assets" (as defined in that certain Agreement for Purchase and Sale of Assets, dated as of January 6, 2025, by and among Azzur Labs, LLC, Azzur Group Holdings, LLC, Azzur Group, LLC and Gillson).

40.     All entities that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Purchaser on or prior to the Closing Date or such later date that such party and the Purchaser mutually agree.

41.     This Order and the APA shall be binding in all respects upon all prepetition and postpetition creditors of the Debtors, all interest holders of the Debtors, any non-Debtor parties to the Assumed Contracts, the Official Committee of Unsecured Creditors appointed on March 14, 2025 (the "Committee"), all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in these Chapter 11 Cases or upon a conversion of the Debtors' cases to those under chapter 7 of the Bankruptcy Code, including a chapter 7 trustee, and the APA and Sale shall not be subject to

rejection or avoidance under any circumstances by any party.  If any order under Bankruptcy Code section 1112 is entered, such order shall provide (in accordance with Bankruptcy Code sections 105 and 349) that this Order and the rights granted to the Purchaser hereunder shall remain effective and, notwithstanding such dismissal, shall remain binding on parties in interest.  For the avoidance of doubt, the Debtors' inability to satisfy in full all administrative expense claims of the Debtors' estates shall not be a basis for termination, rejection or avoidance (as applicable) of the APA or the Sale.

42.    This Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including any and all disputes with any counterparty to any executory contract or unexpired lease of the Debtors (including, without limitation, disputes with respect to assumption and assignment of any Assumed Contracts or any cure disputes) and any party that has, or asserts, possession, control or other rights in respect of any of the Acquired Assets; provided, however, that, in the event the Court abstains from exercising or declines to exercise such jurisdiction with respect to the APA, the Bidding Procedures Order, or this Order, such abstention, refusal, or lack of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.  This Court retains exclusive jurisdiction to compel delivery of the Acquired Assets, to protect the Debtors and their assets, including the Acquired Assets, against any Claims and Successor or Transferee Liability and to enter orders, as appropriate, pursuant to Bankruptcy Code

sections 105(a) or 363 (or other applicable provisions) necessary to transfer the Acquired Assets to the Purchaser.

43.     The Purchaser shall not be required to seek or obtain relief from the automatic stay under Bankruptcy Code section 362, to give any notice permitted by the APA.  The automatic stay imposed by Bankruptcy Code section 362 is modified solely to the extent necessary to implement the preceding sentence; provided however, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

44.     Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d) or any applicable provisions of the Local Rules, this Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the 14-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.  Time is of the essence in closing the Sale and the Debtors and the Purchaser intend to close the Sale as soon as practicable.

45.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

## Exhibit 1

**APA**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**DATED AS OF APRIL 18, 2025**

**BY AND AMONG**

**CHRYSALIS HOLDINGS LLC, AS PURCHASER,**

**AND**

**AZZUR GROUP, LLC**

**AND ITS SUBSIDIARIES NAMED HEREIN, AS SELLERS**

# TABLE OF CONTENTS

Page

**ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES** ............................................................................................. 1

1.1     Purchase and Sale of the Acquired Assets ............................................. 1

1.2     Excluded Assets ....................................................................................... 4

1.3     Assumption of Certain Liabilities ........................................................... 6

1.4     Excluded Liabilities ................................................................................. 6

1.5     Assumption/Rejection of Certain Contracts ........................................... 7

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING** .............................................. 10

2.1     Consideration ......................................................................................... 10

2.2     Closing .................................................................................................... 10

2.3     Closing Deliveries by Sellers ............................................................... 10

2.4     Closing Deliveries by Purchaser ........................................................... 11

2.5     Withholding. Reserved. ......................................................................... 11

2.6     Deposit and Cash Purchase Price .......................................................... 11

2.7     Prorations. .............................................................................................. 12

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS** ..................... 12

3.1     Organization and Qualification .............................................................. 12

3.2     Authorization of Agreement .................................................................. 13

3.3     Conflicts; Consents ................................................................................ 13

3.4     Capitalization of Sellers ........................................................................ 13

3.5     Financial Matters. .................................................................................. 13

3.6     Title to Acquired Assets; Sufficiency ................................................... 14

3.7     Contracts ................................................................................................ 14

3.8     Permits; Compliance with Laws. ........................................................... 16

3.9     Environmental Matters .......................................................................... 17

3.10    Intellectual Property; IT and Data Security and Privacy. ...................... 17

3.11    Tax Matters. ........................................................................................... 20

3.12    Benefit Plans. ......................................................................................... 21

3.13    Employees. ............................................................................................. 23

3.14    Accounts Receivable and Accounts Payable. ........................................ 24

3.15    Material Customers; Material Suppliers. ............................................... 24

3.16    Insurance ................................................................................................ 25

i

3.17    Absence of Certain Changes ........................................................................ 25

3.18    Litigation; Compliance; Permits. ................................................................ 26

3.19    Brokerage. .................................................................................................. 26

3.20    No Other Representations or Warranties ..................................................... 26

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER ................. 27**

4.1    Organization and Qualification ................................................................... 27

4.2    Authorization of Agreement ....................................................................... 27

4.3    Conflicts; Consents. ................................................................................... 27

4.4    Financing .................................................................................................... 28

4.5    Brokers ....................................................................................................... 28

4.6    No Litigation .............................................................................................. 28

4.7    No Additional Representations or Warranties ............................................. 28

**ARTICLE V BANKRUPTCY COURT MATTERS ............................................................ 28**

5.1    Bankruptcy Actions ................................................................................... 28

5.2    Cure Costs .................................................................................................. 29

5.3    Sale Order ................................................................................................... 30

5.4    Approval ..................................................................................................... 30

**ARTICLE VI COVENANTS AND AGREEMENTS ........................................................... 30**

6.1    Conduct of Business of Sellers ................................................................... 30

6.2    Access to Information. ................................................................................ 31

6.3    Employee Matters. ...................................................................................... 33

6.4    Notices and Consents ................................................................................. 35

6.5    Further Assurances ..................................................................................... 35

6.6    Receipt of Misdirected Assets; Liabilities. ................................................. 35

6.7    Publicity ..................................................................................................... 36

6.8    Business Continuity Matters. ..................................................................... 36

6.9    Seller Confidentiality. ................................................................................ 37

6.10    Other Bids. ............................................................................................... 37

6.11    Post-Petition Accrued Rent. ..................................................................... 37

**ARTICLE VII CONDITIONS TO CLOSING ..................................................................... 37**

7.1    Conditions Precedent to the Obligations of Purchaser and Seller ............... 37

7.2    Conditions Precedent to the Obligations of Purchaser ................................ 38

7.3    Conditions Precedent to the Obligations of Sellers .................................... 38

**ARTICLE VIII TERMINATION ......................................................................................... 39**

1618520946.11
1618520946.11

| | | |
|---|---|---|
| 8.1 | Termination of Agreement | 39 |
| 8.2 | Effect of Termination | 41 |
| **ARTICLE IX TAXES** | | **41** |
| 9.1 | Transfer Taxes | 41 |
| 9.2 | Allocation of Cash Purchase Price | 42 |
| 9.3 | Cooperation | 42 |
| 9.4 | Apportionment of Taxes | 42 |
| 9.5 | Tax Returns | 43 |
| **ARTICLE X MISCELLANEOUS** | | **43** |
| 10.1 | Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers | 43 |
| 10.2 | Expenses | 43 |
| 10.3 | Notices | 43 |
| 10.4 | Binding Effect; Assignment | 45 |
| 10.5 | Amendment and Waiver | 45 |
| 10.6 | Third Party Beneficiaries | 45 |
| 10.7 | Non-Recourse | 45 |
| 10.8 | Severability | 45 |
| 10.9 | Construction | 45 |
| 10.10 | Schedules | 46 |
| 10.11 | Complete Agreement | 46 |
| 10.12 | Specific Performance | 46 |
| 10.13 | Jurisdiction and Exclusive Venue | 47 |
| 10.14 | Governing Law; Waiver of Jury Trial. | 47 |
| 10.15 | Counterparts and PDF | 48 |
| 10.16 | Bulk Sales Laws | 48 |
| 10.17 | Time of Essence | 49 |
| 10.18 | Sellers' Representative | 49 |
| **ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS** | | **49** |
| 11.1 | Certain Definitions | 49 |
| 11.2 | Index of Defined Terms. | 59 |
| 11.3 | Rules of Interpretation | 60 |

1618520946.11
1618520946.11

## INDEX OF EXHIBITS

EXHIBIT A    FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT
EXHIBIT B    FORM OF SALE ORDER
EXHIBIT C    FORM OF BIDDING PROCEDURES ORDER
EXHIBIT D    FORM OF ESCROW AGREEMENT
EXHIBIT E    FORM OF INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

APPENDIX 1 ASSIGNED TRADEMARKS

1618520946.11
1618520946.11

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of April 18, 2025, is made by and among Chrysalis Holdings LLC, a Delaware limited liability company ("Purchaser"), Azzur Group, LLC, a Pennsylvania limited liability company ("Azzur Group, LLC"), and the subsidiaries of Azzur Group, LLC that are indicated on the signature pages attached hereto ("Azzur COD Group", and together with Azzur Group, LLC, each a "Seller" and collectively "Sellers"). Purchaser and Sellers are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, on March 2, 2025, Sellers, together with other of Sellers' subsidiaries and Affiliates (the "Debtors"), commenced voluntary cases (collectively, the "Bankruptcy Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), (the filing date being the "Petition Date");

WHEREAS, in accordance with the Bidding Procedures and subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order, Sellers desire to sell to Purchaser all of the Acquired Assets and to assign to Purchaser all of the Assumed Liabilities, Purchaser desires to purchase from Sellers all of the Acquired Assets and assume all of the Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated hereby, upon the terms and conditions hereinafter set forth;

WHEREAS, the Acquired Assets and Assumed Liabilities shall be purchased and assumed by Purchaser pursuant to the Sale Order, free and clear of all Encumbrances (other than Permitted Encumbrances), pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, and Rules 4001, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and

WHEREAS, the performance under this Agreement and Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Bidding Procedures Order and the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchaser and Sellers hereby agree as follows.

## ARTICLE I
## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1    Purchase and Sale of the Acquired Assets. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and subject to the entry and terms of the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "Acquired Assets" means each Seller's properties, rights, interests and assets used in the Business, whether or not located at an Assumed

COD Location, whether real or personal and whether tangible or intangible, and including the following assets of each Seller, but excluding in all cases the Excluded Assets:

(a)    all Available Contracts that Purchaser has designated as Assigned Contracts pursuant to Section 1.5 (which includes the customer License Agreements that are designated therein and all of Sellers' rights thereunder), and all purchase orders made to any Seller, to the extent assignable under applicable Law, excluding, for the avoidance of doubt, the Excluded Contracts;

(b)    all Accounts Receivable related to the Business (which in the case of any invoice that includes both amounts due and owing to the Business, and amounts due and owing to other businesses of the Sellers, will only include all of such amounts in such invoice that are related to the Business), as of the Closing Date, and all Cash proceeds thereof (subject to Section 6.1 hereof);

(c)    subject to the right of Sellers to retain copies of Documents that may relate to Excluded Assets (at Sellers' sole expense), all Documents;

(d)    all IT Assets that relate to the Business;

(e)    all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Assigned Contract), including, but not limited to, claims, causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds, causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties ("Causes of Action"), in each case, arising out of or relating to the Business, the sale of the Business, any of the Acquired Assets or any of the Assumed Liabilities, but excluding Causes of Action related solely to the Excluded Assets or the Excluded Liabilities;

(f)    to the extent transferable under applicable Law, all of the rights, interests and benefits (if any) accruing under all Permits and Governmental Authorizations, and all pending applications therefor, in each case, that relate to the Business;

(g)    all Intellectual Property of Sellers that relates to the Business, including copies and tangible embodiments thereof and Licensed Intellectual Property, in whatever form or medium, together with all goodwill associated therewith, all rights to collect royalties and proceeds in connection with such Intellectual Property, all past, present, and future rights to sue and recover damages or any other compensation for infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including, without limitation, all such Intellectual Property set forth or required to be set forth on Schedule 1.1(g);

(h)    all demands, credits, statements, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment

2

relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Assigned Contract that relate to the Business;

(i)　　in each case to the extent related to the Business, related to any Top Vendor or related to any Transferred Employee or COD Advisor, (i) all preference or avoidance claims or actions arising under the Bankruptcy Code or other applicable Law, and (ii) all other rights, claims, causes of action, rights of recovery, rights of set-off and rights of recoupment as of the Closing; provided, however, that, with respect to any Transferred Employee or COD Advisor, Purchaser agrees not to pursue any of the claims, rights, causes of action, and so forth referenced in the foregoing subparts (i) and (ii).

(j)　　all rights under or arising out of all insurance policies and binders relating to the Business, except for such policies maintained that relate solely to Excluded Assets or Excluded Liabilities;

(k)　　all goodwill, payment intangibles and general intangible assets and rights of Sellers associated with the Business;

(l)　　all personnel files and forms I-9 for the Transferred Employees;

(m)　　all supplies, materials and inventory to the extent used or held for use in, or related to, the Business, including all rights of Sellers to receive such supplies and materials that are on order;

(n)　　all Deposits;

(o)　　all leasehold and other interests in the real property with respect to each Assumed COD Location set forth on Schedule 1.1(o), whether granted to Sellers pursuant an Assigned Contract or otherwise;

(p)　　all telephone numbers, fax numbers, email addresses and internet domain names used in connection with, or relate to, the Business;

(q)　　all rights of Sellers under non-disclosure or confidentiality, non-compete, assignment of intellectual property rights (inventions), acknowledgements of work-for-hire or non-solicitation agreements with employees, consultants, independent contractors and agents of Sellers or with third parties, including non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with the sale of the Business;

(r)　　all (i) fixed assets, equipment, spare parts, machinery, furniture, fixtures, tools, computers, servers, telephone systems, furniture, leasehold improvements and supplies, and other personal property wherever located and any related rights thereto, including, without limitation, the items set forth on Schedule 1.1(r) (collectively, the "Equipment"); and (ii) any rights of Seller, to the extent transferable, to the warranties and licenses received from manufacturers and sellers of the Equipment (if any); and

3

(s)    all other assets of Seller of every nature, kind and description, tangible and intangible, owned or leased or licensed, wherever located related to the Business, other than Available Contracts that are not Assumed Contracts and the Excluded Assets.

1.2    <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain all right, title and interest to, in and under the following properties, rights, interests and other assets of Sellers (collectively, the "<u>Excluded Assets</u>"):

(a)    all Excluded Contracts, including, without limitation, the Contracts of Sellers listed on <u>Schedule 1.2(a)</u>, and all prepayments related to such Excluded Contracts, which, for the avoidance of doubt, shall include that certain customer License Agreement and related statements of work and similar agreements that are the subject of that certain *Emergency Motion of the Debtors for Entry of an Order Approving and Authorizing the Settlement Agreement by and between Azzur Cleanrooms-on-Demand – Devens, LLC and Editas Medicine, Inc.* [D.I. 412], filed with the Bankruptcy Court on April 14, 2025, and the proceeds of the foregoing;

(b)    all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses that have been prepaid by any Seller, in each case unrelated to the Business, as of the Closing Date, other than Deposits and Accounts Receivable to be conveyed to Purchaser as Acquired Assets;

(c)    accounts receivable of Sellers not related to the Business;

(d)    all Documents (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities, (ii) that are Sellers' financial accounting Documents, all minute books, organizational documents, stock certificates, stock registers, Tax Returns and such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller, corporate seal, checkbooks and canceled checks or (iii) that any Seller is required by Law to retain; <u>provided</u>, that Purchaser shall have the right to access to and make copies of any portions of such Documents to the extent not prohibited by applicable Law;

(e)    except as provided in <u>Section 1.1(q)</u> above, all documents prepared or received by any Seller or any of its Affiliates or on their behalf in connection with the sale of the Acquired Assets, this Agreement or the other Transaction Agreements, the transactions contemplated hereby or thereby or the Bankruptcy Case, including (i) all records and reports prepared or received by Sellers or any of their respective Affiliates or Advisors in connection with the sale of the Acquired Assets and the transactions contemplated hereby, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets, (iii) all privileged materials, documents and records of any Seller or any of its subsidiaries, Affiliates, and (iv) any other files or records to the extent relating exclusively to any Excluded Assets, Excluded Liabilities or the Bankruptcy Case;

(f)    all shares of capital stock and other equity interests of any Seller or any of their respective subsidiaries or securities convertible into, or exchangeable or exercisable for, any such shares of capital stock, or other equity interests;

1618520946.11
1618520946.11

(g)     all claims that any Seller may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(h)     Sellers' claims, causes of action or other rights arising solely under this Agreement, including claims, causes of action or other rights relating to the Cash Purchase Price hereunder, or any agreement, certificate, instrument or other document executed and delivered between any Seller and Purchaser in connection with the transactions contemplated hereby, or any other agreement between any Seller and Purchaser entered into on or after the date hereof;

(i)     all Causes of Action related solely to any Excluded Asset or Excluded Liability;

(j)     all materials, documents and records, in any form, whether written, electronic or oral, containing or reflecting any communications to or from, or the work product of, legal counsel to any Seller or any of its Affiliates to the extent solely relating to the Excluded Liabilities;

(k)     except with respect to Assigned Contracts and as otherwise set forth on Schedule 1.1(o), all real property leased, subleased or licensed to, or for which a right to use, possess or occupy has been granted to, Sellers, together with all rights, easements and privileges appertaining or relating to such interest in real property, and all improvements located on such real property, including any office furniture located therein;

(l)     any retainers or similar amounts paid to, or held in escrow for the benefit of, Sellers' Advisors or other professional service providers not related to the Business or the Assumed COD Locations;

(m)     all Tax refunds with respect to the Business or Acquired Assets allocable to a pre-Closing Tax period;

(n)     any and all proceeds relating to any and all bonds, letters of credit, guarantees or other security provided by any Seller not related to the Business;

(o)     all current and prior insurance policies that do not relate to the Business, including, for the avoidance of doubt, all director and officer insurance policies, inclusive of all insurance recoveries thereunder and rights to assert claims with respect to any insurance recoveries;

(p)     all rights to the warranties, express or implied, and, subject to the obligations under Section 6.8, licenses granted by any third party related solely to any Excluded Assets;

(q)     all Personal Data, including any credit card numbers or related customer payment source, social security numbers, and all other information to the extent prohibited by Law for transfer hereunder, excluding all personnel files for the Transferred Employees;

(r)     for the avoidance of doubt, assets used solely in Azzur Group, LLC's other businesses, including the consulting business, laboratory services business, or any business that is

5

not the Business, which shall include, for the avoidance of doubt, all of the "Acquired Assets" with respect to the sale of the consulting business pursuant to that certain *Order (I) Approving and Authorizing the Sale of the Debtors' Consulting Business and Related Assets, (II) Approving Assumption and Assignment of Certain Executory Contracts, and (III) Granting Related Relief* [D.I. 408], entered by the Bankruptcy Court on April 14, 2025 (the "Consulting Sale Order"), and proceeds of the foregoing;

(s)     the sponsorship of, and all rights, title, interests and assets of and associated with any Seller Plans, including as set forth on Schedule 3.12(a), and including any funding arrangements related thereto (including all trusts, insurance policies, and administrative services Contracts relating thereto), and all rights thereunder; and

(t)     the properties, rights, interests and assets set forth on Schedule 1.2(t).

