**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>AZZUR GROUP HOLDINGS LLC, *et. al*),[1]<br><br>    Debtors. | Chapter 11<br><br>Case No. 25-10342(KBO)<br><br>(Jointly Administered)<br><br>**Re: D.I. 410, 531** |

**MEMORANDUM OF LAW (I) IN SUPPORT OF CONFIRMATION OF FIRST AMENDED COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN OF AZZUR GROUP HOLDINGS LLC AND ITS AFFILIATED DEBTORS, AND (II) OMNIBUS RESPONSE TO COMMITTEE'S AND U.S. TRUSTEE'S OBJECTIONS**

Stuart M. Brown (DE 4050)
**DLA PIPER LLP (US)**
1201 N. Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: Stuart.Brown@us.dlapiper.com

W. Benjamin Winger (admitted *pro hac vice*)
**DLA PIPER LLP (US)**
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Telephone: (312) 368-4000
Facsimile: (312) 236-7516
Email: Benjamin.Winger@us.dlapiper.com

*Counsel for the Debtors*

May 16, 2025
Wilmington, Delaware

---

[1]    A list of the Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Azzur. The mailing address for the Debtors is 485 Lexington Avenue, 10th Floor, New York, NY 10017.

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

JURISDICTION AND VENUE ........................................................................................4

BACKGROUND ...............................................................................................................5

I.     Procedural History .................................................................................................5

II.    Solicitation and Voting Results ............................................................................7

III.   Objections to Confirmation and Final Approval of Disclosure Statement ..........8

ARGUMENT .....................................................................................................................9

I.     Section 1129(a)(1): The Combined Disclosure Statement and Plan Complies with the Applicable Provisions of the Bankruptcy Code.................................................................9

    A.  The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. ...............................................................................................................10

    B.  The Plan Complies with Section 1123(a) of the Bankruptcy Code. ...........................12

        1.  Section 1123(a)(1): Designation of Classes of Claims and Interests....................12

        2.  Section 1123(a)(2): Specification of Unimpaired Classes....................................12

        3.  Section 1123(a)(3): Specification of Treatment of Classes Impaired by the Plan.12

        4.  Section 1123(a)(4): Equal Treatment within Each Class......................................12

        5.  Section 1123(a)(5): Adequate Means for Implementation. ..................................13

        6.  Section 1123(a)(6): Prohibition on the Issuance of Non-Voting Securities. .........13

        7.  Section 1123(a)(7): Provisions Regarding Officers and Directors. ......................14

    C.  The Plan Complies with Section 1123(b) of the Bankruptcy Code...........................14

        1.  Section 1123(b)(1): Impairment of Claims and Interests. ...................................14

        2.  Section 1123(b)(2): Executory Contracts. ..........................................................15

        3.  Section 1123(b)(3): Settlement of Any Claim by the Debtors. ............................15

        4.  Section 1123(b)(3): Retention of Claims or Equity Interests. ..............................16

        5.  The Releases, Exculpation, Section 1125(e), and Injunction Provisions under the Combined Disclosure Statement and Plan Are Appropriate under Section 1123(b)(3) and (6). ..............................................................................................17

           a.  The Releases by the Debtors Are Appropriate under Section 1123(b)(3). ......18

           b.  The Third-Party Release Is Consensual, Appropriate, and Complies with Section 1123(b)(6) of the Bankruptcy Code....................................................27

           c.  The Exculpation under the Combined Disclosure Statement and Plan Is Appropriate under Section 1123(b)(6)............................................................32

i

d.   The Section 1125(e) Provision Is Appropriate and Complies with the Bankruptcy Code. ..................................................................................34

e.   The Injunction under the Combined Disclosure Statement and Plan Is Appropriate and Should Be Approved............................................36

II.   The Plan Complies with Section 1129(a)(2) of the Bankruptcy Code. ...........................37

A.  The Debtors Have Complied with Section 1125, and the Disclosure Statement Should be Approved on a Final Basis. .....................................................................37

B.  The Debtors' Solicitation Complies with Section 1126 of the Bankruptcy Code. ......38

III.   Section 1129(a)(3): The Combined Disclosure Statement and Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law....................................................39

IV.   Section 1129(a)(4): The Combined Disclosure Statement and Plan Provides for Court Approval of Certain Administrative Payments...................................................................41

V.   Section 1129(a)(5): The Combined Disclosure Statement and Plan Discloses Post-Effective Date Management. ............................................................................................42

VI.   Section 1129(a)(6): The Combined Disclosure Statement and Plan Does Not Require Governmental Approval of Rate Changes. ........................................................................42

VII.   Section 1129(a)(7): The Combined Disclosure Statement and Plan Is in the Best Interests of Creditors. ....................................................................................................................42

VIII.   Section 1129(a)(8) Acceptance by Impaired Classes. ......................................................44

IX.   Section 1129(a)(9): The Combined Disclosure Statement and Plan Complies with Statutorily Mandated Treatment of Administrative Claims and Priority Tax Claims.......45

X.   Section 1129(a)(10): The Combined Disclosure Statement and Plan Has Been Accepted by at Least One Impaired Class of Claims..........................................................................45

XI.   Section 1129(a)(11): The Combined Disclosure Statement and Plan Is Feasible. ............45

XII.   Section 1129(a)(12): The Combined Disclosure Statement and Plan Provides for Payment of All Fees Under 28 U.S.C. § 1930. ................................................................................47

XIII.   Sections 1129(a)(13)-(16) Are Inapplicable. ..................................................................47

XIV.   Section 1129(b): The Combined Disclosure Statement and Plan Satisfies the "Cramdown" Requirements. .............................................................................................48

A.  Section 1129(b)(1): The Plan Does Not Unfairly Discriminate. ................................48

B.  Section 1129(b)(2): The Plan Is Fair and Equitable. ................................................50

XV.   Section 1129(c): Only One Combined Disclosure Statement and Plan............................50

XVI.   Section 1129(d): The Principal Purpose of the Combined Disclosure Statement and Plan Is Not Avoidance of Taxes or Section 5 of the Securities Act. .........................................50

XVII.  Section 1129(e): The Debtors' Chapter 11 Cases Are Not Small Business Cases............51

THE OBJECTIONS SHOULD BE OVERRULLED....................................................................52

THE DEBTORS' DISCLOSURE STATEMENT, SOLICITATION AND VOTING PROCEDURES SHOULD BE APPROVED ON A FINAL BASIS ...........................................59

CAUSE EXISTS TO WAVE A STAY OF THE CONFIRMATION ORDER ............................59

THE PROPOSED MODIFICATIONS TO THE COMBINED DISCLOSURE STATEMENT AND PLAN ARE APPROPRIATE................................................................................................60

CONCLUSION.................................................................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 203 N. LaSalle St. Ltd. P'ship*,
  190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *Bank of Am.*,
  526 U.S. 434 (1999) ......................................................................................48

*In re Abbotts Dairies of Pa., Inc.*,
  788 F.2d 143 (3d Cir. 1986) ............................................................................39

*In re Abeinsa Holding, Inc.*,
  562 B.R. 265 (Bankr. D. Del. 2016) ................................................................21

*In re Aleris Int'l, Inc.*,
  Case No. 09-10478, 2010 WL 3492664 (Bankr. D. Del. May 13, 2010) ...............48

*In re Alpha Latam Mgmt., LLC*,
  21-11109 (JKS) (Bankr. D. Del. Mar. 14, 2022) .........................................27, 59

*In re Am. Capital Equip. LLC*,
  688 F.3d 145 (3d. Cir. 2012) ............................................................................40

*In re Appgate*,
  Case No. 24-10956 (CTG) (Bankr. D. Del. Jun. 18, 2024) ................................57

*In re Appgate, Inc.*,
  Case No. 24-10956 (CTG) (Bankr. D. Del. June 18, 2024) ...............................31

*In re Armstrong World Indus., Inc.*,
  348 B.R. 111 (D. Del. 2006) .........................................................................9, 48

*Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 North LaSalle St. P'ship*,
  526 U.S. 415 (1999) ........................................................................................42

*In re Beach*,
  731 F. App'x 322 (5th Cir. 2018) .....................................................................16

*In re Blackhawk Mining LLC*,
  Case No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019) ................................26

*In re Bowflex Inc.*,
  Case No. 24-12364 (ABA) (Bankr. D.N.J. Aug. 19, 2024) .................................28

*Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*,
  764 F.2d 406 (5th Cir. 1985*)* ..........................................................................39

*In re Burns & Roe Enters., Inc.*,
   Case No. 08-4191 (GEB), 2009 WL 438694 (D.N.J. Feb. 23, 2009) ..................................... 60

*In re Cano Health, Inc.*,
   Case No. 24-10164 (KBO) .................................................................................................. 28

*In re Caribbean Petroleum Corp.*,
   512 B.R. 774 (Bankr. D. Del. 2014) ................................................................................... 19

*In re Century Glove, Inc.*,
   Civ. A. Nos. 90-400-SLR and 90-401-SLR, 1993 WL 239489 (D. Del. Feb.
   10, 1993) .............................................................................................................................. 39

*In re Chaparral Energy, Inc.*,
   Case No. 20-11947 (MFW) (Bankr. D. Del. Oct. 1, 2020) .................................................. 59

*In re Chapel Gate Apartments, Ltd.*,
   64 B.R. 569 (Bankr. N.D. Tex. 1986) .................................................................................. 40

*In re Checkout Holding Corp.*,
   Case No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019) .................................................... 26

*In re Chisholm Oil and Gas Operating, LLC*,
   Case No. 20-11593 (BLS) (Bankr. D. Del. Sept. 23, 2020) ................................................. 59

*In re DBSD N. Am., Inc.*,
   419 B.R. 179 (Bankr. S.D.N.Y. 2009), *aff'd*, Case No. 09-10156 (LAK), 2010
   WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part on other*
   *grounds*, 627 F.3d 496 (2d Cir. 2010) .................................................................................. 28

*In re Energy Future Holding Corp.*,
   Case No. 14-10979 (CSS) ............................................................................................. 57, 58

*In re Enron Corp.*,
   326 B.R. 497 (S.D.N.Y. 2005) ............................................................................................. 32

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans*
   *Ltd. P'ship)*,
   116 F.3d 790 (5th Cir. 1997) ............................................................................................... 39

*In re Future Energy Corp.*,
   83 B.R. 470 (Bankr. S.D. Ohio 1988) .................................................................................. 40

*In re Gigamonster Networks, LLC*,
   Case No. 23-10051 (JKS) (Bankr. D. Del. Aug. 30, 2024) .................................................. 28

*In re Glob. Safety Textiles Holdings LLC*,
   Case No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009) ..................... 60

*In re Greate Bay Hotel & Casino, Inc.*,
  251 B.R. 213 (Bankr. D.N.J. 2000) .................................................10

*Grogan v. Garner*,
  498 U.S. 279 (1991)...............................................................................9

*In re GT Real Estate Holdings LLC*,
  Case No. 22-10505 (KBO) (Bankr. D. Del. Dec. 16, 2022).................57

*Hargreaves v. Nuverra Env't Sols., Inc. (In re Nuverra)*,
  590 B.R. 75 (D. Del. 2018), *aff'd*, 834 F. App'x 729 (3d Cir. 2021), *as
  amended* (Feb. 2, 2021) .......................................................................48

*Harrington v. Purdue Pharma L.P.*,
  603 U.S. 204 (2024).............................................................29, 30, 52, 53

*In re Hercules Offshore, Inc.*,
  565 B.R. 732 (Bankr. D. Del. 2016) ....................................................56

*Heroes World Dist., Inc. v. MAFCO Holdings, Inc. (In re Marvel Entm't Grp.,
  Inc.)*,
  273 B.R. 58 (D. Del. 2002) ..................................................................18

*In re Horsehead Holding Corp.*,
  Case No. 16-10287 (CSS) (Bankr. D. Del. Sep. 9, 2016)....................26

*In re Indianapolis Downs, LLC*,
  486 B.R. 286 (Bankr. D. Del. 2013) ................................19, 27, 28, 57

*In re Insys Therapeutics, Inc.*,
  Case No. 19-11292 (KG) (Bankr. D. Del. Jan. 16, 2020)....................56

*In re Jambys, Inc.*,
  Case No. 24-10913 (KBO) (Sep. 12, 2024)..........................................28

*In re Jersey City Med. Ctr.*,
  817 F.2d 1055 (3d Cir. 1987)...............................................................10

*Key3media Grp., Inc. v. Pulver.Com, Inc. (In re Key3media Grp., Inc.)*,
  336 B.R. 87 (Bankr. D. Del. 2005) ......................................................16

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
  337 F.3d 314 (3d Cir. 2003)..................................................................36

*In re Legacy IMBDS, Inc.*,
  Case No. 23-10852 (KBO) (Bankr. D. Del. Feb. 21, 2024) .................57

*In re Lisanti Foods, Inc.*,
    329 B.R. 491 (D.N.J. 2005) .................................................................40

*In re Mallinckrodt PLC*,
    639 B.R. 837 (Bankr. D. Del. Feb. 8, 2022) .........................................47

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994).................................................19

*In re Millennium Lab Holdings II, LLC*,
    Case No. 15-12284 (LSS) (Bankr. D. Del. Dec. 15, 2015) ...................56

*Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*,
    25 F.3d 1132 (2d Cir. 1994).................................................................36

*Myers v. Martin* (*In re Martin*),
    91 F.3d 389 (3d Cir. 1996).............................................................15, 54

*In re NII Holdings, Inc.*,
    288 B.R. 356 (Bankr. D. Del. 2002) ....................................................39

*In re Northwestern Corp.*,
    Case No. 03-12872 (KJC), 2008 WL 2704341 (Bankr. D. Del. Jul. 10, 2008)......................16

*In re One Aviation Corp.*,
    Case No. 18-12309 (CSS) (Bankr. D. Del. Sep. 18, 2019)....................26

*In re Premier Int'l Holdings, Inc.*,
    Case No. 09-12019, 2010 WL 2745964 (CSS) (Bankr. D. Del. Apr. 29, 2010) ....................32

*In re Prosomnus, Inc.*,
    Case No. 24-10972 (JTD) (Bankr. D. Del. June 26, 2024)....................31

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000)......................................................31, 32, 39

*In re Pyxus Int'l, Inc.*,
    Case No. 20-11570 (LSS) (Bankr. D. Del. Aug. 21, 2020) ...................59

*In re RMBR Liquidation, Inc.*,
    Case No. 19-10234 (KBO) (Bankr. D. Del. June 12, 2019)...................57

*In re S & W Enter.*,
    37 B.R. 153 (Bankr. N.D. Ill. 1984) ......................................................9

*In re Samson Resources Corp.*,
    Case No. 14-11934 (CSS) (Bankr. D. Del. Feb. 13, 2017)....................26

*In re Skillsoft Corp.*,
 Case No. 20-11532 (MFW) (Bankr. D. Del. Aug. 6, 2020) ..................................................59

*In re Smith*,
 357 B.R. 60 (Bankr. M.D.N.C. 2006), *appeal dismissed*, Case No. 07-0030,
 2007 WL 1087575 (M.D.N.C. Apr. 4, 2007) .........................................................................43

*In re Spansion Inc., et al.*,
 Case No. 09-10690, 2010 WL 2905001 (Bankr. D. Del. April 16, 2010)........................32, 56

*In re TK Holdings Inc.*,
 Case No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) ...................................................26

*In re Tribune Co.*,
 464 B.R. 1262 (Bankr. D. Del. 2011) .................................................................................9, 22

*In re Tribune Co.*,
 476 B.R. 843 (Bankr. D. Del. 2012) .....................................................................................10