1.3     Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and subject to the entry and terms of the Sale Order, effective as of the Closing, Purchaser shall assume from each Seller, and Sellers shall transfer, assign, convey and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid on or prior to the Closing (collectively, the "Assumed Liabilities"), and no other Liabilities of the Seller or its Affiliates:

(a)     all Liabilities and obligations of any Seller under the Assigned Contracts, each only to the extent such Liabilities are to initially be performed or accrue on or after the Closing Date, and all Cure Costs in respect of the Assigned Contracts;

(b)     all Liabilities and obligations of any Seller in respect of postpetition accounts payable solely related to the Business incurred by Sellers in the Ordinary Course with an invoice date that is within 30 days of the Closing Date;

(c)     all Liabilities of Purchaser under this Agreement;

(d)     all Transfer Taxes and the Apportioned Taxes with respect to the Acquired Assets specifically allocated to Purchaser pursuant to this Agreement;

(e)     all accrued payroll (in the Ordinary Course), accrued and unused vacation hours, sick time, or other paid time off, and retention plans of the Business Employees (irrespective of whether such Business Employees are Transferred Employees), but excluding any obligation arising under the Bankruptcy Court's *Order (I) Approving the Debtors Sale Incentive Plan, and (II) Granting Related Relief* [D.I. 171]; provided, that the foregoing shall only include the amount thereof attributable to the current pay period of the Closing Date and shall not include any Liabilities related to long term incentive plans or similar incentive equity plans sponsored by the Sellers or their Affiliates; and

(f)     all Liabilities set forth on Schedule 1.3(f).

1.4     Excluded Liabilities.  Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, any Seller, or of any predecessor, shareholder or any other Affiliate of any Seller, or in

6

relation to any business (including, without limitation, the Business) or activities of any Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, direct or derivative, and however arising, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities, including, without limitation, (i) all Excluded Environmental Liabilities, (ii) any Liabilities for claims against any Seller or any of Sellers' Affiliates, including, without limitation, those arising under any Laws including any employment or labor Laws, (iii) any Liability to the extent arising out of the operation or conduct by Sellers or any of their Affiliates of the Business or any business other than the Business (including the laboratory services business and the consulting business operated by Sellers and certain of their Affiliates, and any guarantee supporting the obligations thereof), (iv) all Taxes of Sellers (including, without limitation, all Apportioned Taxes allocated to Sellers pursuant to this Agreement), (v) all Indebtedness, (vi) all inter-company liabilities between any Seller and any other Seller or any of their respective Affiliates or subsidiaries, (vii) all liabilities under any Seller Plan or pension plan maintained by Sellers, (viii) Liabilities or obligations of Sellers for all professional fees and expenses for all of their Advisors, including, but not limited to, their Advisors retained pursuant to any Order of the Bankruptcy Court, (ix) any administrative expense Actions accruing in the Bankruptcy Cases, (x) Liabilities or obligations in connection with the Excluded Contracts, (xi) any Liabilities related to employees and former employees except as provided in <u>Section 1.3(e)</u>, (xii) any Liabilities of Sellers that any Person seeks to impose upon Purchaser by virtue of any theory of successor liability or "bulk transfer" laws, (xiii)  any Liabilities with respect to any Action or other contingent liabilities of Sellers (including any environmental, health or safety matters), whether or not disclosed to Purchaser, relating to periods and occurrences ended on, before or after the Closing Date, including any Actions or other claims or contingent liabilities relating to tort, personal injury and products liability, (xiv) any Liabilities and obligations of Sellers arising under or relating to any notice and other requirements of the WARN Act related to terminations prior to, on or after the Closing, (xv) any obligations to provide and any claims made pursuant to any coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985, (xvi) any obligations and Liabilities of Sellers resulting from, caused by or arising out of, or that relate to, directly or indirectly, the conduct of Sellers or ownership, lease or license of any properties or assets or any properties or assets previously used by Sellers or any predecessor of Sellers, or other actions, omissions with respect to the period prior to Closing and any related administrative costs, (xvii) the March Stub Rent, and (xviii) any other Liability or obligation not expressly assumed pursuant to <u>Section 1.3</u> (all such Liabilities being referred to collectively herein as the "<u>Excluded Liabilities</u>").

1.5     <u>Assumption/Rejection of Certain Contracts</u>.

(a)     Assumption and Assignment of Unexpired Leases and Executory Contracts.

(i)     <u>Schedule 1.5(a)</u> sets forth a list of all executory Contracts that relate to the Business to which any Seller is a party that is subject to assumption or rejection pursuant to Section 365 of the Bankruptcy Code (the "<u>Available Contracts</u>") and the estimated Cure Costs for each Available Contract.  No later than the Designation Deadline, Purchaser shall designate in writing (a "<u>Designation Notice</u>") the Available Contracts that Purchaser wishes for Sellers to assume and assign to Purchaser (the "<u>Assigned Contracts</u>"). All Available Contracts that Purchaser does not designate as Assigned Contracts pursuant

7

to this Section 1.5 shall not constitute Assigned Contracts or Acquired Assets (any Contract that is not an Assigned Contract, the "Excluded Contracts"); provided, however, that if there is a Cure Cost dispute with respect to an Available Contract or any other dispute as to the assumption or assignment of such Available Contract (such Available Contract, a "Disputed Contract") that has not been resolved to the mutual satisfaction of Purchaser and Sellers prior to the Designation Deadline, then the Designation Deadline shall be extended (but only with respect to such Disputed Contract) to no later than three (3) Business Days following the earlier of (A) the date on which such Available Contract is deemed rejected by operation of section 365 of the Bankruptcy Code, and (B) the date upon which such dispute is finally determined by the Bankruptcy Court (the "Extended Contract Period"). If a Designation Notice with respect to a Disputed Contract is not delivered by Purchaser in writing by the date which is three (3) Business Days following the expiration of such Extended Contract Period, such Disputed Contract shall not be an Assigned Contract or Acquired Asset.

(ii)     Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all Counterparties to all Available Contracts (the "Contract Assumption Notice"). Such Contract Assumption Notice shall (A) identify each Available Contract by the name or appropriate description and date (if available), the Counterparty, and the address of such Counterparty for notice purposes, (B) set forth Sellers' good faith estimate of the applicable Cure Costs for each Available Contract as determined by Sellers based on their books and records and (C) be filed by Sellers with the Bankruptcy Court.

(iii)     Purchaser shall have the right to notify Sellers in writing up to two (2) Business Days prior to the Sale Hearing (the "Designation Deadline"), of any Available Contract (other than purchase orders) that it does not wish to assume or any Excluded Contract that Purchaser wishes to designate as an Assigned Contract, and (A) any such Available Contract that Purchaser no longer wishes to assume shall be automatically deemed an Excluded Contract and added to Schedule 1.2(a), in each case, without any adjustment to the Cash Purchase Price, and (B) any such previously Excluded Contract that Purchaser wishes to designate as an Assigned Contract shall automatically become an Assigned Contract, in each case, without any adjustment to the Cash Purchase Price. If any previously Excluded Contract becomes an Assigned Contract and Sellers have not previously notified the Counterparties to such Contracts pursuant to Section 1.5(a)(ii) above, Sellers shall promptly (and in no event later than one Business Day following its designation as an Assigned Contract) (i) deliver a supplemental Contract Assumption Notice to Purchaser and the applicable Counterparty, and (ii) file such supplemental Contract Assumption Notice with the Bankruptcy Court. Counterparties shall have until the later of (x) the bid deadline established by the Bidding Procedures Order and (y) 5 Business Days after Sellers' delivery of a Contract Assumption Notice to object, in writing, to the proposed Cure Costs or the assumption and assignment of its Contract. If the Counterparties, Sellers, and Purchaser are unable to reach a consensual resolution with respect to any objection, Sellers shall seek an expedited hearing before the Bankruptcy Court to determine the Cure Costs and approve the assumption and assignment to Purchaser. If no objection is timely served, the Sale Order shall approve the applicable Cure Costs and assumption of such Contract and its assignment to Purchaser.

8

(iv)    At the Closing (or, with respect to Available Contracts that remain Disputed Contracts, at such later date when all disputes have been resolved to the mutual satisfaction of Sellers and Purchaser), subject to any adjustment pursuant to Section 1.5, Purchaser shall pay all applicable Cure Costs and Seller shall assume and assign to Purchaser all Assigned Contracts that may be assigned by such Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, and Purchaser shall assume such Assigned Contracts.   Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing.

(b)    Non-Assignment.

(i)    Notwithstanding anything to the contrary in this Agreement, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by a Seller under section 365 of the Bankruptcy Code or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder.

(ii)    The Sale Order shall provide, pursuant to sections 365(e) and 365(f) of the Bankruptcy Code, that any provision in any Assigned Contract that purports to prohibit, restrict, or condition Sellers' assignment of such Assigned Contract to Purchaser or provide for the termination or modification of such Assigned Contract based on the filing of a bankruptcy case, the financial condition of Sellers or similar circumstances shall be unenforceable and of no force and effect.

(iii)    Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to and determined after giving effect to any order of the Bankruptcy Court, including the Sale Order) in order to permit the assignment, sale or transfer to Purchaser of the applicable Seller's right, title and interest in and to such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as such right, title and interest is to be assigned, sold or transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be assigned, sold or transferred to Purchaser. If any Acquired Asset is deemed not to be assigned, sold or transferred pursuant to this clause (iii), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six (6) months following the Closing (or the closing of the Bankruptcy Cases, if shorter), Sellers and Purchaser shall use reasonable best efforts to (A) secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement proposed by Purchaser, including subcontracting, licensing or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of the applicable Governmental Body or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates or any direct costs, in each case that are solely associated with the retention and maintenance of such Acquired Asset incurred by any

9

Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained, and (2) Purchaser shall assume and timely discharge any related burden and obligation with respect to such Acquired Asset. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, Sellers' right, title and interest in and to such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement and the Sale Order. Notwithstanding anything herein to the contrary, no Seller will be obligated to pay any consideration therefore to any Governmental Body from whom Consent or Governmental Authorization is requested or to initiate any such litigation to obtain any such Consent or Governmental Authorization. Sellers shall segregate and hold in trust for, and pay to Purchaser, promptly upon receipt thereof, all income, proceeds and other monies received by any Seller derived from their use of any asset that would be an Acquired Asset in connection with the arrangements under this <u>Section 1.5(b)</u>.

## ARTICLE II
## CONSIDERATION; PAYMENT; CLOSING

2.1     <u>Consideration</u>. The aggregate consideration (the following clauses (i) and (ii), collectively, the "<u>Purchase Price</u>") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities; and (ii) cash in an aggregate amount equal to Six Hundred Thousand and 00/100 Dollars ($600,000) (such amount, the "<u>Cash Purchase Price</u>").

2.2     <u>Closing</u>. The closing of the purchase and sale of the Acquired Assets, the delivery of the Cash Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "<u>Closing</u>") will take place by telephone conference and electronic exchange of documents following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in <u>Article VII</u> (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "<u>Closing Date</u>."  For the avoidance of doubt, the Closing Date shall be no later than April 30, 2025.

2.3     <u>Closing Deliveries by Sellers</u>. At or prior to the Closing, Sellers shall deliver to Purchaser (or to one or more Affiliates designated by Purchaser (each, a "<u>Purchaser Designee</u>")):

(a)     a bill of sale and assumption and assignment agreement substantially in the form of <u>Exhibit A</u> (the "<u>Bill of Sale</u>") duly executed by the applicable Sellers;

(b)     an appropriately completed and duly executed IRS Form W-9, executed by each Seller or each Seller's regarded owner for U.S. federal income Tax purposes, as applicable;

(c)     counter signatures of the Escrow Agreement, duly executed by Sellers and the Escrow Agent;

(d)     a certificate, dated as of the Closing Date, executed by a duly authorized officer of Azzur COD Group, certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied;

(e)     a certified copy of the Sale Order, that has become a Final Order, or, alternatively, the Sale Order includes a finding that Purchaser is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code and grant Purchaser the protections of section 363(m) of the Bankruptcy Code;

(f)     [Reserved];

(g)     an intellectual property assignment agreement in substantially the form attached hereto as Exhibit E (the "IP Assignment");

(h)     a statement from Sellers meeting the requirements of section 1.1445-2(b) of the Treasury Regulations, to the effect that Seller is not a "foreign person" within the meaning of Section 1445 of the Code and the Treasury Regulations thereunder;

(i)     delivery of all right, title and interest in and to the Acquired Assets to the Purchaser; and

(j)     such other documents as Purchaser's counsel may reasonably request that are necessary to evidence or consummate the transactions contemplated by this Agreement.

2.4     Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to (or at the direction of), or shall cause the applicable Purchaser Designee to deliver to, Sellers:

(a)     the Cash Purchase Price, minus the Deposit, by wire transfer of immediately available funds to an account (or accounts) designated by Sellers;

(b)     the Bill of Sale and the IP Assignment, duly executed by Purchaser or the applicable Purchaser Designee;

(c)     counter signatures to the Escrow Agreement, duly executed by the Purchaser and the Escrow Agent;

(d)     a certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser, certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied; and

(e)     such other documents as Sellers' counsel may reasonably request that are necessary to evidence or consummate the transactions contemplated by this Agreement.

2.5     Withholding. [Reserved.]

2.6     Deposit and Cash Purchase Price.

(a)      Purchaser shall deposit 10% of Cash Purchase Price, or an amount equal to Sixty Thousand and 00/100 Dollars ($60,000) (such amount, together with all interest and other earnings accrued thereon, the "Deposit"), in the Escrow Account within one (1) Business Day of the execution of this Agreement, to be disbursed as follows:

(i)      if the Closing shall occur, then the Deposit shall be applied at Closing as a credit toward the Cash Purchase Price payable by Purchaser or, if the Cash Purchase Price is paid in full at Closing, then the Deposit shall be released to Purchaser at the Closing;

(ii)      if this Agreement is terminated by Sellers pursuant to Section 8.1(e) or Section 8.1(j), then the Deposit shall be released to Sellers within two (2) Business Days following such termination; or

(iii)      if this Agreement is terminated by either party pursuant to Sections 8.1(a)-(d) or (f)-(k), then the Deposit shall be released to Purchaser within two (2) Business Days following such termination; and

(iv)      in each case described in clauses (i)-(iii) above, Sellers and Purchaser shall deliver joint written instructions to the Escrow Agent directing the Escrow Agent to release the Deposit in accordance with the terms of the applicable clause.

(b)      If this Agreement is terminated by Sellers as contemplated by Section 2.6(a)(ii), Purchaser shall forfeit the Deposit and Purchaser and Sellers shall deliver joint written instructions to the Escrow Agent directing the Escrow Agent to release the Deposit to Sellers.

2.7      Prorations. All expenses (a) due and payable at times after 12:01 a.m. ET on the Closing Date (the "Closing Time") for periods prior to the Closing Time or (b) paid prior to the Closing Time for periods following the Closing Time, including utility payments, payments due in respect of rents, real and personal property taxes, insurance premiums, employment taxes related to the Transferred Employees and similar expenses shall be prorated between Sellers and Purchaser as of the Closing Time and adjusted through the Cash Purchase Price pursuant to customary and standard procedures for such adjustments.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers jointly and severally represent and warrant to Purchaser as of the date hereof and as of the Closing as follows:

3.1      Organization and Qualification. Each Seller is a limited liability company, duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation. Each Seller is duly qualified or authorized to do business and is in good standing in each jurisdiction in which the property and assets owned, leased or operated by it, or the nature of the business conducted by it, makes such qualification or authorization necessary, except where the failure to be so qualified, authorized, or in good standing would not, individually or in the aggregate, have a Material Adverse Effect.

12

3.2     <u>Authorization of Agreement</u>. The execution, delivery and performance by each Seller of this Agreement and the other Transaction Agreements to which such Seller is a party, and the consummation by such Seller of the transactions contemplated hereby and thereby, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate action, limited liability company action or limited partnership action on the part of such Seller, as applicable, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery and performance by such Seller of this Agreement or the other Transaction Agreements and the consummation by it of the transactions contemplated hereby and thereby. Subject to requisite Bankruptcy Court approvals, this Agreement and the other Transaction Agreements to which each Seller is a party have been, or will be, duly executed and delivered by such Seller and, assuming due authorization, execution and delivery hereof and thereof by Purchaser and Sellers, as applicable, constitutes, or will constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms.