*In re True Value Company, LLC*,
 Case No. 24-12337 (KBO) (April 17, 2025) ....................................................................28, 52

*In re True Value Company, LLC*,
 Case No. 24-12447 (KBO) (Bankr. D. Del. Feb. 11, 2025) ...................................................53

*U.S. Bank. Nat'l Ass'n v. Wilmington Tr. Co. (In re Spansion)*,
 426 B.R. 114 (Bankr. D. Del. 2010) ............................................................................. *passim*

*United States v. Reorganized CF&I Fabricators of Utah, Inc.*,
 518 U.S. 213 (1996).............................................................................................................42

*In re Virgin Orbit Holdings, Inc.*,
 Case No. 23-10405 (KBO) (Bankr. D. Del. July 26, 2023)...............................................31, 56

*In re W.R. Grace & Co.*,
 475 B.R. 34 (D. Del. 2012)...................................................................................................39

*In re Wash. Mut., Inc.*,
 442 B.R. 314 (Bankr. D. Del. 2011) .........................................................................24, 27, 32

*In re Wheel Pros, LLC*,
 Case No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024) ....................................................57

*In re World Health Alts, Inc.*,
 344 B.R. 291 (Bankr. D. Del. 2006) .....................................................................................15

*In re Zenith Elec. Corp.*,
 241 B.R. 92 (Bankr. D. Del. 1999) ............................................................................. *passim*

**Statutes**

11 U.S.C. § 365 ............................................................................................................. 15, 59

11 U.S.C. § 503 .................................................................................................................... 44

11 U.S.C. § 523 .................................................................................................................... 53

11 U.S.C. § 365 ............................................................................................................. 15, 59

11 U.S.C. § 1107 ............................................................................................................ *passim*

11 U.S.C. § 1108 ..................................................................................................................... 5

11 U.S.C. § 1114 .................................................................................................................. 47

11 U.S.C. § 1122 ............................................................................................................ *passim*

11 U.S.C. § 1123 ............................................................................................................ *passim*

11 U.S.C. § 1124 ................................................................................................................... 4

11 U.S.C. § 1125 ............................................................................................................ *passim*

11 U.S.C. § 1126 .............................................................................................................. 4, 38

11 U.S.C. § 1127 ............................................................................................................. 59, 60

11 U.S.C. § 1129 ............................................................................................................ *passim*

28 U.S.C. § 157 ..................................................................................................................... 4

28 U.S.C. § 1334 .................................................................................................................. 4

28 U.S.C. § 1408 .................................................................................................................. 4

28 U.S.C. § 1409 .................................................................................................................. 4

28 U.S.C. § 1930 ................................................................................................................ 46

**Rules**

Del. Bankr. L.R. 3017 ......................................................................................................... 4

Fed. R. Bankr. P. 3017 ......................................................................................................... 4

Fed. R. Bankr. P. 3018 ......................................................................................................... 4

Fed. R. Bankr. P. 3019 ....................................................................................................... 60

Fed. R. Bankr. P. 3020 ................................................................................................4, 40, 59, 61

Fed. R. Bankr. P. 6004 ................................................................................................4, 59

Fed. R. Bankr. P. 6006 ................................................................................................59

Fed. R. Bankr. P. 9019 ................................................................................................4

**Other Authorities**

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977) ..............................................9

S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978) ...................................................9

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), by and through their undersigned counsel, DLA Piper LLP (US) ("DLA Piper"), hereby submit this memorandum of law (this "Memorandum") in support of confirmation of the *First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Azzur Group Holdings LLC and Its Affiliated Debtors*[2] (as may be further amended, supplemented, or otherwise modified from time to time, the "Combined Disclosure Statement and Plan" or the "Plan")[3] under sections 1125, 1126, 1129, 1145 and 1146 respectively,  of title 11 of the United States Code (the "Bankruptcy Code").

In support of confirmation of the Combined Disclosure Statement and Plan, the Debtors are also submitting the *Declaration of Clarissa D. Cu. Regarding the Solicitation and Tabulation of Votes on the First Amended Combined Disclosure Statement and Chapter 11 Plan of Azzur Group Holdings LLC and Its Affiliated Debtors*[4] (the "Voting Report"), and the *Declaration of M. Benjamin Jones in Support of Confirmation of the Debtors' First Amended Combined Disclosure Statement and Joint Chapter 11 Plan* (the "Jones Declaration"), which is being filed contemporaneously herewith, and are incorporated fully by reference into this Memorandum.  In further support of confirmation of the Combined Disclosure Statement and Plan, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

The Debtors commenced these Chapter 11 Cases with the goal of completing their prepetition sale process and realizing one or more value-maximizing transactions in the best

---

[2]       *See* D.I. 531.

[3]       Capitalized terms used but not defined in this notice shall have the meanings given to them in the Combined Disclosure Statement and Plan.

[4]       *See* D.I. 551.

interests of all stakeholders.  The Debtors commenced these Chapter 11 Cases with a Stalking Horse Purchaser for the Debtors' Consulting Business.  On May 6, 2025, the Debtors closed the Stalking Horse Sale Transaction for a purchase price of $56,000,000, plus the assumption of certain assumed liabilities.  Following a continued post petition marketing process, the Debtors closed the COD Business Sale Transaction with Chrysalis Holdings, LLC on April 30, 2025, for a purchase price of $600,000, plus the assumption of certain assumed liabilities.  Together with the prepetition sale of the Labs Business, the Sale Transactions preserved substantially all jobs for employees, paid substantially all creditors of the Consulting and Labs business in full, delivered a going-concern outcome for landlords and creditors of the COD business, and paved the way for increased recoveries for all other creditors of the Debtors, secured and unsecured alike—both in terms of cash to the estate and assumed liabilities.

The Debtors actively engaged in good faith, hard-fought, negotiations with their Prepetition Lender and DIP Lender, Manufacturers and Traders Trust Company ("M&T"), the Committee, various landlords, and other parties in interest regarding the best possible vehicle to make distributions to creditors and otherwise conclude the chapter 11 process as efficiently as possible— consummating two Sale Transactions *and* potentially the Plan in *less than three months since the Petition Date*.  The Plan also facilitates the Cash distributions to Holders of Allowed Class 4 Claims as contemplated under the M&T-UCC Settlement.

The Debtors efforts in these chapter 11 cases have succeeded.  The Plan is the final step in that process.  The results of such consensus are embodied in the Plan, which enjoys overwhelming support: *creditors holding more than 98% or 99.9% of all Claims, in amount, that voted on the Plan have voted to accept the Plan*.[5]  The Plan is consensual among all parties except the U.S.

---

[5] The only member of the Committee to have delivered a ballot on the Plan voted to *accept* the Plan, including the Debtor Release, and *opted into* the Third-Party Release.

Trustee and the Committee—who take issue primarily with the Debtor Release, Third-Party Release, and Exculpation. For the reasons set forth herein and as will be demonstrated by the evidentiary record at the Confirmation Hearing, each of the Debtor Release, Third-Party Release, and Exculpation is fully justified by the facts and circumstances of these chapter 11 cases and is consistent with the standards and practices applied in this jurisdiction. Neither the U.S. Trustee nor the Committee make any compelling argument to the contrary.

DLA Piper, acting at the direction of the Debtors' Chief Restructuring Officer, undertook a full and unfettered investigation into potential estate claims and causes of action, if any, that may be subject to the Debtor Release. DLA Piper reviewed thousands of documents, conducted five formal interviews, solicited (multiple times) input from the Committee,[6] and engaged with M&T and multiple other stakeholders in considering the scope of such release. Each of the Chief Restructuring Officer and DLA Piper concluded that there were no such viable, valuable estate claims or causes of action—let alone ones that reasonably could be expected to generate distributable value to Holders of Allowed General Unsecured Claims in excess of the projected $625,000 Cash Distribution to Class 4 and the contributions to the estates by each Released Party. The lead Debtor's board of directors agrees. M&T supports the Plan and the releases contained therein. So too do *98% or 99.9% of general unsecured creditors*, by claim amount, that voted on the Plan—the vast majority of which also consensually "opted into" the mutual release with the Debtors thereunder. Again, the Debtors will present evidence and further arguments in support of the Debtor Release at the Confirmation Hearing.

---

[6] The Committee has failed to identify a single potential estate claim or cause of action that would be subject to the Debtor Release—despite having deposed the Chief Restructuring Officer for three hours, received thousands of pages of discovery, more than two months on the job (including more than a month since publicly declaring potential issues with the Debtor Release), and the Debtors' multiple written requests that the Committee share its views as to any potential estate claim or cause of action that warrants any review whatsoever (none have been identified).

The Debtors submit this Memorandum and the Declarations to establish that the Combined Disclosure Statement and Plan is in the best interests of the Debtors' estates and creditors and meets the requirements for final approval of the Disclosure Statement under section 1125 of the Bankruptcy Code as well as confirmation of the Plan under section 1129 of the Bankruptcy Code. For the reasons detailed herein, the Debtors respectfully submit that the Court should approve the Disclosure Statement on a final basis and confirm the Plan.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction to consider confirmation of the Plan under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these Chapter 11 Cases is proper before the Court under 28 U.S.C. §§ 1408 and 1409.

2.      The Debtors consent to the entry of an order or judgment by the Court in connection with confirmation of the Plan if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

3.      The statutory predicates for confirmation of the Plan are sections 1122, 1123, 1124, 1125, 1126, and 1129 of the Bankruptcy Code, Rules 3017, 3018, 3020, 6004, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 3017-1 and 3017-3 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## BACKGROUND[7]

### I.    Procedural History

4.      On March 2, 2025, (the "Petition Date"), the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      To date, no request has been made for the appointment of a trustee or examiner. On March 14, 2025, the U.S. Trustee appointed the Committee to represent the interests of the unsecured creditors of the Debtors in the Chapter 11 Cases.[8]  On May 14, 2025, the U.S. Trustee filed an amended notice of appointment of the Committee.[9]

6.      The factual background regarding the Debtors, including their business operations and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of M. Benjamin Jones, Chief Restructuring Officer of the Debtors, In Support of the Debtor' Chapter 11 Petitions and First Day Pleadings.*[10]

7.      On March 7, 2025, the Debtors filed an initial version of the Combined Disclosure Statement and Plan.[11]  Contemporaneously therewith, the Debtors filed the *Motion of the Debtors for Entry of an Order (I) Approving the Combined Disclosure Statement and Plan on an Interim*

---

[7]      In addition to the facts set forth in this Memorandum, the factual background regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the commencement of these Chapter 11 Cases, and other pertinent facts relating to these Chapter 11 Cases are set forth in the Combined Disclosure Statement and Plan and the Jones Declaration.  Such facts are incorporated into this Memorandum by reference as though set forth fully herein.

[8]      *See* D.I. 99.

[9]      *See* D.I. 541.

[10]      *See* D.I. 12.

[11]      *See* D.I. 85.

*Basis for Solicitation Purposes Only; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Combined Disclosure Statement and Plan; (III) Approving the Form of Ballot and Solicitation Packages; (IV) Establishing the Voting Record Date; (V) Scheduling a Combined Hearing for Final Approval of the Adequacy of Disclosures in, and Confirmation of, the Combined Disclosure Statement and Plan; and (VI) Granting Related Relief* (the "Solicitation Motion").[12]

8.      On April 10, 2025, the Debtors filed a revised version of the Combined Disclosure Statement and Plan.[13]  On April 14, 2025, the Court entered an order (the "Solicitation Order"),[14] granting the Solicitation Motion.  The Solicitation Order approved the Disclosure Statement on a conditional basis for solicitation purposes only, which, among other things, established procedures to solicit and tabulate votes to accept or reject the Plan (the "Solicitation Procedures") and the notices, forms, and ballots used in connection therewith.

9.      Following the entry of the Solicitation Order, Stretto, Inc., the Debtors' claims and noticing agent and administrative advisor (the "Claims and Noticing Agent"), distributed the solicitation packages containing, among other things, the Combined Disclosure Statement and Plan and the applicable ballots to all members of the Voting Classes (as defined below) entitled to vote to accept or reject the Plan in accordance with the Solicitation Procedures.[15]

---

[12]      *See* D.I. 86.

[13]      *See* D.I. 386.

[14]      *See* DI. 407.

[15]      *See* D.I. 431, 451, 501, 518, 528, 543 & 544.

10.     On April 21, 2025, the Debtors published the notice of the Confirmation Hearing[16] (the "Confirmation Hearing Notice") in the *Wall Street Journal.*[17]

11.     On April 28, 2025, the Debtors filed the *Notice of Filing of Plan Supplement to the Combined Disclosure Statement and Joint Chapter 11 Plan* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan Supplement").[18]

12.     On May 7, 2025, the Debtors filed the *Notice of First Supplement to the Plan Supplement for the Combined Disclosure Statement and Joint Chapter 11 Plan* (the "First Supplement to Plan Supplement").[19]

13.     On May 12, 2025, the Debtors filed the *First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Azzur Group Holdings LLC and Its Affiliated Debtors.*[20]

## II.    Solicitation and Voting Results

14.     On May 14, 2025, the Debtors completed solicitation on the Plan.  The consolidated voting results are set forth below.[21]

---

[16]     "Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider (i) final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (ii) confirmation of the Combined Disclosure Statement and Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

[17]     *See* D.I. No. 446.

[18]     *See* D.I. 502.

[19]     *See* D.I. 552.

[20]     *See* D.I. 531.

[21]     On May 16, 2025, the Debtors filed that certain *Supplemental Declaration of Clarissa Cu Regarding the Solicitation and Tabulation of Votes on the First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Azzur Group Holdings LLC and its Affiliated Debtors* [D.I. 559] (the "Supplemental Voting Declaration").  As set forth in the Supplemental Voting Declaration, in the interest of transparency and without prejudice in any respect to the Debtors' rights to argue otherwise, the Voting Agent included an alternative tabulation summary at the Committee's request whereby the L.E.A.F. Pharmaceutical claim was tabulated at $1.00, instead of $190 million as asserted in the filed Proof of Claim, for purposes of tabulating votes for Class 4.  Applying this alternative tabulation, Class 4 would have accepted the Plan by Claim amount of 98%, instead of 99.9%.  In either scenario, Class 4

| Total Ballots Counted | | | | | | | Opt-Out Releases |
|---|---|---|---|---|---|---|---|
| Voting Class | Voting Class Description | Accepting | | Rejecting | | Class Voting | Opt-Out Box Checked |
| | | Number | Amount | Number | Amount | Result | Number |
| Class 3 | M&T Claims | 1 100.0% | $59,548,033.49 100.0% | 0 0.0% | $0.00 0.0% | Accepts | 0 |
| Class 4 | General Unsecured Claims | 30 88.2% | $201,776,482.46 99.9% | 4 11.8% | $243,803.89 0.1% | Accepts | 5 |

## III.  Objections to Confirmation and Final Approval of Disclosure Statement

15.  On May 14, 2025, the United States Trustee filed the *United States Trustee's Objection to Combined Disclosure Statement and Joint Chapter 11 Plan of Azzur Group Holdings LLC and Its Affiliated Debtors* (the "UST Objection") [22] and the Committee filed the *Objection of the Official Committee of Unsecured Creditors to Debtors' First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Azzur Group Holdings LLC and Its Affiliated Debtors* (the "Committee Objection," and together with the UST Objection, the "Objections").[23]  The Objections are addressed herein.[24]  No other objections were filed in response to the Combined Disclosure Statement and Plan.

---

overwhelmingly accepted the Plan by a measure of either 98% or 99.9%, in amount of Claims actually voted.  There is no change to the number of creditors in Class 4 that voted to accept the Plan.

[22]  *See* D.I. 545.