3.3     <u>Conflicts; Consents</u>. Assuming that (a) requisite Bankruptcy Court approvals are obtained and (b) the notices, authorizations, approvals, Orders, Permits or consents set forth on <u>Schedule 3.3</u> are made, given or obtained (as applicable), neither the execution and delivery by Sellers of this Agreement or the other Transaction Agreements, nor the consummation by Sellers of the transactions contemplated hereby or thereby, nor performance or compliance by Sellers with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of a Seller's certificate of formation or limited liability company agreement or other governing documents, as applicable, (ii) (x) conflict with, violate or constitute a breach of or default (with or without notice or lapse of time, or both) under, (y) give rise to a right of termination, modification, acceleration or cancelation of any obligation or to the loss of any benefit, under, or (z) accelerate any Seller's obligations under, any Material Contract, (iii) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any Acquired Asset or (iv) violate any Law, except, in the case of clauses (ii) and (iv), as would not, individually or in the aggregate, reasonably be expected to be material to the Business.

3.4     <u>Capitalization of Sellers</u>.  The Persons set forth on <u>Schedule 3.4</u> are the record and beneficial owners of 100% of the authorized and outstanding equity interests of Azzur Group, LLC, free and clear of all Encumbrances (other than restrictions on transfer under applicable federal and state securities laws and Encumbrances that will automatically be released upon the Closing). Azzur Group, LLC is the record and beneficial owner of 100% of the authorized and outstanding equity interests of each Seller, free and clear of all Encumbrances (other than restrictions on transfer under applicable federal and state securities laws and Encumbrances that will automatically be released upon the Closing.)

3.5     <u>Financial Matters.</u>

(a)     Attached to <u>Schedule 3.5(a)</u> are the audited consolidated balance sheets as of December 31, 2023 and as of December 31, 2022, and the related consolidated statements of operations, changes in members' equity (deficit) and cash flows for each fiscal year then ended, of Azzur Group, LLC (collectively, the "<u>Financial Statements</u>").  The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and fairly present in all material respects the

consolidated financial position of Sellers with respect to the Business as of the dates thereof and the consolidated results of their operations and cash flows for the periods shown, except as may be indicated in the notes thereto.

(b)    Except as disclosed on <u>Schedule 3.5(b)</u>, the Financial Statements were prepared in accordance with the books and records of Azzur Group, LLC and the applicable Seller (which books and records are accurate and complete, represent actual, bona fide transactions, and have been maintained in accordance with sound business practices). Sellers' system of internal controls over financial reporting is sufficient to provide reasonable assurance that (i) transactions are recorded only in accordance with the authorization of management and (ii) there is prevention or timely detection of the unauthorized acquisition, use, or disposition of the Acquired Assets. Since December 31, 2019, no officer, director, employee or independent contractor of Azzur COD Group has reported to any Seller or any other Person any actual or alleged fraud or willful misconduct with respect to any of Azzur COD Group's financial statements or books and records.

3.6    <u>Title to Acquired Assets; Sufficiency</u>. Except as set forth on <u>Schedule 3.6</u>, Sellers have (or at Closing will have) sole and exclusive, good and marketable title to, or, in the case of property held under a lease or other contractual obligation applicable to the Business, a sole and exclusive, enforceable leasehold interest in, or right to use and otherwise commercially exploit, all of the Acquired Assets. Except as set forth on <u>Schedule 3.6</u>, the Acquired Assets, together with the services, assets, and rights granted or made available to the Purchaser under the Transaction Agreements at the Closing, comprise all of the assets, properties and rights of every type and description used in or necessary to the conduct of the Business and are adequate and sufficient in all material respects to conduct the Business as currently conducted. Except as disclosed on <u>Schedule 3.6</u>, none of the personal property of Sellers is subject to any Encumbrance other than any Permitted Encumbrance. The tangible assets (whether owned or leased) included in the Acquired Assets are, except for ordinary wear and tear, in good condition and repair and are usable in the Ordinary Course.

3.7    <u>Contracts</u>.

(a)    <u>Schedule 3.7(a)</u> sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "<u>Material Contract</u>" means any Contract (x) by which any of the Acquired Assets are bound or affected or (y) to which any Seller is a party, or by which it is bound, in each case in connection with the Acquired Assets (in each case, excluding any Seller Plan) that:

(i)    relates to the formation, creation, governance, economics or control of any joint venture, partnership or other similar arrangement;

(ii)    is a Contract (i) under which any Seller has created, incurred, assumed, or guaranteed any third party debt, (ii) under which an Encumbrance has been placed on any Acquired Asset or (iii) under which any other Person has guaranteed any third party debt of any Seller;

(iii)    relates to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise) for aggregate consideration under such Contract in excess of $100,000;

(iv)    is a Contract for the purchase of materials, supplies, goods, services, Furniture, Fixtures and Equipment or other assets, whether owned or leased by Seller, pursuant to which Sellers would reasonably be expected to make payments of more than $150,000 during any fiscal year;

(v)    (A) is a Contract pursuant to which any Seller receives any right to use, license, sublicense, covenant not to sue, release, or waiver under any Intellectual Property of any third party (other than agreements for any third-party commercially available or off-the-shelf software with annual, aggregate fees of less than $50,000); or (B) is a Contract pursuant to which any Seller grants any right to use, license, sublicense, covenant not to sue, release, or waiver under any Seller Intellectual Property, other than any non-exclusive outbound license entered into with customers in the Ordinary Course;

(vi)    is a lease required to be capitalized in accordance with GAAP;

(vii)    is a Contract with a Material Customer or Top Vendor;

(viii)    is a Contract under which any Seller is, or may become, obligated to pay any amount in respect of indemnification obligations, purchase price adjustment, or otherwise in connection with any (i) acquisition or disposition of assets or securities (other than the sale of inventory in the Ordinary Course), (ii) merger, consolidation, or other business combination or (iii) series or group of related transactions or events of the type specified in clauses (i) and (ii) above;

(ix)    is a Contract relating to confidentiality or non-competition restrictions or that otherwise restricts the conduct of the Business or limits the freedom of the Business to sell any product or provide any service, to engage in any line of business, or to compete with any Person in any geographic area or to hire, solicit, or retain any Person (whether Sellers are subject to or the beneficiary of such obligation);

(x)    is a Contract which relates to both the Business and other business lines of Sellers or any of their Affiliates;

(xi)    any Contract for the sale of any of the assets of any Seller (whether by merger, sale of stock, sale of assets or otherwise) for consideration in excess of $100,000; or

(xii)    contains any provision (A) limiting, in any material respect, the right of Sellers to engage in any business, make use of, enforce or register any Seller Intellectual Property that is material to Sellers, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of clauses (A) and (B).

15

(b)    Subject only to required Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (subject to satisfaction by Purchaser of any applicable Cure Costs as provided in Section 1.5(a)(iv)), none of the Assumed Contracts require the Consent of any other party thereto in connection with the transactions contemplated by this Agreement.

(c)    Sellers have performed any obligations required to be performed by them to date and are not (with or without the lapse of time or the giving of notice, or both) in material breach or default under any Material Contract, and (ii) to Sellers' knowledge, no other party to any of the Material Contracts is (with or without the lapse of time or the giving of notice, or both) in material breach or default thereunder, except only for those defaults that will be cured by Sellers in accordance with the Sale Order.

(d)    Purchaser either has been supplied with, or has been given access to, a true and correct copy of all Contracts which are referred to on Schedule 1.5(a), together with all material amendments, waivers or other changes thereto.

3.8    Permits; Compliance with Laws.

(a)    The Business operates and, during the past two years, has operated in compliance in all material respects with all state or federal laws, statutes, ordinances, codes, rules or regulations ("Laws") or Orders, including Healthcare Laws, applicable to the Business, and each Seller holds all licenses, franchises, permits, certificates, approvals and authorizations from Governmental Bodies necessary for the lawful conduct of the Business (collectively, "Permits"). Each such Permit is in full force and effect, and the Business is in compliance in all material respects with the terms and conditions of all such Permits.

(b)    Except as set forth on Schedule 3.8(b), since January 1, 2022, (i) none of Sellers has received notice alleging non-compliance with any Law, including any Healthcare Law, involving the Business and (ii) no Action relating to any applicable Law or Order, including any Healthcare Law, is pending or, to the Knowledge of Sellers, threatened involving the Business.

(c)    To the extent applicable, the Business operates, and has operated since January 1, 2022, in material compliance with all Laws administered, promulgated, or enforced by the Food and Drug Administration and any similar Governmental Bodies.  Neither the Business nor any Sellers are subject to any obligation arising under an administrative or regulatory action, inspection, warning letter, notice of violation letter, or other notice, response or commitment made to or with FDA or any similar Governmental Bodies, and to the Knowledge of Sellers, no such proceedings have been threatened.

(d)    The Business does not manufacture, distribute, repackage, relabel, market, advertise, promote, develop on their own behalf, import, or sell any drugs, medical devices, or other products subject to regulation under the Laws administered, promulgated, or enforced by the FDA or similar Governmental Bodies. Sellers have not submitted to the FDA or similar Governmental Bodies and do not themselves hold any marketing authorization applications, including, but not limited, to new drug applications, investigational new drug applications,

16

abbreviated new drug applications, 510(k) notifications, premarket approval applications, de novo classification submissions, or investigational device exemptions.

(e)     Neither the conduct of the Business nor the conduct of the Sellers requires, or has ever required, that the Business or any of the Sellers comply with HIPAA. No Seller has executed any business associate agreements under HIPAA.

(f)     Neither Sellers, the Business nor any owner, officer, director, employee, or, to the Knowledge of Sellers, any consultant or agent of the Business is, has been, or is, proposed or threatened to be: (i) charged with or convicted of any criminal offense relating to the delivery of an item or service under any Governmental Healthcare Program; (ii) debarred under the provisions of the Generic Drug Enforcement Act of 1992, 21 U.S.C. § 335a ("Debarred"); (iii) excluded, debarred, suspended or otherwise ineligible to participate in Governmental Healthcare Programs or in federal procurement or non-procurement programs ("Excluded"); or (iv) convicted or indicted for a crime or otherwise engaged in conduct for which a person or entity can be Debarred or Excluded. Sellers verify upon hire that the owners, partners, officers, directors, employees, and consultants of the Business have not been subject to any of the actions described in (i) through (iv).

(g)     Each Seller and each of their respective directors, officers and employees acting in such capacity and, to the Knowledge of Sellers, each other agent acting on their behalf, is, and has been since January 1, 2022, in compliance with (i) the Foreign Corrupt Practices Act of 1977 and any rules and regulations promulgated thereunder and (ii) applicable Information Privacy and Security Laws.

3.9     Environmental Matters. Except as would not, individually or in the aggregate, reasonably be expected to result in Sellers incurring material Liabilities, (a) Sellers are, and have been, in compliance with all applicable Environmental Laws, (b) Sellers have not received any written notice alleging that any Seller is in violation of or liable under, any Environmental Law that is unresolved, (c) Sellers possess and are and have been in compliance with all Permits required under Environmental Laws for the operation of their businesses as currently conducted ("Environmental Permits"), (d) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Sellers, threatened in against any Seller, (e) Sellers are not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of any Seller, and (f) there are no Hazardous Substances that are used by Sellers in operation of the Business that are present at, in, on or under any real property owned, leased or occupied by any Seller in quantities or concentrations in excess of those permitted under Environmental Laws.

3.10     Intellectual Property; IT and Data Security and Privacy.

(a)     Schedule 3.10(a) sets forth a complete and accurate list of all Seller Intellectual Property that is (i) the subject of any issuance, registration, or a pending application for registration with the U.S. Patent and Trademark Office, the U.S. Copyright Office or any similar governmental office or agency, or registrar (including domain name registrars) anywhere in the world ("Registered Seller Intellectual Property"), (ii) a social media account or handle, or

1618520946.11
1618520946.11

(iii) a material Seller Software. Each item of Registered Seller Intellectual Property is registered in the name of a Seller. All Registered Seller Intellectual Property are subsisting, and, to the Knowledge of Sellers, are not invalid or unenforceable. Except as noted on Schedule 3.10(a), Sellers exclusively own all of the rights, title and interest in and to the Seller Intellectual Property, including all Registered Seller Intellectual Property, free and clear of all Encumbrances (other than Permitted Encumbrances) and have valid and enforceable licenses to all other Intellectual Property necessary for, used in or held for use in the conduct of the Business. Schedule 3.10(a) accurately identifies each Contract pursuant to which any Person has been granted any license under, or otherwise has received or acquired any right (whether or not currently exercisable) or interest in, any Seller Intellectual Property. The Seller has not assigned or otherwise transferred ownership of, or agreed to assign or otherwise transfer ownership of, any Seller Intellectual Property to any Person. Except for Intellectual Property that is licensed to the Seller, as set forth on Schedule 3.10(a) attached hereto (which schedule also accurately identifies each applicable Contract pursuant to which such Intellectual Property is licensed to the Seller) (the "Licensed Intellectual Property"), the Seller Intellectual Property constitutes all of the Intellectual Property used in connection with or necessary for the operation and conduct of the Business.

(b)     Sellers take and have taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of Trade Secrets disclosed to, owned or possessed by them. Except as set forth on Schedule 3.10(b), Sellers are not in breach of and have not breached any obligations or undertakings of confidentiality which they owe or have owed to any third party. Each present or past employee, officer, consultant or any other Person who developed any material Seller Intellectual Property has executed a Contract with a Seller that irrevocably assigns to such Seller any and all right, title and interest in and to all Seller Intellectual Property developed by such Person in connection with such Person's employment or engagement by such Seller, or such Seller owns such Intellectual Property by operation of law.

(c)     No Actions are pending or, to the Knowledge of Sellers, threatened against any Seller, and in the past three (3) years, Sellers have not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by any Seller of any Seller Intellectual Property or (ii) alleging that any Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person. Except as set forth on Schedule 3.10(c), Sellers have not brought any Action or sent any notice alleging infringement, misappropriation or violation of Seller Intellectual Property to any other Person.

(d)     Except as set forth on Schedule 3.10(d), in the past three (3) years, no Person has infringed, misappropriated or otherwise violated any Seller Intellectual Property and the operation of the Business, including the use of any products or services of the Business, has not violated, misappropriated or infringed the Intellectual Property of any other Person.

(e)     No Seller Software contains or is derived from, linked with, called by, or used, combined or distributed with third-party Open Source Software in a manner that, according to the terms of the license for such Open Source Software, (i) requires that such Seller Software (excluding the Open Source Software) be disclosed, delivered, distributed, licensed or otherwise made available to a third party in source code form, (ii) limits Sellers' freedom to seek full compensation in connection with the marketing, licensing or distribution of any of the products or services of the Business, or (iii) allows a third party to decompile, disassemble or otherwise reverse

18

engineer any Seller Intellectual Property. Sellers have not (x) granted, directly or indirectly, to any other Person, any current or contingent rights, licenses or interests in or to any source code of any Seller Software or (y) provided or disclosed any source code of any Seller Software to any third party.

(f)    Except as would not reasonably be expected to be material to the Business, taken as a whole, the IT Assets and Seller Software do not contain any viruses, malware, undocumented or unauthorized portals or other access (including backdoors), "Trojan horse," "worms," "time-bombs," "drop dead device," key-locks, key-logs, or any other devices, codes or commands that would be reasonably likely to materially disrupt or interfere with the operation of the IT Assets, Seller Software or Equipment upon which the IT Assets or Seller Software operates, or the safety, security or integrity of the data, information or signals the IT Assets or Seller Software produces in a manner adverse to any customer, licensee or recipient.

(g)    Except as would not reasonably be expected to be material to the Business, taken as a whole, to the Knowledge of Sellers, all IT Assets (i) are configured in accordance with generally accepted industry security standards, and (ii) are maintained in accordance with standards set by the manufacturers or otherwise in accordance with generally accepted standards prudent in the industry. Sellers lawfully own, lease or license all IT Assets and such IT Assets are reasonably sufficient for the Business as currently conducted, including as to capacity, scalability, and ability to process current and anticipated peak volumes in a timely manner.  Except as set forth on Schedule 3.10(g), in the past three (3) years, there has been no failure or other prolonged substandard performance of or any security incident involving any IT Asset that has caused a material disruption to the Business. Sellers maintain commercially reasonable backup and data recovery, disaster recovery, and business continuity plans, procedures, and facilities and test such plans and procedures on a regular basis, and such plans and procedures have been proven effective in all material respects upon such testing. Except as set forth on Schedule 3.10(g), Sellers are not in breach of any of their Contracts relating to IT Assets.  In the past three (3) years, Sellers have not been subjected to an audit of any kind in connection with any Contract pursuant to which they use any third-party IT Asset, nor received any notice of intent to conduct any such audit.

(h)    Sellers take and have taken commercially reasonable efforts designed to protect the confidentiality, integrity and security of its Personal Data, Seller Software, and the IT Assets against any unauthorized use, access, interruption, modification, or corruption. Sellers have implemented and maintained an information security program that (i) complies and has at all times in the past three (3) years complied in all material respects with all applicable Information Privacy and Security Laws; (ii) identifies internal and external risks to the security of any proprietary or confidential information in its possession, including Personal Data; (iii) monitors and is designed to protect Personal Data, Seller Software and all IT Assets against any unauthorized use, access, interruption, modification or corruption; (iv) implements, monitors, and maintains administrative, organizational, technical, and physical safeguards and controls with respect to the risks described above in (ii) and (iii); and (v) maintains incident response and notification procedures, including in the case of any breach of security compromising Personal Data. Except as would not reasonably be expected to be material to the Business, taken as a whole, Sellers have implemented and have at all times in the past three (3) years maintained a commercially reasonable information security program designed to ensure that third parties collecting or handling Personal Data on behalf of

Sellers provide similar safeguards in compliance with applicable Information Privacy and Security Laws.