[23]  *See* D.I. 546.

[24]  The Debtors' response to the remaining Objections is summarized in the chart attached hereto as **Exhibit A** (the "Confirmation Objection Chart").  The Debtors' responses in the Confirmation Objection Chart are incorporated into this Memorandum as though fully set forth herein.

## **ARGUMENT**

16.     To confirm the Combined Disclosure Statement and Plan, the Court must find that the Debtors have satisfied the applicable provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[25]    Moreover, the Disclosure Statement contains adequate information and should be approved on a final basis.  Based on the record of the Chapter 11 Cases, the Declarations, and the Debtors' arguments set forth herein, the applicable burden is clearly satisfied and the Combined Disclosure Statement and Plan complies with all relevant sections of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and applicable non-bankruptcy law. In particular, the Combined Disclosure Statement and Plan fully complies with the requirements of sections 1122, 1123, 1125, and 1129 of the Bankruptcy Code.  This Memorandum addresses each requirement individually below.

**I.      Section 1129(a)(1): The Combined Disclosure Statement and Plan Complies with the Applicable Provisions of the Bankruptcy Code.**

17.     Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code.  The principal objective of section 1129(a)(1) is to assure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan.  The determination of whether the Plan complies with section 1129(a)(1) of the Bankruptcy Code, thus, requires an analysis of sections 1122 and 1123 of the Bankruptcy Code.[26]

---

[25]     *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006); *In re Tribune Co.*, 464 B.R. 126, 15152 (Bankr. D. Del. 2011).  Preponderance of the evidence has been described as just enough evidence to make it more likely than not that the fact the claimant seeks to prove is true.  *See Grogan v. Garner*, 498 U.S. 279, 286 (1991) ("The preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants.") (citations omitted).

[26]     The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision is intended to draw in the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan, respectively.  S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978); H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977); *In re S & W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An

A.    **The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

18.    Section 1122 of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  The Third Circuit "permits the grouping of similar claims in different classes" as long as those classifications are reasonable.[27]  Courts have recognized that section 1122, thus, gives both debtors and the bankruptcy court considerable discretion in determining whether similar claims may be separately classified.[28]

19.    The Combined Disclosure Statement and Plan provides for separate classification of Claims and Interests based on differences in the legal nature and/or priority of such Claims and Interests.  The Combined Disclosure Statement and Plan designates the following classes of Claims and Interests as follows:

| CLASS | DESIGNATION | IMPAIRMENT | VOTING RIGHTS |
|-------|-------------|------------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote / Deemed to Accept |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote / Deemed to Accept |
| Class 3 | M&T Secured Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 | Intercompany Claims & Interests | Unimpaired / Impaired | Not Entitled to Vote |
| Class 6A | Azzur Group Holdings Interests | Impaired | Not Entitled to Vote / Deemed to Reject |
| Class 6B | Section 510(b) Claims | Impaired | Not Entitled to Vote / Deemed to Reject |

examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was more directly aimed at were Sections 1122 and 1123.").

[27]    *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987); s*ee also In re Tribune Co.*, 476 B.R. 843, 854–55 (Bankr. D. Del. 2012) (holding that plan proponents have discretion to classify claims so long as the classification scheme is reasonable).

[28]    *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 224 (Bankr. D.N.J. 2000).

20.     Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class.[29]  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Combined Disclosure Statement and Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.[30]  Namely, the Combined Disclosure Statement and Plan separately classifies the Claims because each Holder of such Claims or Interests may hold (or may have held) rights in the estates legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience resulted from such classification.

21.     For example, the classification scheme distinguishes Holders of Other Secured Claims (Class 1) and Other Priority Claims (Class 2) are classified separately due to their required treatment under the Bankruptcy Code.   General Unsecured Claims (Class 4) are classified separately from M&T Secured Claims (Class 3) and Azzur Group Holdings Interests (Class 6A).

22.     Valid business, legal, and factual reasons justify the separate classification of the particular Claims and Equity Interests into the Classes created under the Combined Disclosure Statement and Plan.  Accordingly, the Combined Disclosure Statement and Plan's classification of Claims and Equity Interests is consistent with the requirements of the Bankruptcy Code and, thus, is appropriate.

23.     Accordingly, the Debtors submit that the Combined Disclosure Statement and Plan's classification scheme is necessary, reasonable, and appropriate under the facts and circumstances of these Chapter 11 Cases and should be approved.

---

[29]     *See* Jones Decl. ¶ 13.

[30]     *See id.* ¶ 49.

11

**B.      The Plan Complies with Section 1123(a) of the Bankruptcy Code.**

24.      Section 1123(a) of the Bankruptcy Code sets forth several requirements with which a chapter 11 plan must comply.  The Combined Disclosure Statement and Plan complies with each such requirement:

**1.      Section 1123(a)(1): Designation of Classes of Claims and Interests.**

25.      Section 1123(a)(1) provides that a plan must designate, subject to section 1122, classes of claims and interests.  As discussed above, the Combined Disclosure Statement and Plan clearly designates 7 separate classes of Claims and/or Interests.[31]   Accordingly, the Combined Disclosure Statement and Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

**2.      Section 1123(a)(2): Specification of Unimpaired Classes.**

26.      1123(a)(2) of the Bankruptcy Code requires that a plan "specify any class of claims or interests that is not impaired under the plan."  The Combined Disclosure Statement and Plan meets this requirement by identifying each Class in Article III that is Unimpaired.

**3.      Section 1123(a)(3): Specification of Treatment of Classes Impaired by the Plan.**

27.      Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan."  The Combined Disclosure Statement and Plan meets this requirement by setting forth the treatment of each Class in Article III that is Impaired.

**4.      Section 1123(a)(4): Equal Treatment within Each Class.**

28.      Section 1123(a)(4) of the Bankruptcy Code requires that a plan provide the same treatment for each claim or equity interest within a particular class unless any claim or equity

---

[31]      *See* Combined Disclosure Statement and Plan, Art. III.

interest holder agrees to receive less favorable treatment than other class members.  Pursuant to the Combined Disclosure Statement and Plan, the treatment of each Claim against or Interest in the Debtors, in each respective Class, is the same as the treatment of each other Claim or Equity Interest in such Class.  Accordingly, the Combined Disclosure Statement and Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

     **5.**       **Section 1123(a)(5): Adequate Means for Implementation.**

29.     Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means for the plan's implementation."  Article VII of the Combined Disclosure Statement and Plan provides adequate and proper means for implementation of the Combined Disclosure Statement and Plan, including, without limitation: (a) funding of distributions under the Plan, (b) cancellation of existing securities and agreements, (c) preservation of Retained Actions that vest in the Wind-Down Debtor, (d) the authorization for the Wind-Down Debtor  to take corporate actions necessary to effectuate the Combined Disclosure Statement and Plan, and (e) the ability for the Debtors and Plan Administrator, as applicable, to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Disclosure Statement and Plan.  As such, the requirements of section 1123(a)(5) of the Bankruptcy Code have been satisfied.

     **6.**       **Section 1123(a)(6): Prohibition on the Issuance of Non-Voting Securities.**

30.     Section 1123(a)(6) of the Bankruptcy Code requires that the charter of the debtor, or the surviving corporation if the debtor is transferring all of its property or merging or consolidating with another entity, contain a prohibition against issuing nonvoting equity securities. Section 1123(a)(6) is not relevant to these Chapter 11 Cases as the Debtors are not issuing any equity securities under the Combined Disclosure Statement and Plan.

**7.      Section 1123(a)(7): Provisions Regarding Officers and Directors.**

31.      Section 1123(a)(7) requires that the Combined Disclosure Statement and Plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." The Debtors have disclosed in the Plan Supplement that Scott A. Rinaldi—who is a managing director within Ankura Consulting that specializes in wind-down processes—is proposed to serve as Plan Administrator after the Effective Date and will oversee the wind-down of the Debtors' estates. Mr. Rinaldi was selected by the Debtors in a manner consistent with the interests of creditors and with public policy. The Debtors intend to provide further evidence with respect to the selection of Mr. Rinaldi and the business judgment therefor at the Confirmation Hearing. Accordingly, the Combined Disclosure Statement and Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

**C.      The Plan Complies with Section 1123(b) of the Bankruptcy Code.**

**32.**      Section 1123(b) of the Bankruptcy Code sets forth certain provisions that may be incorporated into a plan, although they are not required. As set forth below, the Combined Disclosure Statement and Plan includes certain of these discretionary provisions, such as releases. The contents of the Combined Disclosure Statement and Plan are consistent with these provisions.

**1.      Section 1123(b)(1): Impairment of Claims and Interests.**

33.      In accordance with section 1123(b)(1) of the Bankruptcy Code, Article III of the Plan provides that certain Classes of Claims and Interests are impaired while certain other Classes of Claims are Unimpaired. In particular, the Deemed Accepting Classes are Unimpaired, and both the Voting Classes and Deemed Rejecting Classes are Impaired.[32]

---

[32]      *See* Combined Disclosure Statement and Plan, Art. III.

## 2.    Section 1123(b)(2): Executory Contracts.

34.    Section 1123(b)(2) of the Bankruptcy Code allows a plan to provide for the assumption and assignment, or rejection of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code.  Section 9.1 of the Combined Disclosure Statement and Plan provides that all executory contracts and unexpired leases of the Debtors that are (i) not assumed or rejected before the Effective Date (excluding, for the avoidance of doubt, insurance policies) or (ii) not subject to a pending motion to assume or reject as of the Effective Date will be deemed rejected.  Accordingly, the Combined Disclosure Statement and Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

## 3.    Section 1123(b)(3): Settlement of Any Claim by the Debtors.

35.    Section 1123(b)(3) of the Bankruptcy Code permits a plan to provide for the settlement of claims belonging to the debtor or its estate or an appointed representative of any such claim or interest.[33]  That provision states that a chapter 11 plan may provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate.[34]

36.    Pursuant to this authority, Section 8.1 of the Combined Disclosure Statement and Plan provides for the settlement and release of certain claims belonging to the Debtors.  The Debtor Release under Section 8.3 of the Combined Disclosure Statement and Plan is addressed below.

37.    Compromises are favored, and in fact encouraged, in bankruptcy proceedings "[t]o minimize litigation and expedite the administration of a bankruptcy estate."[35]  The decision

---

[33]    11 U.S.C. § 1123(b)(3).

[34]    11 U.S.C. § 1123(b)(3)(A).

[35]    *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 393 (3d Cir. 1996); *see also In re World Health Alts, Inc*., 344 B.R. 291, 296 (Bankr. D. Del. 2006).

whether to approve or reject a settlement lies within the sound discretion of the Court.[36]  To make this determination, a court must assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal to ensure that the settlement is fair and equitable and in the best interest of the estate.[37]

38.     The compromises set forth in the Combined Disclosure Statement and Plan are critical to bringing closure to these and other matters addressed in the Plan and will allow the Debtors to maximize the value of the Estates for the benefit of all parties in interest and maximize recoveries for all Holders of Claims and Interests.[38]

### 4.    Section 1123(b)(3): Retention of Claims or Equity Interests.

39.     Section 1123(b)(3) of the Bankruptcy Code provides that a plan may "provide for the retention and enforcement by the debtor" of claims or interests belonging to the debtors.[39] Section 7.10 of the Combined Disclosure Statement and Plan preserves and vests any and all Causes of Action that are not expressly released or waived under the Combined Disclosure Statement and Plan or any Final Order in the Wind-Down Debtor on the Effective Date.  The Debtors and the Plan Administrator expressly reserve those Retained Actions as and to the extent set forth in the Plan, including those identified in <u>Exhibit A</u> of the Plan Supplement.[40] Accordingly, the Combined Disclosure Statement and Plan is consistent with section 1123(b)(3) of the Bankruptcy Code.

---

[36]     *See In re Northwestern Corp.*, Case No. 03-12872 (KJC), 2008 WL 2704341, at *6 (Bankr. D. Del. Jul. 10, 2008) ("In exercising this discretion, the bankruptcy court must determine whether the compromise is fair, reasonable, and in the best interests of the estate.") (quoting *Key3media Grp., Inc. v. Pulver.Com, Inc. (In re Key3media Grp., Inc.)*, 336 B.R. 87, 92 (Bankr. D. Del. 2005)).

[37]     *In re Beach*, 731 F. App'x 322, 325 (5th Cir. 2018).

[38]     *See* Jones Decl. ¶ 24.

[39]     11 U.S.C. § 1123(b)(3)(B).

[40]     *See* Combined Disclosure Statement and Plan, Art. VII.

5. **The Releases, Exculpation, Section 1125(e), and Injunction Provisions under the Combined Disclosure Statement and Plan Are Appropriate under Section 1123(b)(3) and (6).**

40. Section 1123(b)(6) of the Bankruptcy Code permits a plan to include, as a catchall, any appropriate provision not inconsistent with the applicable provisions of the Bankruptcy Code. In accordance with section 1123(b)(6) of the Bankruptcy Code, Article VIII of the Combined Disclosure Statement and Plan provides for (a) the Debtors' release of certain parties, (b) consensual releases to the Debtors and certain other parties in interest, (c) a provision granting all protections and benefits afforded by section 1125(e) of the Bankruptcy Code, and (d) exculpation and injunction provisions prohibiting parties from pursuing Claims and Causes of Action released under the Combined Disclosure Statement and Plan.

41. These provisions are proper because, among other things, they are the product of arm's-length negotiations, are supported by substantial consideration provided by the beneficiaries thereof, have been critical to obtaining the support of the various constituencies for the Combined Disclosure Statement and Plan, and, as part of the Combined Disclosure Statement and Plan, have received overwhelming support from the creditors that voted for the Combined Disclosure Statement and Plan.[41]  The releases, exculpation, and injunction provisions of the Combined Disclosure Statement and Plan are fair and equitable, given for valuable consideration, and in the best interests of the Debtors and the Chapter 11 Cases.  None of these provisions are inconsistent with the Bankruptcy Code, and therefore, the requirements of section 1123(b) of the Bankruptcy Code are satisfied.  The principal terms of these provisions of the Combined Disclosure Statement and Plan are discussed below.

---

[41]    *See* Jones Decl. ¶ 23.

a.     **The Releases by the Debtors Are Appropriate under Section 1123(b)(3).**

42.     The Combined Disclosure Statement and Plan provides for the Debtor Release (a release by the Debtors of the Released Parties),[42] as more fully set forth in Section 8.3 of the Combined Disclosure Statement and Plan (the "Debtor Release").  Section 1123(b)(3)(A) of the Bankruptcy Code states that a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[43]  The Bankruptcy Code thus clearly contemplates that the Debtors are permitted to settle or release any claim or cause of action that they might otherwise have against a third party.  When considering releases by a debtor of non-debtor third parties pursuant to section 1123(b)(3)(A), the appropriate standard is whether "the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[44]  As an exercise of its business judgment, a debtor's decision to release claims against third parties under a plan is afforded deference.[45]

---

[42]     Under the Combined Disclosure Statement and Plan, the term "Released Parties" means "collectively, and in each case in its capacity as such: (a) the Debtors; (b) M&T; (c) all Holders of Claims or Interests that (i) vote to accept the Plan and do not opt-out of the voluntary release contained in Section 8.4 hereof by checking the opt out box on the ballot, or (ii) abstain from voting or do not vote on the Plan and affirmatively opt-in to the releases provided under the Plan; and (d) with respect to each of the Debtors, and each of the foregoing Entities in clauses (a) through (c), the Related Parties of such Entities; provided, that any Holder of a Claim or Interest that votes to reject or objects to the Plan shall not be a 'Released Party'."  The identities of the core Released Parties are also disclosed in Section 5.9 of the Combined Disclosure Statement and Plan.