(i)        Except as set forth on Schedule 3.10(i), in the past three (3) years there has been no, and no third party claim has alleged any, Security Breach relating to any Seller Software, IT Assets, or Sensitive Data owned, transmitted, used, stored, received, or controlled by or on behalf of Sellers in connection with the operation of the Business.

(j)        Sellers' Processing of any Personal Data is and has at all times in the past three (3) years been in material compliance with (i) all Information Privacy and Security Laws, (ii) all applicable Privacy Policies and internal policies and procedures relating to Sellers' processing of Personal Data, and (iii) the requirements of any Contract to which any Seller is a party.

(k)        Sellers have all authorizations, consents, data processing agreements and data transfer agreements that are required to maintain compliance under Information Privacy and Security Laws to Process the Personal Data in such entity's possession or control in connection with the operation of the Business. The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) conflict with or result in a violation or breach of any Information Privacy and Security Laws or applicable Privacy Policies (as currently existing or as existing at any time during which any Personal Data was Processed by or for Sellers); or (ii) require the consent of or notice to any Person concerning such Person's Personal Data.

(l)        Sellers (i) are not and have not been under investigation by any Governmental Body for a violation of any Information Privacy and Security Laws; and (ii) have not at any time in the past three (3) years received any notice of any claim or lawsuit from any Person alleging any violation of Information Privacy and Security Laws.

3.11    Tax Matters.

(a)        All income and other material Tax Returns of each Seller and with respect to the Acquired Assets or the Business required to be filed prior to the date hereof have been timely filed (taking into account valid extensions of time within which to file) with the appropriate Governmental Body, and all such filed Tax Returns (taking into account all amendments thereto) are true, complete and accurate in all material respects. No claim has ever been made in writing by a Governmental Body in a jurisdiction where (x) a specific type of Tax Returns is not filed with respect to the Acquired Assets that such specific type of Tax Returns is or may be required to be filed with respect to the Acquired Assets or the Business in such jurisdiction and (y) the Business and the Acquired Assets or the Business are not subject to a specific type of Taxes that the Acquired Assets or the Business are or may be subject to such specific type of Taxes in such jurisdiction.

(b)        All material Taxes with respect to the Acquired Assets or the Business or of any Seller that are due (whether or not shown on any Tax Return) have been timely paid in full in the manner required by applicable Law.

20

(c)      There are no Encumbrances for Taxes on any of the Acquired Assets or the Business other than Permitted Encumbrances.

(d)      None of the Sellers has waived any statute of limitations in respect of material Taxes with respect to the Acquired Assets or agreed to any extension of time with respect to an assessment or deficiency for Taxes with respect to the Acquired Assets or the Business (other than pursuant to automatic extensions of time to file Tax Returns) and no such waiver or extension has been requested in writing by any Governmental Body.

(e)      No deficiencies for Taxes with respect to the Acquired Assets or the Business has been, or is expected to be, asserted, claimed, proposed or assessed by any Governmental Body.  There is no pending or threatened Action for or relating to any Liability in respect of Taxes with respect to the Acquired Assets or the Business.

(f)      Each Seller has deducted and withheld and timely paid over to the appropriate Governmental Body all material amounts of Taxes with respect to the Acquired Assets or the Business required to have been deducted and withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, equity holder or other Person, and all reporting and recordkeeping requirements with respect thereto have been properly completed and timely filed in substantial compliance with all applicable Law.

(g)      None of the Acquired Assets is an interest in a joint venture, partnership, or other arrangement that is treated as a partnership for U.S. federal income Tax purposes or an equity interest in an entity treated as a corporation for U.S. federal income Tax purposes.

(h)      No closing agreements, private letter rulings, technical advice memoranda or similar agreements or rulings with respect to Taxes or Tax Returns related to the Acquired Assets or the Business have been entered into, issued by, or requested from any Governmental Body.

(i)      All material amounts of sales and use Taxes relating to the Acquired Assets or the Business that were required to be paid under all applicable Laws have been timely paid. All material amounts of sale Taxes relating to the Acquired Assets or Business under all applicable Laws have been properly collected and remitted. For all sales relating to the Acquired Assets or Business exempt from sale Taxes and made without charging or remitting sale or similar Taxes, any appropriate Tax exemption certificate and/or other document qualifying such a sale as exempt has been received and retained except where the failure to retain such certification or other document would not, individually or in the aggregate, have a Material Adverse Effect.

(j)      Any other representation or warranty contained in this Article III notwithstanding, the representations and warranties contained in this section constitute the sole representations and warranties of Sellers relating to Taxes.

3.12    Benefit Plans.

(a)      Schedule 3.12(a) sets forth a true and complete list of each Seller Plan.  With respect to each material Seller Plan, Sellers have made available to Purchaser true and complete copies (to the extent applicable) of (i) the current plan document or a written description of the

21

material terms thereof, including any amendments thereto, other than any document that any Seller is prohibited from making available to Purchaser as the result of applicable Law relating to the safeguarding of data privacy, (ii) the most recent annual report on Form 5500 filed with the Department of Labor, (iii) the most recent IRS determination or opinion letter received by each Seller, (iv) the most recent summary plan description (including any summary of material modifications), (v) each current insurance Contract or trust agreement, and (iv) any non-routine correspondence (including any applications or submissions under any voluntary correction programs) with any Governmental Body within the last six (6) years.

(b)        Each Seller Plan intended to be "qualified" within the meaning of Section 401(a) of the Tax Code has received a favorable determination letter from the IRS or is entitled to rely upon a favorable opinion letter issued by the IRS regarding the form of such plan. To the Knowledge of Sellers, there are no existing circumstances or any events that have occurred that would reasonably be expected to cause the loss of any such qualification status of any such Seller Plan. There are no pending, or to the Knowledge of Sellers, threatened in writing, claims (other than routine claims for benefits) by, on behalf of or against any Seller Plan and no audit or other proceeding by a Governmental Body is pending, or to the Knowledge of Sellers, threatened with respect to such plan. The Seller Plans comply (and at all times with the last six (6) years have complied) in all material respects in form and in operation with their terms and applicable Laws, including the applicable requirements of the Tax Code and ERISA.

(c)        No Seller Plan is and none of Sellers or any of their respective ERISA Affiliates sponsors, maintains, contributes to, or has (or in the past six (6) years has had) any Liability with respect to any (i) pension plan that is subject to Title IV of ERISA or Section 412 of the Tax Code, (ii) "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA), (iii) a "multiple employer plan" as described in Section 413(c) of the Code, or (iv) a "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA.

(d)        Except as set forth on Schedule 3.12(d), no Seller Plan provides benefits or coverage in the nature of health or life insurance following retirement or other termination of employment, other than coverage or benefits required to be provided under Part 6 of Subtitle B of Title I of ERISA or section 4980B of the Tax Code, or any other applicable Law at the participant's sole expense.

(e)        Each Seller Plan that is a "group health plan" for purposes of the Affordable Care Act has been maintained and administered in compliance in all material respects with the Affordable Care Act, to the extent applicable thereto, including, to the extent required by the Affordable Care Act, offering health care coverage that does not subject any Seller to any assessment under Section 4980H(a) or 4980H(b) of the Code. No Seller has, or would reasonably be expected to have, any liabilities for Taxes under Sections 4975 through 4980 of the Code or Sections 4980A through 4980I of the Code.

(f)        The consummation of the transactions contemplated hereby, either alone or in connection with any other event, will not (i) result in any payment or benefit (whether of compensation, termination or severance pay or otherwise) becoming due to any current or former employee, officer, or independent contractor, or other service provider of Sellers, (ii) accelerate the time of payment or vesting, or increase the amount, of compensation due to any director,

officer, employee, independent contractor or other service provider of any Seller, including under any Seller Plan, (iii) cause a Seller to transfer or set aside any assets to fund any benefits under any Seller Plan (iv) result in any forgiveness of indebtedness of any current or former employee, director, officer, independent contractor, or other service provider of Sellers, or (v) result in any "excess parachute payment" (each such term as defined in Section 280G of the Tax Code). No Person is entitled to any gross-up, make-whole, indemnification, reimbursement, or other additional payment from Sellers in respect of any Tax or interest or penalty related thereto under Section 409A of the Code, Section 4999 of the Code, or otherwise.

      3.13   <u>Employees.</u>

      (a)   <u>Schedule 3.13(a)</u> sets forth a complete and accurate list, as of the date of this Agreement, of each Business Employee, by name or employee identification number, including each such employee's direct employing entity, position or title, annualized base salary or hourly wage (as applicable), 2024 annual bonus or commission opportunity (as applicable), date of hire, work location (city, state and country), amount of accrued and unused vacation or paid time off (if applicable), part-time, full-time, temporary or other status, exempt or non-exempt status, leave status and anticipated return-to-work date (if applicable), and visa status (if not a United States citizen or lawful permanent resident) and date of visa expiration (the "<u>Employee Census</u>").

      (b)   Except as set forth on <u>Schedule 3.13(b)</u>, none of Sellers is party to or subject to any collective bargaining agreements or similar labor-related Contracts with any Union covering any employees of a Seller, and no such Contract is currently being negotiated by Seller. No employees of Sellers are represented by a Union. There is no, and in the past four (4) years, there has not been, (i) demand for recognition as the bargaining representative of any employees made to any Seller by or on behalf of any Union is currently outstanding, (ii) pending or, to the Knowledge of Sellers, threatened strike, lockout, organized labor slowdown, concerted work stoppage, picketing, handbilling, or other similar activity by or with respect to the employees of any Seller, and (iii) to the Knowledge of Sellers, effort currently being made or threatened by, or on behalf of, any Union to organize any employees of Seller. Except as set forth on <u>Schedule 3.13(b)</u>, each Seller is, and for the last four (4) years has been, in compliance in all material respects with all applicable Laws respecting employment and employment practices, including Laws concerning terms and conditions of employment, wages and hours, exempt and non-exempt employee and individual independent contractor classification and payment practices, and occupational safety and health.

      (c)   For the past four (4) years, no Seller has been found liable for non-compliance with or failed to provide advance notice of any mass layoff or plant closing as required by the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq ("<u>WARN Act</u>").

      (d)   Except as set forth on <u>Schedule 3.13(d)</u>, in the course of the performance of their employment duties with the Business, no employee of Sellers holding a management-level position or higher (i) to the Knowledge of Sellers, has engaged in any conduct, (ii) has been or is being investigated for any conduct, or (iii) has been or is being subjected to any disciplinary action in connection with any conduct, in each case that would reasonably be expected to cause or has

23

caused any material damage to the reputation of Sellers, including but not limited to, any conduct constituting sexual misconduct, harassment (including sexual harassment), discrimination, or retaliation. For the purposes of this Section 3.13(d), the term "management-level position or higher" shall be defined as positions carrying the title of "vice-president" or another title senior to vice-president.

(e)    Except as set forth on Schedule 3.13(e), there are no, and within the last four (4) years have been no, pending or threatened material Actions, against Seller brought by or on behalf of any applicant for employment, or current or former employee, applicant or independent contractor of Seller, or any group or class of the foregoing, alleging violation of any labor or employment Laws, breach of any express or implied contract of employment, wrongful termination of employment, or any other discriminatory, wrongful, or tortious conduct in connection with the employment or working relationship.

(f)    No officer or executive of Seller or the Business, and no other employee of Seller or the Business holding a management-level position or higher, (i) has, to the Knowledge of Seller, given notice of termination of employment or otherwise disclosed plans to terminate employment with Seller or the Business within the twelve (12) month period following the Closing Date or (ii) except as set forth on Schedule 3.13(f), is employed under a non-immigrant work visa or other work authorization that is limited in duration. For the purposes of this Section 3.13(f), the term "management-level position or higher" shall be defined as positions carrying the title of "vice-president" or another title senior to vice-president.

3.14    Accounts Receivable and Accounts Payable.

(a)    All Accounts Receivable, inclusive of unbilled receivables, held by Sellers and related to the Business were acquired or arose from sales actually made or services actually performed in the Ordinary Course that represent bona fide transactions and valid claims, are not subject to any setoff, counterclaim or action, except those set forth on Schedule 3.14(a) and are enforceable in accordance with their terms, subject to the Enforceability Exceptions, except to the extent of any specific reserves against such Accounts Receivable are reflected on the most recent Financial Statements.

(b)    All accounts payable of the Business have been incurred in the Ordinary Course.

3.15    Material Customers; Material Suppliers.

(a)    Schedule 3.15(a) sets forth a true, correct and complete list of the ten (10) largest customers (measured by the dollar amount of revenue paid to Sellers) (each, a "Material Customer") for the 12 months ended on December 31, 2024, showing the aggregate sales to each such Material Customer and the percentage of total revenue of the business of Sellers attributable to such Material Customer during such period.

(b)    Schedule 3.15(b) sets forth a true, correct and complete list of the ten (10) largest vendors (measured by the dollar amount of payments made by Sellers) (each, a "Top Vendor") of the Business for the 12 months ended on December 31, 2024, showing aggregate

amount invoiced by each such Top Vendor and the percentage of total vendor expenditures of Sellers attributable to such Top Vendor during such period.

3.16    Insurance. Schedule 3.16 sets forth a true and complete list of all insurance policies in force with respect to the Business.  The list includes for each insurance policy the type of insurance policy, form of coverage, policy number, name of insurer, period (term), limits, deductibles and premiums.  All such policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the Closing have or will have been paid, Sellers are not in default thereunder, and no notice of cancellation or termination has been received by Sellers with respect to any such insurance policy.  Schedule 3.16 also describes any self-insurance or co-insurance arrangements by or affecting the Business, including any reserves established thereunder.  In addition, Schedule 3.16 contains a list of all pending claims and all claims submitted, in each case with respect to the Business, during the previous three (3) years under any insurance policy maintained by Sellers in respect of the Business.  No insurer has (a) denied or disputed (or otherwise reserved its rights with respect to) the coverage of any such claim pending under any insurance policy or (b) to Sellers' Knowledge, threatened to cancel any such insurance policy.

3.17    Absence of Certain Changes.  Except as expressly contemplated by this Agreement or as set forth on Schedule 3.17, since December 31, 2023, (i) the Sellers have conducted the Business only in the Ordinary Course; (ii)  there has occurred no fact, event or circumstance which, individually or in the aggregate has had or could reasonably be expected to have a Material Adverse Effect or would or could reasonably be expected to prevent or impair the Sellers from carrying on the Business in all material respects in the manner it is presently being conducted by the Sellers; and (iii) the Sellers have not taken any of the following actions or made any of the following omissions:

(i)    made any loan to, or made, granted or promised any bonus or any wage or salary increase or made or promised any other change in employment or compensation terms for, or entered into any other transaction with, any employee, manager, officer or director, other than routine wage increases in the Ordinary Course;

(ii)    except to the extent required by applicable Law, entered into adopted, amended, modified or terminated any pension, retirement, welfare, bonus, profit-sharing, incentive, severance or other plan, contract, or commitment for the benefit of any of the current or former officers, managers or directors or any of the current or former employees of the Company or its Subsidiaries or committed to do any of the foregoing;

(iii)    increased the compensation or fringe benefits of, or paid any bonus to, any director, officer, manager, employee or consultant or other independent contractor, except for the payment of interim bonuses to members of the Seller's senior management consistent with past practice;

(iv)    except to the extent required by applicable Law, taken or failed to take any action, the result of which could reasonably be expected (with the passage of time, the consummation of the transactions contemplated hereby or otherwise) to (A) result in any representation and warranty of the Seller set forth in this Agreement ceasing to be true

25

and correct in any material respect, or (B) require a payment or give rise to any rights or any Person in connection with the transactions contemplated herein;

(v)      sold, leased, assigned, transferred, licensed, sublicensed, encumbered or otherwise disposed of any tangible asset, except in the Ordinary Course;

(vi)     accelerated the collection of Accounts Receivable, delayed the purchase of supplies, delayed capital expenditures, repairs or maintenance, or delayed payment of accounts payable or accrued expenses, except in the Ordinary Course;

(vii)    suffered any extraordinary losses or waived any rights of value (whether or not in the ordinary course of business or consistent with past practice) in excess of $50,000 in the aggregate; or

(viii)   taken, offered, proposed or authorized any of, or committed or agreed to take any of the foregoing actions.

3.18     Litigation; Compliance; Permits.  Except as set forth on the Schedule 3.18, there are no Actions related to the Business pending or, to Sellers' Knowledge, overtly threatened against any Seller, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign.  There are no outstanding Orders, judgments, injunctions or decrees of any court or Governmental Body against any Seller or, to Sellers' Knowledge, relating to any Action related to the Business that apply, in whole or in part, to Seller.  Since January 1, 2022, (a) no Seller has not violated any Law in any material respect; (b) no Seller has not been in default with respect to any Order applicable to any of the Acquired Assets; and (c) no Action has been pending or threatened against any Seller alleging any failure to comply with any Order or Law.

3.19     Brokerage.  There are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of Seller (other than the fees and expenses of Brown Gibbons Lang & Co. LLC, the Sellers' retained investment banker, which shall be paid by Sellers).

3.20     No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article III or in any Transaction Agreement, or the certificate delivered pursuant to Section 2.3(d) of this Agreement (the "Express Representations"), no Seller nor any other Person on behalf of any Seller makes, and each Seller expressly disclaims, any express or implied representation or warranty, whether at Law or in equity, with respect to any Seller, the Business, the Acquired Assets, the Excluded Assets, the Assumed Liabilities, any Affiliate of Seller or their respective businesses, affairs, assets, liabilities, condition (financial or otherwise), results of operations, future operating or financial results or prospects, or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including, without limitation, in any presentations or other materials prepared by Sellers or BGL) (the "Information Presentation") or in that certain datasite administered by Sellers or BGL (the "Dataroom").

26

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser represents and warrants to Sellers as of the date hereof and as of the Closing as follows.

4.1     <u>Organization and Qualification</u>. Purchaser is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement.