[43]     11 U.S.C. § 1123(b)(3)(A).

[44]     *U.S. Bank. Nat'l Ass'n v. Wilmington Tr. Co. (In re Spansion)*, 426 B.R. 114, 143 (Bankr. D. Del. 2010).

[45]     *See, e.g., In re Spansion*, 426 B.R. at 140 ("It is not appropriate to substitute the judgment of the objecting creditors over the business judgment of the Debtors."); *Heroes World Dist., Inc. v. MAFCO Holdings, Inc. (In re Marvel Entm't Grp., Inc.)*, 273 B.R. 58, 78 (D. Del. 2002) ("[U]nder the business judgment rule…… a court will not interfere with the judgment of a board of directors unless there is a showing of gross and palpable overreaching.  Thus, under the business judgment rule, a board's decisions will not be disturbed if they can be attributed to any rational purpose and a court will not substitute its own notions of what is or is not sound business judgment.") (internal quotation marks and citations omitted).

43.     Additionally, some courts in this District have identified the following list of non-exhaustive factors in determining the propriety of a debtor release, commonly known as the *Zenith* or *Master Mortgage* factors (the "*Zenith* Factors"):[46]

> (1)    an identity of interest between the debtor and the non-debtor such that a suit against the non-debtor will deplete the estate's resources;
>
> (2)    a substantial contribution to the plan by the non-debtor;
>
> (3)    the necessity of the release to the plan;
>
> (4)    the overwhelming acceptance of the plan and release by creditors and interest holders; and
>
> (5)    the payment of all or substantially all of the claims of the creditors and interest holders under the plan.

44.     As a list of nonconjunctive factors, these factors provide a way of "weighing the equities of the particular case after a fact-specific review."[47]  Importantly, not each factor is relevant in every case and consensual releases may be approved where only one or two factors are present.[48]

45.     The Debtors considered and examined the scope of the Debtor Release since before the Petition Date.  Those efforts culminated with the investigation, undertaken at the direction of Mr. Ben Jones, the Chief Restructuring Officer, described in the Combined Disclosure Statement

---

[46]     The *Zenith* factors were first articulated as the standard for approving a third-party release (*i.e.*, a provision releasing a non-debtor's claim against another non-debtor.) *See In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994).  Later, in *Zenith*, this Court applied the *Master Mortgage* factors to a debtor release. *See In re Zenith Elec. Corp.*, 241 B.R. 92, 110–11 (Bankr. D. Del. 1999) (citing *Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994)).  As such, the Debtors have applied the *Zenith* Factors to the Debtor Release and, for the reasons set forth herein, submits that the Debtor Release in this case satisfy the *Zenith* Factors and should be approved.

[47]     *Indianapolis Downs*, 486 B.R. 286, 303 (Bankr. D. Del. 2013).

[48]     *See, e.g., In re Caribbean Petroleum Corp.*, 512 B.R. 774, 778 (Bankr. D. Del. 2014) (finding "no question" that release of debtor's claims was proper because non-debtor "provided Debtors with substantial consideration in exchange for the releases, providing the justification for the Court approving the releases"); *In re Spansion*, 426 B.R. at 143 (approving release where releasees were actively involved in negotiating the plan and four of five creditor classes voted overwhelmingly in favor).

and Plan.  The Debtors intend to introduce evidence at the Confirmation Hearing detailing the process and findings of such investigation.  By way of preview and as disclosed in Sections 4.3(i), 5.9, and elsewhere in the Combined Disclosure Statement and Plan, DLA Piper acting at the direction of the Chief Restructuring Officer:

- reviewed thousands of documents, including the limited liability company agreement for Debtor Azzur Group Holdings LLC;

- conducted five formal interview of directors, officers, and key equity holders;

- asked the Committee, multiple times, to identify any potential claims and causes of action that it believes warrant further review (none were identified); and

- held multiple informal discussions with M&T and the Debtors' in-house counsel, other advisors, and relevant management and operational teams.[49]

The potential claims and causes of action that were subject to the foregoing review include matters pertaining to:  (a) retention payments made to employees in October 2024; (b) contractual reimbursement payments made to directors; (c) payments, if any, to equity holders (including dividends, if any); (d) forbearance agreements with M&T; (e) prepetition settlement agreements with certain general contractors; (f) potential breach of fiduciary duty claims, including with respect to the expansion of the COD Business; and (g) the prepetition and postpetition sale transactions involving the Labs, COD, and Consulting business segments.  Each of the Chief Restructuring Officer and DLA Piper determined that there are no viable, valuable claims or causes of action that would be subject to the Debtor Release—let alone ones that reasonably could be expected to generate distributable value to Holders of Allowed General Unsecured Claims in

---

[49] M&T supported the Debtor Release as proposed before it agreed, as part of the bilateral M&T-UCC Settlement, to release its liens on proceeds of any purported estate claims and causes of action against insiders.  That is, prior to the M&T-UCC Settlement, the then economic party in interest (M&T) concurred with the Debtors' business judgment that the Debtor Release should be given effect as proposed under the Plan.  As noted herein, the Debtors negotiated and formulated the Plan in good faith and at arms' length with M&T—which was and remains impaired but still supports the Plan, including the Debtor Release thereunder.

excess of the projected Cash Distributions to Holders of such Allowed Class 4 Claims (currently estimated to be $625,000 in the aggregate) and the contributions by each Released Party.

46.    The Debtor Release is also the product of good faith, arm's-length negotiations throughout the course of the plan process by and among the Debtors, M&T, and various other parties in interest.[50]  The Debtors also consulted with, and incorporated feedback from, the U.S. Trustee and the Committee with respect to the Debtor Release (as well as other Plan provisions). The Debtor Release is fair and reasonable, overwhelmingly supported by the Debtors' economic stakeholders, and in the best interest of the Estates.

47.    Additionally, the Debtor Release meets the *Zenith* Factors and should be approved. *First*, each of the Released Parties, as a stakeholder and critical participant in the chapter 11, sale, and plan processes, shares a common goal with the Debtors in seeing the Combined Disclosure Statement and Plan succeed and would have been unwilling to participate in the negotiations and compromises that led to the ultimate formation of the Combined Disclosure Statement and Plan, negotiating and closing the going-concern Sale Transactions, the Editas Settlement, the DIP Orders, the consensual exit from the Devens leased premises, and other key achievements in these Chapter 11 Cases, without the Debtor Release.  Like the Debtors, these parties support confirmation of the Combined Disclosure Statement and Plan.[51]  All of the Released Parties have played an instrumental role in the Debtors' marketing and sale process, facilitating value-maximizing sales of the Debtors' businesses and subsequent wind-down, and in the formulation

---

[50]       *See* Jones Decl. ¶ 23.

[51]       *See In re Abeinsa Holding, Inc.,* 562 B.R. 265, 284 (Bankr. D. Del. 2016) (finding that "there is an identity of interest between the Debtors and the released parties arising out the shared common goal of confirming and implementing the Plan."); *see also Zenith,* 241 B.R. at 110 (concluding that certain releasees who "were instrumental in formulating the Plan" shared an identity of interest with the debtor "in seeing that the Plan succeed and the company reorganize").

of the Combined Disclosure Statement and Plan.[52]  In particular, the directors and officers of the Debtors that are Released Parties were heavily involved in the Debtors' process leading up to the filing of the Chapter 11 Cases and continued to support and facilitate the Debtors' efforts during these Chapter 11 Cases.[53]  Without such contributions, the value-maximizing transactions embodied in the going-concern Sale Transactions and the Plan would not have been achieved. Furthermore, such Debtor Release is being given in exchange for their efforts to develop and implement a restructuring strategy that facilitated the Debtors' smooth transition into chapter 11 as well as their management of operations throughout the pendency of these Chapter 11 Cases, which also preserved and maximized the value of the Debtors' estates.[54]

48.     With respect to current and former directors, officers, and equity holders that are Released Parties, there is an identity of interest with the Debtors because of indemnification claims that they may assert under Debtor Azzur Group Holdings' limited liability company agreement and applicable Delaware limited liability company law.  That is, a claim against such indemnified parties would be, in effect, a claim against the Debtors.  Outside of the Plan, such indemnification claims would dilute creditor recoveries and estate assets—especially those Distributions that are otherwise available to Holders of Allowed Class 4 Claims under the Plan.  Moreover, even if the indemnification claims were characterized as General Unsecured Claims, those Claims would be asserted at Debtor Azzur Group Holdings where the Debtors project there will be no meaningful Allowed General Unsecured Claims apart from the indemnification claims that could be asserted by such directors, officers, and equity holders that are Released Parties.  This type of structural

---

[52]     *See* Jones Decl. ¶ 22.

[53]     *Id.*

[54]     *Id.*; *see, e.g.*, *In re Tribune Co.*, 464 B.R. at 187.

subordination relative to other General Unsecured Creditors means any theoretical recovery against such parties would merely "round trip" to the same creditors of Debtor Azzur Group Holdings.

49.    *Second,* the substantial contributions are clear.  As set forth in the Combined Plan and Disclosure Statement, the Released Parties have made meaningful contributions—whether in the form of cash, claims waivers, support for sale processes and financing efforts, or otherwise— that enhance creditor recoveries.  With respect to creditors of the Consulting and Labs Businesses, those creditors have largely been paid in full as a result of, in part, the Released Parties' substantial contributions.  With respect to creditors of the COD Business, the Released Parties helped deliver a going-concern Sale Transaction when that outcome was very much uncertain at the outset of these Chapter 11 Cases.  Since the Petition Date, the Released Parties have also effectively managed the overall claims pool down from an amount in excess of $200 million to approximately $30 million for Class 4 projected recovery purposes.  Holders of Allowed General Unsecured Claims will receive meaningfully improved recoveries under the Plan as a direct result of the Released Parties' efforts—unquestionably above and beyond any normal scope of D&O responsibilities—dedicated to these Chapter 11 Cases, the DIP Facility, the Sale Transactions, the Editas Settlement, the consensual exit from the Devens leased premises, and other value-maximizing achievements realized for the benefit of all parties in interest.

50.    In addition, Released Parties played an integral role in the formation of the Combined Disclosure Statement and Plan, the terms of the DIP Documents and the Sale Transactions documentation, the Editas Settlement Agreement, the agreed rejection order with the Devens' landlord, and have expended significant time and resources analyzing and negotiating the other issues present in these Chapter 11 Cases to reach a value-maximizing outcome.  In many

23

cases, Released Parties were effectively asked to work themselves out of a job with the Sale Transactions—which is precisely what happened in several instances. With respect to directors, officers, and equity owners, such Released Parties have agreed to conditionally waive certain indemnification claims and limit any recourse solely to available D&O insurance (and not the Debtors' property), provided the Plan is confirmed.[55] Azzur Blocker, an equity owner of the Debtors, also holds consent rights over any sale transaction under the Azzur Group Holdings limited liability company agreement. Azzur Blocker consented to, among other things, the Labs sale even though it did not realize any economic benefit whatsoever from that transaction. By closing the Labs sale, the Debtors unlocked additional liquidity and runway that bridged to the Stalking Horse APA, COD Sale Transaction, and these Chapter 11 Cases, each in furtherance of maximizing the value of the estates. M&T, for its part, contributed value in the form of their agreement to continue funding the Debtors prepetition after several events of default and provide the DIP Facility in these Chapter 11 Cases. These measures, among others, improved the Debtors' liquidity throughout these Chapter 11 Cases, enabled the Debtors to consummate two value-maximizing, going-concern Sale Transactions, and have allowed the Debtors to chart a path toward an orderly and cost-efficient Wind Down, on the terms set forth in the Plan. Delaware bankruptcy courts recognize that a wide variety of acts may comprise a substantial contribution to a debtor's bankruptcy for *Zenith* factors purposes.[56] Here, the value contributed by the Released Parties is certainly substantial and the Debtors intend to present evidence at the Confirmation Hearing in support thereof. The Debtor Release is narrowly tailored to estate fiduciaries in these Chapter 11

---

[55] *See* Section 8.9 of the Combined Disclosure Statement and Plan.

[56] *See id.* at 304 (finding that the non-debtor party had substantially contributed by performing services for the debtors post-petition without receiving compensation); *In re Wash. Mut., Inc.*, 442 B.R. 314, 347 (Bankr. D. Del. 2011) (finding substantial contribution required the contribution of "cash or anything else of a tangible value to the [plan] or to creditors"); *In re Zenith Elecs. Corp.*, 241 B.R. at 111 (finding that prepetition contribution of work in negotiating a plan constituted adequate consideration for debtor's release).

Cases and those parties whose contributions have been critical to facilitate and implement the highly consensual Combined Disclosure Statement and Plan.  The Debtor Release, therefore, is essential to the Debtors' Combined Disclosure Statement and Plan.

51.    *Third,* the Debtor Release is essential because it constitutes an integral term of the Combined Disclosure Statement and Plan.  Indeed, absent the Debtor Release, the Released Parties would not have agreed to support the Combined Disclosure Statement and Plan, the Sale Transactions, the Editas Settlement, the consensual exit from the Devens leased premises, or these Chapter 11 Cases in general.  As described herein, each of the Released Parties went above-and-beyond their normal job responsibilities to contribute substantial value to these Chapter 11 Cases and did so with the understanding that they would receive customary releases from the Debtors and thus receive some measure of finality in exchange for their 18-month effort to maximize the value of the enterprise for the benefit of all stakeholders.[57]  In the absence of these parties' support, the Debtors would not be in a position to have closed three going-concern sale transactions that preserved nearly all jobs for rank-and-file employees, confirm the Combined Disclosure Statement and Plan, and expeditiously make Distributions to Holders of Allowed Class 4 Claims and conclude these Chapter 11 Cases.  The Debtor Release, therefore, is essential to the Plan and these Chapter 11 Cases.

52.    *Fourth,* as evidenced by the Voting Report and noted herein, in the aggregate, the Debtors' stakeholders nearly unanimously support the Combined Disclosure Statement and Plan.[58]  By Class, creditors in Class 3 representing 100 percent by amount of voted claims and 100 percent by number in the aggregate voted to accept the Combined Disclosure Statement and Plan.

---

[57]    *See* Jones Decl. ¶ 23.

[58]    *See* Voting Report, Ex. A.

Creditors in Class 4 representing either 98.0 or 99.9 percent by amount of voted claims and 88.2 percent by number in the aggregate voted to accept the Combined Disclosure Statement and Plan.[59] As to the one Committee member that actually voted on the Plan, that creditor voted to accept the Plan, including the Debtor Release thereunder, and "opt in" to the mutual consensual releases thereunder. Given the critical nature of the Debtor Release, these figures evidence the Debtors' key stakeholders' support for the Debtor Release and the Combined Disclosure Statement and Plan.

53. *Fifth,* the Combined Disclosure Statement and Plan provides for meaningful recoveries under the circumstances for all creditors theoretically walking away from potential recoveries (if any) on account of purported derivative claims and causes of action that might be subject to the Debtor Release. As shown in the Liquidation Analysis, the ranges of recoveries for Holders of Claims are materially higher under the Combined Disclosure Statement and Plan than they would have been in a chapter 7 liquidation scenario.[60] In the alternative scenario, Holders of General Unsecured Claims would likely see *no* recovery on account of such Allowed Claims. The Combined Disclosure Statement and Plan, on the other hand, maximizes value and provides meaningful recoveries for all stakeholders under the circumstances.

54. For the reasons set forth above, and as supported by the Jones Declaration as well as further direct testimony to be adduced at the Confirmation Hearing, the *Zenith* factors support approval of the Debtor Release. Moreover, the breadth of the Debtor Release is consistent with those regularly approved in this jurisdiction and others.[61] The Debtors have satisfied the business

---

[59]     *See id.*

[60]     *See* First Supplement to Plan Supplement, Ex. D.