4.2     <u>Authorization of Agreement</u>. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the transactions contemplated hereby, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite limited liability company or similar organizational action and no other limited liability company or similar organizational proceedings on Purchaser's part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the transactions contemplated hereby. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Parties, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms.

4.3     <u>Conflicts; Consents.</u>

(a)     Assuming that (i) requisite Bankruptcy Court approvals are obtained and (ii) the notices, authorizations, approvals, Orders, Permits or consents set forth on <u>Schedule 4.3(a)</u> are made, given or obtained (as applicable), neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the transactions contemplated hereby, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (B) (w) violate any Law or Order applicable to Purchaser, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under, (x) give rise to a right of termination, modification or cancelation of any obligation or to the loss of any benefit under, (y) accelerate any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or (z) accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its subsidiaries, except, in the

27

case of clauses (C) and (D), as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the transactions contemplated hereby.

(b)     Except as set forth on Schedule 4.3(a), Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the transactions contemplated hereby, except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the transactions contemplated hereby.

4.4     Financing. At the Closing, Purchaser will have access to sufficient assets necessary to fully discharge all of its obligations under this Agreement, including the payment contemplated by Section 2.4(a).

4.5     Brokers. There is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

4.6     No Litigation. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will adversely affect Purchaser's performance of its obligations under this Agreement or the consummation of the transactions contemplated by this Agreement.

4.7     No Additional Representations or Warranties. Except for the representations and warranties contained in this Article IV, neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers by Purchaser.

### ARTICLE V
### BANKRUPTCY COURT MATTERS

5.1     Bankruptcy Actions.

(a)     Within one (1) day of the date hereof, Sellers shall file a notice or other appropriate document with the Bankruptcy Court seeking approval of the sale of the Acquired Assets pursuant to the Bidding Procedures Order and proposed form of Sale Order, including the approval the execution, delivery and performance of this Agreement by Sellers, and the Sale Order and any modification to the Bidding Procedures or the Bidding Procedures Order shall be in form and substance acceptable to Purchaser and Sellers.  Sellers may modify the motion seeking approval of the Sale Order pursuant to discussions with the Office of the United States Trustee, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Cases or any other party in interest, following notice to and approval by Purchaser.  In the event of any discrepancy between this Agreement and the Bidding Procedures Order, and the Sale Order, the Sale Order shall govern.

(b)     Sellers shall provide Purchaser with proposed drafts of all applications, pleadings, notices, proposed Orders and other documents to be filed by Sellers in the Bankruptcy Cases that relate to this Agreement, the transactions contemplated by this Agreement, the Bidding Procedures, the Bidding Procedures Order, or the Sale Order, and shall use commercially reasonable efforts to provide such drafts at least one (1) Business Day prior to the making of any such filing with or submission to the Bankruptcy Court.  Seller shall promptly notify Purchaser upon receipt of any notice of termination of Sellers' use of cash collateral or any notice of an event of default under Sellers' debtor-in-possession ("DIP") financing facility (if applicable).

(c)     Upon the execution of this Agreement, Sellers shall designate Purchaser as the Successful Bidder under the Bid Procedures Order and shall file a notice of such designation with the Bankruptcy Court along with a copy of this Agreement.

(d)     From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII and (ii) the Closing Date, the Parties shall use their respective commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order. Purchaser shall promptly take all actions as are reasonably requested by Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court for the purposes of, among other things, providing adequate assurance of future performance by Purchaser under the Assigned Contracts and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and did not engage in collusive bidding under section 363(n) of the Bankruptcy Code.  In the event the entry of the Sale Order is appealed, the Parties shall use commercially reasonable efforts to defend such appeal(s).

(e)     Each Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other or as required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including, upon reasonable request, promptly furnishing the other with copies of notices or other communications received by Sellers or Purchaser, as applicable, from the Bankruptcy Court with respect to the transactions contemplated by this Agreement.

(f)     From and after the date hereof, Sellers shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification, or staying of the Bidding Procedures Order or the Sale Order or consummation of the transactions contemplated hereby.  From and after the date hereof, Purchaser shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification, or staying of the Bidding Procedures Order, or the Sale Order or consummation of the transactions contemplated hereby.

5.2     Cure Costs. Subject to entry of the Sale Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs.

1618520946.11
1618520946.11

5.3    Sale Order. The Sale Order shall, among other things: (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of their obligations under this Agreement and (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances); (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts; (c) declare any provisions in any Assigned Contract that purport to prohibit, restrict, or condition the assignment of such Contract to Purchaser or provide for the termination or modification of an Assigned Contract based on the filing of a bankruptcy case, the financial condition of the Debtors or similar circumstances to be unenforceable and of no force an effect; (d) find that Purchaser is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code and grant Purchaser the protections of section 363(m) of the Bankruptcy Code; (e) find that Purchaser is not a successor to any Seller; (f) find that Purchaser shall have no Liability or responsibility for any obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liability of any kind or character, including any theory of antitrust, environmental, successor or transferee Liability, labor law, de facto merger or substantial continuity; (g) include robust findings that Sellers provided adequate actual and constructive notice to holders of claims and interests impacted by the Sale Order, sufficient to sell the Acquired Assets free and clear of any such claims or interests; (h) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance under the Assigned Contracts; (i) find that Purchaser shall have no Liability for any Excluded Liability; (j) such other terms that are required for the indefeasible sale and transfer of the Acquired Assets to Purchaser free and clear of liens, claims and encumbrances as may be required under the Bankruptcy Code.

5.4    Approval. Sellers' obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Bidding Procedures Order and Sale Order). Nothing in this Agreement shall require Sellers or their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor to their respective stakeholders or the Bankruptcy Court.

## ARTICLE VI
## COVENANTS AND AGREEMENTS

6.1    Conduct of Business of Sellers.  Except (i) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or agreements governing Sellers' DIP financing or use of cash collateral, as the case may be, (ii) as expressly required by this Agreement, (iii) as authorized by the Bankruptcy Court, or (iv) as set forth on Schedule 6.1(a), during the period from April 1, 2025 until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII) unless Purchaser otherwise consents in writing, Sellers shall, with respect to the Business and Acquired Assets, (A) perform all functions necessary to conduct the Business in the Ordinary Course pursuant to an operating budget that provides reasonable detail of all costs and expenses to be directly incurred in the ongoing operation of the Business, which is approved by the Parties and Seller's secured lenders, (B) preserve the present operations, organization and goodwill of the Business, (C) preserve the present relationships with customers of the Business, (D) not take, offer, propose or authorize any of, or commit or agree to take any

30

of, the actions described in <u>Section 3.17</u>, (E) not make any changes, modifications, amendments or other actions with respect to any customer contract or license agreement, or any obligation arising thereunder; (F) not make any compromise, settlement for less than all amounts owed or any other agreement or arrangement with any customer of the Business relating to any obligation of such customer to any Seller that is to be included in the Acquired Assets, including, but not limited to, any Assumed Contract; and (G) not accept any prepayments from customers except in the Ordinary Course for use in the operation of the Business. From April 1, 2025 until the Closing, Accounts Receivable that are related to the Business under <u>Section 1.1(b)</u> hereof shall be used to fund, operate, and otherwise carry on the Business in the Ordinary Course as contemplated under this paragraph.

6.2    <u>Access to Information.</u>

(a)    From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to <u>Article VIII</u>), Sellers will, and will cause their respective Advisors to, provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the offices, properties, appropriate officers, employees, accountants, auditors, counsel and other representatives, books and records (including Tax records) of Sellers, the Acquired Assets or the Assumed Liabilities, in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Assets and the Assumed Liabilities as is reasonably necessary in order to consummate the transactions contemplated by this Agreement and in connection with transitional and operational planning purposes; <u>provided</u>, access shall not unreasonably interfere with the normal operations of any Seller; <u>provided, further</u>, that Sellers shall not be required to provide access to materials or disclose information to the extent such access or disclosure would (i) jeopardize any legally recognized privilege, including attorney-client privilege or other attorney work-product privilege, (ii) violate applicable Laws, or (iii) violate any confidentiality obligations due and owing to third parties by Seller or its Affiliates in a manner that may create an Administrative Claim.

(b)    The information provided pursuant to this <u>Section 6.2</u> will be governed by all the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein, and the Parties agree that the terms of the Confidentiality Agreement shall continue in full force and effect until the Closing. Purchaser will abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors.

(c)    For a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Cases), Purchaser will provide Sellers and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, at Sellers' expense, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings and other documents (for the purpose of examining and copying) solely relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser (including for the purpose of better understanding the books and records), in each case, in connection with the preparation or

1618520946.11
1618520946.11

amendment of tax returns, claims or obligations relating to Excluded Liabilities; <u>provided</u>, that Purchaser shall not be required to provide Sellers with any such access to the extent necessary to (i) ensure compliance with any applicable Law or an Order of the Bankruptcy Court, (ii) preserve any applicable privilege (including the attorney-client privilege) or (iii) comply with any contractual confidentiality obligations (<u>provided</u>, that Purchaser shall use commercially reasonable efforts to allow for such access in a way that would not have any of the foregoing effects); <u>provided</u>, <u>further</u>, that such access shall not unreasonably interfere with the business or operations of the business of Purchaser following Closing; <u>provided</u>, <u>further</u>, that Purchaser shall not be required to provide Sellers with any such access in connection with a legal proceeding between Purchaser or any of its Affiliates, on the one hand, and any Seller or any of its Affiliates, on the other hand. Unless otherwise consented to in writing by Sellers, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Sellers such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of to the extent that such approach is consistent with Sellers' historic document retention practices with respect to the Business.

(d)     Sellers will use commercially reasonable efforts to facilitate that, as of the Closing, those certain employees or contractors identified by the Purchaser within five (5) Business Days of the date hereof shall enter into consulting agreements with the Purchaser or an Affiliate of Purchaser on reasonably acceptable terms to Purchaser.  From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to <u>Article VIII</u>), Sellers will provide Purchaser and its Advisors with reasonable access to the Persons set forth on <u>Schedule 6.2(d)(i)</u> (the "<u>COD Advisors</u>").  From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to <u>Article VIII</u>), Sellers will direct that the COD Advisors reasonably cooperate with Purchaser in responding to questions and serving as a resource for transition and integration related questions that Purchaser and its Advisors may have with respect to the transactions contemplated by this Agreement and the integration of the Business into the business of Purchaser.  Within two (2) Business Days of the date of this Agreement, if requested by Purchaser, Sellers shall provide Purchaser, in a format reasonably acceptable to Purchaser, documentation supporting the Business' processes for its financing activities (including accounts receivable, accounts payable, payroll and cash management), human resource activities (including on and off boarding and immigration processing), and other corporate processes reasonably required to support the Business; <u>provided</u>, that Sellers shall not be required to disclose information to the extent such disclosure would (i) jeopardize any legally recognized privilege, including attorney-client privilege or other attorney work-product privilege, (ii) violate applicable Laws, or (iii) violate any confidentiality obligations due and owing to third parties by Seller or its Affiliates in a manner that may create an Administrative Claim.  From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to <u>Article VIII</u>), Sellers will provide Purchaser and its Advisors with reasonable access to the IT systems set forth on <u>Schedule 6.2(d)(ii)</u> for the purpose of preparing to consummate the transactions hereunder; <u>provided</u>, that Sellers shall not be required to disclose information to the extent such disclosure would (i) jeopardize any legally recognized privilege, including attorney-client privilege or other attorney work-product privilege, (ii) violate applicable Laws, or (iii) violate any confidentiality obligations due and owing to third parties by Seller or its Affiliates in a manner that may create an Administrative Claim.

(e)     From and after the date of this Agreement, Sellers shall keep confidential non-public information in their possession (other than information which was or becomes available

32

to Sellers on a non-confidential basis from a source other than Purchaser or any of its Affiliates) in respect of Purchaser; provided, however, that Sellers shall not be liable hereunder with respect to any disclosure to the extent such disclosure is required pursuant to legal process (including pursuant to the assertion of Sellers' rights under this Agreement or the Bankruptcy Code) (by interrogatories, subpoena, civil investigative demand or similar process), regulatory process or request, or to the extent such disclosure is reasonably necessary for purposes of compliance by Sellers or their respective Affiliates with tax or regulatory reporting requirements; provided, that in the event of any disclosure pursuant to legal process, Sellers shall exercise commercially reasonable efforts to preserve the confidentiality of the non-public information disclosed, including by cooperating with Purchaser (at Purchaser's sole cost) to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the non-public information required to be disclosed.

      6.3    <u>Employee Matters.</u>

      (a)    No later than one (1) Business Day after the date of this Agreement, Sellers shall make available to Purchaser an updated Employee Census with respect to each Business Employee (including to reflect any employee resignations, deaths, new hires, terminations of employment, or compensation changes that are not prohibited by this Agreement (including pursuant to <u>Section 6.1</u> hereof), as well as updated amounts of accrued and unused vacation and paid time off for each Business Employee) and to the extent Closing does not occur within twenty (20) Business Days of the date such updated Employee Census is provided to Purchaser, upon written request from Purchaser, Seller shall provide a further updated Employee Census with respect to each Business Employee, provided that Seller shall not be required to provide Purchaser with more than one updated Employee Census in any twenty (20) Business Day period.  Prior to the Closing, Purchaser shall make offers of employment to substantially all Business Employees pursuant to the terms of this <u>Section 6.3</u> (collectively, the "<u>Offered Employees</u>"); provided, that any such offer of employment shall be in writing and shall be extended within two (2) Business Days after the entry of the Sale Order.  Such offers of employment will provide for a position and base salary or wage rate (as applicable) that is similar to such Offered Employee's position and base salary or wage rate (as applicable) immediately prior to the Closing, will provide for an acknowledgement from the applicable Offered Employee that if he or she accepts such offer of employment from Purchaser, he or she shall not be entitled to receive any severance payments or benefits from Seller upon such employee's termination of employment with Seller at the Closing, and will be conditioned on such Offered Employee satisfactorily completing Purchaser's standard hiring procedures (a "<u>Transfer Offer</u>").  Any Transfer Offer that is accepted shall become effective immediately after the Closing; provided, however, that with respect to any Transfer Offer made to an Offered Employee who is on an approved leave of absence as of the Closing Date, such offer will be effective as of such date, not to exceed six (6) months following the Closing Date, when such Offered Employee returns to active employment.  Offered Employees who accept such Transfer Offers and begin active employment with Purchaser in accordance with this <u>Section 6.3(a)</u> shall be referred to herein as "<u>Transferred Employees</u>."  Purchaser shall notify Sellers in a reasonable timeframe, but no later than the anticipated Closing Date, with respect to whether a Transfer Offer has been accepted or rejected. Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all of the Business Employees will accept a Transfer Offer or will continue in employment with Purchaser following the Closing for any period of time. Purchaser shall carry out all necessary actions to effect the

timely transfer of employment to it of each such Transferred Employee who has received and accepted a Transfer Offer; provided, that Sellers shall reasonably cooperate with the Purchaser in carrying out such actions. Effective as of the Closing, each Transferred Employee shall cease to be an employee of each Seller or its respective Affiliates.

(b)     For the period beginning on the Closing Date and ending on December 31 of the year in which the Closing occurs (or, if sooner, ending the date on which the applicable Transferred Employee's employment with Purchaser ends), Purchaser shall undertake to provide each Transferred Employee with: (i) a base compensation or wage rate, as applicable, that is similar to that provided to such Transferred Employee as of immediately prior to the Closing; and (ii) other employee benefits (but excluding any deferred compensation, equity or equity-based incentive, long-term incentive, or transaction bonus, or any defined benefit pension or retiree medical or death benefits (the "Excluded Benefits")) that are substantially comparable in the aggregate to, at the discretion of the Purchaser, (y) those provided by Purchaser or its Affiliates to similarly situated employees of Purchaser or its Affiliates, or (z) those provided by Seller immediately prior to the Closing Date. For purposes of eligibility, vesting and determining level of benefits under the benefit plans and programs maintained by Purchaser or any of its Affiliates after the Closing Date (the "Purchaser Plans"), each Transferred Employee shall be credited with his or her years of service with Sellers (and any predecessor thereof) before the Closing Date, except for purposes of any Excluded Benefits or to the extent such credit would result in a duplication of benefits.

(c)     Without limiting the generality of any other provision of this Agreement: (i) Purchaser shall make commercially reasonable efforts to provide that each Transferred Employee shall be immediately eligible to participate, without any waiting time, in any and all Purchaser Plans; (ii) for purposes of each Purchaser Plan providing health or welfare benefits, Purchaser shall take commercially reasonable efforts to cause all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Plan to be waived for such Transferred Employee and his or her covered dependents (unless such exclusions or requirements were applicable under comparable Seller Plans); and (iii) Purchaser shall make commercially reasonable efforts to cause any co-payments, deductible and other eligible expenses incurred by such Transferred Employee or his or her covered dependents during the plan year in which the Closing Date occurs to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Purchaser Plan, subject to Sellers providing sufficient documentation to Purchaser regarding any such amounts to be so credited.

(d)     For any Transferred Employees who are principally based outside the United States, the provisions of this Section 6.3 shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law.

(e)     To the extent necessary for any Transferred Employee to perform services in connection with such Transferred Employee's employment with Purchaser or any of its Affiliates, Sellers shall release or cause to be released each Transferred Employee from any existing non-competition, non-solicitation, no-hire, confidentiality or other similar obligation owed to Sellers or any of its Affiliates.

(f)     All provisions contained in this Agreement with respect to employee benefit plans or compensation of Transferred Employees are included for the sole benefit of the respective parties hereto.  Nothing contained herein (i) shall confer upon any former, current or future employee of Sellers or Purchaser or any legal representative or beneficiary thereof any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period, or any term or condition of employment, (ii) shall cause the employment status of any former, present or future employee of Sellers or Purchaser to be other than terminable at will, (iii) shall confer any third party beneficiary rights upon any current or former employee of Sellers, including any Transferred Employee or any dependent or beneficiary thereof or any heirs or assigns thereof or (iv) shall be construed to establish or be treated as an amendment or modification of any employee benefit plan, program, agreement, arrangement, or policy.