[61]     *See, e.g., In re One Aviation Corp.*, Case No. 18-12309 (CSS) (Bankr. D. Del. Sep. 18, 2019) (approving Plan providing for definition of Released Parties including, among others, the Debtors' directors and officers); *In re Blackhawk Mining LLC,* Case No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019) (same); *In re Checkout Holding*

judgment standard in granting the Debtor Release under the Combined Disclosure Statement and Plan. The Debtor Release easily meets the applicable standard. It is fair, reasonable, and in the best interests of the Debtors' Estates. The Court should approve the Debtor Release.

> **b.      The Third-Party Release Is Consensual, Appropriate, and Complies with Section 1123(b)(6) of the Bankruptcy Code.**

55.      Section 8.4 of the Combined Disclosure Statement and Plan of the Combined Disclosure Statement and Plan contains an appropriately tailored consensual third-party release by the Releasing Parties[62] (the "Third-Party Release") of the Released Parties. Here, the Combined Disclosure Statement and Plan includes, among other specifically enumerated entities, the following persons as "Releasing Parties" under the Plan and the Third-Party Release: (a) the Debtors; (b) M&T; (c) all Holders of Claims or Interests that (i) vote to accept the Plan and do not opt-out of the voluntary release contained in Section 8.4 hereof by checking the opt out box on the ballot, or (ii) abstain from voting or do not vote on the Plan and affirmatively opt-in to the releases provided under the Plan; and (d) with respect to each of the Debtors, and each of the foregoing Entities in clauses (a) through (c), the Related Parties of such Entities; provided, that any Holder of a Claim or Interest that votes to reject or objects to the Plan shall not be a "Released Party."[63]

---

*Corp.*, Case No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019) (same); *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) (same); *In re Samson Resources Corp.*, Case No. 14-11934 (CSS) (Bankr. D. Del. Feb. 13, 2017) (same); *In re Horsehead Holding Corp.*, Case No. 16-10287 (CSS) (Bankr. D. Del. Sep. 9, 2016) (same).

[62]      Under the Combined Disclosure Statement and Plan, the term "Releasing Parties" means "collectively, and in each in case in its capacity as such: (a) the Debtors and the Wind-Down Debtor; (b) each Holder of a Claim or Interest that (x) votes to accept the Plan and does not opt-out of the voluntary release contained in Section 8.4 hereof by checking the opt-out box on the ballot, or (y) either (I) abstains from voting on the Plan or (II) is deemed to accept or reject the Plan and, in the case of either (I) or (II), affirmatively opts-in to the voluntary release contained in Section 8.4 hereof by checking the opt-in box on the ballot or notice, and returning it in accordance with the instructions set forth thereon, indicating that they opt-in to the releases provided in the Plan; and (c) the Related Parties of the foregoing but only to the extent such Related Party would be obligated to release under principles of agency if it were so directed by the applicable Person or Entity in clauses (a) through (b); provided, however, that notwithstanding the foregoing, M&T shall not be deemed a "Releasing Party" under the Plan and shall benefit only from releases by the Debtors."

[63]      *See* Combined Disclosure Statement and Plan, Art. I.105.

The Third-Party Release is an integral part of the Combined Disclosure Statement and Plan and should be approved given that it is fully consensual.

i.   *The Third-Party Release Is Wholly Consensual and Appropriate.*

56.   Third-party releases are consensual as applied to holders of claims deemed to accept a plan.[64]  Moreover, where parties receive sufficient notice of a plan's release provisions and have an opportunity to object to or opt out of the release and fail to do so, the releases are consensual.[65]  Approval of the Third-Party Release under the circumstances of these Chapter 11 Cases is appropriate because they are fully consensual and appropriately tailored.[66]  Third-party release provisions containing an additional opt-out mechanism for "accepting" voters have been approved in this Court and others as a sufficient manifestation of consent.[67]

57.   In this case, all parties that opted into the Third-Party Release had ample opportunity to evaluate the terms thereof.  In addition, Holders of Claims or Interests who either

---

[64]   *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 304-05 (Bankr. D. Del. 2013) (approving third-party release that applied to unimpaired holders of claims deemed to accept the plan as consensual).

[65]   *See id.* at 306 ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots. Under these circumstances, the Third-Party Releases may be properly characterized as consensual and will be approved."); *see also In re Alpha Latam Mgmt., LLC*, 21-11109 (JKS) (Bankr. D. Del. Mar. 14, 2022) [D.I. 651 at 11:6–22] ("Importantly, I find the third-party releases are consensual. . . The ballot contained an opt out election box and holders had the right to opt out of the releases.  Unimpaired holders in non-voting classes were provided with a notice of non-voting status that included the proposed third-party releases, prominent instructions on the right to object to the releases, and conspicuous disclaimers that the releases would be binding on holders if they did not timely object to the plan.  As I have previously ruled, an opt-out mechanism is a valid means of obtaining consent.  The court can imply consent from a creditor, not opting out or objecting to releases contained in a plan.").

[66]   *See, e.g.*, *In re Wash. Mut.*, 442 B.R. at 352 (observing that consensual third-party releases are permissible); *In re Zenith Elecs.*, 241 B.R. at 111 (approving non-debtor releases for creditors that voted in favor of the plan).

[67]   *See, e.g.*, *In re Jambys, Inc.*, Case No. 24-10913 (KBO) (Sep. 12, 2024) (post-*Purdue* confirmation of a plan containing third-party releases with an opt-out box for parties voting to accept the plan); *In re True Value Company, LLC*, Case No. 24-12337 (KBO) (April 17, 2025) (same); *In re Cano Health, Inc.*, Case No. 24-10164 (KBO) (confirming a plan containing an opt-out box for parties voting to accept and holding that the third party releases "are consensual in nature because all Releasing Parties have either affirmatively consented to such releases or were given due and adequate notice thereof and sufficient opportunity and instruction to elect to opt out of such releases."); *In re Gigamonster Networks, LLC*, Case No. 23-10051 (JKS) (Bankr. D. Del. Aug. 30, 2024) (post-*Purdue* ruling

voted to reject, abstained from voting or were presumed to accept or deemed to reject the Plan will be subject to the Third-Party Release only if they affirmatively consented to provide it through their selections on the opt-in election. Moreover, Holders of Claims who voted to accept the Plan were still given the opportunity to affirmatively opt-out of granting the Third-Party Releases on the ballot.[68]

58.    *First,* a holder of a claim, including a claim that is impaired under a plan, may be deemed to consent to a third-party release if the holder is provided with ample notice of the third-party release and is provided with an opportunity to opt out of the third-party release—even if a creditor abstains from voting.[69] Here, Holders of Claims in Classes 3 and 4 are Impaired and entitled to vote to accept or reject the Combined Disclosure Statement and Plan. Each such Holder was provided with ample notice and had an opportunity to both affirmatively (i) vote in favor of the plan and (ii) opt-out of the Third-Party Release by checking the opt out box on the ballot sent to each holder, which were attached as Exhibit 5-A and Exhibit 5-B of the Solicitation Order. Moreover, the Debtors made every effort to ensure that each holder of a Claim had notice of the Third-Party Release and the consequences of voting in favor of the Combined Disclosure Statement and Plan and failing to opt out of the Third-Party Release. The Debtors also published the Confirmation Hearing Notice in the *Wall Street Journal*, which clearly and conspicuously advised all parties in interest to carefully review and consider the Combined Disclosure Statement

---

confirming a plan containing third-party releases with an opt-out provision); *In re Bowflex Inc.*, Case No. 24-12364 (ABA) (Bankr. D.N.J. Aug. 19, 2024) (same).

[68]    *See* Solicitation Order, Ex. 5-A, Ex. 5-B.

[69]    *See Indianapolis Downs*, 486 B.R. at 306; *see also In re Spansion, Inc.* 426 B.R. at 144 (finding that returning a ballot is not essential to demonstrating consent to a release by unimpaired class); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 218 (Bankr. S.D.N.Y. 2009), *aff'd*, Case No. 09-10156 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part on other grounds*, 627 F.3d 496 (2d Cir. 2010) (determining that adequate notice of the proposed release was given to impaired creditors, and the ballots set forth the effect of abstaining without opting out of the release).

and Plan, including the Third-Party Release.  Accordingly, each Holder of a Claim in the Voting

Classes who voted in favor of the Combined Disclosure Statement and Plan and did not elect to

opt out of the Third-Party Release affirmatively consented to the Third-Party Release.  Tellingly,

*five* parties in interest that voted in favor of the Combined Disclosure Statement and Plan have

elected to opt out of the Third-Party Release, illustrating that Holders were in fact adequately put

on notice of their ability to opt out and could readily do so.[70]  The Third-Party Release is

consensual as to all Claims Holders who affirmatively consented to the Third-Party Release.  The

Court should approve the Third-Party Release.

59.     Moreover, the Supreme Court's decision in *Purdue* is not at odds with the release

provisions routinely approved by this Court, and its holding is generally inapplicable to release

provisions contemplated by the Debtors.  In *Purdue*, the Supreme Court made clear the narrow

scope of the decision by pointing out that "nothing in this opinion should be construed to call into

question consensual third-party releases offered in connection with a bankruptcy reorganization

plan."[71]  Because the Third-Party Release is wholly consensual, the *Purdue* decision governing

non-consensual releases in inapplicable.

60.     *Second*, the Third-Party Release is narrow.  The Third-Party Release provides that

each Releasing Party will give and receive a ***mutual*** release of any and all claims and Causes of

Action such party could assert in connection with the Debtors and these Chapter 11 Cases against

the (a) Debtor, (b) M&T, (c) all Holders of Claims or Interests that (i) vote to accept the Plan and

do not opt-out of the voluntary release contained in Section 8.4 by checking the opt out box on the

ballot, or (ii) abstain from voting or do not vote on the Plan and affirmatively opt-in to the releases

---

[70]     *See* Voting Report, Ex. A.

[71]     *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024).

provided under the Plan; and (d) with respect to each of the Debtors, and each of the foregoing Entities in clauses (a) through (c), the Related Parties of such Entities.

61.     *Third,* the Third-Party Release was given for consideration in exchange for the mutual release of their Claims against the Released Parties to justify the Third-Party Release, which was a critically negotiated provision of the Combined Disclosure Statement and Plan and was necessary to secure support for the Combined Disclosure Statement and Plan and the Debtors' chapter 11 objectives.  The vast majority of Holders that voted to accept the Plan also opted-into the mutual Third-Party Release.  The Third-Party Release helped bring key stakeholders to the table for negotiations around the DIP Credit Facility, the Sale Transactions, and the Combined Disclosure Statement and Plan, each of which contributed to the Debtors' success in chapter 11. And importantly, the Third-Party Release only applies to parties who have (a) actively participated in the chapter 11 or Plan process, including in the formulation and negotiation of the Third-Party Release, or (b) manifested their affirmative consent to the Third-Party Release.

62.     The Debtors submit that the inclusion of "Related Parties" as "Releasing Parties" is also appropriate, even though those parties have not necessarily manifested consent to the Third-Party Release.[72]  Courts in this district regularly approve such provisions, so long as the Combined Disclosure Statement and Plan specifies that such entities are "Releasing Parties" solely to the extent they can be bound under principles of applicable agency law by the "Releasing Party" to which they are related, so that a hypothetical future court may intelligibly interpret the Plan to determine if a party was released or not.[73]  Here, the Plan provides that "Related Parties" are

---

[72]     *See* Combined Disclosure Statement and Plan, Art. I.103.

[73]     *See, e.g., In re EXP OldCo Winddown, Inc. f/k/a Express*, Case 24-110831 (KBO) (Bankr. D. Del. Dec. 17, 2024); *In re Prosomnus, Inc.*, Case No. 24-10972 (JTD) (Bankr. D. Del. June 26, 2024) *Virgin Orbit Holdings, Inc.*, Case No. 23-10405 (KBO) (Bank. D. Del. July 31, 2023); *In re Appgate, Inc.*, Case No. 24-10956 (CTG) (Bankr. D. Del. June 18, 2024).

"Releasing Parties" "only to the extent such Related Party would be obligated to release under principles of agency if it were so directed by the applicable Person or Entity …"[74]  Therefore, the inclusion of "Related Parties" in the Third-Party Release should be approved.

> **c.    The Exculpation under the Combined Disclosure Statement and Plan Is Appropriate under Section 1123(b)(6).**

63.    Section 8.5 of the Combined Disclosure Statement and Plan should also be approved under the standards established by the Third Circuit.  Courts evaluate the appropriateness of exculpation provisions based on a number of factors, including whether the plan was proposed in good faith, whether liability is limited, and whether the exculpation provision was necessary for plan negotiations.[75]

64.    Courts evaluate the appropriateness of exculpation provisions based on a number of factors, including whether the plan was proposed in good faith, whether liability is limited, and whether the exculpation provision was necessary for plan negotiations.[76]  Exculpation provisions that apply to estate fiduciaries that are limited to claims not involving actual fraud, willful misconduct, or gross negligence, are customary and generally approved in this District under appropriate circumstances.[77]  Unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se*, but rather set a standard of care of gross negligence or willful

---

[74]    *See* Combined Disclosure Statement and Plan, Art. I.103.

[75]    *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 246-47 (3d Cir. 2000) (observing that the debtors and certain other parties, such as the unsecured creditors' committee members and the professionals retained by such committee, who provided services to assist in the reorganization, are entitled to a "limited grant of immunity . . . for actions within the scope of their duties").

[76]    *See, e.g.*, *In re Enron Corp.,* 326 B.R. 497, 503 (S.D.N.Y. 2005) (evaluating the exculpation clause based on the manner in which the clause was made a part of the agreement, the necessity of the limited liability to the plan negotiations, and that those who participated in proposing the plan did so in good faith).

[77]    *See Wash. Mut.*, 442 B.R. at 350-51 (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate).

misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring.[78]

65.    Here, the Exculpation Provision is appropriate under applicable law because it is part of a Combined Disclosure Statement and Plan proposed in good faith, is appropriately limited in scope, and is being granted only to the Exculpated Parties.  The Exculpated Parties, including current directors and officers, have made substantial and valuable contributions to the Debtors' restructuring through efforts to market, negotiate, and implement the going-concern Sale Transactions, the Editas Settlement, the DIP Facility, the consensual exit from the Devens leased premises, and with respect to the formulation and solicitation of the Plan.  Furthermore, the Exculpation Provision is limited to estate fiduciaries and acts or omissions taken in furtherance of these Chapter 11 Cases on a postpetition basis.  No Exculpated Party is being exculpated for acts or omissions that constitute actual fraud or gross negligence.  The protection from liability that the Exculpation Provision provides to these parties is appropriate given their efforts in these Chapter 11 Cases and the Plan process.

66.    The Debtors and their officers, directors, and professionals, actively negotiated with Holders of Claims and Interests across the Debtors' capital structure in connection with the Combined Disclosure Statement and Plan and these Chapter 11 Cases.  Such negotiations were extensive and the resulting agreements were implemented in good faith with a high degree of transparency, and as a result, the Plan enjoys nearly unanimous support.[79]  The Exculpated Parties

---

[78]    *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, Case No. 09-12019, 2010 WL 2745964, at *10 (CSS) (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion Inc, et al.*, Case No. 09-10690, 2010 WL 2905001, at *16 (Bankr. D. Del. April 16, 2010) (same).