6.4     <u>Notices and Consents</u>.  Sellers will give all notices to, make all filings with and use their commercially reasonable efforts to obtain all authorizations, consents or approvals from any Governmental Body or other Person that are set forth or are required to be set forth on <u>Schedule 3.3</u>, <u>provided</u>, <u>that</u>, Sellers shall not make or cause their Advisors to make any agreement or understanding affecting the Acquired Assets or the Business as a condition for obtaining any such waivers, consents or approvals, except with the prior written consent of Purchaser.

6.5     <u>Further Assurances</u>. From time to time prior to, on and following the Closing Date, upon the request of either Sellers or of Purchaser, each of the parties hereto shall do, execute, acknowledge, and deliver all such further acts, assurances, deeds, assignments, transfers, conveyances, and other instruments and papers as may be reasonably required or appropriate to carry out, give effect to and/or evidence the transactions contemplated hereunder. All payments and reimbursements received by Sellers or any of their Affiliates after the Closing to the extent arising out of the Business after the Closing or otherwise relating to the Acquired Assets shall be held by such person in trust for the benefit of Purchaser and, promptly upon receipt by such Person of any such payment or reimbursement, such Person shall pay over to Purchaser the amount of such payment or reimbursement.

6.6     <u>Receipt of Misdirected Assets; Liabilities.</u>

(a)     From and after the Closing, if any Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset, the applicable Seller shall transfer or cause such of its Affiliates to transfer such right, property or asset in the same form as received (and shall endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, within five (5) business days of receipt, and such asset will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall transfer or cause such of its Affiliates to transfer such asset in the same form as received (and shall endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the applicable Seller, within five (5) business days of receipt, and such asset will be deemed the property of such Seller held in trust by Purchaser for such Seller until so transferred.

(b)     From and after the Closing, if any Seller or any of its respective Affiliates is subject to a Liability that should belong to Purchaser pursuant to the terms of this Agreement,

35

such Seller shall promptly transfer or cause such of its Affiliates to transfer such Liability to Purchaser, and Purchaser shall assume and accept such Liability. From and after the Closing, if Purchaser or any of its Affiliates is subject to a Liability that should belong to a Seller pursuant to the terms of this Agreement, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such Liability to the applicable Seller, and such Seller shall accept such Liability.

6.7     Publicity.  No public announcement or disclosure will be made by any party with respect to the subject matter of this Agreement or the transactions contemplated hereunder without the prior written consent of Purchaser and Sellers; provided, however, that Purchaser and Sellers shall reasonably cooperate in connection with issuing mutually acceptable press releases following the date hereof; provided, further, however, that the provisions of this Section 6.7 will not prohibit (a) any disclosure required by any applicable Laws or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, (b) any disclosure made in connection with the enforcement of any right or remedy relating to the transactions contemplated hereunder and (c) any disclosure by Purchaser or Sellers or their respective Affiliates to report and disclose the status of this Agreement and the transactions contemplated hereunder in the Ordinary Course to its Affiliates or financing sources.

6.8     Intellectual Property and Business Continuity Matters.

(a)     For all licenses of IT Assets used by the Business that are shared among the Business and Sellers' retained businesses, Sellers shall reasonably cooperate with Purchaser in contacting the relevant vendor(s) to request and cause the applicable units used by the Business to be transferred and/or assigned, as applicable, to Purchaser by such vendor(s) prior to, and effective upon, the Closing.

(b)     Notwithstanding anything to the contrary contained herein, with respect to any Intellectual Property that is an Acquired Asset hereunder **and** is subject to the Debtors' obligations under section 6.10(c) of that certain Asset Purchase Agreement, dated as of March 2, 2025, as amended by that certain letter agreement, dated as of March 28, 2025, which was approved by the Consulting Sale Order, the Purchaser assumes all of the Debtors' post-closing obligations thereunder and reaffirms the non-exclusive licenses to use the trademarks described therein and granted for the benefit of the Consulting Purchaser thereunder in all respects.

(c)     For the IT Assets and Licensed Intellectual Property that are not Assigned Contracts, prior to Closing, Sellers shall use commercially reasonable efforts to contact the relevant vendors and licensors and cause the applicable agreements (e.g., license, subscription, and master services agreements) to be transferred and/or assigned, as applicable, effective as of Closing, to Purchaser by such vendor(s) and licensor(s).

(d)     Where both the ownership and control of the applicable accounts are not being transferred to Purchaser as of Closing, prior to Closing, Sellers shall use commercially reasonable efforts to identify the data files and other information stored on its systems that relate to the Business and transfer all such data files and other information to Purchaser in a format reasonably acceptable to Purchaser at the Closing.

36

6.9     Seller Confidentiality.  After the Closing, Sellers agree not to disclose or use at any time (and such Person shall cause its Affiliates not to use or disclose at any time) any Seller Confidential Information.  After the Closing, Seller further agrees to take all appropriate steps (and to cause its Affiliates to take all appropriate steps) to safeguard such Seller Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft.  In the event any Seller or any of their respective Affiliates is required by Law or legal process to disclose any Seller Confidential Information after the Closing, the applicable Seller(s) shall promptly notify Purchaser in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and such Seller(s) shall cooperate with Purchaser to preserve the confidentiality of such information consistent with applicable Law.

6.10    Other Bids.  Purchaser acknowledges that, pursuant to the Bidding Procedures Order, Sellers have prior to the date of this Agreement, solicited bids from other prospective purchasers for the sale of all of the Acquired Assets; provided, however, that, following execution of this Agreement until the Closing, Seller shall not, directly or indirectly, through any officer, director, employee, agent, professional or advisor, solicit any Alternative Transaction or participate in any negotiations or discussions with respect to any Alternative Transaction, and Sellers shall not, and Sellers shall cause their Affiliates not to, (i) execute an agreement (other than a customary confidentiality agreement) with respect to an Alternative Transaction or (ii) seek or support Bankruptcy Court approval of a motion or Order inconsistent in any material respect with the transactions contemplated by this Agreement.

6.11    Post-Petition Accrued Rent.  Notwithstanding anything herein to the contrary, Sellers shall be solely responsible for, and shall pay to the applicable landlords to which the obligations are owed promptly following the Closing Time, and they shall pay within two (2) Business Days of the entry of the Sale Order, all undisputed accrued rent and other fees and charges due in respect of all leasehold interests in the Assumed COD Locations for the period beginning from and after the Petition Date and ending through March 31, 2025 (collectively, the "March Stub Rent").  To the extent any March Stub Rent is unpaid as of the Closing, Purchaser shall be permitted to pay such remaining amounts of the applicable Assumed COD Location landlords at Closing and any amounts paid shall be deducted from the Cash Purchase Price.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1     Conditions Precedent to the Obligations of Purchaser and Seller.  The respective obligations of each Party to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers and Purchaser), on or prior to the Closing Date, of each of the following conditions:

(a)     no Governmental Body shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement that is still in effect, and no action seeking to restrain, enjoin, or otherwise prohibit the transactions contemplated by this Agreement shall be pending; and

(b)    the Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order, in form and substance acceptable to Sellers and Purchaser, and such Bidding Procedures Order and Sale Order shall be in full force and effect, not have been stayed, reversed, modified or amended and have become a Final Order, or, alternatively with respect to the Sale Order, the Sale Order finds that Purchaser is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code and grant Purchaser the protections of section 363(m) of the Bankruptcy Code.

7.2    <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    (i) the representations and warranties made by Sellers in <u>Article III</u> (in each case, other than the Fundamental Representations) shall be true and correct in all respects as of the date hereof and as of the Closing Date as though made on and as of the Closing Date, except (A) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (B) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect (<u>provided</u>, that for purposes of the foregoing clauses, the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect) and (ii) the representations and warranties set forth in <u>Sections 3.1</u>, <u>3.2</u>, <u>3.3(b)(i)</u>, <u>3.4</u>, <u>3.6</u> and <u>3.19</u> (collectively, the "<u>Fundamental Representations</u>") shall be true and correct in all material respects as of the date hereof and as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all material respects only as of such date;

(b)    Sellers shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by them on or prior to the Closing;

(c)    The Sale Order shall have become a Final Order or the Sale Order includes a finding that Purchaser is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code and grant Purchaser the protections of section 363(m) of the Bankruptcy Code;

(d)    Since the date of this Agreement, no fact, event or circumstance shall have occurred or arisen that, individually or in combination with any other fact, event or circumstance, has had or would reasonably be expected to have a Material Adverse Effect; and

(e)    Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 2.3</u>.

7.3    <u>Conditions Precedent to the Obligations of Sellers</u>. The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    the representations and warranties made by Purchaser in <u>Article IV</u> shall be true and correct in all respects as of the date hereof and as of the Closing Date as though made on and as of the Closing Date, except (i) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (ii) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby (<u>provided</u>, that for purposes of the foregoing clauses, the qualifications as to materiality and material adverse effect contained in such representations and warranties shall not be given effect);

(b)    Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing;

(c)    The Sale Order shall have become a Final Order or the Sale Order includes a finding that Purchaser is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code and grant Purchaser the protections of section 363(m) of the Bankruptcy Code; and

(d)    Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in <u>Section 2.4</u>.

## ARTICLE VIII
## TERMINATION

8.1    <u>Termination of Agreement</u>. This Agreement may be terminated only in accordance with this <u>Section 8.1</u>. This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Sellers and Purchaser;

(b)    by written notice of either Purchaser or Sellers, upon the issuance of an Order by a Governmental Body restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; <u>provided</u>, that no Party may terminate this Agreement under this <u>Section 8.1(b)</u> if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c)    by written notice of either Purchaser or Sellers, if the Closing shall not have occurred on or before April 30, 2025 (the "<u>Outside Date</u>") <u>provided</u>, <u>that</u>, the right to terminate this Agreement pursuant to this <u>Section 8.1(c)</u> will not be available to (i) Purchaser, in the event that a breach of or inaccuracy in any representation or warranty of, or a breach or violation of a covenant or agreement of, Purchaser contained in this Agreement was the primary cause of the failure to consummate the transactions contemplated by this Agreement by the Outside Date, and (ii) Sellers, in the event that a breach of or inaccuracy in any representation or warranty of, or a breach or violation of a covenant or agreement of Sellers contained in this Agreement was the primary cause of the failure to consummate the transactions contemplated by this Agreement by the Outside Date;

(d)     by Purchaser if either (i) there has been a breach of, or inaccuracy in, any representation or warranty of Sellers contained in this Agreement, or (ii) Sellers have breached the Bidding Procedures Order, or the Sale Order or violated any of the covenants and agreements contained in this Agreement, in each case, which breach, inaccuracy or violation would give rise to a failure of a condition set forth in Section 7.2 and cannot be or, if capable of cure, has not been cured by the earlier of (A) seven (7) Business Days after Purchaser notifies Sellers in writing of such breach or violation and (B) the Business Day prior to the Outside Date; provided, that, Purchaser will not have the right to terminate this Agreement pursuant to this Section 8.1(d) if Purchaser is then in breach or violation of any of its representations, warranties or covenants or agreements contained in this Agreement in a manner that would result in a failure of a condition set forth in Section 7.3;

(e)     by Sellers if either (i) there has been a breach of, or inaccuracy in, any representation or warranty of Purchaser contained in this Agreement, or (ii) Purchaser will have breached the Bidding Procedures Order or the Sale Order or violated any of its covenants and agreements contained in this Agreement, in each case which breach, inaccuracy or violation would give rise to a failure of a condition set forth in Section 7.3 and cannot be or, if capable of cure, has not been cured by the earlier of (A) seven (7) Business Days after Sellers notify Purchaser in writing of such breach or violation and (B) the Business Day prior to the Outside Date; provided, that, Sellers will not have the right to terminate this Agreement pursuant to this Section 8.1(e) if Sellers are then in breach or violation of any of their representations, warranties or covenants or agreements contained in this Agreement in a manner that would result in a failure of a condition set forth in Section 7.2;

(f)     by written notice from Purchaser to Sellers, if Sellers shall fail to file the Notice of Successful Bidder with the Bankruptcy Court within one (1) Business Day following the date of this Agreement;

(g)     by written notice from either Purchaser or Sellers, if the Bankruptcy Court has not entered the Sale Order by April 25, 2025;

(h)     by written notice from Purchaser to Sellers, if Sellers file a motion requesting, consent to, fail to timely contest pleading seeking, or the Bankruptcy Court, *sua sponte*, orders, which order is not timely contested by Sellers, (A) a conversion of any of the Bankruptcy Cases of any Seller into a liquidation proceeding under chapter 7 of the Bankruptcy Code, (B) the dismissal of any of the Bankruptcy Cases of any Seller, or (C) the appointment of a chapter 11 trustee or examiner with expanded powers in any of the Bankruptcy Cases of any Seller;

(i)     by written notice from either Sellers or Purchaser, if any of Sellers or their respective governing bodies or members determine in good faith upon advice of outside of legal counsel that proceeding with the transactions contemplated under the Transaction Agreements or failing to terminate this Agreement would be inconsistent with its fiduciary duties;

(j)     by written notice from Sellers to Purchaser, if (i) all of the conditions set forth in Section 7.1 and Section 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived, (ii) Sellers have notified Purchaser in writing that (A) they are ready, willing

40

and able to consummate the Closing, and (B) all conditions set forth in <u>Section 7.3</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or that they are willing to waive any unsatisfied conditions set forth in <u>Section 7.3</u>; (iii) Sellers have given Purchaser written notice at least two (2) Business Days prior to such termination stating Sellers' intention to terminate this Agreement pursuant to this <u>Section 8.1(j)</u> if Purchaser fails to consummate the transactions contemplated herein within one (1) Business Day of the date of such notice; and (iv) Purchaser fails to consummate the transactions contemplated herein within one (1) Business Day of the date of such notice; or

(k)    by written email notification from either Sellers or Purchaser, if



8.2    <u>Effect of Termination.</u>

(a)    In the event of termination of this Agreement pursuant to <u>Section 8.1</u>, this Agreement shall forthwith become void, and no Party nor any of its partners, officers, directors, managers or equity holders will have any Liability under this Agreement; <u>provided</u>, that <u>Section 2.2</u>, <u>Section 6.2(b)</u>, this <u>Section 8.2</u> and <u>Article X</u> shall survive any such termination; <u>provided</u>, <u>further</u>, that no termination will relieve any Party from any Liability for damages, losses, costs or expenses resulting from Fraud by such Party or any Willful Breach of this Agreement prior to the date of such termination. Subject to <u>Section 10.12</u>, nothing in this <u>Section 8.2</u> will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

(b)    Subject in all cases to <u>Section 10.12</u>, prior to the Closing, in the event of any breach by Sellers of this Agreement, Purchaser may, as its sole and exclusive remedy at law or in equity, either: (i) terminate this Agreement in accordance with <u>Section 8.1</u>, (ii) waive such breach by Sellers and consummate the transactions contemplated hereby in accordance with the terms of this Agreement, or (iii) specifically enforce Sellers' obligation to consummate the transactions contemplated hereunder in accordance with the terms and conditions of this Agreement.

**ARTICLE IX**
**TAXES**

9.1    <u>Transfer Taxes.</u>  Subject in all respects to section 1146 of the Bankruptcy Code and/or to the extent not exempt under any Final Order, any applicable sales, use, purchase, conveyance fees, registration, transfer, franchise, deed, fixed asset, stamp, documentary, or other

41

Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby (the "Transfer Taxes") shall be equally borne between Sellers, on the one hand, and by Purchaser, on the other hand. Purchaser shall timely pay, or cause to be paid, and file, or cause to be filed, all Tax Returns related to any Transfer Taxes, and if required by applicable Law, Sellers will, and will cause their Affiliates to, join in the execution of any such Tax Returns. Purchaser shall be entitled to reimbursement from Sellers to the extent it pays the Sellers' portion of any Transfer Taxes. Upon payment of any Transfer Tax, Purchaser shall present a statement to Sellers setting forth the amount of reimbursement to which Purchaser is entitled, together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed. Sellers shall make such reimbursement promptly but in no event later than ten (10) days after the presentation of such statement.

9.2    Allocation of Cash Purchase Price. For U.S. federal and applicable state and local income Tax purposes, Purchaser, Sellers, and their respective Affiliates shall allocate the Cash Purchase Price (and any Assumed Liabilities or other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the methodology set forth on Schedule 9.2 (the "Allocation Methodology"). Within 60 days following the determination of the final Cash Purchase Price, Purchaser shall prepare and provide a proposed allocation to Sellers setting forth the allocation of the Cash Purchase Price (and other amounts treated as part of the Cash Purchase Price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the Allocation Methodology (the "Allocation"). If Sellers deliver any written comments within 30 days after receipt of the draft Allocation proposed by Purchaser, then Purchaser and Sellers negotiate in good faith to agree on the Allocation. If Purchaser and Sellers are unable to resolve any such disagreement, the disputed items shall be referred to an independent accounting firm to be mutually agreed upon by Purchaser and Sellers (the "Nonpartisan Accountants") for resolution. The Nonpartisan Accountants shall be directed to render a written report on the unresolved disputed items with respect to the allocation of the Cash Purchase Price (and all other amounts required to be treated as consideration for U.S. federal income Tax purposes) as promptly as practicable, but in no event more than 30 days after such submission to the Nonpartisan Accountants, and to resolve only those unresolved disputed items set forth in the Sellers written comments delivered to the Purchaser. The Allocation (i) as delivered by Purchaser (if any objections thereto are not timely submitted by Seller pursuant to this Section), (ii) as revised to reflect agreed revisions by Seller and Purchaser, or (iii) as determined by the Nonpartisan Accountants, in each case, pursuant to this Section, shall be hereinafter referred to as the "Final Allocation". Each Party and its respective Affiliates shall file all Tax Returns (including, but not limited to IRS Form 8594) in accordance with the Final Allocation (as finally determined under this Section 9.2) and not take any Tax related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Tax Code.