[79]    *See* Voting Report, Ex. A.

played a critical role in negotiating, formulating, and implementing the Combined Disclosure Statement and Plan, the Editas Settlement, the DIP Orders, the Purchase Agreements, the Sale Orders, and related documents in furtherance of the Sale Transaction and other transactions contemplated by the Combined Disclosure Statement and Plan.[80]   Accordingly, the Court's findings of good faith vis-à-vis these Chapter 11 Cases should also extend to the Exculpated Parties.

67.     Significantly, the Combined Disclosure Statement and Plan has received overwhelming support from creditors.  For the reasons set forth herein, the Exculpation Provision provides reasonable and appropriate protections and should be approved.

### d.     The Section 1125(e) Provision Is Appropriate and Complies with the Bankruptcy Code.

68.     Section 8.6 of the Combined Disclosure Statement and Plan provides that each of the 1125(e) Parties are entitled to all of the protections and benefits provide by section 1125(e) of the Bankruptcy Code in connection with the 1125(e) Parties' solicitation and participation in relation to the Plan (the "Section 1125(e) Provision").[81]   Section 1125(e) of the Bankruptcy Code provides, in relevant part, that "[a] person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title. . . is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities."  These protections are fair and appropriate under both applicable law[82] and the facts and circumstances of these Chapter 11 Cases.  The Section 1125(e) Provision is the product of

---

[80]     *See* Jones Decl. ¶ 21.

[81]     "1125(e) Parties" means "collectively, and in each case in its capacity as such:  the Debtors; and the Related Parties of such Entities.

[82]     11 U.S.C. § 1125(e).

arm's-length negotiations, was critical to obtaining the support of various constituencies for the Plan, and, as part of the Combined Disclosure Statement and Plan, has received support from the Debtors' major stakeholders.[83]  The Section 1125(e) Provision was important to the development of a feasible, confirmable plan, and the 1125(e) Parties participated in these Chapter 11 Cases in reliance upon the protections afforded to those constituents by the Section 1125(e) Provision.[84]

69.     The 1125(e) Parties have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in solicitation and participation in relation to the Combined Disclosure Statement and Plan as it relates to the Debtors, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties.[85]  Here, the Debtors and their officers, directors, and professionals, actively negotiated with the Debtors' stakeholders in connection the solicitation and participation in relation to the Combined Disclosure Statement and Plan and these Chapter 11 Cases.[86]  Such negotiations were extensive and the resulting agreements were implemented in good faith with a high degree of transparency, and as a result, the Plan enjoys near unanimous support from creditors.[87]  The 1125(e) Parties played a critical role in the solicitation and participation in the Plan.  Furthermore, the Section 1125(e) Provision is limited to acts during these Chapter 11 Cases and does not extend beyond such time period, and is tailored to only provide such protections for acts or omissions in connection with the solicitation and participation in the Plan to the extent permissible by section

---

[83]     *See* Jones Decl. ¶ 21.

[84]     *Id.*

[85]     *See* Jones Decl. ¶ 21.
[86]     *Id.*

[87]     *See* Voting Report, Ex. A.

1125(e) of the Bankruptcy Code.  Accordingly, the Court's findings of good faith vis-à-vis these Chapter 11 Cases should also extend to the 1125(e) Parties.

70.     Under the circumstances, it is appropriate for the Court to approve the Section 1125(e) Provision, and to find that the 1125(e) Parties have acted in good faith and in compliance with the law.

> **e.      The Injunction under the Combined Disclosure Statement and Plan Is Appropriate and Should Be Approved.**

71.     Section 8.7 of the Combined Disclosure Statement and Plan (the "<u>Injunction</u>") merely implements the Combined Disclosure Statement and Plan's release and exculpation provisions, in part, by permanently enjoining all entities from commencing or maintaining any action against the Debtors, the Wind-Down Debtor, the Released Parties, the 1125(e) Parties, the Plan Administrator, or the Exculpated Parties on account of or in connection with or with respect to any such claims or interests released, discharged, or subject to exculpation.  Thus, the Injunction is a key provision of the Combined Disclosure Statement and Plan because it enforces the Exculpation Provision that is centrally important to the Combined Disclosure Statement and Plan.

72.     In addition, each Holder of a Claim or Interest was provided with a notice that contained the express language of the Debtor Release, the Third-Party Release, the Exculpation Provision, the Section 1125(e) Provision, and the Injunction, all in bold font.  No economic party in interest opposes the Injunction.

73.     Accordingly, the Debtors respectfully submit that the Injunction is appropriate, narrowly tailored to achieve its purpose, and should be approved.

## II.     The Plan Complies with Section 1129(a)(2) of the Bankruptcy Code.

74.     The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires that the proponent of a plan comply with the applicable provisions of the Bankruptcy Code—here, sections 1125 and 1126.

### A.     The Debtors Have Complied with Section 1125, and the Disclosure Statement Should be Approved on a Final Basis.

75.     The cases and legislative history discussing section 1129(a)(2) indicate that this section principally embodies the disclosure and solicitation requirements of section 1125 of the Bankruptcy Code.  Section 1125 prohibits the solicitation of acceptances or rejections of a plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[88] Section 1125 ensures that parties in interest are adequately informed regarding the debtor's condition so that they may make an informed decision whether to approve or reject the plan.[89]

76.     On March 7, 2025, the Debtors filed the Solicitation Motion, which described in detail the legal and factual bases supporting a finding that the Disclosure Statement contains "adequate information" as defined in section 1125(a)(1) of the Bankruptcy Code.[90]  The Debtors hereby incorporate the Debtors' arguments contained in the Solicitation Motion by reference as if fully set forth herein.

---

[88]     11 U.S.C § 1125(b).

[89]     *See Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *see also Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003).

[90]     *See* Solicitation Motion, ¶¶ 13-17.

77.     On April 14, 2025, the Court approved the Combined Disclosure Statement and Plan on a conditional basis for solicitation purposes in accordance with section 1125(a)(1) of the Bankruptcy Code.[91]

78.     The Court also approved the contents of the Solicitation Packages provided to Holders of Claims entitled to vote on the Combined Disclosure Statement and Plan, the non-voting materials provided to creditors and equity holders not entitled to vote on the Combined Disclosure Statement and Plan, and the relevant dates for voting and objecting to the Combined Disclosure Statement and Plan.[92] The Debtors, through its Claims and Noticing Agent, complied with the content and delivery requirements of the Solicitation Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.

79.     The Debtors have also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each Holder of a Claim or Interest in a particular Class.  The Debtors transmitted the Combined Disclosure Statement and Plan to all parties entitled to vote on the Combined Disclosure Statement and Plan.

80.     For the reasons set forth herein and in the Solicitation Motion, the Debtors believe the Disclosure Statement contains adequate information within the meaning of Bankruptcy Code section 1125.  Accordingly, the Debtors submit that the Debtors have complied with section 1125 and the Court should approve the Disclosure Statement on a final basis.

**B.      The Debtors' Solicitation Complies with Section 1126 of the Bankruptcy Code.**

81.     Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan.  Specifically, only Holders of Allowed Claims and Interests in Impaired classes of Claims

---

[91]     *See* Solicitation Order.

[92]     *Id.*

or Interests that will receive or retain property under a plan on account of such Claims or Interests may vote to accept or reject such plan. Classes that are Unimpaired under the Combined Disclosure Statement and Plan are conclusively deemed to accept.[93] Conversely, classes that are entitled to nothing under the Combined Disclosure Statement and Plan are conclusively deemed to reject.[94]

82.     In accordance with section 1126 of the Bankruptcy Code, the Debtors solicited acceptances or rejections of the Combined Disclosure Statement and Plan from the Holders of Claims in Classes 3 and 4, which are the only Classes entitled to vote on the Combined Disclosure Statement and Plan. As provided in the Voting Report, Classes 3 and 4 voted to accept the Combined Disclosure Statement and Plan.[95]

### III.     Section 1129(a)(3): The Combined Disclosure Statement and Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law.

83.     Section 1129(a)(3) requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[96] The Third Circuit has found that "[f]or purposes of determining good faith under section 1129(a)(3) the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[97] Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement of section 1129(a)(3) of the Bankruptcy

---

[93]     11 U.S.C. § 1126(f).

[94]     11 U.S.C. § 1126(g).

[95]     *See* Voting Report, Ex. A.

[96]     11 U.S.C. § 1129(a)(3).

[97]     *PWS*, 228 F.3d at 242 (internal quotations, citations, and modifications omitted).

Code is satisfied.[98]   The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan.[99]

84.   The Debtors have met their good faith obligation under the Bankruptcy Code. Throughout these cases, the Debtors have focused on maximizing value for their various stakeholders.   The Combined Disclosure Statement and Plan, Plan Supplement, and all documents necessary to effect the Combined Disclosure Statement and Plan were developed after substantial discussions, analysis, and/or negotiations between the Debtors and other key constituents, including M&T and the Committee, and were proposed with the legitimate and honest purpose of maximizing the value of the Debtors' estates and effectuating a successful and speedy wind-down of the Debtors' operations after the sale of substantially all of the Debtors' assets.   Moreover, the Combined Disclosure Statement and Plan is the product of arm's-length negotiations among the Debtors and various parties in interest, including the Committee.   It is clear that the Combined Disclosure Statement and Plan has been proposed in good faith as interpreted under the Bankruptcy Code in that the Combined Disclosure Statement and Plan will achieve a result consistent with the overall objectives and purposes of the Bankruptcy Code.[100]

---

[98]   *See, e.g., PWS,* 228 F.3d at 242 (quoting *In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship),* 116 F.3d 790, 802 (5th Cir. 1997) (quoting *Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.),* 764 F.2d 406, 408 (5th Cir. 1985*)); In re Century Glove, Inc.,* Civ. A. Nos. 90-400-SLR and 90-401-SLR, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993); *In re NII Holdings, Inc.,* 288 B.R. 356, 362 (Bankr. D. Del. 2002).

[99]   *See, e.g., In re W.R. Grace & Co.,* 475 B.R. 34, 87 (D. Del. 2012) ("[A] determination of good faith associated with a Chapter 11 reorganization plan requires a factual inquiry into a totality of the circumstances surrounding the plan's proposal.") (citing *In re Sun Country Dev., Inc.,* 764 F. 2d at 408); *Century Glove,* 1993 WL 239489, at *4 ("The requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start.") (citing *In re Sun Country Dev., Inc.,* 764 F.2d at 408); *In re T-H New Orleans Ltd. P'ship,* 116 F.3d at 802 (same).

[100]   *See In re Am. Capital Equip. LLC,* 688 F.3d 145 (3d. Cir. 2012) (internal quotations omitted) (court noting that the important point of a good faith inquiry is whether the plan itself will achieve a result consistent with objectives and purposes of the bankruptcy code.

85.     Based on the foregoing, the facts and record of these Chapter 11 Cases and the record to be made at the Confirmation Hearing, the Combined Disclosure Statement and Plan and related documents have been proposed in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  Indeed, no party has asserted otherwise.[101]

## IV.     Section 1129(a)(4): The Combined Disclosure Statement and Plan Provides for Court Approval of Certain Administrative Payments.

86.     Section 1129(a)(4) requires that certain professional fees and expenses paid by the plan proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, be subject to approval of the Court as reasonable.[102]

87.     Here, all payments made or to be made by the Debtors for services or for costs or expenses in connection with these Chapter 11 Cases prior to the Effective Date, including all Professional Fee Claims, have been approved by, or are subject to approval of, the Court.  Section 2.2 of the Combined Disclosure Statement and Plan provides that all final requests for payment of Professional Fee Claims for services rendered through the Effective Date shall be filed and no later than thirty (30) days after the Effective Date and all such final requests will be subject to approval by the Bankruptcy Court in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders.  Accordingly, the Combined Disclosure Statement and Plan fully complies with the requirements of section 1129(a)(4).

---

[101]     *See* Bankruptcy Rule 3020(b)(2) ("The court shall rule on confirmation of the plan after notice and hearing as provided in Rule 2002.  If no objection is timely filed, the court may determine that the plan has been proposed in good faith and not by any means forbidden by law without receiving evidence on such issues.").

[102]     *See In re Lisanti Foods, Inc.*, 329 B.R. 491, 503 (D.N.J. 2005) ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court."); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

**V.     Section 1129(a)(5): The Combined Disclosure Statement and Plan Discloses Post-Effective Date Management.**

88.     Section 1129(a)(5) of the Bankruptcy Code requires: (i) that the proponent of a plan disclose the identity of any individual proposed to serve after confirmation as a director, officer, or voting trustee of the debtor; (ii) that the appointment of such individuals be consistent with the interests of creditors and shareholders and with public policy; and (iii) that the proponent disclose the identity of any insider that will be employed by the reorganized debtor and the nature of the compensation to be provided to such insider.

89.     The Debtors have satisfied the foregoing requirements to the extent applicable.  As noted, the Debtors have disclosed in the Plan Supplement that Scott A. Rinaldi is proposed to serve as Plan Administrator after the Effective Date.  For the reasons set forth herein and as will be adduced at the Confirmation Hearing, the appointment of Mr. Rinaldi to the role of Plan Administrator is consistent with the interests of creditors.

**VI.    Section 1129(a)(6): The Combined Disclosure Statement and Plan Does Not Require Governmental Approval of Rate Changes.**

90.     Section 1129(a)(6) permits confirmation only if any regulatory commission that will have jurisdiction over the debtor after confirmation has approved any rate change provided for in the plan.  As the Combined Disclosure Statement and Plan does not provide for any rate changes, section 1129(a)(6) is inapplicable here.

**VII.   Section 1129(a)(7): The Combined Disclosure Statement and Plan Is in the Best Interests of Creditors.**

91.     Section 1129(a)(7) is often referred to as the "best interests test" or the "liquidation test," and provides:

With respect to each impaired class of claims or interests –

(A) each holder of a claim or interest of such class –

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date...

92.     The best interests test focuses on individual dissenting creditors or equity interest holders rather than classes of claims or equity interests.[103]   Under the best interests test, each non-accepting creditor or equity holder must "receive . . . on account of such claim . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive. . . if the debtor were liquidated under chapter 7. . . on such date."[104]   The best interests test is generally satisfied by a liquidation analysis demonstrating that an impaired class will receive no less under the plan than under a chapter 7 liquidation.[105]

93.     The Combined Disclosure Statement and Plan satisfies section 1129(a)(7) of the Bankruptcy Code.  The Debtors, with the assistance of their financial advisors, have prepared a liquidation analysis comparing the range of recoveries generated under the Combined Disclosure Statement and Plan with a hypothetical chapter 7 liquidation (the "Liquidation Analysis").[106]

94.     As set forth in the Liquidation Analysis and the Jones Declaration, confirmation of the Combined Disclosure Statement and Plan will provide Holders of Allowed Claims and Interests with an equal or greater recovery than the value of any distributions if the Chapter 11

---

[103]     *See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 North LaSalle St. P'ship*, 526 U.S. 415, 434 (1999).

[104]     *Id.* at 442 n. 13, citing section 1129(a)(7); *United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213, 228 (1996).

[105]     *See In re Smith*, 357 B.R. 60, 67 (Bankr. M.D.N.C. 2006), *appeal dismissed*, Case No. 07-0030, 2007 WL 1087575 (M.D.N.C. Apr. 4, 2007) ("In order to show that a payment under a plan is equal to the value that the creditor would receive if the debtor were liquidated, there must be a liquidation analysis of some type that is based on evidence and not mere assumptions or assertions.") (citations omitted).

[106]     *See* First Supplement to the Plan Supplement, Ex. D.