9.3    Cooperation. Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other, in connection with the filing of Tax Returns and any Action with respect to Taxes.

9.4    Apportionment of Taxes. All real property Taxes, personal property Taxes, and similar ad valorem obligations (but excluding, for the avoidance of doubt, any Transfer Taxes)

42

levied with respect to the Acquired Assets for a taxable period that includes (but does not end on) the Closing Date (collectively, the "Apportioned Taxes") and the costs related to the filing of all applicable filings, reports and returns with respect to the Apportioned Taxes will be apportioned between Sellers, on the one hand, and Purchaser, on the other hand, based on the number of days in the taxable period prior to the Closing. Sellers will be liable for the proportionate amount of Apportioned Taxes and related costs attributable to days before (and including) the Closing Date and Purchaser will be liable for the proportionate amount of Apportioned Taxes and related costs attributable to days after the Closing Date.

9.5    Tax Returns. Sellers shall provide Purchaser with copies of all non-income Tax Returns related to the Business within fifteen (15) Business Days following the Closing Date.

### ARTICLE X
### MISCELLANEOUS

10.1    Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms and nothing in this Section 10.1 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Sellers acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or Sellers' Affiliates, as the case may be, that the agreements contained in this Section 10.1 (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this Section 10.1, none of the Parties would enter into this Agreement. Nothing in this Agreement shall limit the remedies available to any Party in connection with any claim based on Fraud.

10.2    Expenses. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, any Expense Reimbursement that becomes payable, and Section 8.2), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all Cure Costs will be allocated pursuant to Section 5.2 and (b) all Transfer Taxes will be allocated pursuant to Section 9.1.

10.3    Notices. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered,

1618520946.11
1618520946.11

(b) when transmitted by electronic mail (provided no message of non-delivery is received), (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Parties.

<u>Notices to Purchaser</u>:

MidCap Capital Investments, LLC
1108 Lavaca Street
Suite 110-279
Austin, TX 78701
Email: jblack@midcap.com
Attention: Jeff Black

Klehr Harrison Harvey Branzburg LLP
919 N. Market Street, Suite 1000
Wilmington, DE 19801
Email: rbeck@klehr.com
Attention: Richard M. Beck

Blank Rome LLP
125 High Street
Boston, MA 02110
E-mail:        William.Sopp@blankrome.com

Attention:     William Sopp

<u>Notices to Sellers</u>:

Azzur Group, LLC
330 South Warminster Road, Suite 341
Hatboro, Pennsylvania 19040
E-mail:        ben.jones@ankura.com
Attention:     Ben Jones, Chief Restructuring Officer


with copies to (which shall not constitute notice):

DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Email:         benjamin.winger@us.dlapiper.com
               katie.allison@us.dlapiper.com

Attention:     W. Benjamin Winger

44

Katie Allison

10.4    Binding Effect; Assignment. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases; provided, that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Sellers, as applicable, and any attempted assignment or delegation without such prior written consent shall be null and void; provided, further, that Purchaser may freely assign its rights and obligations, in whole or in part, to one or more Affiliates or to any of its financing sources without the consent of Sellers (including, without limitation, any rights and obligations of Purchaser in and to any of the Acquired Assets and Assumed Liabilities hereunder, including the leasehold and other interests set forth in Section 1.1(o)), so long as Purchaser continues to remain liable for its obligations hereunder to Sellers.

10.5    Amendment and Waiver. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Sellers or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6    Third Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    Non-Recourse. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Agreement Dispute.

10.8    Severability. Each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement Purchaser determines is not material to this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9    Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have

been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10   Schedules. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; provided, that each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules in which it is reasonably apparent on the face of such disclosure that the information is required to be included in such other section of the Schedules, and any disclosure in the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11   Complete Agreement. This Agreement, together with the Confidentiality Agreements and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control, and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12   Specific Performance. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) Sellers and Purchaser will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 10.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Sellers nor

Purchaser would have entered into this Agreement. Notwithstanding anything herein to the contrary, while Sellers may pursue both a grant of specific performance to the extent permitted by this Section 10.12 and the payment of the Deposit (to the extent permitted under Section 2.6(a)(ii) and 2.6(b)), under no circumstances shall Sellers be permitted or entitled to receive both a grant of specific performance to consummate the transactions contemplated hereunder and payment of the Deposit (unless the Cash Purchase Price is paid in full at Closing in accordance with the terms of Section 2.6(a)(i) in which case, the Deposit shall be released to Purchaser at Closing) or other damages. The Parties acknowledge and agree that either Sellers or Purchaser pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 10.12 will not be required to provide any bond or other security in connection with any such Order. The remedies available to Sellers and Purchaser pursuant to this Section 10.12 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller or Purchaser from seeking to collect or collecting damages. In no event will this Section 10.12 be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty made by any Seller herein.

10.13   Jurisdiction and Exclusive Venue. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the transactions contemplated hereby and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "Agreement Dispute ") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Court of Chancery and any state court sitting in the State of Delaware to which an appeal from the Delaware Court of Chancery may be validly taken (or, if the Delaware Court of Chancery declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) ((a) and (b), the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of forum non-conveniens. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

10.14   Governing Law; Waiver of Jury Trial.

(a)     Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such state without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15   <u>Counterparts and PDF</u>. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.16   <u>Bulk Sales Laws</u>. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other

similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

10.17    Time of Essence. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

10.18    Sellers' Representative. Each Party agrees that Azzur Group, LLC has the power and authority to unilaterally act on behalf of all or any of Sellers for the purposes specified under this Agreement. Such power will include the power to make all decisions, actions, Consents and determinations on behalf of Sellers, including to make any waiver of any Closing condition or agree to any amendment to this Agreement. No Seller shall have any right to object, dissent, protest or otherwise contest the same. Purchaser shall be entitled to rely on any action or omission taken by Azzur Group, LLC on behalf of Sellers.

## ARTICLE XI
## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1    Certain Definitions.

(a)    "Accounts Receivable" means accounts receivable and prepaid contract amounts, inclusive of unbilled receivables, held by Sellers that relate to the Business, that were acquired or arose from sales actually made or services actually performed in the ordinary course of business of the Business that represent bona fide transactions and valid claims, are not subject to any setoff, counterclaim or action and are enforceable in accordance with their terms, except to the extent of any specific reserves against such accounts receivable are reflected on the most recent Financial Statements.

(b)    "Action" means any action, claim (including a counterclaim, cross-claim, or defense), cause of action, demand, complaint, summons, suit, litigation, charge, arbitration, mediation, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before any Governmental Body.

(c)    "Administrative Claim" means any claim for administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 506(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code

(d)    "Advisors" means, with respect to any Person, any investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(e)    "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause

the direction of the management, affairs and policies of such Person, whether through ownership of greater than 50% of the voting securities, by Contract or otherwise.

(f)    "Alternative Transaction" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Sellers and their Affiliates or Purchaser and its Affiliates) acquires (i) beneficial ownership of a majority of the equity interests of Sellers or (ii) the Business or substantially all of the Acquired Assets, in each case, whether by merger, sale of assets or equity, recapitalization, plan of reorganization or otherwise.

(g)    "Assumed COD Location" collectively means the following locations where Seller has operated the Business:  Burlington, Massachusetts; Waltham, Massachusetts, and Raleigh, North Carolina.

(h)    "Auction" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(i)    "Backup Bidder" means the next highest bidder after the Successful Bidder at the Auction.

(j)    "Bidding Procedures" means the bidding procedures attached as Exhibit C to the Bidding Procedures Order and approved by the Bankruptcy Court pursuant to the Bidding Procedures Order and as amended and supplemented with the consent of Purchaser.

(k)    "Bidding Procedures Order" means the Order of the Bankruptcy Court, in form and substance satisfactory to Purchaser approving the Bidding Procedures. The form of Bidding Procedures Order is attached hereto as Exhibit C (as may be modified and amended with the prior written consent of Purchaser).

(l)    "Business" means the cleanroom-on-demand business of Sellers engaged in providing cleanroom facilities to the life sciences industry.

(m)    "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(n)    "Business Employee" means any current employee of Sellers or any of their Affiliates whose duties and responsibilities are primarily related to the Business, which the Parties agree is comprised of the list of employees set forth on the Employee Census, subject to updates following the date hereof pursuant to Section 6.3(a).

(o)    "Cash and Cash Equivalents" means all of each Seller's cash (including checks and deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, money orders, certificates of deposits, time deposits, bankers' acceptances, commercial paper, marketable securities, short-term investments, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, and any other cash equivalents whether on hand, in transit, in banks or other financial institutions, or otherwise held and other cash equivalents and liquid investments.

1618520946.11
1618520946.11

(p)     "<u>Confidentiality Agreements</u>" means that certain confidentiality agreement or other arrangement(s) governing the Parties' sharing of confidential and/or non-public information.

(q)     "<u>Consent</u>" means either (i) any approval, consent, ratification, permission, waiver or authorization or (ii) an Order of the Bankruptcy Court that deems or renders the same unnecessary or unenforceable.

(r)     "<u>Contract</u>" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, including any statements of work, purchase orders or similar ancillary agreements or arrangements which are issued or entered into pursuant to, or in accordance therewith.

(s)     "<u>Cure Costs</u>" means all cure costs required to be paid either (1) pursuant to section 365 of the Bankruptcy Code, or (2) as may otherwise have been agreed as between Buyer and the applicable Counterparty, in connection with the assumption and assignment of the Assigned Contracts as agreed between Buyer and the applicable Counterparty.

(t)     "<u>Counterparty</u>" means a non-Debtor counterparty to a Contract, including any Affiliate of a Counterparty listed on <u>Schedule 1.5(a)</u>.

(u)     "<u>Deposits</u>" means all deposits (including maintenance deposits and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses that have been prepaid by any Seller, in each case, in respect of any Assigned Contract or relating to the Acquired Assets or the Assumed Liabilities.

(v)     "<u>Documents</u>" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.) and other similar materials, in each case, whether or not in electronic form, that primarily relate to the Business.

(w)     "<u>Encumbrance</u>" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, covenant, debenture, lease, license, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, occupancy rights, Orders, rights of first refusal, rights of first offer, rights of way, setoff or recoupment rights, restrictions, servitude, preemptive rights, preference, priority, community property interest or restriction, conditional sale or other title retention agreements or installment or finance Contract, and any other similar impositions, imperfections or defects of title or restrictions on transfer or use, in each case, of any type, nature, or kind whatsoever, whether disclosed or undisclosed, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, accrued or unaccrued, asserted or unasserted, recorded or

51

unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material, disputed or undisputed, direct or indirect, and regardless of whether currently exercisable, whether arising prior to or subsequent to the Petition Date, and whether imposed by agreement, understanding, law, equity or otherwise. "Encumbrance" shall include all Claims and Encumbrances as defined in the Sale Order.

(x)     "Environmental Laws" means all applicable Laws concerning pollution or protection of the environment or human health and safety.

(y)     "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

(z)     "ERISA" means the Employee Retirement Income Security Act of 1974.

(aa)     "ERISA Affiliate" means any trade or business, whether or not incorporated, that, together with any Seller, is or would be considered a "single employer" within the meaning of Section 414 of the Code or Section 4001 of ERISA.

(bb)     "Escrow Account" means a segregated interest-bearing escrow account established by the Escrow Agent to hold the Deposit pursuant to the terms of the Escrow Agreement.

(cc)     "Escrow Agent" means Citibank, N.A.

(dd)     "Escrow Agreement" means an escrow agreement to be entered into by the Purchaser, Sellers and the Escrow Agent.

(ee)     "Excluded Environmental Liabilities" means all Liabilities of any Seller arising from or relating to (i) fines or penalties associated with noncompliance with Environmental Law, (ii) the presence of Hazardous Substances at any Leased Real Property, (iii) any Action alleging exposure prior to the Closing to Hazardous Substances.

(ff)     "Final Order" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court that has not been reversed, vacated, revoked, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided, that, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

52

(gg)    "FDA" means the U.S. Food and Drug Administration.

(hh)    "Fraud" means common law fraud under the Laws of the State of Delaware with respect to the representations and warranties set forth in this Agreement, in any Transaction Agreement or any certificate to be delivered hereto.

(ii)    "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(jj)    "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(kk)    "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court, or mediator, arbitrator or arbitral body of any applicable jurisdiction.

(ll)    "Governmental Healthcare Program" means the Medicare and Medicaid Programs, the CHAMPUS Program, the TRICARE Program, and any other federal or state reimbursement program involving payment of governmental funds (including "Federal health care programs" as defined in 42 U.S.C. § 1320a-7b(f)).

(mm)    "Hazardous Substance" means any material, substance or waste regulated under any Environmental Laws due to its harmful or deleterious properties.

(nn)    "Healthcare Laws" means all health care regulatory Laws applicable to the Business and any items and services provided by the Business, including all Laws relating to: (i) the licensure, certification, qualification or authority to transact the Business; (ii) the solicitation or acceptance of improper incentives involving persons operating in the health care industry; (iii) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended; (iv) the Medicare Program Laws at Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395lll, including specifically, the Ethics in Patient Referrals Act (the "Stark Law"), as amended, 42 U.S.C. § 1395nn; (v) Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (the Medicaid statute); (vi) the Federal Health Care Program Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); (vii) the False Claims Act, 31 U.S.C. §§ 3729-3733 (as amended); (viii) the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; (ix) the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51-58; (x) the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7a and 1320a-7b; (xi) the Exclusion Laws, 42 U.S.C. § 1320a-7; (xii) the Federal Health Care Fraud Law (18 U.S.C. § 1347); (xiii) TRICARE, 10 U.S.C. § 1071; (xiv) the Patient Protection and Affordable Care Act (Pub. L. 111-148) as amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111-152); (xv) the Eliminating Kickbacks in Recovery Act (18 U.S.C. § 220) and any state equivalents thereto; and (xvi) all applicable regulations, rules, ordinances, judgments and orders promulgated under each of the foregoing, and any similar foreign, federal, state and local statutes, regulations, rules, ordinances, judgments and orders.

(oo)    "HIPAA" means the Health Insurance Portability and Accountability Act of 1996, including the Standards for Privacy of Individually Identifiable Health Information (45 CFR Part 160 and Part 164, Subparts A, D and E), the Transactions and Code Set Standards (45 CFR Part 162), and Security Standards for the Protection of Electronic Protected Health Information (45 CFR Part 164, Subparts A and C), and all other implementing regulations in effect, and the Health Information Technology for Economic and Clinical Health Act provisions of the American Recovery and Reinvestment Act of 2009 set forth at 42 U.S.C. § 17931 et seq., and all implementing regulations thereof.

(pp)    "Indebtedness" means all indebtedness for borrowed money (i) owed by the Sellers under a credit facility or (ii) evidenced by any note, bond, debenture or other debt security issued by Seller and also shall include (A) any obligation incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in current liabilities and incurred in respect of property purchased in the ordinary course of business, (B) the face amount of all letters of credit issued for the account of Sellers, (C) obligations (whether or not such Seller has assumed or become liable for the payment of such obligation) secured by Encumbrances, (D) capitalized lease obligations, (E) overdue trade payable, (F) all guarantees and similar obligations of Seller, (G) all accrued interest, fees and charges in respect of any Indebtedness, and (H) all prepayment premiums and penalties, and any other fees, expenses, indemnities and other amounts payable as a result of the prepayment or discharge of any Indebtedness.

(qq)    "Intellectual Property" means all rights, title and interests in and to all intellectual property rights of every kind and nature, however denominated, throughout the world, including the following: (i) patents, patent applications and patent disclosures; (ii) trademarks, service marks, trade dress, trade names, logos, brands, corporate names and Internet domain names, together with all goodwill associated with each of the foregoing; (iii) social media accounts and handles; (iv) copyrights and works of authorship; (v) confidential and proprietary information and trade secrets, including methods, processes, procedures, designs, drawings, technical data, customer lists, know-how and any other information that derives actual or potential value from not being generally known to the public (collectively, "Trade Secrets"); (vi) rights in Software, databases and data, and all other rights in technology; (vii) rights of privacy and publicity and moral rights; and (viii) any registrations, applications or other rights arising under Law or Contract relating to any of the foregoing.

(rr)    "Information Privacy and Security Laws" means all applicable Laws concerning the use, collection, protection, Processing, storage, transfer, privacy and/or security of Personal Data, and all regulations promulgated thereunder, including, where applicable, HIPAA, state data privacy and breach notification laws (including the California Consumer Privacy Act and the California Privacy Rights Act), state social security number protection laws, any applicable Laws concerning requirements for website and mobile application privacy policies and practices, data or web scraping, call or electronic monitoring or recording or any outbound communications (including, outbound calling and text messaging, telemarketing, and e-mail marketing), the European Union Directive 95/46/EC, Regulation (EU) 2016/679 and section 3 of the European Union (Withdrawal) Act 2018 and the UK Data Protection Act 2018, the European Union ePrivacy Directive (Directive 2002/58/EC) and applicable implementing laws, the Federal Trade Commission Act, the Gramm Leach Bliley Act, the Fair Credit Reporting Act, the Fair and

1618520946.11
1618520946.11

Accurate Credit Transaction Act, the CAN-SPAM Act, the Telephone Consumer Protection Act, Children's Online Privacy Protection Act, and state consumer protection laws.

(ss) "IT Assets" means all information technology and computer systems, including Software, information technology and telecommunication hardware, workstations, servers, routers, switches, endpoints, electronics, firmware, firewalls and other Equipment, and related information technology or outsourced services, and all electronic connections between them, in each case, owned, leased, licensed or used by Sellers in connection with the Business.

(tt) "IRS" means the United States Internal Revenue Service.

(uu) "Knowledge of Seller", "Knowledge of Sellers", or words of like import means the knowledge, after reasonable inquiry, of Ryan Ott, James Kalinovich, Ray Jaffe, Ilya Vasserman, and Sarah Stevens.