Cases were converted to cases under chapter 7 of the Bankruptcy Code.[107]  If converted under chapter 7, the Debtors would incur the additional costs of a Chapter 7 trustee, as well as the costs of counsel and other professionals retained by the Chapter 7 trustee.[108]  These costs would reduce potential distribution to Holders of Allowed Claims on a dollar-for-dollar basis.[109]  Conversion also would likely delay the liquidation process and the ultimate distribution, if any, to unsecured creditors.[110]

95.     Accordingly, because the recoveries provided under the Combined Disclosure Statement and Plan would exceed the recoveries that would be available in a chapter 7 liquidation, the Combined Disclosure Statement and Plan satisfies section 1129(a)(7) of the Bankruptcy Code.

**VIII.   Section 1129(a)(8) Acceptance by Impaired Classes.**

96.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either vote to accept a plan or be unimpaired under that plan.[111]  As evidenced by the Voting Report, Classes 3 and 4 each voted overwhelmingly to accept the Combined Disclosure Statement and Plan.

97.     As discussed above, Classes 1 and 2 are deemed to have accepted the Combined Disclosure Statement and Plan.  Holders of Claims and Interests in Classes 6A and 6B are deemed to reject the Combined Disclosure Statement and Plan; however, the Combined Disclosure Statement and Plan may still be confirmed over the dissent of Classes 6A and 6B because, as set

---

[107]     *See* Jones Decl. ¶ 37.

[108]     *See id* ¶ 36.

[109]     *Id.*

[110]     *Id.*

[111]     11 U.S.C. § 1129(a)(8).

forth below, the Debtors have satisfied the requirements for cramdown under section 1129(b) of the Bankruptcy Code.

## IX.     Section 1129(a)(9): The Combined Disclosure Statement and Plan Complies with Statutorily Mandated Treatment of Administrative Claims and Priority Tax Claims.

98.     Section 1129(a)(9) of the Bankruptcy Code requires that holders of claims for administrative expenses allowed under section 503(b) of the Bankruptcy Code must receive on the effective date cash equal to the allowed amount of such claims or such other agreed treatment. The treatment of Administrative Claims and Priority Tax Claims, as set forth in Section 2.1 of the Combined Disclosure Statement and Plan and in the proposed form of Confirmation Order, is in accordance with the requirements of section 1129(a)(9) of the Bankruptcy Code.  Accordingly, the Combined Disclosure Statement and Plan complies with section 1129(a)(9) of the Bankruptcy Code.

## X.      Section 1129(a)(10): The Combined Disclosure Statement and Plan Has Been Accepted by at Least One Impaired Class of Claims.

99.     Section 1129(a)(10) provides that if a class of claims is impaired under a plan, at least one impaired class of claims must accept the plan, excluding acceptance by any insider. Classes 3 and 4 each have accepted the Combined Disclosure Statement and Plan regardless of the votes of any insider(s).  Accordingly, the Combined Disclosure Statement and Plan satisfies the requirements of section 1129(a)(10).

## XI.     Section 1129(a)(11): The Combined Disclosure Statement and Plan Is Feasible.

100.    Section 1129(a)(11) of the Bankruptcy Code requires that, as a condition to confirmation, the Bankruptcy Court determine that a plan is feasible.  Specifically, the Bankruptcy Court must determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  As

described below, the Combined Disclosure Statement and Plan is feasible within the meaning of this provision.

101.     The feasibility test set forth in section 1129(a)(11) requires the Bankruptcy Court to determine whether a plan is workable and has a reasonable likelihood of success.  Moreover, "the feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed."

102.     Applying the foregoing legal standards, the Combined Disclosure Statement and Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.  The Combined Disclosure Statement and Plan provides for the completion of the Debtors' liquidation and the distribution of their assets in accordance with the priority scheme set forth in the Bankruptcy Code and the terms of the Combined Disclosure Statement and Plan.  Therefore, confirmation of the Combined Disclosure Statement and Plan will not be followed by the need for further financial reorganization of the Debtors, thereby satisfying (or eliminating the need to consider) section 1129(a)(11) of the Bankruptcy Code.

103.     In any event, the Combined Disclosure Statement and Plan is feasible.  The Plan Administrator will have sufficient assets to make distributions on account of Allowed Claims or Interests and accomplish its task under the Combined Disclosure Statement and Plan pursuant to the Wind-Down Budget and consideration made available to the Wind-Down Debtor from the Sale Transactions and the Plan.  Moreover, the Debtors have already taken significant steps to wind down in an orderly fashion during the Chapter 11 Cases, including, without limitation, via the Sale Transactions, exiting leased premises, and, thereafter, advancing the process to finally wind down their estates.

104.     Based upon the foregoing, the Combined Disclosure Statement and Plan has more than a reasonable likelihood of success and satisfies the feasibility standard of section 1129(a)(11).

**XII.    Section 1129(a)(12): The Combined Disclosure Statement and Plan Provides for Payment of All Fees Under 28 U.S.C. § 1930.**

105.     Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under [28 U.S.C. § 1930], as determined by the court at the hearing on confirmation of the plan."  Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [28 U.S.C. § 1930]" are afforded priority as administrative expenses.  In accordance with these provisions, Section 2.1 of the Combined Disclosure Statement and Plan provides that the Wind-Down Debtor shall be liable to pay any and all U.S. Trustee Fees when due and payable until the earliest of each particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.  Accordingly, the Combined Disclosure Statement and Plan complies with section 1129(a)(12).

**XIII.   Sections 1129(a)(13)-(16) Are Inapplicable.**

106.     The Debtors do not have any retiree benefit programs within the meaning of section 1114 of the Bankruptcy Code and, as such, section 1129(a)(13) does not apply to the Combined Disclosure Statement and Plan.

107.     The Debtors are not required to pay domestic support obligations.  Accordingly, section 1129(a)(14) does not apply.

108.     The Debtors are not individuals.  Thus, section 1129(a)(15) does not apply.

109.     The Debtors are a moneyed, business, or commercial corporation.  Therefore, section 1129(a)(16), which applies only to debtors that are nonprofit entities or trusts, does not apply.

**XIV.  Section 1129(b): The Combined Disclosure Statement and Plan Satisfies the "Cramdown" Requirements.**

110.    Section 1129(b)(1) of the Bankruptcy Code provides that if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8), a plan may be confirmed so long as the requirements set forth by section 1129(b) of the Bankruptcy Code are satisfied.[112]  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[113]

**A.    Section 1129(b)(1): The Plan Does Not Unfairly Discriminate.**

111.    Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.[114]  In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if (a) it provides less favorable treatment to a dissenting class of creditors than to another class of creditors with similar

---

[112]    *See* 11 U.S.C. § 1129(b).

[113]    *See* 11 U.S.C. § 1129(b)(1); *In re Mallinckrodt PLC*, 639 B.R. 837 (Bankr. D. Del. Feb. 8, 2022) (stating that a debtor must show no unfair discrimination and that the recovery is fair and equitable to each class of claims to confirm a cramdown plan).

[114]    *See Hargreaves v. Nuverra Env't Sols., Inc. (In re Nuverra)*, 590 B.R. 75, 93 (D. Del. 2018), *aff'd*, 834 F. App'x 729 (3d Cir. 2021), *as amended* (Feb. 2, 2021) ("As unfair discrimination is not defined in the Bankruptcy Code, courts must examine the facts and circumstances of the particular case to determine whether unfair discrimination exists."); *In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established."), *rev'd on other grounds*, *Bank of Am.*, 526 U.S. 434 (1999).

legal rights, taking into account whether the different treatment is material and the relative risks associated with each class's treatment, and (b) there is not sufficient justification for doing so.[115]

112.    Because Class 6A and Class 6B (the "Deemed Rejecting Classes") are deemed to have rejected the Combined Disclosure Statement and Plan, the requirements of Bankruptcy Code section 1129(a)(8) are not satisfied.  The Debtors therefore request confirmation of the Combined Disclosure Statement and Plan under section 1129(b) of the Bankruptcy Code, the "cramdown" provision, with respect to Class 6A (Azzur Group Holdings Interests) and Class 6B (Section 510(b) Claims).

113.    The Combined Disclosure Statement and Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes.[116]  Here, the Combined Disclosure Statement and Plan's treatment of the Deemed Rejecting Classes is proper because all similarly situated Holders of Claims and Interests will receive substantially similar treatment and the Combined Disclosure Statement and Plan's classification scheme rests on a legally acceptable rationale.[117]  Claims and Interests in the Deemed Rejecting Classes are not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Interests.  The Combined Disclosure Statement and Plan's treatment of the Deemed Rejecting Classes is proper because no similarly situated class will receive more favorable treatment.  Furthermore, where the Combined Disclosure Statement and Plan provides differing treatment for certain Classes of Claims or Interests, the Debtors have a rational basis for doing so.

---

[115]    *See In re Aleris Int'l, Inc.*, Case No. 09-10478, 2010 WL 3492664, at *31 (Bankr. D. Del. May 13, 2010) ("section 1129(b) of the Bankruptcy Code ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value the dissenting class will receive under a plan when compared to the value given to all other similarly situated classes") (citing *In re Armstrong World Indus.*, 348 B.R. at 121).

[116]    *See* Jones Decl.¶ 49.

[117]    *See id.*

114.     For the reasons set forth above, the Combined Disclosure Statement and Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code and the Combined Disclosure Statement and Plan may be confirmed notwithstanding the deemed rejection by the Deemed Rejecting Classes.

### B.     Section 1129(b)(2): The Plan Is Fair and Equitable.

115.     The Combined Disclosure Statement and Plan is also "fair and equitable" with respect to the Deemed Rejecting Classes because the Combined Disclosure Statement and Plan complies with the "absolute priority" rule.   Section 1129(b)(2)(C) of the Bankruptcy Code provides, among other things, that a plan is fair and equitable with respect to a class of interests if the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.   The Combined Disclosure Statement and Plan satisfies section 1129(b)(2)(C) for the Deemed Rejecting Classes, because no Class junior to the Deemed Rejecting Classes will receive or retain property under the Combined Disclosure Statement and Plan on account of such junior interest.

116.     Accordingly, the Combined Disclosure Statement and Plan satisfies the requirements of section 1129(b)(2) of the Bankruptcy Code.

### XV.   Section 1129(c): Only One Combined Disclosure Statement and Plan.

117.     Only one Combined Disclosure Statement and Plan is before the Court.   Therefore, section 1129(c) of the Bankruptcy Code is satisfied or otherwise inapplicable.

### XVI.   Section 1129(d): The Principal Purpose of the Combined Disclosure Statement and Plan Is Not Avoidance of Taxes or Section 5 of the Securities Act.

118.     Section 1129(d) provides that "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the

Securities Act of 1933."[118]   The Debtors commenced these Chapter 11 Cases with a bona fide business need, and business objective, to maximize the value of its assets–which they have accomplished–and not to avoid taxes or the application of section 5 of the Securities Act.[119] Specifically, the Debtors commenced these Chapter 11 Cases after concluding in March 2025 that they lacked sufficient capital to satisfy their ongoing expenses and that these Chapter 11 Cases were necessary to preserve liquidity, complete their marketing and sale processes, maximize the value of the enterprise, and otherwise wind-down operations in the most responsible and efficient manner.[120]

119.    The Debtors took several affirmative steps in furtherance of these objectives, including by engaging appropriate restructuring advisors and conducting a prepetition marketing effort to explore the potential sale of their assets.  The Debtors successfully consummated the Sale Transactions, and such sale proceeds (and other assets) are now proposed to be distributed to creditors in accordance with the Sale Orders and the Combined Disclosure Statement and Plan. Accordingly, the Combined Disclosure Statement and Plan satisfies the requirements of section 1129(d).

**XVII.   Section 1129(e): The Debtors' Chapter 11 Cases Are Not Small Business Cases.**

120.    Finally, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' Chapter 11 Cases is a "small business case."  A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,490,925[] (excluding debt owed to 1 or more

---

[118]       *See* 11 U.S.C. § 1129(d).

[119]       *See* Jones Decl. ¶ 52.

[120]       *See id.*

affiliates or insiders)." Thus, the Combined Disclosure Statement and Plan satisfies the Bankruptcy Code's mandatory confirmation requirements.

## THE OBJECTIONS SHOULD BE OVERRULLED

121.    The U.S. Trustee and/or the Committee primarily object to the Plan on the grounds that (a) the opt-in mechanism for the Third-Party Release is not a consensual release, as required post-*Purdue* (U.S. Trustee), (b) the Third-Party Release and Debtor Release should include exceptions for fraud, willful misconduct, and gross negligence like the Exculpation (U.S. Trustee and Committee), and (c) the Debtor Release should not be approved (Committee).[121]    For the reasons set forth herein, the Objections should be overruled, as they lack merit and rehash arguments which have been rejected by this and other courts.

               i.    *The Third-Party Release Accords with Applicable Law.*

122.    The U.S. Trustee erroneously contends that "[the] Debtors purport to impose an otherwise non-existent duty to speak on these claimants [who vote to accept the plan] regarding the offer to release non-debtors, and their silence —the failure to opt out —is 'deemed' consent."[122] Notwithstanding the U.S. Trustee's extensive discussion on this topic, Holders of Claims and Interests must affirmatively "opt in" to the Third-Party Release to participate in the mutual, consensual release under the Plan—which fits squarely in line with consensual third-party release authority.    The U.S. Trustee does not, and indeed ***cannot***, explain how *Purdue* changed existing law concerning consensual releases, because *Purdue* itself held that it has no effect on the current state of the law on consensual third-party releases.    The holding in *Purdue* is limited to the validity of nonconsensual third-party releases—which, for the avoidance of doubt, do not exist in the

---

[121]    The remaining objections are addressed in Confirmation Objection Chart, attached hereto as **Exhibit A**.

[122]    UST Obj. ¶ 33.

Plan—and has no effect on the existing law regarding consensual third-party releases.  In other words, the Court may rule on the third-party release issues presented as if *Purdue* did not exist because *Purdue* is clear that the law relating to (a) consensual releases and (b) what constitutes consent, remains undisturbed. [123]

123.    This Court has addressed the issue of what constitutes consent for third-party release purposes by considering procedures similar to those used in the approved forms of Class 3 and Class 4 Ballots, both pre- and post-*Purdue*, finding they are sufficient to find an affirmative manifestation of consent supporting a consensual release.[124]  In *True Value*, for instance, this Court noted that "parties that return a ballot, vote in favor, affirmatively act to vote in favor of the plan, do not opt out, sign the ballot and return the ballot, is sufficient for me to determine that there has been a manifestation of affirmative consent."[125]  This Court further noted that "*Purdue* has not changed my analysis … my decision-making on this issue is guided [by] whether there's sufficient manifestation of affirmative consent."[126]  Here, only those Holders of Allowed Claims that affirmatively voted to accept the Plan ***and chose not to opt-out*** of the release, or voted to reject or did not vote ***and chose to opt-in*** to the release, are bound by the Third-Party Release.  In line with this Court's guiding principles, such Holders have "sufficiently manifested affirmative consent" to be bound by the Third-Party Release provision.  Accordingly, the Debtors respectfully urge this Court to overrule the UST Objection and approve the Third-Party Release as consensual.

---

[123]     *Purdue Pharma*, 144 S. Ct. at 2088 (noting that "[a]s important as the question we decide today are ones we do not. Nothing in what we have said should be construed to call into question consensual third-party releases offered in connection with a bankruptcy reorganization plan ...").

[124]     *See* note *supra* [66].

[125]     *In re True Value Company, LLC*, Case No. 24-12447 (KBO) (Bankr. D. Del. Feb. 11, 2025), Hr'g Tr. 12:13-13:10 [D.I. 932].