(vv) "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, Order, requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(ww) "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine or contribution obligation of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(xx) "Material Adverse Effect" means any circumstance, change, effect, event, occurrence, state of facts or development (collectively, "Events") that, individually or taken together with all other Events, has had or would be reasonably expected to have in the future a material adverse effect on (a) the results of operations, liabilities or conditions (financial or otherwise), properties or assets of the Sellers or Business, taken as a whole, or (b) the ability of Sellers to consummate the transactions contemplated by this Agreement; provided, however, that in the case of clause (a), a "Material Adverse Effect" shall not include any Events to the extent resulting from: (i) conditions generally affecting the industry in which the Business participates; (ii) changes in general United States or global economic, monetary, or financial conditions, including changes in prevailing interest rates, credit markets, or financial market conditions; (iii) political conditions (or changes in such conditions) or acts of war (whether or not declared), sabotage, armed hostilities, or terrorism; (iv) any effect resulting from any action taken by any Party hereto that is expressly required hereunder or by applicable Law (or taken by any Seller or any of its Affiliates with the prior written consent or at the written request of Purchaser (and vice versa) or any failure of a Party to take any action that is expressly prohibited hereunder or by applicable Law (or not taken by any Seller or any of its Affiliates with the prior written consent or at the written request of Purchaser (and vice versa); or (v) any changes in applicable Laws or accounting rules, including GAAP or any authoritative implementation or enforcement of any of the foregoing; provided, further, however, that the Events described in prongs (i), (ii), (iii), or (v),

55

may be considered in determining whether a "Material Adverse Effect" has occurred to the extent that such conditions have a disproportionate effect on the Business as compared to other participants in the Business' industry (in which case, only the incremental disproportionate adverse effect may be taken into account in determining whether a Material Adverse Effect has occurred).

(yy)    "Open Source Software" means any Software (in source or object code form) that is subject to (a) a license commonly referred to as an "open source" or "free software" license (including any software licensed under the GNU General Public License, GNU Lesser General Public License, BSD License, or Apache Software License, or any other public source code license arrangement or any license defined as an open source license by the Open Source Initiative as set forth on www.opensource.org) or any other public source code license arrangement or any license defined as an open source license by the Open Source Initiative as set forth on www.opensource.org or (b) any other license or other agreement that requires, as a condition of the use, modification or distribution of Software subject to such license or agreement, that such Software or other Software linked with, called by, combined or distributed with such Software be (i) disclosed, distributed, made available, offered, licensed or delivered in source code form, (ii) licensed for the purpose of making derivative works, (iii) licensed under terms that allow reverse engineering, reverse assembly, or disassembly of any kind, or (iv) redistributable at no charge.

(zz)    "Order" means any order, injunction, order, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

(aaa)    "Ordinary Course" means the ordinary and usual course of operations of the Business taken as a whole consistent with past practice; *provided*, that, with respect to Devens COD, "Ordinary Course" shall take into account the anticipated wind-down of operations at such location on or before April 30, 2025.

(bbb)    "Permitted Encumbrances" means, to the extent not extinguished by the Sale Order (it being understood that the Sale Order shall extinguish Encumbrances to the maximum extent permissible under applicable Law): (i) Encumbrances for utilities and Taxes not yet due and payable, (ii) non-exclusive licenses of Intellectual Property granted by a Seller to their customers or service providers in the Ordinary Course in connection with the provision or receipt by such Seller of products or services, (iii) materialmens', mechanics', artisans', landlords', shippers', warehousemens', or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable or that are being contested in good faith by appropriate proceedings; (iv) Encumbrances that arise solely by reason of acts of Purchaser or its successors and permitted assigns or otherwise consented to by Purchaser in accordance with the terms of this Agreement or the Transaction Agreements, and (v) Encumbrances incurred or deposits made in the Ordinary Course in connection with workers' compensation, unemployment insurance and other types of social security.

(ccc)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(ddd)    "<u>Personal Data</u>" means any information that alone or in combination with other information (i) identifies, or could be used to identify, a Person, (ii) can be used to authenticate an individual (including employee identification numbers, social security numbers, government-issued identification numbers, passwords or PINs, financial account numbers, credit report information, biometric or health data, answers to security questions and other personal identifiers), and (iii) any information that is defined as "personal data," "personally identifiable information," "individually identifiable health information," "protected health information" or "personal information" under any applicable Information Privacy and Security Laws, including without limitation, Protected Health Information as defined under HIPAA.

(eee)    "<u>Privacy Policy</u>" means any published or publicly-facing policies and procedures relating to Personal Data.

(fff)    "<u>Process</u>" or "<u>Processing</u>" means any operation or set of operations which is performed on data, including Sensitive Data or sets of Sensitive Data, whether or not by automated means, such as the receipt, access, acquisition, collection, recording, organization, compilation, structuring, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transfer, transmission, dissemination or otherwise making available, alignment or combination, restriction, disposal, erasure or destruction.

(ggg)    "<u>Purchaser Group</u>" means Purchaser, any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(hhh)    "<u>Sale Hearing</u>" means that certain hearing before the Bankruptcy Court to consider entry of the Sale Order and approval of the Transaction Agreements and transactions contemplated thereunder.

(iii)    "<u>Sale Order</u>" means the Order of the Bankruptcy Court, in form and substance satisfactory to Purchaser, (i) approving this Agreement and the terms and conditions hereof, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (ii) approving and authorizing Sellers to consummate the transactions contemplated hereby, and (iii) containing the terms set forth in <u>Section 5.3</u>. The form of Sale Order is attached hereto as <u>Exhibit B</u> (as may be modified and amended with the prior written consent of Purchaser).

(jjj)    "<u>Schedules</u>" means the disclosure schedules and any other schedule to this Agreement.

(kkk)    "<u>Security Breach</u>" means any (i) unauthorized acquisition of, access to, loss of, or misuse (by any means) of Sensitive Data; (ii) unauthorized or unlawful Processing, sale, or rental of Sensitive Data; (iii) act or omission that compromises the security, integrity, or confidentiality of Sensitive Data, or (iv) phishing or other cyberattack that results in a monetary loss or a significant business disruption.

(lll)    "<u>Seller Confidential Information</u>" means confidential and proprietary information (including with respect to the Business Records) concerning Sellers, including information relating to financial statements, clients, customers, potential clients or customers, employees, advertisers, publishers, suppliers, equipment, designs, drawings, programs, strategies,

1618520946.11
1618520946.11

analyses, profit margins, sales, methods of operation, plans, products, technologies, materials, trade secrets, strategies, prospects or other proprietary information.

(mmm) "Seller Intellectual Property" means all Intellectual Property owned or purported to be owned by any Seller in connection with the operation of the Business.

(nnn)  "Seller Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), and (iii) stock option, stock purchase, stock appreciation right, other equity or equity-based incentive, loan, employment, consulting, severance, retention, bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, termination pay, fringe benefit or other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Sellers, to which Sellers are a party, to which any Seller is obligated to contribute or with respect to which any Seller has any Liability.

(ooo)  "Sensitive Data" means all (a) Personal Data and (b) Trade Secrets.

(ppp)  "Seller Software" means all Software developed by or on behalf of a Seller in connection with the operation of the Business or otherwise included in Seller Intellectual Property, in each case, including all past and present versions thereto, and all object code, source code, documentation, specifications, databases and build instructions related thereto.

(qqq)  "Software" means computer software programs, applications, algorithms and databases, including all source code, object code, firmware, specifications, designs and documentation therefor.

(rrr)  "Successful Bidder" is defined in the Bidding Procedures.

(sss)  "Tax" or "Taxes" means any U.S. federal, state or local, or non-U.S. or other income, gross receipts, capital gain, customs duties, environmental, license, capital stock, franchise, profits, withholding, social security (or similar, including FICA), payroll, employment, unemployment, severance, disability, premium, registration, conveyance, inventory, documentary, real property, ad valorem, personal property, stamp, excise, occupation, sales, use, transfer, value added, windfall profits, import, export, alternative or add-on minimum, escheat, abandoned or unclaimed property, financial transaction, or estimated tax, including any interest, penalty or addition thereto, in each case, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Tax Liability of any other Person.

(ttt)  "Tax Code" means the United States Internal Revenue Code of 1986, as amended.

(uuu)  "Tax Return" means any return, declaration, election, report, claim for refund, or information return or statement filed or required to be filed with any Governmental Body relating to any Tax, including any schedule or attachment thereto, and including any amendment thereof, and, further, including any information return, claim for refund, amended

return or declaration of estimated Tax, and including, where permitted or required, combined, consolidated or unitary returns for any group of entities that includes any Seller.

(vvv) "Transaction Agreements" means this Agreement, Bill of Sale, Escrow Agreement, the IP Assignment, and any other agreements, instruments or documents entered into pursuant to this Agreement.

(www) "Treasury Regulations" means the regulations issued under the Tax Code by the United States Department of the Treasury, as amended.

(xxx) "Union" means any labor union, works council or other employee representative body.

(yyy) "Willful Breach" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act.

11.2    Index of Defined Terms.

Acquired Assets ........................................................................................................ 2
Agreement ............................................................................................................... 1
Agreement Dispute.................................................................................................... 48
Allocation ............................................................................................................... 43
Allocation Methodology ........................................................................................... 43
Assigned Contracts ................................................................................................... 6
Assumed Benefit Plans ............................................................................................. 2
Assumed Liabilities .................................................................................................. 5
Available Contracts .................................................................................................. 6
Bankruptcy Cases..................................................................................................... 1
Bankruptcy Code...................................................................................................... 1
Bankruptcy Court ..................................................................................................... 1
Bankruptcy Rules...................................................................................................... 1
Bill of Sale .............................................................................................................. 9
Causes of Action ...................................................................................................... 2
Chosen Courts .......................................................................................................... 48
Closing .................................................................................................................... 9
Closing Date............................................................................................................. 9
Closing Time............................................................................................................. 12
Copyright Assignment Agreement.............................................................................. 9
Counterparties .......................................................................................................... 6
Cure Costs ............................................................................................................... 5
Dataroom ................................................................................................................. 26
Debtors .................................................................................................................... 1
Designation Deadline ................................................................................................ 7
Designation Notice.................................................................................................... 6
Disputed Contract..................................................................................................... 6
Employee Census ...................................................................................................... 22
Enforceability Exceptions .......................................................................................... 10

1618520946.11
1618520946.11

Environmental Permits ................................................................................................. 17
Excluded Assets .............................................................................................................. 3
Excluded Contracts ........................................................................................................ 4
Excluded Liabilities ........................................................................................................ 6
Express Representations ............................................................................................... 25
Extended Contract Period .............................................................................................. 6
Financial Statements ..................................................................................................... 11
Fundamental Representations ...................................................................................... 39
Indebtedness .................................................................................................................. 31
Information Presentation ............................................................................................... 26
Laws ............................................................................................................................... 16
Leased Real Property .................................................................................................... 14
Licensed Intellectual Property ...................................................................................... 18
Material Contract ........................................................................................................... 15
Material Customer ......................................................................................................... 24
Outside Date .................................................................................................................. 40
Parties .............................................................................................................................. 1
Party ................................................................................................................................. 1
Patent Assignment Agreement ........................................................................................ 9
Permits ........................................................................................................................... 16
Petition Date .................................................................................................................... 1
Purchase Price ................................................................................................................. 8
Purchaser ......................................................................................................................... 1
Purchaser Designee ......................................................................................................... 9
Purchaser Plans ............................................................................................................. 35
Registered Seller Intellectual Property ......................................................................... 17
Seller ................................................................................................................................ 1
Sellers ............................................................................................................................... 1
Top Vendor .................................................................................................................... 24
Transfer Offer ................................................................................................................ 35
Transfer Taxes ............................................................................................................... 43
Transferred Employees ................................................................................................. 35
WARN Act ..................................................................................................................... 36

11.3    Rules of Interpretation. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All

1618520946.11
1618520946.11

Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)    The words "to the extent" shall mean "the degree by which" and not simply "if."

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)    Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)    The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)    All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)    All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)    Any document or item will be deemed "delivered," "provided" or "made available" by Sellers, within the meaning of this Agreement if such document or item is (i) included in the Dataroom, (ii) actually delivered or provided to Purchaser or any of Purchaser's Advisors or (iii) made available upon request, including at Sellers' offices.

(k)    Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided, that for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance with, any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(l)    A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(m)    A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

*[Signature pages follow.]*

62

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>**PURCHASER**</u>:

**CHRYSALIS HOLDINGS LLC**

By: *W. Jeff Black*
W. Jeff Black (Apr 18, 2025 19:54 EDT)
Name: William (Jeff) Black
Title:   Manager

*[Signature Page to Asset Purchase Agreement]*

**SELLERS**:

**AZZUR GROUP, LLC**

By: _M Benjamin Jones_____
        46622479A69843E...
Name: Ben Jones
Title:  Authorized Signatory

**AZZUR – COD SERVICES LLC**

By: _M Benjamin Jones_____
        46622479A69843E...
Name: Ben Jones
Title:  Authorized Signatory

**AZZUR – COD BOSTON LLC**

By: _M Benjamin Jones_____
        46622479A69843E...
Name: Ben Jones
Title:  Authorized Signatory

**AZZUR – COD SAN FRANCISCO LLC**

By: _M Benjamin Jones_____
        46622479A69843E...
Name: Ben Jones
Title:  Authorized Signatory

**AZZUR – COD SAN DIEGO LLC**

By: _M Benjamin Jones_____
        46622479A69843E...
Name: Ben Jones
Title:  Authorized Signatory

*[Signature Page to Asset Purchase Agreement]*

**AZZUR – COD DEVENS LLC**

By: _M Benjamin Jones_____
    Signed by:
    46622179A69843E...
Name: Ben Jones
Title:   Authorized Signatory


**AZZUR – COD RALEIGH LLC**

By: _M Benjamin Jones_____
    Signed by:
    46622179A69843E...
Name: Ben Jones
Title:   Authorized Signatory


**AZZUR – COD BURLINGTON LLC**

By: _M Benjamin Jones_____
    Signed by:
    46622179A69843E...
Name: Ben Jones
Title:   Authorized Signatory


**AZZUR OF NE, LLC**

By: _M Benjamin Jones_____
    Signed by:
    46622179A69843E...
Name: Ben Jones
Title:   Authorized Signatory


**COBALT LLC**

By: _M Benjamin Jones_____
    Signed by:
    46622179A69843E...
Name: Ben Jones
Title:   Authorized Signatory


*[Signature Page to Asset Purchase Agreement]*

## APPENDIX 1

## ASSIGNED TRADEMARKS

*Registered Trademarks*

1. Mark: AG

   ▪ Serial Number: 98001348

   ▪ Registration Number: 7491740

   ▪ Associated with: Azzur Group, LLC

   ▪ Mark Image:



2. Mark: AZZUR

   ▪ Serial Number: 86262781

   ▪ Registration Number: 4754417

   ▪ Associated with: Azzur Group, LLC

   ▪ Mark Image:

# AZZUR

3. Mark: AZZUR

   ▪ Serial Number: 98001388

   ▪ Registration Number: 7491741

   ▪ Associated with: Azzur Group, LLC

   ▪ Mark Image:

# AZZUR

4. Mark: AG

   ▪ Serial Number: 88077747

   ▪ Registration Number: 5749280

   ▪ Associated with: Azzur Group, LLC

   ▪ Mark Image:



5. Mark: FROM DISCOVERY TO DELIVERY

   ▪ Serial Number: 88886670

   ▪ Registration Number: 6367771

   ▪ Associated with: Azzur Group, LLC

   ▪ Mark Image:

FROM DISCOVERY TO DELIVERY

6. Mark: THE SCIENCE OF SOCIALIZING

   ▪ Serial Number: 88722747

   ▪ Registration Number: 6145858

   ▪ Associated with: Azzur Group, LLC

   ▪ Mark Image:

THE SCIENCE OF SOCIALIZING

7.  Mark: FROM DISCOVERY TO DELIVERY

   ▪ Serial Number: 98001438

   ▪ Registration Number:  7491742

   ▪ Associated with: Azzur Group, LLC

   ▪ Mark Image:

FROM DISCOVERY TO DELIVERY

8.  Mark: SMART. SCALE. SUSTAIN

   ▪ Serial Number: 90101268

   ▪ Registration Number: 7122262

   ▪ Associated with: Azzur Group, LLC

9.  Mark: SMART. SCALE. SUSTAIN

   ▪ Serial Number: 98001484

   ▪ Registration Number: 7491744

   ▪ Associated with: Azzur Group, LLC

10.  Mark: YOU BRING THE SCIENCE, WE BRING THE COMPLIANCE

   ▪ Serial Number: 90080385

   ▪ Registration Number: 7122256

   ▪ Associated with: Azzur Group, LLC

11. Mark: YOU BRING THE SCIENCE, WE BRING THE COMPLIANCE

- Serial Number: 98001496

- Registration Number: 7491745

- Associated with: Azzur Group, LLC

*Pending Marks*

1. Mark: AG

- Serial Number: 98588985

- Associated with: Azzur Group, LLC

- Mark Image:



2. Mark: FROM DISCOVERY TO DELIVERY

- Serial Number: 98589073

- Associated with: Azzur Group, LLC

- Mark Image:

FROM DISCOVERY TO DELIVERY

3. Mark: AZZUR

- Serial Number: 98589017

- Associated with: Azzur Group, LLC

- Mark Image:

# AZZUR

4.  Mark: SMART. SCALE. SUSTAIN

    ▪  Serial Number: 98589090

    ▪  Associated with: Azzur Group, LLC

5.  Mark: YOU BRING THE SCIENCE, WE BRING THE COMPLIANCE

    ▪  Serial Number: 98589103

    ▪  Associated with: Azzur Group, LLC

**<u>Exhibit 2</u>**

**Assigned Contracts List**