[126]     *Id*. at 12:14-18.

ii.    *The Debtor Release Accords with Applicable Law.*

124.    The U.S. Trustee and Committee each argue that the Debtor Release ***must*** provide exceptions for claims of actual fraud, willful misconduct, or gross negligence.[127]  They further argue that it is the Debtors' burden to establish how the Debtor Release meets the requirements under *Master Mortgage* and *Zenith*.[128]  But nowhere does the U.S. Trustee argue how this standard is not satisfied in this case; rather the U.S. Trustee merely states the standard, of which the Debtor is aware, and as discussed herein, has met.  There is no such per se rule and, as shown above, the Debtors satisfy the standard for a debtor release in this district.  The Committee does not—and cannot—identify a single potential claim or cause of action in its Objection.  Its one voting Committee member actually supports the Debtor Release.  And it articulates no legitimate factual or legal basis to overrule the Debtors' business judgement in favor of the Debtor Release, especially when considering the relative value of any such purported claims and causes of action that might be subject to such release measured against the value of the Released Parties' substantial contributions to a highly successful sale and marketing process that led to three going-concern sale transactions, nearly all rank-and-file jobs being preserved, the vast majority of creditors being paid in full or receiving agreed treatment, managing the Claims pool downward by several orders of magnitude, formulating the Combined Disclosure Statement and Plan, administering these Chapter 11 Cases in a highly efficient (both in terms of timing and cost) manner, and otherwise maximizing the value of the Debtors' estates.[129]

---

[127]    UST Obj.  ¶ 33; Committee Obj. ¶ 23.  Section 523 of the Bankruptcy Code, to the extent relevant, provides exceptions to discharge, not exceptions to consensual releases.[127]

[128]    UST Obj. ¶ 53.

[129]    Committee Obj. ¶ 18, 20-22.

125.    As an initial matter, courts in this district have found that chapter 11 debtors are generally allowed to release claims pursuant to section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, fair, reasonable, and in the best interests of the estate."[130]  The *Martin* factors may also guide courts in deciding whether a debtor's release should be approved.[131]  The Debtor Release in this case meets the applicable standards and is a sound exercise of the Debtors business judgment.  As described herein, DLA Piper, acting at the direction of the Debtors' Chief Restructuring Officer, undertook a full and unfettered investigation into potential estate claims and causes of action, if any, that may be subject to the Debtor Release.  Based on that investigation, each of the Chief Restructuring Officer and DLA Piper concluded that there were no such viable, valuable estate claims or causes of action.  The Debtors will introduce evidence at the Confirmation Hearing in respect of that investigation and its findings.

126.    As set forth above, there can be no question that the Released Parties, including the Debtors' current and former directors, officers, and equity holders, have made a substantial contribution to the Debtors' estates.[132]  The Debtors have provided, and will further provide evidence at the hearing on Confirmation, that the Released Parties have played an integral role in,

---

[130]    *See In re Spansion*, 426 B.R. at 143 (("[A] debtor may release claims in a plan pursuant to Bankruptcy Code § 1123(b)(3)(A), if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate.")

[131]    In determining whether to approve a settlement, courts in the Third Circuit ultimately consider the following four "Martin factors": (a) "the probability of success in litigation"; (b) "the likely difficulties in collection"; (c) "the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it"; and (d) "the paramount interest of the creditors."  *Martin*, 91 F.3d at 393.

[132]    For its part, the Committee appears to take no issue with the Debtor Release for the benefit of trade creditors, including one Committee member, that consensually opted into the mutual release under the Plan.  Nor does it appear to take issue with the Debtor Release for the benefit of M&T.  Rather, the Committee identifies directors, officers, and equity owners—each of which have made material contributions to the estates and the success of these Chapter 11 Cases—as potential litigation targets without actually identifying, let alone introduce evidence in support of, a single, colorable claim that they believe should be pursued.

among other things, the Debtors marketing and sale process, and have expanded significant time and resources analyzing and negotiating issues present in these Chapter 11 Cases, including by agreeing to compromise or waive their own rights and Claims. Without any supporting evidence or facts, the Committee erroneously declares that certain Released Parties were only "being paid to do [their] job [which] does not constitute substantial contribution to obtain a release."[133] For the reasons set forth above and as will be shown by the evidence during the Confirmation Hearing, this is false: directors, officers, and equity owners have gone above-and-beyond their normal job responsibilities to help maximize the value of the estate for the benefit of all parties in interest. Even so, courts in this district, however, have found that, where a debtor's officers and directors have provided such contributions, as in this case, a debtor release is a valid exercise of the debtor's business judgement.[134] Further, this Court and other have consistently that non-cash consideration is a valid contribution in exchange for inclusion as a released party. [135] Finally, while the

---

[133] *See* Committee Obj. ¶ 21.

[134] *See, e.g.*, *In re Hercules Offshore, Inc.*, 565 B.R. 732, 757-60 (Bankr. D. Del. 2016) (finding the releases to the officers and directors to be appropriate emphasizing the board and management's "intensive and thoughtful effort" to evaluate the debtors' options and evaluate bids); *In re Spansion, Inc.*, 426 B.R. at 143 ("The Debtor Releasees were actively involved in negotiating and formulating the Plan. It is a valid exercise of the Debtors' business judgment to include a settlement of any claims it might own against such parties as a discretionary provision of the plan."); *In re Zenith Elecs.*, 241 B.R. at 111 (Bankr. D. Del. 1999) (finding substantial contribution by officers and directors for "designing and implementing the operational restructuring and negotiating the financial restructuring").

[135] This Court and others have routinely found that non-cash consideration is a valid contribution in exchange for a debtor release. *See, e.g.*, *In re EXP OldCo Winddown, Inc. f/k/a Express*, Case 24-110831 (KBO) (Bankr. D. Del. Dec. 17, 2024) (confirming a plan with releases to directors and officers that provided significant consideration by laying the framework for a value maximizing sale); *In re Virgin Orbit Holdings, Inc.*, Case No. 23-10405 (KBO) (Bankr. D. Del. July 26, 2023) (approving releases of the debtors' directors, officers, and employees who made a substantial contribution by their effort to preserve the value of the business and maximize value for their stakeholders by engaging with the Debtors' advisors regarding the sale process and expending hundreds of hours preparing materials and responding to diligence requests, additional reporting, and other tasks relating to the bankruptcy and sale process); *In re Insys Therapeutics, Inc.*, Case No. 19-11292 (KG) (Bankr. D. Del. Jan. 16, 2020) (approving third-party releases and releasing directors and officers who did not make a financial contribution but contributed significant "sweat equity"); *In re Hercules Offshore, Inc.*, 565 at 757-60 (finding the releases to the officers and directors to be appropriate emphasizing the board and management's "intensive and thoughtful effort" to evaluate the debtors' options and evaluate bids); *In re Millennium Lab Holdings II, LLC*, Case No. 15-12284 (LSS) (Bankr. D. Del. Dec. 15, 2015), Hr'g Tr. 21:5–11 [D.I. 206] (finding that "in this case, where the record is unrebutted that the efforts of management successfully resulted in a viable plan that garnered support from all parties other than Voya, and results in 100 percent payment to all creditors other than the prepetition lenders; and that management, in the prepetition

Committee wrongfully alleges that the Released Parties have made no substantial contribution to these Chapter 11 Cases, the Committee's own case law supports the proposition that a creditor objecting to a proposed plan bears the burden of providing evidence to support their objection.[136] Here, the Committee has failed to provide any evidentiary support suggesting that the Debtor Release is inappropriate.

127.    As shown above, with respect to the release of the Debtors' current and former directors and officers, there is a clear identity of interest supporting the Debtor Release because the Debtors owe certain indemnification obligations to such parties pursuant to the Debtors' governance documents, which would otherwise increase the Claims pool and delay distributions to Holders of Allowed Claims and Interests to the detriment of all parties in interest.[137] Prosecution of the claims and causes of action, if any, that are subject to the Debtor Release would be complex and time consuming and could mire the Debtors and parties in interest in costly litigation rather than effectuating an orderly wind-down and the anticipated Cash Distribution to Holders of Allowed Class 4 Claims under the Plan. The Debtors do not believe that they have material causes of action subject to the Debtor Release that would justify the risk, expense, and delay of pursuing any such causes of action as compared to the results and benefits achieved under the Plan. The Committee offers no evidence to the contrary. The Debtor Release provides, among other things, some measure of finality in exchange for the substantial contributions from Released Parties that

---

lenders' view, is critical to unlocking the reorganized debtors' total enterprise value, I find that the directors and officers have made a substantial contribution.").

[136]    *See Genesis Health Ventures.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001) ; *see also In re Hercules Offshore.,* 565 B.R. at 767 (Bankr. D. Del. 2016) (holding that an objecting equity committee failed to create any doubt that Debtor had met its burden that confirmation requirements were satisfied).

[137]    *See Indianapolis Downs*, 486 B.R. at 303 ("An identity of interest exists when, among other things, the debtor has a duty to indemnify the nondebtor receiving the release.").

the Committee simply deems unworthy.  The Plan is the best vehicle to conclude these Chapter 11 Cases and make timely Distributions to creditors.  The Debtor Release is integral to the Plan.  As such, the Debtor Release is worthwhile and to the benefit of all the Debtor's stakeholders.

> iii.   *There Is No Per Se Rule That Plan Releases Must Contain Exceptions for Actual Fraud, Gross Negligence, or Willful Misconduct.*

128.    As discussed herein, the scope of the releases is appropriate and consistent with authorities in this jurisdiction.  This Court and others have approved releases, notwithstanding that they did not exclude claims or Causes of Action for fraud, intentional misconduct, or gross negligence.[138]  Notably, as Judge Sontchi found in *Energy Future Holding* when he addressed this particular issue and overruled the objection of the U.S. Trustee, "[w]hile such carve outs are necessary in connection with exculpation, and are common in releases, ***they're not actually required for the Court to approve a release.  Requiring this carve out would weaken the settlement that is at the heart of this plan.***"[139]

129.    In addition, neither the U.S. Trustee nor the Committee offer any facts that support the pursuit of any currently unknown and unidentified purported claims based on fraud, willful misconduct, or gross negligence.  Finally, all parties in interest have received sufficient notice of the releases and such releases are wholly consensual among the parties participating in such releases.  The voting results speak volumes.  Thus, the terms of such releases should be within the discretion of the participants.

---

[138]    *See, e.g., In re Wheel Pros, LLC*, Case No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024) (approving debtor and third-party releases that do not exclude claims for fraud, intentional misconduct, or gross negligence); *In re Legacy IMBDS, Inc.*, Case No. 23-10852 (KBO) (Bankr. D. Del. Feb. 21, 2024) (same); *In re Appgate*, Case No. 24-10956 (CTG) (Bankr. D. Del. Jun. 18, 2024) (same); *In re GT Real Estate Holdings LLC*, Case No. 22-10505 (KBO) (Bankr. D. Del. Dec. 16, 2022) (same); *In re RMBR Liquidation, Inc.*, Case No. 19-10234 (KBO) (Bankr. D. Del. June 12, 2019) (same).

[139]    *In re Energy Future Holding Corp.*, Case No. 14-10979 (CSS), Hr'g Tr. at 69 (Bankr. D. Del. Dec. 3, 2015) (emphasis added).

130.    As set forth in the Confirmation Objection Chart, the remaining objections lack merit and should be overruled.  Accordingly, the Debtors respectfully submit that the Court should overrule the Objections and confirm the Plan.

## THE DEBTORS' DISCLOSURE STATEMENT, SOLICITATION AND VOTING PROCEDURES SHOULD BE APPROVED ON A FINAL BASIS

131.    On April 11, 2025, the Court approved the Combined Disclosure Statement and Plan on a conditional basis for solicitation purposes in accordance with section 1125(a)(1) of the Bankruptcy Code.  For the reasons discussed in section II.A above, the Combined Disclosure Statement and Plan contains adequate information necessary to enable all parties in interest entitled to vote on the Combined Disclosure Statement and Plan to make an informed judgment with respect to the Combined Disclosure Statement and Plan, as required by the Bankruptcy Code and the Bankruptcy Rules.  No party in interest contends otherwise.

132.    For the reasons set forth herein and in the Solicitation Motion, the Disclosure Statement contains adequate information within the meaning of Bankruptcy Code section 1125. Accordingly, the Court should approve the Disclosure Statement on a final basis.

## CAUSE EXISTS TO WAVE A STAY OF THE CONFIRMATION ORDER

133.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise." Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and to orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits modification of the imposed stay upon court order.

134.    The Debtors respectfully submit that cause exists for waiving the stay of the entry of the Confirmation Order such that the Confirmation Order will be effective immediately upon

its entry.[140]   The Debtors believe that an expeditious effectuation of the Combined Disclosure

Statement and Plan will reduce costs and maximize the value of the Estates.   Thus, the Debtors

respectfully request a waiver of any stay imposed by the Bankruptcy Rules so that the

Confirmation Order may be effective immediately upon its entry.

### THE PROPOSED MODIFICATIONS TO THE COMBINED DISCLOSURE STATEMENT AND PLAN ARE APPROPRIATE

135.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify

its plan at any time before confirmation as long as such modified plan meets the requirements of

sections 1122 and 1123 of the Bankruptcy Code.   Furthermore, when a plan proponent files a

modified plan with the court, the modified plan becomes the Plan.   Bankruptcy Rule 3019 provides

that modifications after a plan has been accepted will be deemed accepted by all creditors and

equity security holders who have previously accepted the plan if the court finds that the proposed

modifications do not adversely change the treatment of the claim of any creditor or the interest of

any equity security holder.   Interpreting Bankruptcy Rule 3019, courts consistently have held that

a proposed modification to a previously accepted plan will be deemed accepted where the proposed

modification is not material or does not adversely affect the way creditors and stakeholders are

treated.[141]

---

[140]    *See, e.g., Alpha Latam Mgmt., LLC*, Case No. 21-11109 (JKS) (Bankr. D. Del. Mar. 16, 2022) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re Chaparral Energy, Inc.*, Case No. 20-11947 (MFW) (Bankr. D. Del. Oct. 1, 2020) (same); *In re Chisholm Oil and Gas Operating, LLC*, Case No. 20-11593 (BLS) (Bankr. D. Del. Sept. 23, 2020) (same); *In re Pyxus Int'l, Inc.*, Case No. 20-11570 (LSS) (Bankr. D. Del. Aug. 21, 2020) (same); *In re Skillsoft Corp.*, Case No. 20-11532 (MFW) (Bankr. D. Del. Aug. 6, 2020) (same).

[141]    *See, e.g., In re Glob. Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

136.    On May 12, 2025, the Debtors filed the *First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Azzur Group Holdings LLC and Its Affiliated Debtors,*[142] which includes certain updates and modifications to the Plan.  Such modifications do not adversely affect the way creditors are treated and thus comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  No modifications will require additional solicitation or disclosure is required on account of the modifications, and such modifications should be deemed accepted by all creditors that previously accepted the Plan.

## CONCLUSION

For all of the reasons set forth herein, the Debtors respectfully request that the Court overrule the  Objections and approve the Disclosure Statement on a final basis and confirm the Combined Disclosure Statement and Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the Confirmation Order, waiving the stay imposed by Bankruptcy Rule 3020(e), and granting such other and further relief as may be appropriate under the circumstances.

---

[142]    *See* D.I. 531.

Dated:  May 16, 2025
        Wilmington, Delaware

Respectfully submitted,

**DLA PIPER LLP (US)**

 */s/ Stuart M. Brown*
Stuart M. Brown (DE 4050)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: Stuart.Brown@us.dlapiper.com

-and-

W. Benjamin Winger (admitted *pro hac vice*)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Telephone: (312) 368-4000
Facsimile: (312) 236-7516
Email: benjamin.winger@us.dlapiper.com

*Counsel for the Debtors*